# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS, NATIONAL PARENTS UNION, NATIONAL KOREAN AMERICAN SERVICE AND EDUCATIONAL CONSORTIUM, & UNDOCUBLACK NETWORK, <br><br> Plaintiffs, <br><br> vs. <br><br> SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service and Secretary of the Treasury; DEPARTMENT OF THE TREASURY; INTERNAL REVENUE SERVICE; FRANK BISIGNANO, Commissioner of the Social Security Administration; SOCIAL SECURITY ADMINISTRATION; KRISTI NOEM, Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, <br><br> Defendants. | Civil Action No.: 25- 12822 <br><br> **COMPLAINT** <br><br><br> *Concurrently filed with Notice of Related Civil Case and Request to Relate Case to Community Economic Development Center of Southeastern Massachusetts v. I.R.S., et al., No. 25-cv-11949-IT (D. Mass).* |

1.    More than 30 million immigrants live and work in the United States, helping to build our economy and support our government.[1] Regardless of their immigrant status, the federal

---

[1] Stephanie Kramer & Jeffrey Passel, PEW CHARITABLE TRUST, *What the data says about immigrants in the U.S.* (Aug. 21, 2025), https://www.pewresearch.org/short-reads/2025/08/21/key-findings-about-us-immigrants/.

government requires workers to file and pay taxes. Undocumented workers alone pay more than $50 billion in annual federal income and payroll taxes.[2] And to facilitate and encourage tax filings, the government protects the privacy of tax-related information, so that taxpayers, regardless of immigration status, can securely disclose personal information about themselves and their families.

2.      The Tax Reform Act of 1976, and specifically 26 U.S.C. § 6103, is the foundation of these privacy protections. Enacted after Richard Nixon used tax agencies to attack political enemies, the statute requires that tax information be kept confidential, unless a specific exception applies.

3.      This confidentiality requirement applies to any federal employee or officer who receives the data, not only within the Internal Revenue Service ("IRS") but also within any other agency. For example, the Social Security Administration ("SSA") and its employees are subject to this requirement, as they regularly receive protected taxpayer information from filers with social security numbers ("SSNs"), including many immigrants. All federal employees are strictly prohibited from sharing confidential tax information, unless a clearly specified exception applies.

4.      Based on § 6103's protections, the IRS, SSA, and other agencies that regularly receive tax information erected an architecture of privacy regulations to ensure that each agency accesses, discloses, and uses tax information only as restricted by the statute.

5.      Having instituted these strong privacy protections, the IRS consistently assured taxpayers and service providers that tax information would not be used for immigration enforcement.

6.      Plaintiffs relied on—and often reiterated to their members, who also relied on— those promises that immigrants' tax-related information was protected. Plaintiffs are membership-based organizations who seek to pursue civil and economic equality for their community members, including immigrant families. In the case of Community Economic Development Center of Southeastern Massachusetts, this includes providing direct assistance for immigrants to file and

---

[2] Inst. on Tax'n & Econ. Pol'y, *Tax Payments by Undocumented Immigrants* (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/.

pay taxes. Hailing from Asia, Africa, Latin America, and the Caribbean, Plaintiffs' members have built lives and paid taxes in communities from Massachusetts to Texas to California to Missouri.

7.    This year, however, the Trump administration abruptly changed course. It has disregarded privacy protections, to facilitate locating, detaining, and deporting immigrant taxpayers en masse.

8.    In or around February 2025, Immigration and Customs Enforcement ("ICE") sought, and the then-Acting SSA Commissioner complied by providing, tens of thousands of immigrants' addresses from the SSA to locate, arrest, and deport those individuals. Much, if not all, of the immigrants' information held by the SSA comes from *privacy-protected tax filings*.

9.    Soon after, the IRS joined ICE in a Memorandum of Understanding ("MOU") whereby the IRS would share taxpayer information about immigrants with ICE. This interagency arrangement seeks to exploit a federal-criminal exception to tax confidentiality at an unforeseen scale and for an unprecedented purpose: to physically locate individuals for the purposes of detention and deportation. But the criminal exception cannot be applied at this mass scale—it is merely a smokescreen to obtain data necessary to deport immigrants at the scale Trump promised on the campaign trail. In fact, in further documenting its implementation of the MOU, the IRS admitted to *destroying records relating to ICE's requests* for information, even as ICE would distribute the confidential information across widely used interagency databases.

10.    ICE's first tranche of expansive data requests sought the addresses of approximately seven million people from the IRS. ICE later requested information for 1.28 million people; and as of the filing of this complaint, ICE has already obtained more than 43,000 physical addresses. Ignoring statutory limitations on disclosure and use of that information, ICE uploaded those addresses to the agency's broadly accessible databases.

11.    Meanwhile, the SSA is working with ICE to facilitate the SSA's own sharing of immigrants' taxpayer information in contravention of the confidentiality protections of § 6103. Indeed, in a recent inter-agency letter describing the SSA-ICE data exchange, there is no mention or acknowledgment that much of the data requested must be kept confidential under the statute.

12.     ICE's requests to the SSA are even more expansive than its requests to the IRS: the agencies have recently agreed that the SSA will provide ICE with detailed information for about *50,000* immigrants every month. SSA has begun providing that data without any apparent acknowledgment that much of this data comes from tax filings and so is protected by § 6103. Nor has the SSA explained how it will protect the data.

13.     This unfettered interagency data-sharing violates the law. 26 U.S.C. § 6103 forbids the IRS and SSA from disclosing this protected taxpayer information to ICE, and further prohibits *ICE's* continued disclosure and use of the information.

14.     The interagency sharing of statutorily protected data also violates the First Amendment. Plaintiffs' members include immigrant taxpayers who have consistently filed tax returns and want to continue following the law, but fear doing so—and fear participating in their community organizations that facilitate their compliance with tax laws—given the federal government's dramatic shift to using taxpayers' information to facilitate deportations. The sharing of data between ICE and the IRS, and ICE and the SSA, violates the associational rights of Plaintiffs and their members, chills their speech rights, and harms their rights to petition the government.

15.     The unlawful data-sharing by these agencies is happening in tandem with the Trump administration's revocation of other longstanding status and protections of immigrants. For example, the administration ended Temporary Protected Status for millions of longtime residents. It also abruptly ended programs through which migrants lawfully entered the United States to seek protection. The Trump administration has also ended longstanding recognition that removal and detention are inappropriate for some communities of immigrants, such as Southeast Asian refugees who fled the aftermath of the Vietnam War and those who are stateless, even after a final order of removal. This administration has now begun deporting people from these communities to random, far-flung third countries where they have no ties and are at risk for persecution.

16.     Under these circumstances, the fear of being misidentified and deported to a dangerous foreign country will likely keep Plaintiffs' immigrant members from filing and paying

their taxes as they have in the past. ICE's reliance on names and addresses to match data across agencies creates a substantial risk of misidentification, wrongful disclosures, and the targeting of individuals not subject to deportation orders, with potentially devastating consequences including detention and deportation to distant, unknown countries. The data systems of ICE, IRS, and SSA are especially prone to such errors in cases involving common names in immigrant communities, dual-surname conventions, and transliterations from non-Latin alphabets, all of which heighten the likelihood of false matches.

17.     These acts of interagency sharing of statutorily protected data also constitute final agency action by ICE, the IRS, and the SSA. In addition to running contrary to both Constitutional and statutory mandates, the radical shift in agency policies and procedures to disclose and use taxpayer information displayed a lack of reasoned decision-making. These actions are arbitrary and capricious, in violation of the Administrative Procedure Act, including because the agencies failed to account for immigrant taxpayers' reliance interests and the risks of misidentification due to technical limitations.

18.     To prevent the agencies' continued lawless and unconstitutional intrusion on immigrant taxpayers' privacy and the harms to the immigrant communities who comprise Plaintiffs' members, Plaintiffs ask this Court to declare that these data-sharing practices are unlawful and prevent further disclosure and use of protected tax-related information.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

20.     Venue is appropriate under 28 U.S.C. § 1391(e)(1) because Plaintiff Community Economic Development Center of Southeastern Massachusetts and National Parents Union are both incorporated in Massachusetts and have offices in New Bedford and Malden, Massachusetts respectively. Both organizations also have and serve affected members who are residents of Massachusetts.

