UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS, NATIONAL PARENTS UNION, NATIONAL KOREAN AMERICAN SERVICE AND EDUCATION CONSORTIUM, & UNDOCUBLACK NETWORK,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT BESSENT, SECRETARY OF THE TREASURY, et al.,<br><br>Defendants. | Case No. 1:25-cv-12822-IT |

**DECLARATION OF REBECCA BELCORE**
**CO-EXECUTIVE DIRECTOR, NATIONAL KOREAN AMERICAN SERVICE & EDUCATION CONSORTIUM**

I, Rebecca Belcore, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Co-Executive Director of the National Korean American Service & Education Consortium ("NAKASEC"). NAKASEC is a national organization that organizes and serves Korean and Asian Americans and immigrants through a network of local grassroots affiliates. We uplift the voices of our most marginalized community members so that they are heard at the local and national level. NAKASEC has over 400 volunteers and 55,000 members primarily in Illinois, New Jersey, New York, Pennsylvania, Texas, and Virginia.

2. I have been NAKASEC's Co-Executive Director for over eight years, but I have been involved in NAKASEC for almost 30—first, as a volunteer and working my way up to my current role. As the Co-Executive Director, I oversee NAKASEC's work, guiding our strategic

mission for achieving justice for immigrants in a way that is responsive to community needs and consistent with our legal obligations as a nonprofit organization.

**NAKASEC's Mission and Activities**

3. NAKASEC's mission is to organize Korean and Asian Americans to achieve social, racial, and economic justice by engaging multigenerational Korean and Asian Americans and immigrants, including undocumented immigrants. We believe in grassroots organizing that centers the experiences and voices of those who are most impacted by systems of social, racial, and economic inequities, and we use a holistic model that includes social services, linguistically and culturally competent community education, community organizing, advocacy, civic engagement, and leadership development.

4. Local community members can become a member of NAKASEC by signing up for our email and mailing lists, donating funds, participating in civic activities, and organizing events. Individuals can become members of NAKASEC either through their involvement in one of its affiliates or through direct engagement with the national organization.

5. Our model engages members both locally and nationally. At the local level, NAKASEC's five affiliates offer critical social services and educational programs to members. We help connect members to public benefits like food stamps and energy assistance, run English language classes, participate in workforce development, and educate people on their rights. Currently, much of our work focuses on know-your-rights presentations for immigrants that seek to inform immigrants about the constitutional and legal protections afforded to them.

6. Local affiliates also engage in organizing campaigns that reflect local needs and goals. In Illinois, our local affiliate was part of a coalition that championed the 2017 TRUST Act that limits state and local law enforcement involvement in civil immigration enforcement activities by Immigration and Customs Enforcement ("ICE").

7. At the national level, our central focus is to win a pathway to citizenship for all immigrants through peaceful, and nonviolent advocacy. We were founded in 1994, by undocumented immigrants and others, to build a movement around federal immigration policy.

We have a long history of organizing on citizenship for all, including successfully fighting for the creation of the Deferred Action for Childhood Arrivals ("DACA") program.

8. Today, Korean Americans are the largest group of Asian American and Pacific Islander recipients of DACA. A crucial part of our work is also advocating for citizenship for Korean adoptees, who may not have status because their naturalization process was never completed following their adoptions. While a 2000 federal law now grants automatic citizenship to international adoptees, many Korean adoptees who were brought to the United States fell outside of the bill's age cutoff. They remain in limbo.

9. As part of NAKASEC's work to educate community members at the local level and to support our national organizing efforts around citizenship, we created a bilingual English-Koren guide about Individual Tax Identification Numbers ("ITINs"). This guide was available on our website until recently. We also had an educational video guide that was available until recently, and local affiliates held workshops and clinics to provide in-person assistance. Our materials helped people who were ineligible for a Social Security Number ("SSN") to apply for an ITIN, regardless of immigration status, so that they could file their taxes and access banking services.

10. The materials we created reflected our understanding that immigrant taxpayers could provide information without fear that it would be shared with immigration enforcement. We also believed, and advised our members, that obtaining an ITIN and filing taxes regularly was not only the right thing to do legally, but that it could help individuals in their later efforts to regularize their immigration status.

**Harm to NAKASEC's Members**

11. As set forth in further detail below, the Internal Revenue Service ("IRS") and Social Security Administration's ("SSA") decisions to share confidential tax return information with ICE have irreparably harmed and will continue to harm NAKASEC's members and the immigrant communities it serves because those members are now at risk of ICE arrest, detention, and removal.

12. Robin Roe is an active member of NAKASEC who lives in New Jersey. They came to the United States as a child. For a period, they were a dependent on their parents' visas. They aged out of dependent status but did so after the date that would make them eligible for DACA. Therefore, they were unable to obtain deferred action and work authorization through that route.

13. Roe learned of NAKASEC from a friend and joined the organization over five years ago in a march for the rights of immigrant youth. Since then, they have remained actively involved. Roe is an important resource who connects community members to programs and shares information. Since college, they have worked as an independent translator and a consultant, filing annual tax returns and quarterly estimates using an ITIN.

14. However, in light of the news that IRS is sharing information with ICE, they are unsure how to comply with their tax obligations. Among other concerns, they recently moved and are hesitant to provide a new home address to an agency that may share it with ICE. They worry that if they were to be arrested, detained, or removed, there would be no one to financially support their elderly parents, who are low-wage restaurant workers with serious health conditions. Roe also fears that their name—which is Korean—could be easily misspelled, leading to false matches by ICE.

