# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS, NATIONAL PARENTS UNION, NATIONAL KOREAN AMERICAN SERVICE AND EDUCATION CONSORTIUM, & UNDOCUBLACK NETWORK, <br><br> Plaintiffs, <br><br> v. <br><br> SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service and Secretary of the Treasury; DEPARTMENT OF THE TREASURY; INTERNAL REVENUE SERVICE; FRANK BISIGNANO, Commissioner of the Social Security Administration; SOCIAL SECURITY ADMINISTRATION; KRISTI NOEM, Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, <br><br> Defendants. | Civil Action No. 25-cv-12822-IT |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR RELIEF UNDER 5 U.S.C. §§ 705, 706 OR, IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ...................................................................................................2

    A.    Congress enacted strict confidentiality protections for tax data. ............................2

    B.    The Treasury Department and DHS begin sharing tax data under an MOU. ..........2

    C.    SSA begins cooperating with ICE on data sharing. .................................................4

    D.    Plaintiffs and their members are being irreparably harmed. ....................................4

III.  LEGAL STANDARD..............................................................................................6

IV.   ARGUMENT ...........................................................................................................7

    A.    Plaintiffs will likely succeed on the merits of their claims. ....................................7

        1.    Defendants' data-sharing arrangements violate the APA. ...........................7

            a.    Defendants engaged in final agency action. ....................................7

            b.    Defendants' data-sharing arrangements are contrary to law...........8

            c.    The data-sharing arrangements are arbitrary and capricious. ........10

        2.    The data-sharing arrangements vitiate First Amendment rights...............12

        3.    The data-sharing arrangements are ultra vires. .........................................14

    B.    Absent preliminary relief, Plaintiffs will continue to suffer irreparable injuries, which are Article III injuries. ...................................................................15

    C.    The balance of equities and public interest strongly favor preliminary relief. .........................................................................................................................18

    D.    Preliminary relief is a necessary and appropriate remedy. ....................................19

V.    CONCLUSION......................................................................................................20

3245494

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*A.B.-B. v. Morgan*,
    548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................................18

Airbnb, Inc. v. City of New York,
    373 F. Supp. 3d 467 (S.D.N.Y. 2019) .....................................................................17

Am. Ass'n of Univ. Professors v. Rubio,
    780 F. Supp. 3d 350 (D. Mass. 2025) .....................................................................17

Ams. for Prosperity Found. v. Bonta,
    594 U.S. 595 (2021) ...........................................................................................12, 13

Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.,
    187 F. Supp. 3d 217 (D. Mass. 2016) .....................................................................17

Ass'n of Am. Universities v. Dep't of Def.,
    2025 WL 2899765 (D. Mass. Oct. 10, 2025) ..........................................................19

Ass'n of Am. Univs. v. Dep't of Def.,
    2025 WL 2022628 (D. Mass. July 18, 2025) .......................................................6, 20

Bennett v. Spear,
    520 U.S. 154 (1997) .............................................................................................7, 8

Boy Scouts of Am. v. Dale,
    530 U.S. 640 (2000) ...........................................................................................12, 13

Center for Taxpayer Rights v. Internal Revenue Service,
    No. 1:25-cv-00457-CKK (D.D.C. filed Feb. 17, 2025) ..............................................3

Centro de Trabajadores Unidos v. Bessent,
    No. 25-5181 (D.C. Cir. May 21, 2025) .....................................................................9

Centro de Trabajadores Unidos v. Bessent,
    2025 WL 1380420 (D.D.C. May 12, 2025) ...............................................................9

Corp. Techs., Inc. v. Harnett,
    943 F. Supp. 2d 233 (D. Mass.), aff'd, 731 F.3d 6 (1st Cir. 2013) .........................17

CVS Pharmacy, Inc. v. Lavin,
    951 F.3d 50 (1st Cir. 2020) ....................................................................................18

ii

Dep't of Com. v. New York,
  588 U.S. 752 (2019) ............................................................................................9

Doe v. Trump,
  2025 WL 2814730 (1st Cir. Oct. 3, 2025) ........................................................20

EEOC v. Astra USA, Inc.,
  94 F.3d 738 (1st Cir. 1996) ...............................................................................15

Encino Motorcars, LLC v. Navarro,
  579 U.S. 211 (2016) .....................................................................................10, 11

F.C.C. v. Fox Television Stations, Inc.,
  556 U.S. 502 (2009) ..........................................................................................11

F.C.C. v. NextWave Pers. Commc'ns Inc.,
  537 U.S. 293 (2003) ............................................................................................8

F.C.C. v. Prometheus Radio Project,
  592 U.S. 414 (2021) ..........................................................................................10

In re Fin. Oversight & Mgmt. Bd. for P.R.,
  110 F.4th 295 (1st Cir. 2024) ...........................................................................18

Grant v. Trial Ct.,
  784 F. Supp. 3d 475 (D. Mass. May 28, 2025) ................................................18

Harper v. Werfel,
  118 F.4th 100 (1st Cir. 2024) .............................................................................7

Havens Realty Corp. v. Coleman,
  455 U.S. 363 (1982) ..........................................................................................18

Hernandez v. Sessions,
  872 F.3d 976 (9th Cir. 2017) ............................................................................16

Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.,
  496 F. Supp. 3d 600 (D. Mass. 2020) ..............................................................19

Me. Forest Prods. Council v. Cormier,
  51 F.4th 1 (1st Cir. 2022) ...................................................................................6

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ............................................................................................11

NAACP v. Alabama,
  357 U.S. 449 (1958) ..........................................................................................14

iii

NAACP v. Button,
    371 U.S. 415 (1963) ................................................................................................ 13

Nat'l Educ. Ass'n v. U.S. Dep't of Educ.,
    779 F. Supp. 3d 149 (D.N.H. 2025) ....................................................................... 17

Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury,
    838 F. Supp. 631 (D.D.C. 1993) ............................................................................ 17

New York v. Kennedy,
    789 F. Supp. 3d 174 (D.R.I. 2025) ...................................................................... 6, 19

New York v. McMahon,
    784 F. Supp. 3d 311 (D. Mass. 2025) ................................................................ 14, 15

