# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

COMMUNITY ECONOMIC DEVELOPMENT
CENTER OF SOUTHEASTERN
MASSACHUSETTS *et al.*,

                *Plaintiffs*,

       *v.*

SCOTT BESSENT, in his official capacity as
Acting Commissioner of the Internal Revenue
Service, *et al.*,

               *Defendants*.

No. 1:25-cv-12822-IT

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
# PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

BACKGROUND...................................................................................................................2

LEGAL STANDARD ...........................................................................................................4

ARGUMENT........................................................................................................................4

     I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS..........4

          A.     Plaintiffs Lack Standing to Pursue Their Claims .....................................4

          B.     Plaintiffs Cannot Prevail on Their APA Claims........................................6

               1.     *The Data-Sharing Arrangements Are Not Reviewable Agency Actions* ...................................................................................................7

               2.     *An Alternate Remedial Scheme Divests Plaintiffs of a Cause of Action Under the APA* ..................................................................................8

               3.     *The Data-Sharing Arrangements Are Lawful*....................................9

          C.     Plaintiffs Cannot Prevail on Their *Ultra Vires* Claim............................14

          D.     Plaintiffs Cannot Prevail on Their First Amendment Claim...................15

     II.     PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF.............................................................................................17

     III.     NEITHER THE EQUITIES NOR THE PUBLIC INTEREST WEIGH IN FAVOR OF PRELIMINARY RELIEF.............................................................................................18

     IV.     IF THE COURT CHOOSES TO GRANT PRELIMINARY RELIEF, SUCH RELIEF MUST BE NARROWLY TAILORED TO PLAINTIFFS AND THEIR MEMBERS .............................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
145 F.4th 39 (1st Cir. 2025) .......................................................................... 19

*Ass'n of Am. Univs. v. Dep't of Def.*,
792 F. Supp. 3d 143 (D. Mass. 2025) ............................................................... 4

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................... 8

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ........................................................................................... 8

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ......................................................................................... 16

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ......................................................................................... 20

*Centro de Trabajadores Unidos v. Bessent*,
No. 25-cv-00677, 2025 WL 1380420 (D.D.C. May 12, 2025) ..................... *passim*

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ........................................................................... 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................... 6

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*,
445 F.3d 13 (1st Cir. 2006) ............................................................................... 4

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ......................................................................................... 13

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................................................................................... 5, 6

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024) ............................................................................ 7

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
110 F.4th 295 (1st Cir. 2024) ............................................................................ 5

*Indep. Equip. Dealers Ass'n v. EPA*,
 372 F.3d 420 (D.C. Cir. 2004) ............................................................. 8

*K-Mart Corp. v. Oriental Plaza, Inc.*,
 875 F.2d 907 (1st Cir. 1989) ............................................................... 17

*Maryland v. King*,
 567 U.S. 1301 (2012) ......................................................................... 18

*Munaf v. Geren*,
 553 U.S. 674 (2008) ............................................................................. 4

*Nken v. Holder*,
 556 U.S. 418 (2009) ........................................................................... 18

*Noem v. Vasquez Perdomo*,
 No. 25-A169, 2025 WL 2585637 (U.S. Sep. 8, 2025) ......................... 19

*Nowicki v. Comm'r*,
 262 F.3d 1162 (11th Cir. 2001) ............................................................ 9

*Nuclear Regul. Comm'n v. Texas*,
 605 U.S. 665 (2025) ..................................................................... 14, 15

*Roberts v. U.S. Jaycees*,
 468 U.S. 609 (1984) ........................................................................... 15

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
 102 F.3d 12 (1st Cir. 1996) ................................................................. 17

*Sampson v. Murray*,
 415 U.S. 61 (1974) ............................................................................. 20

*Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*,
 699 F.3d 1 (1st Cir. 2012) ................................................................. 4, 5

*Starbucks Corp. v. McKinney*,
 602 U.S. 339 (2024) ........................................................................... 20

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ............................................................................. 6

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) ..................................................................... 18, 19

iv

*Trump v. United States*,
   603 U.S. 593 (2024) .......................................................................................... 16, 19

*United States v. Michaelian*,
   803 F.2d 1042 (9th Cir. 1986) ................................................................................ 9

*United States v. Orlando*,
   281 F.3d 586 (6th Cir. 2002) ................................................................................. 9

*URI Student Senate v. Town of Narragansett*,
   631 F.3d 1 (1st Cir. 2011) ............................................................................... 15, 16

*Waite v. Macy*,
   246 U.S. 606 (1918) ............................................................................................. 17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................................. 4, 19


**STATUTES**

5 U.S.C. § 551(13) ....................................................................................................... 7, 8

5 U.S.C. § 552a(b)(3) ............................................................................................... 13, 15

5 U.S.C. § 552a(b)(7) ............................................................................................... 13, 15

5 U.S.C. § 704 ............................................................................................................. 7, 8

5 U.S.C. § 705 ................................................................................................................. 4

8 U.S.C. § 1253(a)(1) ............................................................................................... 3, 11

8 U.S.C. § 1360 ............................................................................................................. 15

8 U.S.C. § 1360(b) ................................................................................................. 3, 7, 13

42 U.S.C. § 1306 ............................................................................................................. 1

42 U.S.C. § 1306(a) ................................................................................................... 7, 13