## PARTIES

21.    Plaintiff Community Economic Development Center of Southeastern Massachusetts ("CEDC") is a membership-based organization that was initially established in 1997 as a community development corporation in New Bedford, MA. Its mission is "to create a more just local economy by building bridges to resources, networks, and cooperative action for new immigrants and working families to find their way to economic opportunity."[3]

22.    For twenty-two years, CEDC has provided tax assistance as a Volunteer Income Tax Assistance Program ("VITA") site to low- and moderate-income residents of New Bedford, including many people who are not citizens of the United States. CEDC is also an accredited representative for immigration proceedings and provides assistance and referrals for a range of immigration issues, including U-visa applications for victims of crime. To support the security of its staff and clients, CEDC requires all clients to become members of the organization before it provides services.

23.    Plaintiff National Parents Union ("NPU") is an organization headquartered in Malden, Massachusetts, consisting of more than 1.7 million parents, families, and kinship providers across 50 states, Puerto Rico, and the District of Columbia. Working alongside approximately 1,800 organizations of parents in localities across the country, NPU seeks to channel the power of parents, families, and kinship providers into powerful policies that improve the lives of children, families, and communities across the United States.

24.    In recent years, NPU has recognized the importance of the tax system to support the economic well-being of families. It advocated for a strengthened and expanded Child Tax Credit, including ensuring that all children benefit from the credit regardless of their parents' immigration status. NPU has sought to be an organization that is open to all parents in the country, including those who are undocumented or otherwise potentially subject to deportation.

---

[3] In quoted excerpts herein, all emphases have been added, and all internal citations and quotation marks have been deleted unless otherwise noted.

25.    Plaintiff National Korean American Service and Education Consortium ("NAKASEC") has a mission to organize Korean and Asian Americans to achieve social, racial, and economic justice. NAKASEC seeks to engage multigenerational Korean and Asian Americans and immigrants in support of a future in which low- and middle-income immigrants, people of color, and marginalized communities are working together as changemakers. It works with 55,000 community members, including more than 400 who serve as active volunteers, particularly in Texas, Illinois, New York, New Jersey, Virginia, and Pennsylvania.

26.    Plaintiff UndocuBlack Network ("UBN") is a nonprofit membership organization incorporated in the District of Columbia. Founded in 2016, UBN is a multigenerational network of Black immigrants that advances the rights and well-being of Black immigrant communities by promoting access to resources, amplifying stories, fostering organizing efforts, and supporting community wellness. UBN has members across the nation with chapters in New York, Los Angeles, and the D.C.-Maryland-Virginia region. UBN serves over 1,000 immigrant members through its organizational chapters with a national network across approximately thirty states.

27.    Defendant Department of the Treasury is a federal agency headquartered in Washington, D.C., responsible for managing federal finances, including collecting taxes, paying government bills, and enforcing finance and tax laws.

28.    Defendant Internal Revenue Service ("IRS") is a federal agency headquartered in Washington, D.C. and is responsible for the implementation of the internal revenue laws. It is a bureau of the Department of the Treasury.

29.    Defendant Scott Bessent is Secretary of Treasury and Acting Commissioner of the IRS. As Treasury Secretary, he is responsible for the administration and enforcement of the Internal Revenue Code. 26 U.S.C. § 7801(a)(1). As Acting IRS Commissioner, he is responsible for execution and application of the internal revenue laws. 26 U.S.C. § 7803(a)(2). He is also responsible for ensuring that IRS employees "are familiar with and act in accord with taxpayer rights," including "the right to privacy" and "the right to confidentiality." 26 U.S.C. § 7803(a)(3)(G), (H).

7

30.     Defendant Social Security Administration ("SSA") is a federal agency headquartered in Washington, D.C. responsible for the administration of certain benefits, including federal Old-Age, Survivors, and Disability Insurance, which requires the handling of personal information.

31.     Defendant Frank Bisignano is the Commissioner of the Social Security Administration.

32.     Defendant Department of Homeland Security ("DHS") is a department within the executive branch of the federal government, headquartered in Washington, D.C. DHS is responsible for immigration enforcement, among other programs.

33.     Defendant Bureau of Immigration and Customs Enforcement ("ICE") is a federal agency headquartered in Washington, D.C. and under the Department of Homeland Security.

34.     Defendant Kristi Noem is Secretary of the Department of Homeland Security. Along with those under her direction, she seeks to obtain taxpayer information and other information held by the IRS and SSA.

35.     Defendant Todd M. Lyons is Acting Director of Immigration and Customs Enforcement. He, and those under his direction, have sought and continue to seek to obtain taxpayer records.

## FACTS

### *Congress established strong privacy protections for tax-related information.*

36.     Everyone in the United States who earns income above a certain threshold is obligated to file and pay taxes, regardless of immigration status. 26 U.S.C. §§ 1, 2(d), 871. The Internal Revenue Code generally does not distinguish among noncitizens on the basis of immigration status but instead imposes tax obligations based on a person's physical presence within the country. *See* 26 U.S.C. § 701(b).

37.     For half a century, federal agencies have been required to maintain confidentiality and privacy of taxpayer records. Until the 1970s, tax-related information was designated as public records, subject to limited protections against intra-governmental disclosure. However, President

8

Richard Nixon exploited this approach to use tax information to target his political opponents. His staff approached the IRS with an "enemies list" and sought information from tax returns and audits of those "enemies." This included investigation of the tax history of opponents in the impending Presidential election.[4]

38.     After the details of President Nixon's efforts to access tax records came to light, Congress revised the statute governing tax-related records, 26 U.S.C. § 6103, to strictly limit the disclosure of information.

39.     Section 6103(a) establishes that tax "returns and return information shall be confidential," and shall not be disclosed without specific statutory authorization. "Return information" is defined broadly to include not only tax returns themselves, but also "any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense." 26 U.S.C. § 6103(b)(2).

40.     Section 6103's prohibition on disclosure extends beyond the IRS, applying to any "officer or employee of the United States," among others. 26 U.S.C. § 6103(a)(1). Sections 7213 and 7213A impose criminal sanctions on willful disclosure in violation of § 6103 and on unauthorized inspection of return information.

41.     Congress and the IRS have repeatedly emphasized the importance of tax confidentiality, even apart from the statutory prohibitions on unlawful disclosure, inspection, and use.

---

[4] Joseph J. Thorndike, Tax History: Did Richard Nixon Weaponize the IRS Against George Wallace?, Tax Notes (Dec. 18, 2023), https://www.taxnotes.com/tax-history-project/tax-history-did-richard-nixon-weaponize-irs-against-george-wallace/2023/12/15/7hp6f; Joseph J. Thorndike, Tax History: Nixon Aide Tried to Weaponize the IRS by Pressuring the Commissioner, Tax Notes (Mar. 13, 2023), https://www.taxnotes.com/tax-history-project/tax-history-nixon-aide-tried-weaponize-irs-pressuring-commissioner/2023/03/10/7g45r.

9

42.     In July 2014, the IRS adopted a Taxpayer Bill of Rights, which included an enumerated right to confidentiality: "Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. Taxpayers have the right to expect appropriate action will be taken against employees, return preparers, and others who wrongfully use or disclose taxpayer return information."

43.     In 2015, Congress wrote the Taxpayer Bill of Rights into the Internal Revenue Code itself, reinforcing the IRS Commissioner's responsibility to ensure the "right to confidentiality." 26 U.S.C. § 7803(a)(3)(D).

44.     Alongside the IRS, the SSA regularly receives and uses return information to administer the Old Age, Survivor, and Disability Insurance and other programs. *See* 26 U.S.C. 6103(l) (providing for the disclosure and use of return information for this purpose). The limitations on disclosure, inspection, and use of return information from § 6103 apply when this information is in the possession of the SSA. *See* 26 U.S.C. § 6103(a)(1).

45.     When tax return information is disclosed to the SSA to administer SSA programs, the Social Security Act additionally prohibits its unlawful disclosure. 42 U.S.C. § 1306(a)(1).

46.     The privacy protections for return information, whether held by the IRS, SSA, or any other agency, contain no exception for civil immigration enforcement or limitation based on immigration status.

### *The IRS and other government agencies have repeatedly promised to protect the information of immigrant taxpayers.*

47.     The IRS has reaffirmed the confidentiality of tax filings by citizens and noncitizens alike.

48.     As recently as the end of last year, the IRS stated clearly and categorically: "*There is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws.*" 89 Fed. Reg. 93,172, 93,174 (Nov. 26, 2024).