15. Alex Doe is a member of NAKASEC who lives in California. They have been a member of NAKASEC for almost a decade and are a regular participant in our support groups. Doe came to the United States as a child. Despite efforts by them and their family to obtain status, including Special Immigrant Juvenile Status, they were unable to successfully do so before turning 21. Since college, they have worked as a tutor and a consultant, in addition to running a small retail business. They pay file their tax returns using an ITIN; now, they are concerned that IRS will share their information with ICE.

16. Countless other members are also impacted by the IRS and SSA's information sharing with ICE. Because the IRS conducts searches for ICE using only an individual's name and former address when they do not have an ITIN or SSN, there is a substantial risk of

mismatching. That is, there is a substantial risk that the IRS will incorrectly match a taxpayer to a name in ICE's request. About 45 percent of Koreans share one of three surnames, "Kim," "Lee," or "Park,"[1] with "Kim" alone accounting for about 22 percent of all Korean surnames.[2] The high incidence of common surnames creates a high risk of a false positives during the information sharing process. NAKASEC's members face serious consequences like detention or deportation simply because their surnames are widespread among Koreans.

17. The harms that will result from the removals carried out using information shared by the IRS and SSA are immeasurable. Most of our members came to the United States at a very young age; they do not speak the Korean language fluently or at all nor do they understand Korean cultural norms—all of which is isolating. These difficulties will be felt acutely for adoptees, who came to the U.S. as babies and often do not have familial connections in Korea.

18. Once deported, members' chances of finding a full-time job in their new country are unlikely, leading to homelessness and instability. One member—a deported adoptee—has eked out a living in Korea on odd jobs for the last decade, finding shelter at churches to get by; he is never able to hold down a job for more than a few months because of his lack of language capacity. Phillip Clay's story from over a decade ago was similar; a deported Korean adoptee, he was unable to speak Korean, and once deported, he could not communicate with others or keep a job. He eventually died by suicide.[3]

19. Removal also means families are being ripped apart, and people lose one of their most important support systems. Most of our members have their entire family in the U.S.—and their own U.S. citizen children and spouses—and any family that they have in Korea are

---

[1] Moon Ki-hoon, *What's in a name? How Koreans faked their way to Kim, Lee, and Park*, KOREA HERALD (Oct. 22, 2024), https://www.koreaherald.com/article/3829184.

[2] Choi Sung-jin, *Kim, Lee, Park remain three most common surnames*, KOREA TIMES (Sep. 17, 2016), https://www.koreatimes.co.kr/southkorea/20160917/kim-lee-park-remain-three-most-common-surnames.

[3] Chris Fuchs, *Deported Adoptee's Death Heightens Calls for Citizenship Bill*, NBC NEWS (June 2, 2017), https://www.nbcnews.com/news/asian-america/deported-adoptee-s-death-heightens-calls-citizenship-bill-n767341.

unknown to them. Based on our experience, without any safety networks to support these individuals, the ordeals experienced from living in a new country without knowledge of the language or culture can culminate in a mental health crisis. Members are also traumatized by having no idea when and if they will be able to see their family members again.

20. Beyond emotional trauma, removal also carries a financial cost. For example, families that lose their one member with DACA lose their main, most stable stream of income, because no one else in the family has work authorization. The financial instability caused by removal is especially dire for these families, as most DACA recipients are now older and the main caretakers for their elderly parents. Many of our DACA recipients' parents also get sicker faster; they typically worked low-wage jobs that were hard on their bodies and did so without ready access to healthcare. Even now, depending on the state, access to healthcare for undocumented immigrants varies. This can create an enormous additional financial burden, making financial stability even more precarious for these families.

21. Even beyond the threat of arrest, detention, and removal, members are harmed by the IRS and SSA's data sharing with ICE. The data-sharing essentially discourages immigrants from obtaining or using an ITIN. ITINs create opportunities to engage in professional work for a living wage, on an independent-contractor basis, notwithstanding a lack of work authorization. IRS and SSA's cooperation with ICE pushes workers back into the underground economy, forcing people to work under the table for whatever they can. It creates a system ripe for workplace abuses, including wage theft and retaliation based on immigration status.

22. Members also now face an impossible catch-22: file their taxes for the potential future hope of being able to regularize their status, while exposing themselves to possible deportation because of IRS and SSA's data-sharing, or protect their information by refraining from filing, even as this will undermine their hope of regularization in the future. Adjustment of status, including naturalization, requires "good moral character," and NAKASEC has encouraged people to file their taxes in the past to demonstrate that they are responsible members of our communities.

23. The threat of deportation also takes a heavy toll on our younger members. Unable to see a future for themselves, some are in a state of despair; they have their bags packed for possible self-deportation. Even though they grew up here and their friends and families are all here, many young members in their 20s no longer see a path forward for themselves in the only place that they have known as home.

24. NAKASEC's members have gone to school in the U.S., made friends in their communities, started families, and built businesses from the ground up. Relying on IRS's promises that their confidential tax information was safe, these members did the right thing by filing their taxes. But IRS and SSA's data sharing with ICE unexpectedly and without any opportunity to object rips the rug out from under them. NAKASEC's members have been and continue to be irreparably harmed, them and their loved ones to arrest, detention, and deportation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11/3/25

Chicago, IL

______________________________

Rebecca Belcore