Nicholas v. N.H. Dep't of Fish & Game, Exec. Dir.,
    2024 WL 1348817 (D.N.H. Mar. 28, 2024) ........................................................... 13

Nken v. Holder,
    556 U.S. 418 (2009) .................................................................................................. 6

Noem v. Abrego Garcia,
    145 S. Ct. 1017 (2025) ........................................................................................... 11

Nuclear Regul. Comm'n v. Texas,
    605 U.S. 665 (2025) ................................................................................................ 14

Orr v. Trump,
    778 F. Supp. 3d 394 (D. Mass. 2025) .................................................................... 19

Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem,
    2025 WL 1825431 (D.D.C. July 2, 2025) ............................................................. 20

Rio Grande Cmty. Health Ctr., Inc. v. Rullan,
    397 F.3d 56 (1st Cir. 2005) ..................................................................................... 15

Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,
    102 F.3d 12 (1st Cir. 1996) ..................................................................................... 16

S.S. by S.Y. v. City of Springfield,
    332 F. Supp. 3d 367 (D. Mass. 2018) .................................................................... 18

Sindicato Puertorriqueno de Trabajadores v. Fortuno,
    699 F.3d 1 (1st Cir. 2012) ....................................................................................... 18

Smith v. Trump,
    2025 WL 2021785 (D. Me. July 18, 2025) ............................................................ 18

Trafalgar Cap. Assocs., Inc. v. Cuomo,
  159 F.3d 21 (1st Cir. 1998)........................................................................8

Trump v. CASA, Inc.,
  606 U.S. 831 (2025)..............................................................................19

U.S. Army Corps of Eng'rs v. Hawkes Co.,
  578 U.S. 590 (2016)................................................................................7

URI Student Senate v. Town of Narragansett,
  631 F.3d 1 (1st Cir. 2011)......................................................................12

Venetian Casino Resort, LLC v. EEOC,
  530 F.3d 925 (D.C. Cir. 2008).................................................................7

Victim Rts. L. Ctr. v. U.S. Dep't of Educ.,
  788 F. Supp. 3d 70 (D. Mass. 2025).....................................................14

Webb v. Injured Workers Pharmacy, LLC,
  72 F.4th 365 (1st Cir. 2023)..................................................................18

Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,
  778 F. Supp. 3d 440 (D.R.I. 2025).........................................................19

**Federal Statutes**

5 U.S.C. § 701 et. seq............................................................... *passim*

8 U.S.C. § 1253.....................................................................................3

8 U.S.C. § 1253(a)(1)(A)......................................................................9

26 U.S.C. § 6103......................................................................... *passim*

42 U.S.C. § 1306...................................................................................4

42 U.S.C. § 1306(a)(1)..........................................................................2

**Regulations**

20 C.F.R. § 401.125..............................................................................4

26 C.F.R. § 301.6109-1(b)(2), (d)(3).....................................................6

**Constitutional Provisions**

First Amendment ........................................................................1, 12, 18

## I.    INTRODUCTION

Protecting the confidentiality of taxpayer information, regardless of taxpayer immigration status, is critical to ensuring compliance with tax law. Congress thus enacted 26 U.S.C. § 6103 to prohibit disclosure of taxpayer information by any federal agency including Defendants here—the Internal Revenue Service ("IRS"), Social Security Administration ("SSA"), and Department of Homeland Security ("DHS"). Nothing in § 6103 or related statutes permits disclosure or use of tax-return information to locate immigrant taxpayers for purposes of civil immigration enforcement. Yet, the IRS and SSA recently agreed to scour their files for confidential immigrant taxpayer information to share with DHS and the Immigration and Customs Enforcement Agency ("ICE"), which in turn declared its intent to use such information to find immigrants, enforce civil immigration laws, and deport taxpayers. The IRS and SSA have shared location information for **tens of thousands** of immigrant taxpayers with ICE.

The IRS, SSA, and ICE's data sharing, policies, and practices—collectively, the "data-sharing arrangements"—are unlawful and violate longstanding protections for confidential taxpayer information. Defendants' conduct and policies have caused irreparable harm to Plaintiffs Community Economic Development Center of Southeastern Massachusetts ("CEDC"), National Parents Union ("NPU"), National Korean American Service and Education Consortium ("NAKASEC"), and UndocuBlack Network ("UBN"), chilling Plaintiffs' members from filing tax returns and from exercising their First Amendment rights to associate freely.[1] For these reasons and as explained below, the Court should vacate the data-sharing arrangements and order Defendants to pause any related practices until resolution of this litigation on the merits.

_____

[1] Each Plaintiff brings a First Amendment claim based on its members' First Amendment rights. CEDC additionally brings a claim based on its own First Amendment rights as an organization. Doc. No. 1 ¶¶ 173–79.

## II.    BACKGROUND

### A.    Congress enacted strict confidentiality protections for tax data.

Congress has long established strict confidentiality to protect tax-related information. Doc. No. 1 ¶¶ 36–40.[2] In response to President Nixon's use of IRS information to target opponents, Congress enacted 26 U.S.C. § 6103 to make tax returns and related data confidential and has continually reinforced taxpayer privacy since then. Id. ¶¶ 36–55; see also 26 U.S.C. § 7803(a)(3)(H) (2014 Taxpayer Bill of Rights ensures all taxpayers' "right to confidentiality."). The same protections extend to information held by agencies like SSA, which receives tax data to administer benefits programs. 26 U.S.C. § 6103; 42 U.S.C. § 1306(a)(1). The IRS, DHS, and Department of Treasury have repeatedly committed to immigrant tax filers that their data cannot lawfully be shared for immigration enforcement purposes. Doc. No. 1 ¶¶ 47–59.