42 U.S.C. § 1306(a)(1) ............................................................................................... 3, 15

I.R.C. § 6103 ....................................................................................................... 8, 12, 13

I.R.C. § 6103(a) ........................................................................................................ 2, 13

I.R.C. § 6103(b)(2)(A)........................................................................................2, 13

I.R.C. § 6103(b)(6)......................................................................................2, 10, 11

I.R.C. § 6103(i)(1)(A)(i)..................................................................................2

I.R.C. § 6103(i)(2)..................................................................................2, 7, 9, 10

I.R.C. § 6103(i)(2)(A)..................................................................................2, 9, 11

I.R.C. § 6103(i)(2)(A)(ii)...............................................................................2, 14

I.R.C. § 6103(i)(2)(B)........................................................................................2

I.R.C. § 6103(i)(2)(B)(i)....................................................................................11

I.R.C. § 6103(i)(2)(C)..................................................................................2, 10, 11

I.R.C. § 7431......................................................................................................8

I.R.C. § 7431(a)................................................................................................17

I.R.C. § 7431(a)(1)..............................................................................................8

I.R.C. § 7431(b)–(d)............................................................................................8

I.R.C. § 7213......................................................................................................8

I.R.C. § 7213(a)(1)..............................................................................................9

I.R.C. § 7213A....................................................................................................8

I.R.C. § 7213A(a)–(b)..........................................................................................9

**REGULATIONS**

20 C.F.R. § 401.120..........................................................................................13

20 C.F.R. § 401.195..........................................................................................13

**OTHER SOURCES**

H.R. Rep. No. 79-1980 (1946) ........................................................................................... 20

Social Security Administration, Program Operations Manual System (POMS),
https://perma.cc/FDU3-JMRD (last accessed Nov. 17, 2025) .............................................. 7

Social Security Administration, *Privacy Act System of Records Notices*,
https://www.ssa.gov/privacy/sorn.html (last accessed Nov. 17, 2025) ................................ 13

## INTRODUCTION

Like many agencies, the Internal Revenue Service (IRS) and Social Security Administration (SSA) share data with their sister agencies when required to do so by law. As relevant here, § 6103 of the Internal Revenue Code generally prohibits IRS from sharing tax-return information, but then affirmatively *requires* the disclosure of certain properly requested information when relevant to a criminal investigation. Likewise, 42 U.S.C. § 1306 generally prohibits SSA personnel from disclosing information obtained in the course of official duties unless certain requirements in that statute are satisfied.

Foreseeing that data in the possession of SSA and IRS would be relevant to criminal investigations conducted by Immigration and Customs Enforcement (ICE), those three agencies formalized their data-sharing relationships in three documents: a "Memorandum of Understanding" between the Treasury Department (on behalf of IRS) and the Department of Homeland Security (DHS, on behalf of ICE) (the "Memorandum"); an "Implementation Agreement" between the same parties, providing a technical framework for implementing the Memorandum; and a letter from SSA to ICE (the "Letter") (together, the "Operative Documents"). In what is now the third lawsuit regarding this issue, Plaintiffs seek preliminary injunctive relief against those documents and the data-sharing practices they contemplate.

For myriad reasons, Plaintiffs' claims fail. The Operative Documents provide no new statement of policy; they merely outline requirements already imposed by statute. Any data-sharing conducted pursuant to those documents, likewise, complies with the statutory requirements described therein. And Plaintiffs' purported need for urgent, preliminary relief is belied by the fact that another district court already denied a near-identical motion for preliminary relief *months* ago in the District of Columbia. *See Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-00677,

1

2025 WL 1380420 (D.D.C. May 12, 2025).  The Court should deny Plaintiffs' motion.

## BACKGROUND

Section 6103 of the Internal Revenue Code establishes a general rule that "returns" and "return information" shall not be disclosed "except as authorized by this title."  I.R.C. § 6103(a).  The term "return information" includes, among other things, "a taxpayer's identity," meaning the taxpayer's "name," "mailing address," "identifying number," "or a combination thereof." § 6103(b)(2)(A), (b)(6).  And that broad prohibition on disclosure is subject to a series of statutory exceptions, including, as relevant here, § 6103(i)(2).  That provision provides that, upon written request, IRS "*shall* disclose return information []other than taxpayer return information[] to officers and employees" of another agency "who are personally and directly engaged in … any investigation which may result in" "any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute."  § 6103(i)(2)(A)(ii), (i)(1)(A)(i).  A valid request must be "in writing" and include "the name and address of the taxpayer," the relevant "taxable period," "the statutory authority" for the criminal investigation in question, and the "specific reason" that the information "may be[] relevant" to the investigation. § 6103(i)(2)(B).  And although the provision excludes "taxpayer return information" from the data IRS must provide in response, § 6103(i)(2)(A), it also specifies that for purposes of this provision, "a taxpayer's identity shall not be treated as taxpayer return information," § 6103(i)(2)(C).