49.     The IRS made this affirmation in the context of regulatory changes providing for disclosure of data for statistical purposes, after a commenter raised a concern that the rule change could "result in the creation of a list of taxpayers . . . that could be used to target individuals presumed to be undocumented for immigration enforcement purposes." The commenter further raised concerns about the "chilling effect" that even the prospect of such a disclosure would cause.

50.     The IRS previously proclaimed the separation between tax administration and immigration enforcement in 1996, when it created Individual Taxpayer Identification Numbers ("ITINs"). An ITIN is a tax processing number issued by the IRS for noncitizens who have a U.S. tax filing or reporting requirement but are not eligible for a Social Security Number ("SSN"). An ITIN does not create an inference about an individual's immigration status. For instance, ITIN holders include investors who rarely set foot in the country, frequent visitors, and long-term residents. 26 C.F.R. § 301.6109–1(b)(2), (d)(3).

51.     When proposing to create the ITIN, the IRS specifically emphasized that confidentiality protections would attach: "The IRS individual taxpayer identification numbers and the information obtained by the IRS as a result of issuing numbers ***constitute confidential taxpayer information***. Section 6103 strictly prohibits the disclosure of this information to other government agencies, private entities, or citizens. Disclosure in violation of the restrictions under section 6103 may lead to civil or criminal penalties." 60 Fed. Reg. 30,211, 30,213 (June 8, 1995).

52.     During the notice and comment period, the IRS received comments suggesting that ITINs should be issued by immigration-enforcement agencies or the SSA. The IRS rejected those suggestions. "The IRS is the most appropriate federal agency to assign the ITIN because ***the number is intended for tax use only***. Having the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding the immigration status of an alien individual or the right of that individual to be legally employed in the United States." Taxpayer Identifying Numbers (TINs), T.D. 8671, 1996-1 C.B. 314 (1996). The IRS reached this conclusion after substantial interagency consultation. *Id.*

53.    In 2003 and 2004, the IRS, DHS, Government Accountability Office, and others reaffirmed that the ***law did not permit data sharing between IRS and DHS***: "[C]urrent statutory restrictions on sharing tax data would need to be modified to permit sharing of IRS data with [Department of Homeland Security]" for immigration enforcement.[5] Congress has never made such modifications.

54.    Around the same time, the Department of Treasury quelled public concern about immigrant taxpayers' information being used for immigration enforcement: "Neither the IRS nor [the Treasury Inspector General for Tax Administration] has a program or project to investigate unauthorized workers in an effort to have them deported. The core missions of IRS and TIGTA are, and must remain, focused on our tax system."[6]

55.    Amid anxiety regarding information sharing under the first Trump administration, the agency issued a statement affirming that "[t]he IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs. ***There is no authorization under this provision to share tax data with ICE.***"[7]

56.    The agency has also reaffirmed its commitment to taxpayer privacy through its VITA program. The VITA program offers "free basic tax return preparation to qualified individuals" which includes low-income communities and "[l]imited English-speaking

---

[5] *See* Gov't Accountability Office, *Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used*, GAO-04-529 at 18 (Mar. 2004). Amid the GAO investigation, the IRS imposed stricter requirements to obtain an ITIN, *id.* at 11, and Congress later codified these and other strictures, Consol. Approps. Act, Pub. L. No. 114-113, Division Q, Title II, § 203, 129 Stat. 2242, 3078–81 (2015).

[6] Gregory F. Jenner, *Treasury Responds to Groups' Concern Over Targeting ITIN Users*, TAX NOTES (March 24, 2004), https://www.taxnotes.com/research/federal/other-documents/treasury-tax-correspondence/treasury-responds-to-groups-concern-over-targeting-itin-users/yqkt.

[7] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, WASH. POST (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html.

taxpayers."[8] VITA services are free and are provided by IRS partners who "must take and pass tax law training" which "includes maintaining the privacy and confidentiality of all taxpayer information."[9]

57.    The IRS enlists community-based organizations like Plaintiff CEDC to provide tax filing assistance through VITA and encourage tax compliance—including for immigrant taxpayers. In recruiting and training organizations to provide VITA and other services, the IRS repeatedly emphasizes the importance of taxpayer privacy.[10]

58.    The IRS has also specifically affirmed its commitment to *immigrant* taxpayer privacy via the VITA program. The agency has sought to broaden its VITA partnerships specifically to provide support for immigrant taxpayers, particularly those who must file with an ITIN. To obtain an ITIN, taxpayers must either mail their passports or other identity documents to the IRS or present them to a Certifying Acceptance Agent ("CAA"), who is trained and screened to provide certified copies of the documents to the IRS. As recently as last October, the IRS made a deliberate effort to expand its CAA services by enlisting VITA sites and similar community institutions: "The goal is to increase the individual Tax Identification Number (ITIN) Services throughout the nation and within individual communities, particularly communities with high ITIN usage."[11]

59.    The IRS and the federal government as a whole benefit from the credibility of VITA sites—such as Plaintiff CEDC—among immigrant communities. The organizations' reassurances about privacy protections for taxpayer information have encouraged millions of taxpayers around the country—and hundreds in the New Bedford community—to trust that they could file tax returns safely.

---

[8] IRS, *Free tax return preparation for qualifying taxpayers*, https://www.irs.gov/individuals/free-tax-return-preparation-for-qualifying-taxpayers (last visited Sept. 29, 2025).
[9] *Id.*
[10] *See, e.g., id.*
[11] IRS, *Fact Sheet: Becoming a Certified Acceptance Agent (CAA) for SPEC Partners* (Oct. 2024).

13

***In response to pressure to unlawfully aggregate and disclose taxpayer data and participate in immigration enforcement, key IRS officials have resigned in protest.***

60.     President Donald J. Trump and his administration have made it a priority to locate and deport noncitizens from the United States en masse. Before taking office, Trump pledged to conduct "the largest deportation operation in the history of our country."[12] The Trump administration first assigned ICE a daily quota of 1,200–1,400 arrests[13]—and these numbers were "a floor, not a ceiling."[14] Frustrated with the speed, even at that level, the administration quickly raised its quota to 3,000 arrests per day.[15] As the agency has struggled to meet these demands, White House officials have reportedly berated its leadership, urging more aggressive measures.

61.     Building on unconstitutional and illegal enforcement activities implemented by prior administrations,[16] DHS has sought to enlist IRS agents' assistance in immigration enforcement. For example, in a February 7, 2025 letter to Secretary Bessent, Secretary Noem urged the use of limited IRS resources to track down employers of unauthorized workers and to assist with immigration arrests.[17]

62.     On February 27, 2025, Trump-administration officials took the request further: demanding the names and addresses of 700,000 taxpayers who filed tax returns with an ITIN.

---

[12] Joel Rose & Sergio Martinez-Beltran, *Trump touts historic deportation plans, but his own record reveals big obstacles*, NPR (Aug. 14, 2024), https://www.npr.org/2024/08/14/nx-s1-5037992/trump-immigrants-border-mass-deportation-presidential-race-migrants.
[13] Kristen Welker & Julia Ainsley, *Trump is 'angry' that deportation numbers are not higher*, NBC NEWS (Feb. 7, 2025), https://www.nbcnews.com/politics/national-security/trump-angry-deportation-numbers-are-not-higher-rcna191273.
[14] Priscilla Alvarez, *White House pressures ICE to pick up pace of migrant arrests, sources say*, CNN (Feb. 7, 2025), https://www.cnn.com/2025/02/07/politics/ice-arrests-pressure/index.html.
[15] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, WALL ST. J. (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.
[16] *See* Shayak Sarkar, *Internal Revenue's External Borders*, 112 CAL. L. REV. 1641, 1650–64 (2024) (describing prior administrations' approaches).
[17] DHS Sec'y Kristi Noem, Letter to Scott Bessent, https://www.documentcloud.org/documents/25521913-25-07283-s1-signed-irs-letter-02072025/ (Erin Mansfield, DocumentCloud) (last modified Feb. 12, 2025) (on file with USA Today).

63.     The requested name and address information is "return information" and therefore, is "confidential" under 26 U.S.C. § 6301(a).