### B.    The Treasury Department and DHS begin sharing tax data under an MOU.

On April 7, 2025, the Treasury and DHS entered a Memorandum of Understanding ("MOU") authorizing the sharing of IRS taxpayer data with ICE. Doc. No. 1-1. The MOU prescribes disclosing taxpayer data to "identify, exclude, or remove aliens illegally present in the United States," targeting individuals with final orders of removal. MOU §1(b)-(c) (citing 8 U.S.C. § 1253(a)(1) which addresses such individuals). To date, ICE has requested addresses for over 7.6 million taxpayers. Declaration of Leo Lam, Doc. No. 28, Ex. 1 at TD_1–5, TD_86. After the IRS denied two requests, ICE then asked for 1.2 million taxpayers' data—many without corroborating identifiers required by § 6103—and the IRS provided information for 47,289 taxpayers in August 2025. Id. at TD_145. Multiple IRS officials have resigned in protest or were fired for refusing to implement the MOU. Doc. No. 1 ¶¶ 64–65, 77.

---

[2] All internal citations, quotations, and alterations are omitted unless otherwise noted.

MOU § 2 asserts that this unprecedented data sharing is permissible under a narrow exception to § 6103's confidentiality protections, which permits disclosure of "return information other than taxpayer return information" for purposes of criminal investigations. (citing 26 U.S.C. § 6103(i)(2); 8 U.S.C. § 1253). While 8 U.S.C. § 1253 does include criminal penalties for "willfully" refusing to depart after a final order of removal, numerous situations permit individuals with final orders of removal to *remain lawfully* in the U.S. *See* Declaration of Bill Ong Hing, Doc. No. 29 ¶¶ 28–37. Indeed, criminal prosecutions under 8 U.S.C. § 1253 are exceedingly rare, and Congress explicitly considered and declined to criminalize presence in the country without immigration status. Id. ¶¶ 44–48; Doc. No. 1 ¶ 83. Yet ICE has indiscriminately sought data for nearly everyone with a final order. Doc. No. 28-1 at TD_145. The MOU therefore is plainly intended for civil immigration enforcement. MOU § 1(a). Defendants' brazen violation of nearly 50 years of settled precedent governing the confidential treatment of tax information is clearly unlawful.

The MOU and the subsequent IRS-ICE Implementation Agreement, dated April 18, 2025, provide scant detail regarding implementation. Doc. No. 1-2. Only the recently available Administrative Record[3] ("AR") reveals how Defendants' data sharing will likely result in errors and allows disclosure of taxpayer information in violation of statutory protections. Doc. No. 28-1. Under § 6103(i)(2)(A), taxpayer data may be shared only with agency employees "personally and directly engaged in" the criminal investigation at issue. Stretching credibility, ICE has identified but *one agent* supposedly personally engaged in the "criminal investigations" that

---

[3] Filed concurrently with this brief are excerpts from the AR in a parallel action, which does not include SSA, DHS, or ICE Defendants, Center for Taxpayer Rights v. Internal Revenue Service, No. 1:25-cv-00457-CKK (D.D.C. filed Feb. 17, 2025). Doc. No. 28-1.

justify all 1.2 million requests—a high-level official within an ICE division with scarce history of conducting criminal investigations. Doc. No. 28-1 at TD_84, TD_100–102; Declaration of Deborah Fleischaker, Doc. No. 30 ¶¶ 27–31.

### C.    SSA begins cooperating with ICE on data sharing.

SSA has also agreed to share data with ICE. Doc. No. 1 ¶¶ 95–104. SSA receives taxpayer data from contributors who pay into Social Security via payroll and self-employment taxes. This data constitutes "return information" under 26 U.S.C. § 6103 and is protected from disclosure. See also 42 U.S.C. § 1306; 20 C.F.R. § 401.125 (confidentiality protections for return information in SSA's possession); Doc. No. 1 ¶¶ 96–97. Yet in February 2025, the Acting Social Security Administrator authorized disclosure of 98,000 taxpayer addresses to ICE. Id. ¶ 98.

On August 26, 2025, SSA Chief Data Officer Charles Borges revealed that SSA political appointees repeatedly violated privacy laws, including § 6103. Id. ¶¶ 99–100. The next day, SSA documented its data-sharing arrangement with ICE. Doc. No. 1-4. The SSA Letter authorizes ICE to send monthly data requests for 50,000 immigrants for whom SSA will share aliases, home addresses, and emails. Id. ***Nothing in the SSA Letter indicates SSA and ICE will follow § 6103***. Rather, the SSA Letter's express purpose is for SSA to share taxpaying immigrants' "identity and location information" to facilitate their deportation by ICE. Id. at 1.

### D.    Plaintiffs and their members are being irreparably harmed.

Plaintiffs are organizations that advocate for immigrants' rights and support members with tax, legal, and community-based services. CEDC is a community-development organization that promotes economic justice for its many immigrant members. Declaration of Corinn Williams, Doc. No. 31. CEDC assists members with immigration and tax issues, enabling them to participate in the American economy and society. Id. ¶¶ 10–18 (immigration), ¶¶ 19–34 (tax). NPU members promote the rights and welfare of parents and families, including advocating for

expanding the Child Tax Credit to immigrant families. Declaration of Keri Rodrigues, Doc. No. 32 ¶ 11. NAKASEC and UBN members similarly promote immigrants' rights, share knowledge and resources, and support members. Declaration of Rebecca Belcore, Doc. No. 33; Declaration of Patrice Lawrence, Doc. No. 34.

Defendants' data-sharing arrangements have wreaked havoc on the lives of Plaintiffs' members. These individuals have complied with tax laws and now fear that filing returns will prompt ICE to locate and deport them. They also fear asking questions or sharing resources within their organizations. Some of Plaintiffs' members hope to adjust their immigration status, for which tax compliance is a criticl display of good moral character. Doc. No. 29 ¶ 43. They face the dilemma of choosing between providing ICE with data that risks their deportation or undermining their chances of someday naturalizing by not filing returns. Some members are hurt financially by not claiming the Child Tax Credit. Doc. No. 32 ¶¶ 11, 24. Others, whose names are common among immigrant communities, fear that they will be confused with ICE targets or that the IRS and SSA's data systems will confuse their common or transliterated names. Doc. No. 33 ¶¶ 16–17 & nn. 1–2. Still others fear for their children, spouses, and family members with fragile immigration statuses who share their home addresses. Doc. No. 34 ¶¶ 23–25.