On April 7, 2025, the Treasury Department and DHS entered into the Memorandum governing the sharing of information, including address information, between IRS and ICE (their respective subcomponents).  *See* ECF 1-1.  The Memorandum provides that all ICE requests for information will conform to the requirements of § 6103(i)(2), *id.* at 5 (§ 6(B)–(C)), and that IRS will disclose the information only if those requirements are satisfied, *id.* at 4 (§ 5(B)).  The

2

Memorandum also provides that ICE will safeguard the information, use it only in connection with non-tax federal criminal investigations and proceedings, and return or destroy it when it is no longer needed. *Id.* at 3–4, 8–11 (§§ 6(D), 6(E), 8, 9). Then, on April 18, 2025, IRS and ICE then also entered into the Implementation Agreement reaffirming that data-sharing would comply with § 6103(i)(2) and outlining, in more technical fashion, descriptions of records to be provided and maintained by each agency. *See* ECF 1-2.

Separately, SSA memorialized its data-sharing arrangement with ICE via an August 27, 2025, Letter, providing that SSA would "provide identity and location information for each alien upon ICE requests in accordance with … []42 U.S.C. § 1306(a)[] and 8 U.S.C. § 1360(b)." *See* ECF 1-4. Because SSA could provide ICE responsive information without resorting to tax records in its possession, Ex. B (Myers Decl.) ¶¶ 4–7, the Letter did not refer to limitations on disclosure of return information in § 6103. Rather, it acknowledged its own statutory requirements: that it make available "[a]ny information in any records" it keeps "as to the identity and location of aliens in the United States," § 1360(b), and that it only do so "as the [SSA Commissioner] may by regulations prescribe and except as otherwise provided by Federal law," § 1306(a)(1).

In June 2025, IRS sent ICE a data request that IRS determined met the requirements of the Memorandum and § 6103(i)(2); the following month, IRS provided ICE with last known address information for roughly 47,000 individuals. Ex. A at TD_0000103–113, 143–145.[1] ICE's request had identified criminal investigations pursuant to 8 U.S.C. § 1253(a)(1), *see* Ex. A at TD_0000097–102, TD_0000112–13, which imposes criminal penalties on "[a]ny alien against whom a final order of removal is outstanding" and who, *inter alia*, "willfully fails or refuses to

---

[1] Plaintiffs import limited portions of the Administrative Record in *Center for Taxpayer Rights v. IRS*, No. 1:25-cv-00457-CKK (D.D.C. 2025), into this case. For completeness, Defendants provide more of that AR (i.e., all but the "authorities" portion thereof) as Exhibit A.

depart from the United States within a period of 90 days from the date of the final order of removal." The request also identified Jesse Williams, Assistant Director for Enforcement in ICE's Enforcement and Removal Operations component, as the official personally engaged in that criminal investigation. *See ibid.*; Ex. C (McShane Decl.) ¶ 1. SSA, meanwhile, has yet to share data with ICE since the Letter memorialized their arrangement. *See* Ex. B (Myers Decl.) ¶ 4.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (quotation cleaned). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quotation cleaned). The same standard applies to motions for preliminary relief under the APA. *See* 5 U.S.C. § 705; *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025).

## ARGUMENT

I. **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

A. **Plaintiffs Lack Standing to Pursue Their Claims**

First, Plaintiffs cannot prevail on the merits of their claims because they lack Article III

standing. To establish standing in this posture, Plaintiffs bear the burden of demonstrating a "strong likelihood," *Sindicato*, 699 F.3d at 10, of three elements: that they have suffered an "injury in fact"; that the injury is traceable to Defendants' conduct; and that the injury will likely be redressed by a favorable decision. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024). Because Plaintiffs are organizations, two kinds of standing are available to them: either "organizational standing," whereby they may "sue on their own behalf for injuries they have sustained," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024); or "associational standing," whereby an organization may sue on behalf of its members, *see In re Fin. Oversight & Mgmt. Bd.*, 110 F.4th at 308 & n.7. On the latter theory, more requirements apply: that its members "would otherwise have standing to sue in their own right"; that "the interests it seeks to protect are germane to the organization's purpose"; and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ibid.*

Here, Plaintiffs claim to have established "standing for CEDC on its own behalf and for all Plaintiffs on behalf of their members." Br. at 15. That claim fails for multiple reasons.

*CEDC's organizational standing.* CEDC claims standing to challenge the data-sharing for three reasons: first, because it has suffered "decrease[d] … funding" due to "interfere[nce] with CEDC's 'core activities'" and the "disabling" of "CEDC's organizational mission to promote economic opportunity"; second, because "the trust and credibility CEDC has spent years developing with its members has been eviscerated"; and third, because it has suffered "the violation of [its] … associational rights." *Id.* at 17–18. But nothing about inter-agency data-sharing remotely interferes with CEDC's ability to conduct its operations, build trust, or associate with its members. Though CEDC reports a downturn in demand for its social programming, that phenomenon can only be fairly traced to the choices of individual participants, not Defendants'

5

actions. And it is black-letter law that a plaintiff attempting to show standing "cannot rely on speculation about the unfettered choices made by independent actors." *FDA*, 602 U.S. at 383.

Further, CEDC's showing of a pocketbook injury falls far short. Its memorandum of law provides no discussion of the subject. And its supporting declaration states simply that CEDC's "funding is directly tied to the number of tax returns filed," and that while it filed 1,666 returns in 2024, it has filed "only 1,436" as of early November 2025. ECF 31 at ¶¶ 38–39. It is sheer speculation that the data-sharing arrangements have caused this modest decline.