64.     IRS leadership resisted this request. Soon after, the then-Acting Commissioner abruptly retired. President Trump replaced the departed officer with a new Acting Commissioner who expressed openness to complying with the request.[18]

65.     Another career IRS employee, Acting Chief Counsel William Paul, also resisted the request to share confidential taxpayer information with ICE, DHS, and other agencies, outside the Congressionally approved protections in 26 U.S.C. § 6103. By March 13, 2025, he was demoted from his position and replaced with Andrew De Mello, whom the Trump administration reportedly believed to be more amenable to its agenda.[19]

### *The Treasury Department and DHS begin cooperating on IRS-ICE information sharing.*

66.     On April 7, 2025, the Department of Treasury and Department of Homeland Security entered into a Memorandum of Understanding ("MOU") on behalf of the IRS and ICE, respectively, to commence sharing of IRS data with ICE. A copy of the MOU is attached as Exhibit A.

67.     By its own terms, the MOU includes only limited information on how information sharing would occur, with further details provided in a separate document on implementation dated April 18, 2025.[20]

---

[18] Jacob Bogage, Meryl Kornfield, & Patrick Svitek, *What in the DOGE is happening at the IRS*, WASH. POST (Mar. 3, 2025), https://www.washingtonpost.com/politics/2025/03/03/what-doge-is-happening-irs/ (noting the confirmation of these events by a White House official).

[19] *IRS chief counsel is demoted and replaced with DOGE ally*, MONEYWATCH (Mar. 13, 2025), https://www.cbsnews.com/news/andrew-de-mello-irs-william-paul-doge-trump/.

[20] *See* Joint Mot. For Protective Order, *Centro de Trabajadores Unidos, et al., v. Bessent, et al.*, No. 1:25-cv-00677 (D.D.C. April 21, 2025), Dkt. No. 44.

68.     Shortly after the MOU was finalized, the new acting Commissioner announced that she would leave the agency.[21]

69.     The Chief Privacy Officer, Chief Financial Officer, Chief of Staff and Chief Risk Officer also announced their decisions to leave the agency.[22] These departures were motivated by the decision to share information with ICE. For example, the then-Chief Privacy Officer has since remarked, "I was asked to do something and lead something and be part of something that, at the time, we had an opinion was not lawful. . . . It was related to sharing the immigrant data."[23]

70.     On June 25, 2025, ICE made an additional request for the addresses of 7.3 million taxpayers.

71.     Even for then-Acting General Counsel De Mello, who had previously been installed because of his willingness to accommodate the IRS-ICE data sharing, the request went too far. He noted "deficiencies" in the agency's request, even under the MOU, and refused to allow the disclosure. Two days later, De Mello was removed from his position.[24]

72.     On June 27, 2025, ICE submitted a new request, this time for the last known address of approximately 1.28 million people.

73.     For some individuals, ICE failed to provide the IRS with enough information to ensure that the taxpayer return information in its databases was a match for the person ICE sought. For others, ICE did not even provide the meager evidence of a criminal investigation laid out in the MOU. IRS did not produce information for those individuals.

---

[21] Nathan Layne & Kanishka Singh, *Top IRS officials join chief in quitting following immigration data deal*, REUTERS (Apr. 9, 2025), https://www.reuters.com/world/us/us-irs-chief-quit-over-deal-share-data-with-immigration-officials-report-says-2025-04-08/.
[22] *Id.*
[23] David Stewart, Paige Jones, and Kathleen Walters, *Ex-IRS Official Talks Tax Data Sharing Deal, Agency Tenure*, TAX NOTES (Sept. 4, 2025), https://www.taxnotes.com/tax-notes-live/tax-notes-talk/ex-irs-official-talks-tax-data-sharing-deal-agency-tenure/7szdf.
[24] William Turton, Christopher Bing, and Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE*, PROPUBLICA (July 15, 2025), https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations.

74.     But IRS did return the addresses for 3.7% of the people in ICE's request—nearly 50,000 people.[25]

75.     Section 6103(i)(1) establishes a strict procedure that federal law enforcement must follow to obtain complete return information. Any disclosed information may be used solely for the specific purpose authorized and may be shared only with employees who are "*personally and directly engaged in*" the *criminal* investigation or proceeding. 26 U.S.C. § 6103(i)(1)(A). ICE dubiously asserts that *one sole* "officer[] or employee[] . . . [is] *personally and directly engaged in*" the criminal investigations of nearly 50,000 people.[26] Defendant Lyons identified Jesse J. Williams, the Assistant Director of the ICE Enforcement and Removal Operations Field Operations, as the individual "personally and directly engaged" in preparing for any criminal proceeding or investigation involving these thousands of individuals.[27]

76.     ICE and the White House were reportedly dissatisfied with the IRS's reluctance to share more information. The White House even sought additional information about taxpayers, beyond their last known address.[28]

77.     Soon after the IRS's response to ICE's request, Commissioner Billy Long was removed from his office. Treasury Secretary Bessent now serves as Acting Commissioner.

78.     On information and belief, Secretary Bessent intends to require IRS staff to comply with ICE requests and share taxpayers' information, even where there is significant uncertainty about the accuracy of a match and/or where ICE does not provide all the information required by the MOU, and the law.

### *The IRS-ICE information sharing is not properly restricted.*

---

[25] Decl. of John J. Walker, *Center for Taxpayer Rights v. IRS*, No. 1:25-cv-457 (D.D.C. filed Aug. 28, 2025), Dkt. No. 31-1.

[26] Min. Order, *Center for Taxpayer Rights v. IRS*, No. 1:25-cv-457 (D.D.C. Sept. 5, 2025).

[27] Defs.' Resp. to Court Order, *Center for Taxpayer Rights v. IRS*, No. 1:25-cv-457 (D.D.C. Sept. 18, 2025), Dkt. Nos. 40, 40-1.

[28] Jacob Bogage & Kadia Goba, IRS, *White House clashed over immigrants' data before tax chief was ousted*, WASH. POST (Aug. 9, 2025) https://www.washingtonpost.com/business/2025/08/09/trump-administration-irs-data-dispute/.

79.     The IRS-ICE MOU begins by quoting Executive Order 14161, which directs the Department of Homeland Security and other agencies "to take immediate steps to identify, exclude, or remove aliens illegally present in the United States." Ex. A at 1.

80.     ICE intends to use this MOU to find and arrest as many as 7 million individuals.[29]

81.     The MOU purports to rely on 26 U.S.C. § 6103(i)(2) to justify the sharing of taxpayer information. It specifically cites to subsection (i)(2). Ex. A at 1. However, subsection (i)(2) provides for disclosure of certain return information in connection with the enforcement of non-tax federal criminal law.

82.     To attempt the legally necessary connection between *criminal* law and immigration enforcement, the agreement focuses first on individuals with final orders of removal. It asserts that ICE seeks information regarding those taxpayers to support "criminal investigation under 8 U.S.C. § 1253(a)(1)." Section 1253(a)(1), in turn, was enacted in 1996 to impose a criminal penalty for individuals who "willfully" remain in the United States after an order of removal becomes final.

83.     The statute has been rarely applied. From 1996, when § 1253 was enacted, until 2023, only 314 people were charged with violating any subsection of the statute.[30] This number includes individuals prosecuted for the willful refusal to obtain travel documents and affirmative efforts to resist removal—such as assaulting ICE officers.

84.     There is also little case law interpreting this statute. For example, there has not been a reported case explaining the effect of § 1253 for individuals who have a final order of removal but who have been granted other forms of *immigration relief*, such as deferred action (including

---

[29] Jacob Bogage, *DHS officials ask IRS to use tax data to locate up to 7 million immigrants*, WASH. POST (Apr. 5, 2025), https://www.washingtonpost.com/business/2025/04/05/irs-tax-data-immigration-enforcement/.

[30] Bureau of Justice Statistics, *Federal Criminal Case Processing Statistics Data Tool*, https://fccps.bjs.ojp.gov/home.html?dashboard=FJSP-CriminalCodeStats&tab=CriminalCodeStatistics&ccm=1 (last visited Sept. 29, 2025).

Deferred Action for Childhood Arrivals), withholding of removal, relief under the Convention Against Torture, Temporary Protected Status, and/or parole.

85.    The MOU does not limit its scope to § 1253. It explicitly provides for further information sharing to locate immigrants who could be investigated under "another specifically designated Federal criminal statute." Ex. A at 1.

86.    In connection with a related Freedom of Information Act ("FOIA") case in this district,[31] the IRS recently produced the "implementation agreement" for its MOU with ICE to Plaintiff CEDC. The implementation agreement is attached here as Exhibit B.

87.    Notably, the implementation agreement requires the IRS to ***destroy records relating to ICE's requests*** for information. Ex. B at 2.