As a Volunteer Income Tax Assistance ("VITA") site, CEDC suffers additional injuries caused by the IRS and SSA's data sharing, undermining the very premise CEDC relied upon to build its tax programs. Doc. No. 31 ¶¶ 32–33, 35–36. CEDC established a VITA program to provide tax filing assistance to low-income members, including immigrants, because the IRS repeatedly committed to keeping taxpayer data confidential. Id. ¶¶ 25, 30, 32–33. CEDC would have used its limited resources in other ways had it known its clients' confidential information would be shared for immigration enforcement. Id. ¶ 34; see also id. ¶¶ 21–23. The IRS's conduct

has undermined years of trust-building, damaged CEDC's credibility, and forced staff to divert time and resources to repair the damage. Id. ¶¶ 35–38. And because CEDC receives funding based on the number of tax returns and applications for Individual Taxpayer Identification Numbers ("ITINs"),[4] CEDC faces significant financial harm due to non-participation of members who rightly fear this data sharing. Id. ¶¶ 38–39.

## III.    LEGAL STANDARD

The Court should grant postponement of agency action under 5 U.S.C. § 705, vacatur under 5 U.S.C. § 706(2), and/or a preliminary injunction where "the balance of four factors tips in their favor: a likelihood of success on the merits; . . . irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships"; "and the effect . . . that either a preliminary injunction or the absence of one will have on the public interest." Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 5 (1st Cir. 2022). The last two factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). So long as one claim is likely to succeed, a court may grant injunctive relief. New York v. Kennedy, 789 F. Supp. 3d 174, 201 (D.R.I. 2025). The same standard governs 5 U.S.C. § 705 requests to postpone agency action, see Ass'n of Am. Univs. v. Dep't of Def., 2025 WL 2022628, at *13 (D. Mass. July 18, 2025) (collecting cases), and 5 U.S.C. § 706(2) requests for preliminary vacatur of agency action, see Kennedy, 789 F. Supp. 3d at 201–13.

---

[4] The IRS has issued ITINs since 1996 to ensure tax compliance by individuals ineligible for Social Security Numbers ("SSNs"). 26 C.F.R. § 301.6109-1(b)(2), (d)(3); see also Doc. No. 29 ¶¶ 38–43 (describing noncitizen eligibility for SSNs and ITINs).

IV.    **ARGUMENT**

A.    **Plaintiffs will likely succeed on the merits of their claims.**

1.    **Defendants' data-sharing arrangements violate the APA.**

Defendants' data-sharing arrangements contravene the relevant statutes and regulations and are arbitrary and capricious under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2).

a.    **Defendants engaged in final agency action.**

As Judge Kollar-Kotelly recently held, the data-sharing arrangements are final agency actions subject to judicial review.[5] 5 U.S.C. § 704. Courts take a "'pragmatic' approach" to determine finality. U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 599 (2016). Final agency action is found not only in documents governing agency conduct but also in practices related to the conduct itself. See Venetian Casino Resort, LLC v. EEOC, 530 F.3d 925, 930–31 (D.C. Cir. 2008) (an agency's "adoption" of a policy to act in a certain way, rather than particular documents reflecting that policy, constituted final agency action).

The arrangements (1) mark the "consummation of the agency's decisionmaking process," and (2) determine "rights or obligations" and create legal consequences. Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). *First*, that the agencies have acted pursuant to the data-sharing arrangements reflects there is nothing "tentative or interlocutory" about their decisions. The arrangements are the endpoint of decision making, see Bennett, 520 U.S. at 178, and later adjustments to data-sharing processes would "not make an otherwise [final action] nonfinal," U.S. Army Corps of Eng'rs, 578 U.S. at 598–99.

_____

[5] Doc. No. 24-2, ("Min. Order, Ctr. for Taxpayer Rights") ("Plaintiffs have shown a substantial likelihood that the IRS has taken final agency action by adopting and implementing a policy of disclosing the addresses of tens of thousands of taxpayers to [ICE].").

*Second*, the data-sharing arrangements have immediate "legal consequences" that affect Plaintiffs' members and other immigrant taxpayers' rights. Bennett, 520 U.S. at 178; see also Trafalgar Cap. Assocs., Inc. v. Cuomo, 159 F.3d 21, 35 (1st Cir. 1998). ICE submitted more than one million names to the IRS, which returned over 47,000 addresses. Doc. No. 28-1 at TD_145–46. Likewise, SSA shared with ICE the addresses of 98,000 immigrants in February and recently agreed to share up to 50,000 more each month. The moment the IRS and SSA provide data, and ICE receives it for use in arrests and removals, the agencies breach the confidentiality guaranteed by 26 U.S.C. § 6103(b)(2)(A). These wholesale and unlawful disclosures place immigrant taxpayers at heightened risk for civil immigration enforcement, including raids, detention, and removal—which have further immediate and concrete legal consequence and impact to rights and obligations. Bennett, 520 U.S. at 177–78.

> **b.    Defendants' data-sharing arrangements are contrary to law.**

The data-sharing arrangements violate 26 U.S.C. § 6103. The APA "requires" courts to set aside agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." F.C.C. v. NextWave Pers. Commc'ns Inc., 537 U.S. 293, 300 (2003).

Section 6103 states unequivocally that "returns and return information shall be confidential" and "no officer or employee of the United States . . . shall disclose" them. None of the very narrow exceptions apply here. Id. § 6103(a). The government's reliance § 6103(i)(2) is misplaced. That subsection allows for data disclosure only for *criminal* investigations and only when the requesting agency *already* has the taxpayer's address and seeks "return information." Id. § 6103(i)(2)(B)(i)–(iv) (request must include the taxpayer's "address" and show relevance to "such proceeding or investigation"); Doc. No. 28-1 at TD_4–5. The unlawful data-sharing arrangements here flip the statute on its head: ICE seeks addresses precisely because it lacks

them and because it wishes to pursue large-scale *civil* immigration detention and deportation, not bona fide criminal prosecutions.[6]