*All Plaintiffs' associational standing.* Plaintiffs assert four injuries on behalf of their members, Br. at 15–17, none of which hold water. First, Plaintiffs fail to explain how their members' alleged hesitancy to comply with the law (here, by filing a tax return) constitutes a concrete, cognizable injury. Fulfilling a legal obligation can hardly be characterized as a legal injury where, as here, Plaintiffs do not contest that obligation. Second, it is entirely speculative that the data of any of Plaintiffs' members has been, or will be, transferred from IRS or SSA to ICE. To satisfy Article III standing, the alleged injury must be "actual or imminent"—and if it has not yet occurred, it "must be *certainly impending*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). Plaintiffs fail to make any showing that unlawful civil detention or unlawful disclosure of data is "certainly impending" as to any of their members. Third, the mere disclosure of data, even if in violation of a statute, does not constitute a "concrete" injury for standing purposes. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425–27 (2021) ("an injury in law is not an injury in fact" because "Article III standing requires a concrete injury even in the context of a statutory violation"). Fourth, Plaintiffs make no showing of associational standing for their First-Amendment claims, *see* Br. at 18—and in any event, they could not plausibly trace a reticence to participate in social programming to the data-sharing arrangements here.

### B.    Plaintiffs Cannot Prevail on Their APA Claims

#### 1.    *The Data-Sharing Arrangements Are Not Reviewable Agency Actions*

The APA expressly limits judicial review, as relevant here, to "final agency action." 5 U.S.C. § 704. "Agency action" refers to a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). And such action is "final" if it satisfies "two conditions": "it must mark the consummation of the agency's decisionmaking process," and it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quotation cleaned). Here, Plaintiffs seek preliminary relief based on purportedly final actions they collectively call "data sharing arrangements," Br. at 7–8, but nothing they challenge satisfies the above criteria.

*First*, the Operative Documents do not mark the consummation of agency decision-making. To the contrary, each document simply outlines the technical framework by which *future* agency action—namely, the transfer of data—might occur. And in each instance, the substance of the document is largely to recite and affirm pre-existing statutory obligations and authorities. The Memorandum and Agreement, for instance, do not establish a new basis for information-sharing; § 6103(i)(2) *already* requires IRS to provide certain information when statutory prerequisites are met. Likewise, the SSA Letter does not independently set out a new data-sharing policy; it simply embodies statutory data-disclosure requirements. *See* ECF 1-4 at 2–3 ("SSA will provide … information … in accordance with … 8 U.S.C. § 1360(b)," which already requires disclosure, and "42 U.S.C. § 1306(a)," which limits the circumstances thereof).[2]

*Second*, even if any of these documents marked the "consummation" of agency decision-

---

[2] Even preceding the Letter, SSA maintained a public policy regarding disclosures of data to DHS. *See* Social Security Administration, Program Operations Manual System (POMS), https://perma.cc/FDU3-JMRD.

making, none independently "determine[s]" "rights or obligations," or serves as a source from which "legal consequences flow." Again, each document simply reflects those legal consequences already set out by statute. And courts "lack[] authority to review claims where an agency merely expresses its view of what the law requires." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). For much the same reason, the data-sharing arrangements do not qualify as reviewable "agency action" at all. § 551(13). Tellingly, Plaintiffs identify no "direct and appreciable legal consequences" imposed on them, or their members, by the Operative Documents or the data-sharing itself. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

2.    *An Alternate Remedial Scheme Divests Plaintiffs of a Cause of Action Under the APA*

The APA limits judicial review not only to "final agency action[s]" but also to actions "for which there is no other adequate remedy." 5 U.S.C. § 704. That provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Here, Plaintiffs seek relief under the APA against data-sharing arrangements purportedly violating I.R.C. § 6103—but Congress has created a different, comprehensive remedial scheme for violations of that statute.

That scheme involves two parts: one civil, one criminal. First, Congress created a waiver of sovereign immunity for violations of § 6103 to allow "a civil action for damages against the United States" if "any officer or employee of the United States … inspects or discloses any return or return information … in violation of … section 6103." I.R.C. § 7431(a)(1). The statute specifically sets out exceptions to the general rule, the amount of damages available, and a limitations period. § 7431(b)–(d). And notably, the statute, despite its detailed description of available remedies in Article III courts, does not authorize injunctive relief. *See generally* § 7431.

Second, Congress imposed criminal penalties for the solicitation, unauthorized disclosure,

or unauthorized inspection of information protected by § 6103.  I.R.C. §§ 7213, 7213A.  Those penalties include dismissal from office, fines (of up to $1,000 for inspection or $5,000 for disclosure), and imprisonment (for up to one year for inspection and five years for disclosure).  § 7213A(a)–(b); § 7213(a)(1).

Given that highly reticulated scheme, courts have indicated that the civil and criminal remedies discussed above represent the full scope of remedies Congress contemplated for violations of § 6103.  *See United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002) ("Congress has provided civil and criminal remedies for violations of § 6103, but no statutory provision" authorized alternative relief sought); *Nowicki v. Comm'r*, 262 F.3d 1162, 1164 (11th Cir. 2001) ("Congress saw fit to provide only certain remedies for violations of § 6103"); *United States v. Michaelian*, 803 F.2d 1042, 1049–50 (9th Cir. 1986) (noting "reluctance to imply a judicial remedy for violations of § 6103 given Congress' explicit provision of a remedy").  In this case, the same result logically follows from the APA's prohibition on circumventing on-point remedial schemes to enjoy the APA's catchall judicial-review provision.