88.    The implementation agreement further provides for ICE to incorporate the address information obtained from the IRS into several general-purpose systems of records: the Alien File, Index, and National File Tracking (which is maintained by a different agency within DHS); External Investigations; and Criminal Arrest Records and Immigration Enforcement Records ("CARIER"). *Id.* at 3.

89.    There is no provision in the implementation agreement that limits the disclosure and use of taxpayer information strictly to ICE officers or employees engaged in criminal investigations or preparation for criminal proceedings, as required by § 6103.

90.    According to news reports, the agencies have arranged to conduct an automated data dump. The Integrated Data Retrieval System, designated in the implementation agreement, accepts queries one at a time, to ensure that each request satisfies the strict legal requirements of § 6103 and related controls. However, that would be incompatible with ICE's desire for bulk data transfer.

---

[31] *Cmty. Econ. Dev. Ctr. of Se. Mass. v. I.R.S.*, No. 25-cv-11949-IT (D. Mass., Aug. 18, 2025).

19

91.     Instead, ICE sends the IRS a spreadsheet with the names and prior addresses of targeted individuals. The request includes the date of a final removal order, a citation to a criminal statute, and a tax period.

92.     Then, an automated system (not a human being) seeks to match these names and addresses to an SSN or ITIN.

93.     If there is a match, the system then "scrapes" the resulting information into a spreadsheet, including the most recent address. That spreadsheet is provided to ICE.

94.     By eliminating an individualized confirmation of individuals' information, the automated matching system exacerbates a risk of "false positives," particularly where ICE has not provided an SSN or ITIN.

### *The SSA-ICE data sharing is not properly restricted.*

95.     In parallel to, but separate from, the IRS-ICE MOU and implementation agreement, the SSA and ICE have also cooperated on unlawful sharing of immigrants' information. Some of the information being shared is information that SSA has received from the IRS or from tax filings and therefore is specifically protected by § 6103.

96.     The SSA generally has access to information about two groups of people who sometimes overlap, but not always: those who pay into the Social Security system, known as "contributors," and those who receive benefits, including through disability or retirement programs, known as "beneficiaries."

97.     Contributors pay into Social Security through employment taxes, via employers' or employees' own tax returns. In other words, for contributors, the data SSA has access to is taxpayer return information, protected from disclosure by 26 U.S.C. § 6103. *See also* 42 U.S.C. § 1306 (imposing additional restrictions and penalties on disclosure of returns in the possession of SSA); 20 C.F.R. § 401.125 (citing the confidentiality protections of § 6103 and noting that the agency "do[es] not disclose information when a law specifically prohibits it"). To the extent that the data was provided via other means, SSA regulations ***independently protect that information*** as

"program records," for which the agency applies "somewhat more strict confidentiality standards than those found in the Privacy Act" because that information "is often very sensitive, and claimants are required by statute and regulation to provide [SSA] with [it] in order to establish entitlement for benefits." 20 C.F.R. § 401.105(b).

98.     Despite these protections, in February 2025, the then-Acting Social Security Administrator provided ICE with the last known addresses of 98,000 immigrants.[32] Upon information and belief, the SSA did not acknowledge that some of this information came from tax filings. Nor did the SSA acknowledge that some of this information was protected by § 6103. Neither ICE nor the SSA explained how any exemption to § 6103 applied or how ICE would protect the confidentiality of the information as required by § 6103.

99.     In the related FOIA case in this district,[33] the SSA maintained, through August 26, 2025, that there were no interagency agreements to govern data sharing with ICE. *See* Exhibit C. On August 26, Charles Borges, Chief Data Officer of the SSA, submitted a protected whistleblower declaration to Congress, which revealed that the SSA political appointees (and related individuals) consistently violated statutory privacy protections, likely including violations of § 6103's protections. The declaration also revealed that at least one politically appointed individual had a particular interest in immigrants' information.

100.    On August 29, 2025, Borges resigned from the SSA. In his resignation letter, he noted that politically appointed officials had refused to inform him about a range of projects that he believed "constitute violations of federal statutes or regulations" and "may involve unauthorized data exchange with other agencies."

---

[32] Alexandra Berzon, Hamed Aleaziz, Nicholas Nehamas, Ryan Mac, and Tara Siegel Bernard, *Social Security Lists Thousands of Migrants as Dead to Prompt Them to 'Self-Deport'*, N.Y. Times (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/us/politics/migrants-deport-social-security-doge.html.

[33] *Cmty. Econ. Dev. Ctr. of Se. Mass. v. I.R.S.*, No. 25-cv-11949-IT (D. Mass., Aug. 18, 2025).

101.     Subsequently, on September 15, 2025, SSA produced to Plaintiff CEDC a letter acknowledging its data sharing with ICE. *See* Exhibit D at 1 ("SSA Letter"). The SSA Letter was dated August 27, 2025, the day after Borges' whistleblower declaration was submitted to Congress.

102.     The SSA Letter provides for ICE to submit a monthly request for information on about 50,000 immigrants. The SSA will take that request and search its files for matches, and "will provide ICE identity and location information" for each matched file. This includes, according to the SSA "known alias(es), address, place of birth, banking data, known phone number(s), [and] known email address(es)." *Id.*

103.     The SSA Letter states that the information will be provided in accordance with 42 U.S.C. § 1306(a) and 8 U.S.C. § 1360(b) but nowhere mentions compliance with 26 U.S.C. § 6103. Nor does the SSA Letter explain that much of the requested information is taxpayer return information that the SSA is prohibited from disclosing unless the statutory exemptions are met. And neither does the SSA Letter mention any exemption that may apply, nor allude to facts suggesting any exemption is relevant.

104.     The SSA says the information "will be retained only as long as necessary to carry out the stated purpose." *Id.* at 2. The SSA Letter does not explicitly state the purpose of the monthly 50,000 data requests, although the purpose is clear from the first paragraph: to "identi[f]y," "locat[e]", and deport taxpaying immigrants. *Id.* at 1.

### *The IRS's and SSA's information-sharing and disclosures with ICE violate § 6103's confidentiality protections.*

105.     Congress enacted 26 U.S.C. § 6103 to protect the confidentiality of tax-related information. It defines protected "return information" broadly and imposes a baseline assumption of confidentiality, which applies not only to the IRS but also across federal, state, and local governments. 26 U.S.C. § 6103. Indeed, in adopting the current form of § 6103, the Senate Finance Committee ensured that the information a taxpayer is compelled to disclose to the IRS is safeguarded to "the same degree of privacy as those private papers maintained in his home." Sen. Fin. Comm. Rep. on Tax Reform Act of 1976, S. Rep. 94-938 at 328.

22

106.    Against this safeguard of confidentiality for return information, § 6103 identifies the precise and limited exceptions that permit disclosure and use of return information. As relevant here, subsection (i) allows for limited disclosure of return information for non-tax enforcement of federal criminal law, with strict limitations and procedures for the disclosure and use of that information.

107.    Subsection (i)(2) provides for disclosure of a subset of return information without a court order to prepare for a proceeding to enforce federal criminal law, to investigate in preparation for such a proceeding, or to prepare for a grand jury proceeding. (Generally, information that originated from a 1040, W-2, or 1099 or other tax filings, may be disclosed only if authorized under another provision and pursuant to a court order.) The receiving agency may use the information only for the purpose for which it was disclosed, and it may be disclosed only to employees who are "personally and directly engaged in" the criminal investigation or proceeding. The strict limit on the use and disclosure of subsection (i)(2) materials applies to any federal officer or employee in possession of the information, including in the IRS, SSA, ICE, or any other agency.

108.    Subsection (i) includes several *other* provisions to provide for information sharing in very specific circumstances, such as to address imminent death, physical injury, or flight from federal prosecution; in relation to terrorist activities; and to locate fugitives from justice.

109.    The IRS regulation implementing subsection (i) lays out several illustrative uses for such disclosures, including guiding forensic experts, preparing for suspect or witness interviews, and supporting plea bargaining. 26 C.F.R. § 301.6103(i)–1(b). The regulation further provides that disclosure "should be made, however, only if [the requesting agency's] purpose or activity cannot otherwise properly be accomplished without making such disclosures." 26 C.F.R. § 301.6103(i)–1(b).