The data-sharing arrangements also fail to comply with the plain text of § 6103. *First*, ICE incredulously claims compliance with § 6103(i)(2)(A) by stating a *single official* is somehow "personally and directly engaged" in criminal investigations of over one million people. Doc. No. 28-1 at TD_100–102; Doc. No. 30 ¶¶ 27–31. And not only does the Implementation Agreement lack any safeguards required by § 6103 against internal redisclosure, but also the IRS in April 2025 *removed* safeguards from its policy manual for handling § 6103(i)(2) requests, including verifications and audit-trail requirements. Doc. No. 1 ¶¶ 124–25. *Second*, although ICE claims to be "investigating" non-citizens for alleged violations of 8 U.S.C. § 1253(a)(1)(A)—which applies only to those who remain more than 90 days after a final removal order—it nevertheless sent requests for individuals whose removal orders are less than 90 days old and who therefore cannot be in violation of § 1253(a). Doc. No. 28-1 at TD_145. Defendants' statements in the MOU that the data sharing complies with § 6103(i)(2) are self-serving and plainly "contrived." Dep't of Com. v. New York, 588 U.S. 752, 756 (2019).

SSA has also agreed to provide ICE with identity and location data—information that it receives primarily through income tax records that SSA is required to protect under § 6103. Even more egregiously than ICE, SSA has not even attempted to invoke any exception to § 6103, instead saying the data will be kept "only as long as necessary." Doc. No. 1-4. But the SSA

---

[6] While another district court denied preliminary injunction based on a misinterpretation of § 6103(i)(2) permitting the IRS to disclose taxpayer addresses to ICE without a court order, we submit this was an error. See Centro de Trabajadores Unidos v. Bessent, 2025 WL 1380420 at *6–7 (D.D.C. May 12, 2025). This misinterpretation ignored § 6103(i)(2)(B)(i)'s requirement that law enforcement already possess the taxpayer's address and ignored IRS policy barring address-only disclosures absent judicial authorization. See Doc. No. 1 ¶¶ 111–23. An appeal is pending. Centro de Trabajadores Unidos v. Bessent, No. 25-5181 (D.C. Cir. May 21, 2025).

Letter expressly admits that the purpose of SSA's data sharing is identifying, locating, and deporting immigrants who comply with tax laws. Id.

      **c.**      **The data-sharing arrangements are arbitrary and capricious.**

Even if the disclosure of some addresses were permissible under § 6103, Defendants' data sharing is arbitrary and capricious and should be set aside. 5 U.S.C. § 706(2)(A). Indeed, the data-sharing arrangements contravene the tax system's core purpose, which is to promote speedy, unimpeded tax collection.

*First*, Defendants ignored "serious reliance interests" and provided no explanation for reversal of Defendants' own assurances that immigrants' tax data would be protected. Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 222, 224 (2016). For decades, immigrant taxpayers, employers, VITA sites, and other community organizations have relied on the IRS's repeated assurances and interpretation that § 6103 prohibits sharing taxpayer data for civil immigration enforcement. This reliance has been the bedrock of tax compliance for millions of immigrants, who contribute billions of dollars in federal revenue yearly. Doc No. 28-2. The data-sharing arrangements have shattered that trust. The Administrative Record reveals that the government did not consider the deterrence of tax filings, resulting loss of federal revenue and state tax receipts, or increased burdens on community VITA sites forced to counsel clients without clear answers, see Doc. No. 31 ¶¶ 35–38.

The data-sharing practices are likewise not "reasonable [or] reasonably explained." F.C.C. v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). Defendants fail to even acknowledge their reversal of longstanding IRS policy that data requests seeking "only a taxpayer's address" are "invalid" under § 6103(i)(2), yet the data-sharing arrangements authorize precisely that—wholesale disclosure of millions of addresses—without "good reasons for the new policy." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009); see also Encino

Motorcars, 579 U.S. at 222 ("unexplained inconsistency" with earlier position renders new policy arbitrary and capricious). And the breakneck speed at which Defendants have implemented data sharing, despite pushback from the IRS's own legal counsel about the ongoing lack of compliance with § 6103, is entirely unreasonable. Doc. No. 28-1 at TD_3–5; TD_93; TD_115–18. Indeed, the speed and urgency, for no apparent reason, add serious risk of error to the data-sharing process. This is the very definition of arbitrary.

*Second*, Defendants "entirely failed to consider" several "important aspect[s] of the problem." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). For example, ICE requested data for nearly every immigrant with a final order of removal, Doc. No. 28-1 at TD_145, assuming they are violating criminal law by not leaving, but Defendants ignore that even immigrants with final orders may reside ***lawfully*** in the country.[7] Doc. No. 29 ¶¶ 28–37. Additionally, Defendants overlook the extraordinary risk of error inherent in their data systems. Doc. No. 28-1 at TD_125–28. Under the data-sharing arrangements, a database error could incorrectly flag law-abiding individuals for immigration enforcement and trigger cascading consequences for them.[8] The stakes here are sky-high: anyone, including citizens, could face arrest, detention, or removal based solely on a database error. And the Trump Administration's efforts to skirt procedural safeguards only magnify the peril. See, e.g., Noem v.

---

[7] For example, although removal orders do not become "final" for 90 days after issuance, ICE has requested data on individuals whose final orders are fewer than 90 days old. Doc. No. 28-1 at TD_145.

[8] When ICE fails to provide SSN or ITIN information in its data request, the IRS attempts to match records using only a name and address. Doc. No. 28-1 at TD_126. This process creates a significant risk of false matches—particularly when common surnames, multiple surnames, or shared addresses are involved, such as individuals living in the same apartment complex or using a P.O. Box. See Doc. No. 33 ¶¶ 16–17 & nn. 1–2.

Abrego Garcia, 145 S. Ct. 1017, 1018 (2025) (noting governmental admission that Abrego

Garcia was deported to El Salvador due to "administrative error").

### 2.    The data-sharing arrangements vitiate First Amendment rights.[9]

All Plaintiffs' members have First Amendment rights to freely associate.[10] The data-

sharing arrangements violate these rights, particularly by using taxpayer information to locate

immigrants and enforce civil immigration law. Defendants can point to no countervailing interest

that justifies such colossal infringement on these constitutional rights. Plaintiffs' First

Amendment claims are likely to succeed.