>    3.    *The Data-Sharing Arrangements Are Lawful*

As the *Centro* court succinctly explained, even if this Court reaches a merits review of the data-sharing arrangements under the APA, Plaintiffs cannot prevail. *See* 2025 WL 1380420, at *5– 7.  The plain terms of § 6103(i)(2) provide for IRS's disclosure of "return information (other than taxpayer return information) to officers and employees" of "any Federal agency" upon request from that agency, so long as the request and data-transfer satisfy certain conditions.  If those requirements are met, then the statute *requires* disclosure of the requested data.  § 6103(i)(2)(A) ("*shall* disclose" (emphasis added)).  Critically, although the return information disclosed must be that "other than taxpayer return information," *id.*, the statute expressly provides that, "[f]or

purposes of [§ 6103(i)(2)], a taxpayer's identity shall *not* be treated as taxpayer return information," § 6103(i)(2)(C) (emphasis added). And "taxpayer identity," in turn, means "the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number, … *or* a combination thereof." § 6103(b)(6) (emphasis added). The upshot is that under § 6103(i)(2), "the IRS must disclose limited taxpayer identity information (*e.g.*, the taxpayer's name and address) to assist another agency in criminal proceedings, if the agency has satisfied the statutory prerequisites in its written request." *Centro*, 2025 WL 1380420, at *5.

The Memorandum expressly incorporates those statutory requirements, rendering that data-sharing agreement lawful on its face. ECF 1-1 at 3–6; *Centro*, 2025 WL 1380420, at *5. Plaintiffs' arguments to the contrary are unavailing. First, they argue that § 6103(i)(2) "allows for data disclosure only for ***criminal*** investigations and only when the requesting agency ***already*** has the taxpayer's address," whereas ICE "seeks addresses precisely because it lacks them and because it wishes to pursue large-scale ***civil*** immigration detention and deportation." Br. at 8–9 (emphasis in original). But that is inconsistent with the Memorandum itself, the governing statute, and the AR that Plaintiffs import from the *Center for Taxpayer Rights* case. By its own terms, the Memorandum serves "to establish the procedures and requirements for … requests for addresses of persons *subject to criminal investigation*." ECF 1-1 at 4. And the AR confirms that, in keeping with § 6103(i)(2), IRS consistently required that any disclosure be for the purposes of a criminal investigation or proceeding. *See* Ex. A at TD_0000003–5 (reflecting determination that IRS could not "disclose address information sought by ICE" without statutory compliance); *id.* at TD_0000083–89 (requiring identification of the "specific nontax Federal criminal statute … under which an investigation or proceeding is being conducted" and information supporting criminal liability); *id.* at TD_0000093 (determining IRS could not process ICE data file that did not contain

all elements required by the Memorandum and statute). Indeed, IRS only approved processing of, and shared information in response to, one ICE request that it determined satisfied all the provisions of the Memorandum and statute. *See id.* at TD_0000103–113.

For that request, ICE sought data from IRS in furtherance of its efforts to investigate violations of 8 U.S.C. § 1253(a)(1), which imposes *criminal* penalties on "[a]ny alien against whom a final order of removal is outstanding" and who, *inter alia*, "willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal." *See id.* at TD_0000097–102 (excerpt of June 25, 2025, ICE data request). The AR also shows that IRS required, and ICE provided, an address for the taxpayers for which it sought IRS data. *See ibid.* As a statutory matter, after requiring that the initial data request include "the name and address of the taxpayer," § 6103(i)(2)(B)(i), the statute requires IRS's disclosure of properly requested return information *including* the last-known mailing address in its possession. *See* § 6103(i)(2)(A) (requiring disclosure of "return information" other than "taxpayer return information"); § 6103(i)(2)(C) ("taxpayer identity" not treated as "taxpayer return information"); § 6103(b)(6) ("taxpayer identity" includes "mailing address"). Accordingly, Plaintiffs' argument that ICE cannot obtain new address information, Br. at 8–9, cannot be right: if an agency could only request name or address information that it already has, there would have been no reason for Congress to specify that a taxpayer's "identity," including "mailing address," must be disclosed in response to the request. *Cf. Centro*, 2025 WL 1380420, at *7 (reciting reasons ICE might need latest addresses). Plaintiffs' argument, in other words, reads § 6103(i)(2)(C) out of the statute.

Next, Plaintiffs argue that "[t]he data-sharing arrangements … fail to comply with the plain text of § 6103" because one ICE data request cited a single official as "personally and directly engaged in the criminal investigations, and because ICE "sent requests for individuals whose

removal orders are less than 90 days old and therefore cannot be in violation of § 1253(a)." Br. at 9. As an initial matter, nothing about this argument calls into question the lawfulness of the data-sharing *agreements*, which simply reflect the governing statutory requirements. But it also fails to undermine the validity of any data exchange. *First*, the listed person of contact for ICE's data requests, Jesse Williams, was Assistant Director for Enforcement in ICE's Enforcement and Removal Operations component. That position is charged with overseeing investigations into individuals violating a final removal order, and it would hardly be unusual for such an investigation to begin with a high-level review of address data to "confirm," for instance, "that the immigrant did in fact overstay the order."[3] *Centro*, 2025 WL 1380420, at \*7; *see* Ex. C (McShane Decl.). The IRS appropriately relied upon the representations of a sister agency to that effect. *Second*, Plaintiffs' naked citation to "Doc. No. 28-1 at TD_145" does not reflect a data exchange regarding individuals outside the scope of § 1253(a); to the contrary, it reflects that IRS does *not* execute the data exchange where the 90-day period has not yet run, in fact providing data for a mere 3.7% of the requested individuals. *See* Ex. A at TD_0000145 ("The date must be greater than 90 days or we reject the record."); *id.* at TD_0000131 (reflecting 3.7% match rate).