23

110.    Here, the IRS-ICE MOU purports on its face to abide by 26 U.S.C. § 6103(i)(2). Ex. A at 1–3. But the actual implementation of IRS-ICE information sharing violates these statutory requirements.[34]

111.    *First,* the IRS-ICE information sharing is wholly incompatible with the text and spirit of § 6103 because its purpose is to locate and apprehend people. That the intended use of the IRS data is location and apprehension is evident from the agreements seeking the most recent address of tax filers.

112.    Return information cannot be used to locate or apprehend someone under subsection (i)(2), even if that individual is suspected of violating a federal criminal law. The permitted uses of return information—for "investigation" and "preparation" for criminal law enforcement proceedings—do not include apprehension.

113.    The distinction between "investigation" and "preparation," on one hand, and apprehension, on the other, is made clear by *separate* provisions in subsection (i) that specifically permit location and apprehension. The statute explicitly provides for the use of return information to *locate* missing or exploited children in subsection (i)(1), to prevent an "imminent flight" from federal prosecution in subsection (i)(3), and to *locate* fugitives from an arrest warrant for a federal felony in subsection (i)(5).

114.    In fact, during the Reagan administration, certain officials sought to use subsection (i)(2)'s exception to obtain addresses—taxpayer identity information under § 6103(b)(6)—"to locate and prosecute" people who had evaded Selective Service (draft) registration.[35] The officials noted that then-pending legislation, which was ultimately enacted as current subsection (i)(5),

---

[34] The SSA Letter does not even acknowledge or feign compliance with § 6103, despite the agencies agreeing to share taxpayer information.

[35] Memorandum from Joel Gerber, Deputy Chief Counsel, IRS to Roscoe L. Egger, Jr., Commissioner (Apr. 2, 1982), *available at* https://www.reaganlibrary.gov/public/2024-07/40-233-12008797-OA10601-004-2023.pdf.

would provide for location of fugitives.[36] The Reagan administration ultimately determined that such a disclosure was improper under subsection (i)(2), relying instead on a specific provision authorizing such a disclosure by SSA.[37]

115.    In enacting subsection (i)(5), Congress intended that "taxpayer identity information be treated as [confidential] taxpayer return information unless return information (other than taxpayer identity information) is requested and disclosed pursuant to such written request." H.R. 97-760, at 674 (1982) (Conf. Rep.).

116.    Further, the statute requires the law enforcement agency (in this case, DHS or ICE) to provide a taxpayer's address as part of the request for taxpayer data. 26 U.S.C. § 6103(i)(2)(B)(i). It makes little sense for a law enforcement agency to be able to use this exception to obtain address information solely for the purpose of locating someone, since the agency is required to have the person's address to make the request.

117.    For this reason, longstanding IRS guidance, in the Internal Revenue Manual and separate publications, has consistently established that a request for only address information is not a proper request under § 6103(i)(2).[38]

118.    In short, both the Executive Branch and Congress concluded that § 6103(i)(2) could not be used solely to obtain a taxpayer's address, not even for criminal fugitives, and Defendants' attempt to use it to locate noncitizens is therefore unlawful. The impropriety of Defendants' misinterpretation of subsection (i)(2) is underscored by Congress's enactment of § 6103(i)(5).

119.    *Second,* the Agreements are incompatible with § 6103 because the data will be used for ***civil*** immigration enforcement, in contravention of the strict limits in subsection (i)(2) restricting use to criminal investigations.

---

[36] *Id.*

[37] Memorandum from Peter Wallison, General Counsel, Treasury to Donald Regan, Secretary (May 17, 1982), *available at* https://www.reaganlibrary.gov/public/2024-07/40-233-12008797-OA10601-004-2023.pdf.

[38] *See* Internal Rev. Manual § 11.3.28.4(5) (Apr. 17, 2025); Disclosure Litig. Reference Book, IRS Pub. 4369, at 5-4 (rev. Oct. 2012), *available at* www.google.com/books/edition/Disclosure_Litigation_Reference_Book/uumGnjISUOoC.

120.    The preamble to the IRS-ICE MOU recites the importance of *civil* immigration enforcement, showing that the agencies intend to use the information for civil enforcement and not criminal prosecution. Ex. A at 1.

121.    In fact, the address information gleaned from the IRS and SSA will be entered into the general databases used across DHS for immigration enforcement, namely the Alien File, Index, and National File Tracking, as well as CARIER. *See* Ex. B at 3.

122.    And there is a long history of ICE using criminal search warrants and other criminal investigatory materials as a pretext, where the agency's real purpose is the removal of immigrants.[39]

123.    Given that the initial subjects of the IRS and SSA information sharing include individuals with final orders of removal, the civil immigration enforcement system provides no additional procedural steps before a person can be put on an airplane—including flights going to a completely unknown third country.[40]

### *The information sharing implementation is arbitrary and capricious.*

124.    In addition to contravening § 6103, the IRS-SSA information sharing is arbitrary and capricious because the agencies failed to acknowledge changes in policy and adequately consider several important interests.

125.    In April, the IRS substantially changed its policy manual to remove several safeguards relating to requests under § 6103(i)(2). These included procedures to ensure that each individual request meets the requirements of subsection (i)(2), and that audit trails for each request

---

[39] *See, e.g., Perez-Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019) (describing use of pretextual criminal warrants to conduct civil immigration enforcement); *Zelaya v. Hammer*, 516 F. Supp. 3d 778 (E.D. Tenn. 2021) (certifying class of immigrant workers subject to civil immigration enforcement that originated with criminal warrant). Under this administration, ICE has reportedly used criminal warrants to enter private spaces from New York to Georgia to California, for the purpose of civil immigration enforcement.

[40] *See Dept. of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2627, 2629 (2025) (staying a district court order that would require an opportunity to be heard on potential torture or other persecution in a third country before removal to that country).

and the IRS's responses to it are recorded.[41] Nothing has replaced these procedures, and the IRS's implementation of information sharing with ICE is inconsistent with them.

126.    The IRS failed to adequately consider the effects of data sharing on the willingness of non-citizen taxpayers and their relatives to file tax returns. The risk that data sharing (and even the *perception* of data sharing) would chill tax filing was presented to the agency as recently as late 2024. 89 Fed. Reg. 93-172, 93-174 (to be codified at 26 C.F.R. pt. 301) (Nov. 26, 2024). Such a chilling effect would reduce revenue collection and frustrate the statutory goals of the Internal Revenue Code, including its tax-credit programs. But the IRS failed to consider or balance this risk.

127.    The IRS likewise failed to adequately consider the reasonable reliance of the millions of immigrant taxpayers—as well as that of relatives whose personal information appears on their tax returns—on the agency's prior representations that information would not be disclosed to immigration-enforcement agencies. As described above, these representations affirmed that § 6103 barred any disclosure to ICE whatsoever, let alone disclosures that will be used directly or indirectly for civil immigration enforcement.

128.    The IRS failed to adequately consider the effect of its information sharing on VITA and other partner organizations that had lent their credibility within immigrant communities to the agency when encouraging individuals to file tax returns, based on the IRS's promises of confidentiality.

129.    The IRS failed to adequately consider the effect of its information sharing on the First Amendment rights of VITA and other partner organizations, and of their members, including their association, speech, and petition rights.

130.    The IRS and SSA also failed to adequately consider the consequences of errors in IRS, SSA, and/or ICE data, particularly for individuals whose names are common among

---

[41] Former Internal Rev. Manual 11.3.28.2 (published Aug. 11, 2023), *available at* https://web.archive.org/web/20250403125859/https://www.irs.gov/irm/part11/irm_11-003-028.

immigrant communities, are not written in the Latin alphabet, and/or have dual-surname or other structures that fit poorly within government databases.

131.    Due to limitations in the IRS and SSA's data-storage systems, there are substantial risks of error among people with non-Anglo surnames or surnames associated with non-English languages. Such errors would expose incorrectly identified people, potentially including citizens, to dire consequences—up to and including detention and deportation.

132.    For example, Spanish and Portuguese naming conventions often provide for two surnames; government databases may be inconsistent with respect to which surname is identified.

133.    Names that originate in other writing systems, such as Arabic, Cyrillic, or Chinese, may be transliterated inconsistently in various locations. The same Chinese name is often pronounced entirely differently in Mandarin and Cantonese, leading to inconsistent transliterated records for people who speak both languages.

134.    The IRS has historically recognized these naming challenges, as reflected in the detailed instructions for name entry to VITA sites.[42]

135.    People with more common names, particularly names that are common in immigrant communities, are susceptible to false positives.