The First Amendment protects the "right to associate with others." Ams. for Prosperity

Found. v. Bonta, 594 U.S. 595, 606 (2021). "Protected association furthers a wide variety of

political, social, economic, educational, religious, and cultural ends, and is especially important

in preserving political and cultural diversity and in shielding dissident expression from

suppression by the majority." Id. Expressive association is constitutionally protected when it is

"for the purpose of engaging in those activities protected by the First Amendment." URI Student

Senate v. Town of Narragansett, 631 F.3d 1, 12–13 (1st Cir. 2011); see also Boy Scouts of Am.

v. Dale, 530 U.S. 640, 658 (2000). A regulation may not impede expressive association unless it

is "[1] adopted to serve compelling state interests, [2] unrelated to the suppression of ideas,

[3] that cannot be achieved through means significantly less restrictive of associational

freedoms." Boy Scouts, 530 U.S. at 648; Bonta, 594 U.S. at 616–17 (exacting scrutiny applies).

*First*, Plaintiffs engage in expressive association. Members and groups engage in

expressive association when they gather to educate youth and instill values through outdoor

---

[9] For all the reasons outlined in this section, the data-sharing arrangements are also contrary to constitutional right under 5 U.S.C. § 706(2)(B) and should be vacated for the same reasons.
[10] These arguments also apply to CEDC's additional First Amendment claim on its own behalf.

activities, see Boy Scouts, 530 U.S. at 649–50; to associate and provide legal assistance to achieve "lawful objectives of equality of treatment," NAACP v. Button, 371 U.S. 415, 429 (1963); and even to "speak, share, and teach" about fishing, happiness, and "going off-grid," Nicholas v. N.H. Dep't of Fish & Game, Exec. Dir., 2024 WL 1348817, at *1 (D.N.H. Mar. 28, 2024). Plaintiffs' members gather for similar reasons.

Plaintiffs bring their members together to engage in protected expressive association. CEDC and its members gather to promote socioeconomic justice and equality for members through tax and immigration services and for community heritage events. Doc. No. 31 ¶¶ 4–9, 43, 47–50. UBN and NAKASEC members likewise promote equality for immigrants, and their members educate each other about their rights. Doc. No. 34 ¶¶ 3–9; Doc. No. 33 ¶¶ 3–9. And NPU members promote shared values of caregiver rights, regardless of immigration status. Doc. No. 32 ¶¶ 3–10. Thus, as in Boy Scouts, members gather to share information and skills while instilling common values. As in NAACP, they provide legal and economic advice to achieve equality of treatment. And like the fisherman in Nicholas, Plaintiffs espouse common values. It is "indisputable that an association that seeks to transmit such a system of values engages in expressive activity." Boy Scouts, 530 U.S. at 650.

*Second*, Plaintiffs' the data-sharing arrangements "significantly affect [Plaintiffs'] ability to advocate public or private viewpoints." Id. at 650. Americans for Prosperity specifically concerned the harm to association from exposure of taxpayer information—even without the concomitant threat of arrest, detention and deportation present here. 594 U.S. at 606. Plaintiffs' members have been intimidated from gathering or engaging with their associations, seeking or offering advice about immigration law, and providing tax advice, preparing ITIN applications, or filing tax returns, because they fear these activities will lead to data being shared with ICE. Doc.

No. 31 ¶¶ 43–44, 48–50. CEDC is hampered in promoting economic justice and immigrants' rights when its members are too scared to show up. Id. ¶¶ 38, 40–41 (74% drop in ITIN filers; cancellation of educational and cultural events). And because CEDC is a government-supported VITA site, it cannot advise its members against filing taxes, but neither can it relinquish its core values and encourage members to risk the immigration consequences by filing. Id. ¶ 36. These fears are caused directly by the data-sharing arrangements, particularly given this Administration's broader goals of deporting all immigrants. See id. ¶¶ 18, 36. Because the data-sharing arrangements' "practical effect" suppresses association, the government must have an overriding valid interest. NAACP v. Alabama, 357 U.S. 449, 460–61 (1958). It does not.

*Third*, the government has no compelling interest, nor does it have an interest that cannot be achieved through significantly less restrictive means. See id. at 463. The government cannot claim an interest in violating the law to obtain location data about immigrants who file taxes and face no criminal charges. The government's interest in immigration enforcement can be furthered through means that are significantly less burdensome. The government has carried out immigration enforcement for decades without resorting to unlawful sharing of taxpayer data and can point to no reason it needs to do so now.

### 3. The data-sharing arrangements are ultra vires.

In addition to violating the APA, the agencies' actions are ultra vires. Where, like here, an agency acts in violation of a statute's prohibition, it exceeds its authority, and the action is ultra vires. See Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681 (2025); New York v. McMahon, 784 F. Supp. 3d 311, 352 (D. Mass. 2025). Ultra vires claims can succeed "for the same reasons" as APA claims as well as where judicial review is unavailable under the APA. Victim Rts. L. Ctr. v. U.S. Dep't of Educ., 788 F. Supp. 3d 70, 93 (D. Mass. 2025).

Defendants' data sharing is ultra vires because it violates statutory prohibitions enacted by Congress, see McMahon, 784 F. Supp. 3d at 352, including cabining agencies' authority by prohibiting data sharing absent strict requirements in specific circumstances, see 26 U.S.C. § 6103(a), (i)(2)(B). The government fails to meet many of those requirements, like providing an address with each request and providing a particularized, written explanation of the request's connection to a criminal proceeding. Id. § 6103(i)(2)(B)(iv); Doc. No. 28-1 at TD_100–102.

### B. Absent preliminary relief, Plaintiffs will continue to suffer irreparable injuries, which are Article III injuries.

"Irreparable injury in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005); see also EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996) (irreparable harm showing need not be strong where "likelihood of success on the merits is great"). CEDC and Plaintiffs' members are suffering ongoing irreparable injury caused by the unlawful data-sharing arrangements. These injuries are sufficient to support Article III standing for CEDC on its own behalf and for all Plaintiffs on behalf of their members.