Conspicuously missing from the bulk of Plaintiffs' arguments is any explanation of how the SSA Letter runs afoul of federal law. In cursory fashion, they make exactly one argument: that SSA possesses any "identity and location data" "primarily" by virtue of "income tax records that SSA is required to protect under § 6103," so the Letter must be unlawful because it does not "invoke" an exception to § 6103. Br. at 9. But Plaintiffs provide no support for their claim that relevant SSA data could come only from tax records in its possession. To the contrary, SSA

---

[3] Jesse Williams has since retired from that position; he has been replaced by Brian McShane.

maintains numerous systems of records, each noticed in the Federal Register, many of which do not contain tax-return data.[4]  SSA has identified four systems of records containing non-tax data responsive to the requests contemplated in the SSA Letter: Master Files of Social Security Number (SSN) Holders and SSN Applications, No. 60-0058; Master Beneficiary Record, No. 60-0090; Supplemental Security Income Record and Special Veterans Benefits, No. 60-0103; and Digital Identity File Record System, No. 60-0373.  Ex. B (Myers Decl.) ¶¶ 5–6.  And SSA has determined not to disclose records from the Master Earnings Records system (No. 60-0059), which is SSA's primary repository for tax return information.  *Id.* ¶ 7.  Of course, information other than "[r]eturns and return information" is not covered by § 6103.  *See* § 6103(a); *see also* § 6103(b)(2)(A) (defining return information).  Accordingly, the SSA Letter did not "invoke any exception to § 6103," Br. at 9, because it did not need to do so.[5]

Finally, Plaintiffs argue that the data-sharing arrangements are "arbitrary and capricious" because they "ignore[] serious reliance interests," are "not reasonable or reasonably explained," and do not "consider several important aspects of the problem."  Br. at 10–12.  But judicial review under the arbitrary-and-capricious standard is "deferential": "[a] court simply ensures that the agency has acted within a zone of reasonableness" while evaluating whether the agency "has reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Here, Defendants' actions fall squarely within the "zone of reasonableness": the Memorandum and Letter each articulate the governing

---

[4]  Social Security Administration, *Privacy Act System of Records Notices*, https://www.ssa.gov/privacy/sorn.html (last accessed Nov. 17, 2025).

[5]  Disclosures of SSA's non-tax data are governed by a different set of statutes and regulations.  *See* 8 U.S.C. § 1360(b); 42 U.S.C. § 1306(a); 5 U.S.C. § 552a(b)(3), (b)(7); 20 C.F.R. §§ 401.120, 401.195.  Because Plaintiffs do not challenge SSA's compliance with those provisions, Defendants do not expound those provisions here.

provisions of law and affirmatively require compliance with those provisions. It cannot be unreasonable for an agency to do what is *required* by law. *See Centro*, 2025 WL 1380420, at *8 ("even assuming that the IRS has changed its position, this type of policy change is not actionable" in significant part because "§ 6103(i)(2) does not give the IRS the discretion to turn down a lawful request"). Nor can Plaintiffs or their members have reasonably relied on federal agencies *declining* to abide by those statutory obligations. Finally, Plaintiffs' complaint that "ICE requested data for nearly every immigrant with a final order of removal" and that Defendants "overlook the … risk of error … in their data systems," Br. at 11, puts the cart before the horse: IRS strictly evaluated data requests for statutory compliance, *see supra* pp. 10–11, and any approved data exchanges are, in keeping with the governing statute, in aid of "an[] investigation," § 6103(i)(2)(A)(ii), not conclusive indicators of criminal liability, *see* Ex. C (McShane Decl.) ¶¶ 5–8.

## C.    Plaintiffs Cannot Prevail on Their *Ultra Vires* Claim

Alongside the APA claims, Plaintiffs argue that they may obtain relief through a non-statutory "*ultra vires*" claim "for the same reasons as [their] APA claims." Br. at 14 (quotation cleaned). But obtaining *ultra vires* review requires clearing a notoriously high bar. Such review is limited to "painstakingly delineated procedural boundaries" so as to prevent plaintiffs from obtaining "an easy end-run around the limitations of … judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Those boundaries have been articulated as three governing principles. First, *ultra vires* review "applies only when an agency has taken action entirely in excess of its delegated powers *and* contrary to a *specific prohibition* in a statute." *Ibid.* (quotation cleaned; first emphasis added). Second, "it does not apply simply because an agency has arguably reached a conclusion which does not comport with the law." *Ibid.* (quotation cleaned). Third, it is "unavailable if, as is usually the case, a statutory review scheme provides

14

aggrieved persons with a meaningful and adequate opportunity for judicial review, or … forecloses all other forms of judicial review." *Ibid.* (quotation cleaned).