136.    Where the information that ICE seeks is the home address—one of the pieces of information that IRS is instructed to use for identification—it is less likely that the agency will identify the correct individual.

137.    An administrative error could lead to dire consequences, particularly where there are no guaranteed procedural steps between a person's arrest and their removal from the United States.

138.    ICE's actions in other contexts illustrate the lack of safeguards to prevent the consequences of such errors. In the span of only five years, ICE arrested 674 U.S. citizens. Of

---

[42] *See* IRS, Pub. 4012, *2024 Returns: VITA/TCE Volunteer Resource Guide: Entering Last Name Correctly* B19–B20 (rev. Oct. 2024).

those, 121 were confined in detention centers, and 70 were wrongfully deported—lives were uprooted and families torn apart, all due to administrative errors.[43] For example, an admitted "administrative error" led ICE to send Kilmar Abrego-Garcia to El Salvador despite an order withholding his removal to that country.[44] There, he experienced precisely the persecution that the withholding was intended to prevent.[45]

139.    ICE has also removed and attempted to remove children, based on administrative errors regarding parental wishes. Several American citizen children, including a toddler with cancer, have been removed without clear indications of parental wishes.[46] More recently, ICE attempted to remove several children to Guatemala in violation of the protections afforded to those children under the law.[47]

## **HARM TO PLAINTIFFS**

140.    Plaintiff CEDC is harmed in several ways by the information sharing conducted between the IRS, SSA, and ICE. CEDC and its members—citizens and noncitizens alike—associate for the purpose of promoting economic equality, rights for immigrants, cultural cohesion, and educational opportunity for all low-income residents of the New Bedford area.

141.    One way that CEDC advances those interests is by providing tax advice and legal advice to its members—citizens and noncitizens alike. CEDC directly assists its members in filing tax returns, and it provides advice and support about the impact of tax laws on members and their families. The organization developed its tax-assistance program in reliance on IRS representations

---

[43] *See* Gov't Accountability Off., *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations*, GAO-21-487 (Jul. 20, 2021), https://www.gao.gov/products/gao-21-487.

[44] *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

[45] Scott Neuman, *Abrego Garcia says he was severely beaten in Salvadoran prison*, NPR (July 3, 3025), https://www.npr.org/2025/07/03/g-s1-75775/abrego-garcia-el-salvador-prison-beaten-torture.

[46] Doha Madani, *U.S. citizen children, including 4-year-old with cancer, taken to Honduras on mother's deportation flight, legal advocates say*, NBC NEWS (April 27, 2025).

[47] *See L.G.M.L. v. Noem*, No. CV 25-2942 (TJK), 2025 WL 2671690, at *20 (D.D.C. Sept. 18, 2025) (provisionally certifying class of minor children and granting preliminary injunction prohibiting the government from deporting the children).

about the security of taxpayers' information. It reinforced its commitment to immigrant taxpayers by becoming a Certifying Acceptance Agent.

142.    As VITA tax preparers, CEDC has advised immigrant taxpayers of the importance of filing taxes. CEDC explains the tax system as an essential duty for residents living in the United States to help fund roads, healthcare, and schools. In addition, tax documents can be a demonstration of "good moral character" and proof of physical presence in the country in cases of adjustment of immigration status.

143.    Cognizant of its clients' and members' concerns about immigration enforcement, CEDC would not have invested resources in promoting tax filing if organizational leaders had perceived a risk that the information would be disclosed.

144.    CEDC members associate with each other to pursue economic equality, immigrant rights, and cultural and educational opportunities for themselves and their community. CEDC members join CEDC and attend events to receive tax advice and assistance with filings, and to receive advice related to immigration law and policy. CEDC members file tax returns, including returns that seek refunds of overpaid taxes and tax credits for which they may be eligible, with the help of CEDC.

145.    Having spent years assuring its clients and members that information provided to the IRS was safe, the organization's credibility within the community has been undermined, and CEDC staff must invest significant time to rebuild it. Organizational credibility is crucial to encourage the local community that they can trust the CEDC and its advice, including on how to file tax returns and otherwise participate in American society and economy.

146.    Moreover, when members come to CEDC with interest in filing tax returns or questions about tax-related matters, the organization now spends additional time explaining the change in the IRS's stance and conduct on information sharing and the attendant risks.

147.    Because of the unlawful data sharing, CEDC members are afraid to be members, to attend events, to ask for tax or immigration advice, and to file their taxes. CEDC has seen a 75 percent drop in individuals seeking to apply for ITINs this year, and a further drop in immigrants

filing their tax returns. Fewer people attend community events, and CEDC has canceled several events based on members' fears of attendance. When members are considering filing tax returns, they are more hesitant to share their information.

148.    When members are afraid to associate, speak, and petition the government, CEDC cannot associate, speak, or help petition the government.

149.    The unlawful information sharing places CEDC in a dilemma. As a government-supported site, it cannot advise immigrants *not* to file tax returns despite the immigration consequences. Simultaneously, as a mission-based organization committed to supporting the local community, CEDC cannot encourage immigrants *to* file tax returns knowing they will risk deportation.

150.    And because CEDC's funding is directly tied to the number of tax returns, it will lose grant funding if members do not file their taxes.

151.    CEDC's members are also harmed directly by information-sharing policies and procedures. CEDC has identified over a dozen members who turned to the organization for both tax and immigration assistance. These members have filed tax returns in recent years with the assistance of CEDC, including several members with ITINs and several members with SSNs. These members fear that the IRS and SSA will share their information with ICE, leading to their arrest, detention, and/or deportation. They are unsure whether to file tax returns this year and even whether to continue attending CEDC meetings and events, out of fear of the immigration-related consequences.

152.    NAKASEC's members are also harmed by these practices. For example, one of its members is actively involved in NAKASEC as an advocate and is an ITIN holder who files annual tax returns and quarterly estimates. Another member is a mentor and resource in NAKASEC and an ITIN holder who files annual tax returns. Both are unsure how to or whether to comply with their tax obligations now that they fear IRS will share their personal information with ICE. They both fear the data sharing will lead to arrest, detainment, and deportation.

31

153.    NPU's members are also harmed by the practices. For example, one of its members is an active community leader and an ITIN holder who has children who are U.S. citizens. She previously filed tax returns but is afraid to do so again because of the data sharing, and she fears deportation would leave her children without care.

154.    UndocuBlack Network's members are also harmed by these practices. For example, one active member with an ITIN has a prior final removal order and regularly files tax returns. This member fears filing tax returns this year given the risk that the data sharing may lead to their arrest, detention, or deportation. Another active member received work authorization and an SSN through DACA and has regularly filed tax returns for years. They fear that filing tax returns this year will mean that the IRS and the SSA share their personal information with ICE and expose them and family members to arrest, detention, or removal.

155.    The Internal Revenue Code does not provide an adequate remedy for these harms. Though 26 U.S.C. § 7431 provides for damages for data sharing in violation of § 6103, monetary damages do not address, alleviate, or terminate ongoing privacy violations, First Amendment harms, or fears from—and the risk itself of—arrest, detention, and deportation.

## CLAIMS FOR RELIEF

### COUNT ONE
**Against All Defendants**
**Administrative Procedure Act**
**Agency Action Contrary to Law**

156.    The foregoing allegations are realleged and incorporated herein.

157.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

158.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and SSA, and ICE's policies and procedures regarding treatment of such disclosed information, are final agency actions.

159.    Section 6103 establishes a strong presumption of confidentiality for taxpayer returns and return information, providing exceptions for disclosure under only precisely defined and limited circumstances. *See, e.g.,* 26 U.S.C. § 6103(i)(1), (i)(2).

160.    Even when information is permissibly disclosed under Section 6103, its use and further disclosure are tightly restricted. *See, e.g.,* 26 U.S.C. § 6103(i)(1)(A), (i)(2)(A).

161.    Both the IRS-ICE and the SSA-ICE data sharing contravene the strict limitations on disclosure in § 6103.

162.    The DHS and ICE Defendants have sought and will soon again seek taxpayer returns and return information from Treasury and the IRS.

163.    The DHS and ICE Defendants have sought and will again (monthly according to the SSA Letter) seek taxpayer returns and return information from the SSA.

164.    Absent judicial intervention, Treasury, the IRS, and SSA Defendants are likely to disclose the return information of immigrant taxpayers to DHS, ICE, and other persons.