*First*, Plaintiffs' members are chilled from filing tax returns, even if it means foregoing much-needed refunds or tax credits. They fear their personal data will be shared, and they or their families will be deported. Doc. No. 31 ¶¶ 45–50; Doc. No. 33 ¶¶ 14, 19–20; Doc. No. 34 ¶¶ 15–35. Members know that ***not*** filing risks their eligibility for future immigration benefits to which they are legally eligible, which require declaring they have followed all laws, including tax laws. Id. ¶ 31; Doc. No. 29 ¶ 43. In short, Defendants have forced Plaintiffs' members into the impossible predicament of choosing between complying with tax laws or minimizing the risk of deportation.

15

*Second*, the unlawful data-sharing practices create, by design, a substantial risk of unlawful civil detention and deportation, with consequences to families, communities, and employers of those detained. These actions cannot be easily stopped or reversed, nor can the attendant harms be measured or adequately compensated by money damages. See Hernandez v. Sessions, 872 F.3d 976, 995 (9th Cir. 2017) ("[A]nyone subject to immigration detention" is subject to "irreparable harms . . . [including] subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained."); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). When ICE acts pursuant to a final order of removal, no further proceedings are guaranteed before physical removal can occur. Doc. No. 29 ¶ 28. The devastation from deportation enabled by unlawful data sharing cannot be undone, Doc. No. 33 ¶¶ 17–19, and even when deemed unlawful, Defendants have demonstrated an unwillingness to remedy mistakes, Doc. No. 28-3.

What's worse, misidentification is built into the data sharing.[11] Defendants' systems will misidentify individuals with common names who were not the intended targets, including even U.S. citizens. Plaintiffs' members who wish to file tax returns reasonably fear that filing will put them into a database that increases the risk of misidentification to themselves, family, or loved ones with common surnames or addresses. The risk that members will be wrongfully identified, detained, or deported is high and exacerbated by ICE's practice of detaining and deporting without confirming identities or status. Doc. Nos. 28-4–7; Doc. No. 33 ¶ 16.

---

[11] While the AR has shed light on the IRS's data matching protocol, SSA's data matching protocols are completely unknown. Even with the existing IRS protocol, Doc. No. 28-1 at TD_126, the risk of remains high, supra n.9; Doc. No. 33 ¶¶ 16–17 & nn. 1–2.

*Third*, the data-sharing arrangements are disabling CEDC's organizational mission to promote economic opportunity and build community, while providing tax-filing and other services. Doc. No. 31 ¶¶ 4–7, 35–41. Because of Defendants' actions, fewer members are filing tax returns and CEDC has been forced to cancel cultural and educational events. Id. ¶¶ 38, 40–41. This directly interferes with CEDC's "core activities" and the decrease in tax returns and ITIN applications in turn decreases CEDC's funding. See Am. Ass'n of Univ. Professors v. Rubio, 780 F. Supp. 3d 350, 386 (D. Mass. 2025).[12] This harm to CEDC's "organizational missions and core activities" is irreparable because it "threaten[s] [CEDC's] very existence." Nat'l Educ. Ass'n v. U.S. Dep't of Educ., 779 F. Supp. 3d 149, 200 (D.N.H. 2025).

*Fourth*, CEDC's reputation is being harmed. "[I]njuries to goodwill and reputation" constitute irreparable injury "because they . . . cannot be easily measured or fully compensable in damages." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 187 F. Supp. 3d 217, 223 (D. Mass. 2016). The trust and credibility CEDC has spent years developing with its members has been eviscerated by Defendants' actions, especially given that CEDC is unable to provide advice regarding the effects of the data sharing or its legality. Doc. No. 31 ¶¶ 35–38.

*Fifth*, "the disclosure of private, confidential information 'is [a] quintessential type of irreparable harm[.]'" Airbnb, Inc. v. City of New York, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019); see also Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 242–43 (D. Mass.), aff'd, 731 F.3d 6 (1st Cir. 2013). "[O]nce this type of highly personal information is disclosed to the government, the revelation cannot be undone." Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury, 838 F. Supp. 631, 640 (D.D.C. 1993). Even if, as Plaintiffs request, ICE deletes the

---

[12] These injuries also support CEDC's organizational standing.

unlawfully disclosed data, injured individuals cannot have their privacy fully restored.[13] Nor can improper use of disclosed information that has already occurred be fully remedied.

*Finally*, it is "well established that the loss of first amendment freedoms constitutes irreparable injury." Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 15 (1st Cir. 2012). Because First Amendment injury, including the violation of CEDC's and members' associational rights, is always irreparable, "[t]here is no need for an extensive analysis" of this prong. Grant v. Trial Ct., 784 F. Supp. 3d 475, 490 (D. Mass. May 28, 2025).

## C.    The balance of equities and public interest strongly favor preliminary relief.

The balance of equities compares "the hardship to the nonmovant if enjoined" with "the hardship to the movant if no injunction issues[,] and the effect . . . on the public interest." CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 55 (1st Cir. 2020).

The harm wreaked by Defendants' unlawful data sharing affects the public and vastly outweighs any government interest. The public has a "concomitant" interest favoring preliminary relief where plaintiffs are deprived of their First Amendment rights. Sindicato Puertorriqueno, 699 F.3d at 15; Smith v. Trump, 2025 WL 2021785, at *6 (D. Me. July 18, 2025) (The public interest "is necessarily 'served by protecting First Amendment rights from likely constitutional infringement.'"). And the public's strong "interest in preventing [noncitizens] from being wrongfully removed" is well established. A.B.-B. v. Morgan, 548 F. Supp. 3d 209, 222 (D.D.C.

---

[13] Each of these are Article III injuries sufficient to establish standing. See Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 372 (1st Cir. 2023) (noting that "disclosure of private information and intrusion upon seclusion" present Article III injuries). CEDC has organizational standing based on its own injuries. See, e.g., Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). All Plaintiffs have associational standing based on their members' injuries, and the interests Plaintiffs seek to protect are germane to their missions. In re Fin. Oversight & Mgmt. Bd. for P.R., 110 F.4th 295, 308 (1st Cir. 2024); see S.S. by S.Y. v. City of Springfield, 332 F. Supp. 3d 367, 375 (D. Mass. 2018) (challenging disability discrimination in school was germane to group's purpose of bettering education for constituents).