Plaintiffs' *ultra vires* claim fails at each turn of that analysis. For the reasons explained in Part I.B.3, *supra* pp. 9–14, Defendants cannot have acted "entirely in excess of … delegated powers" because federal law *does* contemplate inter-agency sharing of taxpayer data. No "specific prohibition" to the challenged data-sharing exists; in fact, "the plain language of … § 6103(i)(2) *mandates* disclosure under the specific circumstances and preconditions outlined in the" Memorandum, *Centro*, 2025 WL 1380420, at *8 (emphasis added), and federal law similarly contemplates data-sharing between ICE and SSA, *see* 8 U.S.C. § 1360; 42 U.S.C. § 1306(a)(1); 5 U.S.C. §§ 552a(b)(3), (b)(7). Even if Plaintiffs' entreaties to the contrary rendered Defendants' conduct "arguably" unlawful (they do not), *ultra vires* review still would not apply. And under either of the parties' theories of the case, an existing statutory scheme provides meaningful opportunity for review: either the APA itself, as Plaintiffs argue; or, more appropriately, § 7431, *see supra* pp. 8–9. For any one of these reasons, Plaintiffs' *ultra vires* claim fails.

### D. Plaintiffs Cannot Prevail on Their First Amendment Claim

Although the Complaint purports to bring a First Amendment claim based on "petition, speech, and associational rights," Compl. ¶ 177, Plaintiffs seek preliminary relief on the basis of only one: the "right[] to freely associate," Br. at 12. They come nowhere close to showing a strong likelihood of success on the merits of that theory.

There are "two types of 'freedom of association' that merit constitutional protection: (i) 'choices to enter into and maintain certain intimate human relationships' and (ii) association 'for the purpose of engaging in those activities protected by the First Amendment.'" *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 12–13 (1st Cir. 2011) (quoting *Roberts v. U.S.*

*Jaycees*, 468 U.S. 609, 617–18 (1984)). Those rights have "never been expanded to include purely social gatherings"; rather, constitutional protection turns on "the presence of underlying individual rights of expression protected by the First Amendment." *Id.* at 12.

Here, only the second of the theories described in *Jaycees* is at issue. But Plaintiffs fail to plausibly allege—much less make a "strong showing"—that the challenged data-sharing arrangements infringe on their rights, or those of their members, to gather together, promote their beliefs, or otherwise freely associate with whomever they choose. As Plaintiffs' own caselaw explains, the existence of a cognizable First Amendment violation turns on whether the challenged action "would significantly affect [one's] ability to advocate public or private viewpoints" or otherwise engage in protected associational conduct. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650 (2000). And here, nothing about Plaintiffs' efforts to "gather to promote socioeconomic justice and equality," "promote equality for immigrants" or "shared values of caregiver rights," or "advocate … viewpoints," Br. at 13–14, is remotely—much less "significantly," *Dale*, 530 U.S. at 650—affected by the data-sharing arrangements, which touch no part of those activities.

Further, even if the Court were to conclude that the challenged data-sharing arrangements do infringe on free-association rights, those rights are "not absolute" and "could be overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 648 (quotation cleaned). The enforcement of federal law—*i.e.*, the animating purpose behind the challenged data-sharing arrangements—constitutes just such an interest. *See, e.g., Trump v. United States*, 603 U.S. 593, 614 (2024) (noting "compelling public interest in fair and effective law enforcement" because "[f]ederal criminal laws seek to redress a wrong to the public" (quotation cleaned)). And the data-sharing is neither related to the suppression of ideas nor aimed

16

at Plaintiffs' associational conduct.  Accordingly, Plaintiffs' First Amendment claims fail.[6]

## II.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).  But the First Circuit has articulated "relevant guideposts" for the exercise of that discretion.  As relevant here, "the plaintiff's showing must… possess some substance" and not rely on "a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).  And that showing must be particularly strong where, as here, Plaintiffs' likelihood of success on the merits is wanting.  *See ibid.* (noting "sliding scale" relationship between preliminary-injunction factors).

Plaintiffs cannot show irreparable harm, for multiple reasons.  First, if any of the challenged data-sharing were found to violate § 6103, Congress has crafted a statutory scheme specifically outlining the nature and scope of a remedy to compensate for that violation.  *See* § 7431(a).  The availability of adequate *monetary* relief for precisely the violation alleged here belies any claim to *irreparable* harm.  Second, any "fear that … personal data will be shared" or alleged "risk of unlawful civil detention and deportation," Br. at 15–16, constitutes precisely the sort of "overly speculative forecast," *Baccarat*, 102 F.3d at 19, that cannot suffice here.  Third, the data-sharing arrangements are clearly tailored to the lawful pursuit of individuals who have violated federal law, and "injunctions against administrative officers" are not appropriate "on the mere apprehension that they will not do their duty or will not follow the law." *Waite v. Macy*, 246 U.S.

---

[6] Although the Complaint recites five claims for relief, Plaintiffs make no mention of Count Five ("*Accardi* Doctrine") in their memorandum of law.  Accordingly, it is not at issue in the Parties' dispute over the propriety of preliminary relief in this case.