165.    Such disclosures themselves constitute individual agency actions that are contrary to law. Moreover, the IRS disclosures are made pursuant to misinterpretations of § 6103 to permit disclosure of address information. And the SSA disclosures are made pursuant to unlawful commitments to disclose taxpayer return information, without regard for § 6103.

166.    Absent judicial intervention, the DHS and ICE Defendants, and those under their direction or control, are likely to further disclose and use the returns and return information for the direct or indirect purpose of civil immigration enforcement.

167.    The unlawful data sharing between the IRS, SSA, and ICE should be barred, and corresponding implicit or explicit policies should be set aside.

**COUNT TWO**
**Against All Defendants**
**Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

168.    The foregoing allegations are realleged and incorporated herein.

169.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and/or "capricious." 5 U.S.C. § 706(2)(A).

170.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and SSA, and ICE's policies and procedures regarding treatment of such disclosed information, are final agency actions.

171.    In undertaking these final agency actions, Treasury, the IRS, SSA, DHS, and ICE failed to consider important factors, including reliance interests, credibility of VITA sites and their ability to provide tax services, the impact of decreased tax contributions, the history and development of the tax laws, and the possibility and consequences of data errors.

172.    The IRS-ICE MOU and implementation agreement, and the parallel SSA-ICE arrangement set forth in the SSA Letter, and corresponding implicit or explicit policies and procedures should accordingly be set aside, and information sharing as contemplated by the agreements and policies should be barred.

**COUNT THREE**
**Against All Defendants**
**First Amendment**

173.    The foregoing allegations are realleged and incorporated herein.

174.    The First Amendment to the United States Constitution protects Plaintiffs' and their members' "freedom of speech" and their "right . . . peaceably to assemble and to petition the Government for a redress of grievances."

175.    The threat that the IRS and SSA will share return information with ICE induces individual immigrants to forego tax filing and limit engagement with tax-preparation and related organizations. It has also interfered with the ability of tax-preparation organizations, like Plaintiff CEDC, to provide accurate professional advice to their current and potential clients.

176.    Moreover, the information sharing directly penalizes individual immigrants for exercising their right to petition the government, by filing tax refunds and seeking refunds or credits through an accurate income-tax filing.

177.    This chill on petition, speech, and associational rights is an objectively reasonable reaction to the threat of arrest, detention, and deportation that information-sharing portends.

178.    The information sharing between ICE, the IRS, and the SSA is not narrowly tailored to any compelling government interest in lawful immigration enforcement.

179.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and the SSA, and ICE's policies and procedures regarding treatment of such disclosed information, should accordingly be set aside, and information sharing as contemplated by the agreements and policies should be barred.

### COUNT FOUR
### Against All Defendants
### *Ultra Vires* Action

180.    The foregoing allegations are realleged and incorporated herein.

181.    Plaintiffs may state a non-statutory cause of action for an injunction to prevent an agency from acting outside its statutory authority.

182.    No statute authorizes the IRS or the SSA to use agency resources in furtherance of immigration enforcement.

183.    No statute authorizes the IRS or the SSA to disclose return information for the purpose of location and apprehension of individuals without a judicial order.

184.    No statute authorizes ICE to use taxpayer return information for the purpose of civil immigration enforcement. ICE's prior conduct establishes a significant risk that the agency will use the addresses gleaned from return information for the purpose of civil immigration enforcement.

185.    No statute authorizes the IRS and ICE to create a matching system to collect address information from taxpayers' files for the purpose of civil immigration enforcement.

186.    Congress also cabined the authority it granted the IRS and the SSA to collect taxpayer data, by prohibiting data sharing absent strict requirements. *See* 26 U.S.C. § 6103(a), (i)(2)(B). For example, subsection 6103(i)(2)(B)(iv) requires a written explanation of the data's

connection to a criminal proceeding. Because the MOU expressly links data requests to *civil* immigration authority, it directly contravenes a prohibition enacted by Congress.

187.    The commitment to and implementation of such disclosures to ICE by the IRS and the SSA, and ICE's policies and procedures regarding treatment of such disclosed information, are *ultra vires*. This includes both initial disclosures by the IRS and SSA and any subsequent disclosures within and from DHS and ICE.

188.    An injunction is proper to prevent such disclosure and use of return information.

### COUNT FIVE
### Against the IRS and SSA Defendants
### *Accardi* Doctrine

189.    "An agency has an obligation to abide by its own regulations." *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) (citing *Accardi v. Shaughnessy*, 347 U.S. 260, 265–67 (1954)). "The failure to follow an applicable regulation may be a sufficient ground for vacation of an agency's decision." *Id.*

190.    The IRS maintained extensive and longstanding internal procedures to protect the privacy of taxpayers' information, including restrictions on the sharing of taxpayer information with immigration-enforcement agencies.

191.    The SSA likewise established regulations to protect individuals' data.

192.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and the SSA flout these internal procedures, without explanation or formal change to the procedures.

193.    This commitment to and implementation of disclosing taxpayer information, contrary to the IRS and the SSA's own internal procedures, prejudices, harms, and presents an imminent threat to Plaintiffs' members.

194.    An injunction is proper to prevent such disclosure and use of tax return information.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

1.      Stay and postpone all agreements or other arrangements governing information transfer between the IRS and ICE, including the IRS-ICE MOU and implementation agreement, and the SSA Letter, pursuant to 5 U.S.C. § 705;

2.      Preliminarily and permanently vacate and set aside the IRS-ICE MOU, SSA Letter, as well as any policies providing for information sharing of taxpayer information, pursuant to 5 U.S.C. § 706(2);

3.      Declare that 26 U.S.C. § 6103(i)(2) does not permit the disclosure of return information for the purpose of location and apprehension of individuals, or for the direct or indirect purpose of civil immigration enforcement;

4.      Enter a preliminary and permanent injunction prohibiting the IRS and SSA Defendants from disclosing any individual's address to an officer or employee of ICE or to a person who will foreseeably disclose the information to an officer or employee of ICE;

5.      Enter a preliminary and permanent injunction directing ICE and DHS to sequester, refrain from access and use, delete, and destroy all information obtained from the IRS and SSA in physical and electronic forms;

6.      Enter a preliminary and permanent injunction prohibiting civil detention, initiation of removal proceedings, or removal of any individual located, identified, or arrested via information disclosed by the IRS and the SSA;

7.      Enter a preliminary and permanent injunction prohibiting all Defendants from disclosing any individual's return information to a person who will use such information in connection with civil detention, removal proceedings, or physical removal from the United States;

8.    Require Defendants to give 48 hours advance notice to this Court regarding any disclosures of return information pursuant to an exception within 26 U.S.C. § 6103, in connection with the enforcement of any immigration-related criminal provision;

9.    Award reasonable attorney's fees and costs to Plaintiffs; and

10.    Provide any other relief that this Court deems just and proper.

GREATER BOSTON LEGAL SERVICES

Dated:  9/30/2025              By:   */s/ Luz Arévalo*
                                    Luz Arevalo BBO 564011
                                    larevalo@gbls.org
                                    Angela Divaris (*Pro Hac Vice Forthcoming*)
                                    adivaris@gbls.org
                                    197 Friend Street
                                    Boston, MA 02114
                                    Telephone: (617) 461-4944

KEKER, VAN NEST & PETERS LLP

Dated:  9/30/2025              By:   */s/ Leo Lam*
                                    Leo L. Lam (*Pro Hac Vice Forthcoming*)
                                    llam@keker.com
                                    Laurie Carr Mims (*Pro Hac Vice Forthcoming*)
                                    lmims@keker.com
                                    Sarah Salomon (*Pro Hac Vice Forthcoming*)
                                    ssalomon@keker.com
                                    Charlotte Kamai (*Pro Hac Vice Forthcoming*)
                                    ckamai@keker.com
                                    Kelly M. Hernandez (*Pro Hac Vice Forthcoming*)
                                    khernandez@keker.com
                                    633 Battery Street
                                    San Francisco, CA 94111-1809
                                    Telephone: (415) 391-5400
                                    Facsimile: (415) 397-7188

ASIAN LAW CAUCUS

Dated: 9/30/2025              By:   */s/ Joshua Rosenthal*

Joshua Rosenthal (*Pro Hac Vice Forthcoming*)
joshr@asianlawcaucus.org
Dorothy Chang (*Pro Hac Vice Forthcoming*)
dorothyc@asianlawcaucus.org
55 Columbus Ave
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

Attorneys for Plaintiffs