2020). As discussed, misidentification is built into the data-sharing processes, which will cause the wrong individuals—immigrants and citizens alike—to be detained and removed by DHS. See Doc. No. 33 ¶¶ 16–17 & nn. 1–2.

The government, in contrast, is not "harmed by an order prohibiting it from violating the law." Woonasquatucket River Watershed Council v. U.S. Dep't of Agric., 778 F. Supp. 3d 440, 476–77 (D.R.I. 2025) (finding the balances of equities and public interest "heavily" favored injunctive relief when agency action cut longstanding budgets and harmed the missions of the funding recipients). Indeed, district courts in this Circuit have often found that these factors favor preliminary relief in APA cases. See, e.g., Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev., 496 F. Supp. 3d 600, 611 (D. Mass. 2020). This Court can and should do so here.

### D.    Preliminary relief is a necessary and appropriate remedy.

This Court should exercise its authority under 5 U.S.C. §§ 705 and 706 to stay the data-sharing arrangements, or in the alternative exercise its equitable authority to preliminary enjoin Defendants from requesting, sharing, relying upon, or using tax-return data.[14]

District courts have the power to postpone and vacate agency action, in its entirety, under APA sections 705 and 706(2). See, e.g., Woonasquatucket, 778 F. Supp. 3d at 478–80 ("The normal remedy for a successful APA challenge is vacatur of the rule[.]"); Mass. Fair Hous. Ctr., 496 F. Supp. 3d at 605, 611–12. The Supreme Court's decision in Trump v. CASA, Inc., 606 U.S. 831 (2025) did not alter this Court's authority to grant this remedy. See, e.g., Kennedy, 2025 WL 1803260, at *14, 21 (preliminary relief); Ass'n of Am. Univs. v. Dep't of Def., 2025 WL 2899765, at *27–30 (D. Mass. Oct. 10, 2025). This Court should stay the IRS, SSA, and

---

[14] See Orr v. Trump, 778 F. Supp. 3d 394, 430 (D. Mass. 2025) (§ 705 stay has similar "practical effect" to preliminary injunction, though "operates upon the [agency action] itself by halting or postponing some portion of the [action], or by temporarily divesting [action] of enforceability").

3245494

officials from disclosing any taxpayer information to ICE, DHS, and officials, and stay ICE, DHS, and officials from inspecting, viewing, using, copying, distributing, or otherwise acting upon taxpayer information obtained from or disclosed by the IRS, or SSA, as well as stay all Defendants from destroying communications, including data requests, between Defendants.

Further, any partial remedy would fail to offer complete relief to Plaintiffs and their more than one million members in every state, Puerto Rico, and D.C. See also Doe v. Trump, 2025 WL 2814730, at *33–34 (1st Cir. Oct. 3, 2025) (affirming universal injunction in part because Casa emphasizes the importance of "complete relief" for plaintiffs). *First*, there is no "plausible manner in which the Court could set the [data-sharing arrangements] aside as to [Plaintiffs], while leaving it in place as to all others." Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem, 2025 WL 1825431, at *51 (D.D.C. July 2, 2025). To do so would inherently require finding and disclosing Plaintiffs' information—the precise harm Plaintiffs seek to prevent. *Second*, the threat of disclosure would continue to chill CEDC's ability to engage new and prospective members through its VITA services. *Third*, the risk of misidentification would remain for Plaintiffs' members. Thus, even for the non-APA claims, complete relief requires universal relief.[15] And this preliminary relief is necessary and appropriate to halt the irreparable and extensive harm that Defendants have caused Plaintiffs and their members.

## V.    CONCLUSION

For these reasons, Plaintiffs respectfully request the stay and preliminary vacatur of the IRS-ICE and SSA-ICE data-sharing arrangements.

---

[15] Even if this Court finds that a preliminary injunction is more appropriate at this juncture, including for Plaintiffs' standalone constitutional claims, Plaintiffs request that the Court preliminary enjoin Defendants from disclosing, inspecting, viewing, using, copying, distributing, or otherwise acting upon taxpayer information, as detailed in the Motion and Proposed Order. See, e.g., Ass'n of Am. Univs., 2025 WL 2022628, at *28.

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(d), Plaintiffs believe oral argument will assist the Court and so respectfully request the opportunity to be heard.

Respectfully submitted,

GREATER BOSTON LEGAL SERVICES

Dated: November 3, 2025          By:  *Luz Arevalo*
Luz Arevalo BBO 564011
larevalo@gbls.org
Angela Divaris (*Admitted Pro Hac Vice*)
adivaris@gbls.org
197 Friend Street
Boston, MA 02114
Telephone: (617) 461-4944

KEKER, VAN NEST & PETERS LLP

Dated: November 3, 2025          By:  */s/ Leo L. Lam*
Leo L. Lam (*Admitted Pro Hac Vice*)
llam@keker.com
Laurie Carr Mims (*Admitted Pro Hac Vice*)
lmims@keker.com
Sarah Salomon (*Admitted Pro Hac Vice*)
ssalomon@keker.com
Charlotte Kamai (*Admitted Pro Hac Vice*)
ckamai@keker.com
Kelly M. Hernandez (*Admitted Pro Hac Vice*)
khernandez@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  (415) 391 5400
Facsimile:  (415) 397 7188

3245494

ASIAN LAW CAUCUS

Dated: November 3, 2025          By:    */s/ Joshua Rosenthal*
                                        Joshua Rosenthal (*Admitted Pro Hac Vice*)
                                        joshr@asianlawcaucus.org
                                        Dorothy Chang (*Admitted Pro Hac Vice*)
                                        dorothyc@asianlawcaucus.org
                                        55 Columbus Ave
                                        San Francisco, CA 94111
                                        Telephone: (415) 896-1701
                                        Facsimile: (415) 896-1702

                                        *Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF). Any counsel for other parties who are not registered participants are being served by first class mail.

                                        */s/ Leo L. Lam*
                                        Leo L. Lam