606, 609 (1918). Fourth, Plaintiffs' claimed need for emergency relief is decisively undercut by the significant delay between the challenged conduct and the instant motion. Both the Memorandum and Implementation Agreement date to April 2025, while the SSA Letter dates to August 2025. But instead of moving swiftly for emergency relief, Plaintiffs sat idle for months, filing their Complaint in September and finally moving for "emergency" relief in November. So much time passed, in fact, that two nearly identical suits in the District of Columbia have progressed significantly since the events that precipitated all three cases: one has been on appeal to the D.C. Circuit since May of this year, *see Centro*, No. 25-5181 (D.C. Cir. 2025); and in the other, the court has already held oral argument on a preliminary-injunction motion and ordered the production of an administrative record, *see Center for Taxpayer Rights*, No. 1:25-cv-00457 (D.D.C. 2025), which Plaintiffs in this case awaited and reviewed before proceeding to seek "emergency" relief. Such inexplicable delay "detracts from the movant's claim of irreparable harm." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004).

Indeed, it is Defendants that would suffer irreparable harm if a preliminary injunction is granted, because "any time" the Government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). And here, the challenged data-sharing arrangements aim to do just that: effectuate statutes enforcing immigration judges' final orders of removal.

## III.    NEITHER THE EQUITIES NOR THE PUBLIC INTEREST WEIGH IN FAVOR OF PRELIMINARY RELIEF

The final two preliminary-injunction factors—namely, the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating those factors, the Court "must balance the competing claims of

injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. That evaluation clearly favors the Government in this case. First, Plaintiffs' proposed injunction would prohibit data-sharing that, as discussed above, is *required* by statute. *See* § 6103(i)(2)(A); *Centro*, 2025 WL 1380420, at \*5–8; *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 56 (1st Cir. 2025) (noting "substantial public interest in having governmental agencies abide by … federal law[]" (quotation cleaned)). Second, the challenged data-sharing is aimed at aiding federal officers in enforcing federal law; an injunction would diminish the ability of law-enforcement officers to perform that task. *See Trump*, 603 U.S. at 614 (noting "compelling public interest in fair and effective law enforcement").

Against those factors, what Plaintiffs muster is, at bottom, [t]he interests of individuals who are illegally in the country in avoiding … law enforcement." *Noem v. Vasquez Perdomo*, No. 25-A169, 2025 WL 2585637, at \*4 (Sept. 8, 2025) (Kavanaugh, J., concurring in grant of application for stay). That, ultimately, is "an interest in evading the law"—which "is not an especially weighty legal interest." *Ibid.* [7] On balance, the third and fourth preliminary-injunction factors favor the government, and for that reason, too, the Court should deny relief.

## IV.   IF THE COURT CHOOSES TO GRANT PRELIMINARY RELIEF, SUCH RELIEF MUST BE NARROWLY TAILORED TO PLAINTIFFS AND THEIR MEMBERS

If the Court chooses to grant Plaintiffs preliminary relief, it should narrowly tailor that relief to Plaintiffs. When a court crafts equitable relief, it is bound by "the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*," not to "*everyone* potentially affected by an allegedly unlawful act." *CASA*, 606

---

[7] Plaintiffs also assume these factors automatically cut in their favor because they "are deprived of their First Amendment rights." Br. at 18. But as discussed above, the challenged conduct does not infringe on such rights, *see supra* pp. 15–17, so that argument fails, too.

U.S. at 852 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) (emphasis in original).

Plaintiffs ask the Court to ignore that binding precedent on the basis of practical concerns: that "there is no plausible manner" in which to craft a tailored injunction because that "would inherently require finding and disclosing Plaintiffs' information," subjecting them to the "threat of disclosure" and "risk of misidentification." Br. at 20. But the Court could, for instance, order *in camera* submission of a roster of Plaintiffs' members, complete with sufficient information to ensure adequate identification, then enjoin IRS and SSA from releasing protected information to ICE regarding those members, while prohibiting ICE from reviewing Plaintiffs' submissions. That would both protect Plaintiffs' interests and remain faithful to the limited nature of the judicial role.

The same limiting principles of equitable relief apply if the Court chooses to grant preliminary relief on the basis of § 705, which was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). The House Report accompanying the APA explained that at the time of the statute's passage in 1946, relief under § 705 should "normally, if not always, be limited to the parties complainant." H.R. Rep. No. 79-1980, at 277 (1946).[8] And the Supreme Court has recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary relief. In the alternative, it should enjoin only the sharing of data relating to the parties in this case.

---

[8] Even if the Court believes that universal relief is available as a *final judgment* under § 706, the clear limitation described in the House Report would still apply to *preliminary* relief under § 705.

20

NOVEMBER 17, 2025                    Respectfully submitted,

                                     BRETT A. SHUMATE
                                     Assistant Attorney General
                                     Civil Division

                                     ELIZABETH J. SHAPIRO
                                     Deputy Director
                                     Federal Programs Branch

                                     */s/ Cesar Azrak*
                                     CESAR AZRAK
                                     Trial Attorney
                                     United States Department of Justice
                                     Civil Division, Federal Programs Branch
                                     1100 L Street, NW
                                     Washington, DC 20005
                                     Telephone: (202) 538-3491
                                     cesar.e.azrak@usdoj.gov

                                     *Counsel for Defendants*

21