# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS, NATIONAL PARENTS UNION, NATIONAL KOREAN AMERICAN SERVICE AND EDUCATION CONSORTIUM, & UNDOCUBLACK NETWORK, <br><br>　　　　　　　　Plaintiffs, <br><br>　　v. <br><br>SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service and Secretary of the Treasury; DEPARTMENT OF THE TREASURY; INTERNAL REVENUE SERVICE; FRANK BISIGNANO, Commissioner of the Social Security Administration; SOCIAL SECURITY ADMINISTRATION; KRISTI NOEM, Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, <br><br>　　　　　　　　Defendants. | Civil Action No. 1:25-cv-12822-IT |

## AMENDED COMPLAINT

1.      More than 50 million immigrants live in the United States, helping to build our economy and support our government.[1] Regardless of their immigrant status, the federal government requires workers to file and pay taxes. Undocumented workers alone contribute more than $90 billion in federal, state, and local taxes, of which more than $50 billion is in annual federal income, payroll, and social insurance taxes, all of which relate to benefits they may not receive until they legalize.[2] To facilitate and encourage tax filings, the government is required by law to protect the privacy of tax-related information, so that taxpayers, regardless of immigration status, can securely disclose personal information about themselves and their families.

2.      The Tax Reform Act of 1976, and specifically 26 U.S.C. § 6103, is the foundation of these privacy protections. Enacted after Richard Nixon used tax agencies to attack political enemies, the statute requires that tax information be kept confidential, unless a specific exception applies.

3.      This confidentiality requirement applies to any federal employee or officer who receives the data, not only within the Internal Revenue Service ("IRS") but also within any other agency. For example, the Social Security Administration ("SSA") and its employees are subject to this requirement, as they regularly receive protected taxpayer information from filers with social security numbers ("SSNs"), including many immigrants. All federal employees are strictly prohibited from sharing confidential tax information, unless a clearly specified exception applies.

---

[1] Stephanie Kramer & Jeffrey Passel, PEW CHARITABLE TRUSTS, What the data says about immigrants in the US (Aug. 21, 2025), https://www.pewresearch.org/shortreads/2025/08/21/key-findings-about-us-immigrants/.

[2] Inst. on Tax'n & Econ. Pol'y, Tax Payments by Undocumented Immigrants (July 30, 2024), https://itep.org/undocumented-immigrants-taxes-2024/.

4.      Based on § 6103's protections, the IRS, SSA, and other agencies that regularly receive tax information erected an architecture of privacy regulations to ensure that each agency accesses, discloses, and uses tax information only as restricted by the statute.

5.      Having instituted these strong privacy protections, the IRS consistently assured taxpayers and service providers that tax information would not be used for immigration enforcement.

6.      Plaintiffs relied on—and routinely reiterated to their members—the IRS's promises to protect immigrants' tax-related information. Plaintiffs' members relied on those promises in turn. Plaintiffs are membership-based organizations that seek to pursue civil and economic equality for their community members, including immigrant families. Hailing from Asia, Africa, Latin America, and the Caribbean, Plaintiffs' members have built lives and paid taxes in communities from Massachusetts to Texas to California to Missouri. For the Community Economic Development Center of Southeastern Massachusetts, this includes providing direct assistance to immigrants to file and pay taxes.

7.      In 2025, however, the Trump administration abruptly changed course. It has disregarded privacy protections to facilitate locating, detaining, and deporting immigrant taxpayers en masse.

8.      In February 2025, Immigration and Customs Enforcement ("ICE") sought, and the then-Acting SSA Commissioner complied by providing, tens of thousands of immigrants' addresses from the SSA to locate, arrest, and deport those individuals. Much, if not all, of the immigrants' information held by the SSA comes from *privacy-protected tax filings*.

9.      Soon after, the IRS joined ICE in a Memorandum of Understanding ("MOU") whereby the IRS would share taxpayer information about immigrants with ICE. This interagency

management seeks to exploit a federal-criminal exception to tax confidentiality at an unforeseen scale and for an unprecedented purpose: to physically locate individuals for the purposes of detention and deportation. But the criminal exception cannot be applied at this mass scale—it is merely a smokescreen to obtain data necessary to deport immigrants at the scale Trump promised on the campaign trail. In fact, in further documenting its implementation of the MOU, the IRS admitted to **destroying records relating to ICE's requests** for information, even as ICE would distribute the confidential information across widely used interagency databases.

10.     As revealed in an Administrative Record ("AR"),[3] ICE's first tranche of expansive data requests sought the addresses of 7.3 million people from the IRS. Doc. No. 28-1 at TD_93. The IRS Chief Counsel and Office of the General Counsel determined that "section 6103 would not permit the IRS to disclose the address information sought by ICE to supplement its removal enforcement packages." Id. at TD_5.

11.     ICE later requested information for 1.28 million people and as of the filing of this amended complaint, ICE has already obtained at least 47,000 physical addresses. Id. at TD_115, TD_145. In violation of statutory limitations on disclosure and use of that information, ICE made the data available to agency employees who were not identified as or were not in fact "personally and directly engaged" in the criminal investigation. See Doc. No. 51-2 ¶ 5.

12.     Meanwhile, the SSA is working with ICE to facilitate the SSA's own sharing of immigrants' taxpayer information in contravention of the confidentiality protections of § 6103. Indeed, in a recent inter-agency letter describing the SSA-ICE data exchange, there is no mention

---

[3] Filed as Doc. No. 28-1 are Excerpts from the Administrative Record in a parallel action, Center for Taxpayer Rights v. Internal Revenue Service, No. 1:25-cv-00457-CKK (D.D.C. filed Feb. 17, 2025), which does *not* include the SSA, DHS, or ICE Defendants.

or acknowledgment that much of the data requested must be kept confidential under the statute. The SSA has even confirmed that it is currently working with ICE to "implement the technical connection that would transmit some or all of the data" described in the inter-agency letter. See Declaration of Sheree L. Myers ("Myers Decl."), Doc. No. 39-2 ¶ 4.

13.     ICE's requests to the SSA are even more expansive than its requests to the IRS: the agencies have recently agreed that the SSA will provide ICE with detailed information for approximately **50,000** immigrants every month. The SSA has begun providing that data without any regard to enforcing or identifying any policies or procedures to ensure that the data provided is not derived from tax filings protected by § 6103. Nor has the SSA explained how it will protect data from tax filings from being improperly shared.

14.     The IRS, SSA, and ICE's information-sharing policies and practices—collectively, the "information-sharing arrangements"—violate the law. 26 U.S.C. § 6103 forbids the IRS and the SSA from disclosing this protected taxpayer information to ICE, and further prohibits ICE's continued disclosure and use of the information.

15.     The interagency sharing of statutorily protected data also violates the First Amendment. Plaintiffs' members include immigrant taxpayers who have consistently filed tax returns and want to continue following the law, but fear doing so, and fear participating in their community organizations that facilitate their compliance with tax laws, given the federal government's dramatic shift to using taxpayers' information to facilitate deportations. The sharing of data between ICE and the IRS, and ICE and the SSA, violates the associational rights of Plaintiffs and their members, chills their speech rights, and harms their rights to petition the government.

16.     The unlawful data-sharing by these agencies is happening in tandem with the Trump administration's revocation of other longstanding status and protections of immigrants. For example, the administration ended Temporary Protected Status for millions of long-time residents. It also abruptly ended programs through which migrants lawfully entered the United States to seek protection. The Trump administration has also ended longstanding recognition that removal and detention are inappropriate for some communities of immigrants, such as Southeast Asian refugees who fled the aftermath of the Vietnam War and those who are stateless, even after a final order of removal. This administration has now begun deporting people from these communities to random, far-flung third countries where they have no ties and are at risk for persecution.

17.     Under these circumstances, the fear of being misidentified and deported to a dangerous foreign country will likely keep Plaintiffs' immigrant members from filing and paying their taxes as they have in the past. ICE's reliance on names and addresses to match data across agencies creates a substantial risk of misidentification, wrongful disclosures, and the targeting of individuals not subject to deportation orders, with potentially devastating consequences, including detention and deportation to distant, unknown countries. The data systems of ICE, IRS, and SSA are especially prone to such errors in cases involving common names in immigrant communities, dual-surname conventions, and transliterations from non-Latin alphabets, all of which heighten the likelihood of false matches.

18.     These acts of interagency sharing of statutorily protected data also constitute final agency action by ICE, the IRS, and the SSA. In addition to running contrary to both Constitutional and statutory mandates, the radical shift in agency policies and procedures to disclose and use taxpayer information displayed a lack of reasoned decision-making. These

actions are arbitrary and capricious, in violation of the Administrative Procedure Act, including because the agencies failed to account for immigrant taxpayers' reliance interests and the risks of misidentification due to technical limitations.

19.     To prevent the agencies' continued lawless and unconstitutional intrusion on immigrant taxpayers' privacy and the harms to the immigrant communities who comprise Plaintiffs' members, Plaintiffs ask this Court to declare that these data-sharing practices are unlawful and prevent further disclosure and use of protected tax-related information.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

21.     Venue is appropriate under 28 U.S.C. § 139l(e)(l) because Plaintiffs Community Economic Development Center of Southeastern Massachusetts and National Parents Union are both incorporated in Massachusetts and have offices in New Bedford and Malden, Massachusetts, respectively. Both organizations also have and serve affected members who are residents of Massachusetts.

## PARTIES

22.     Plaintiff Community Economic Development Center of Southeastern Massachusetts ("CEDC") is a membership-based organization that was initially established in 1997 as a community development corporation in New Bedford, MA. Its mission is "to create a more just local economy by building bridges to resources, networks, and cooperative action for new immigrants and working families to find their way to economic opportunity."[4]

---

[4] In quoted excerpts herein, all emphases have been added, and all internal citations and quotation marks have been deleted unless otherwise noted.

23.     For twenty-two years, CEDC has provided tax assistance as a Volunteer Income Tax Assistance Program ("VITA") site to low- and moderate-income residents of New Bedford, including many who are not citizens of the United States. CEDC is also an accredited representative for immigration proceedings and provides assistance and referrals for a range of immigration issues, including U-visa applications for victims of crime. To support the security of its staff and clients, CEDC requires all clients to become members of the organization before it provides services.

24.     Plaintiff National Parents Union ("NPU") is an organization headquartered in Woburn, Massachusetts, consisting of more than 1.7 million parents, families, and kinship providers across 50 states, Puerto Rico, and the District of Columbia. Working alongside approximately 1,800 organizations of parents in localities across the country, NPU seeks to channel the power of parents, families, and kinship providers into powerful policies that improve the lives of children, families, and communities across the United States.

25.     In recent years, NPU has recognized the importance of the tax system to support the economic well-being of families. It advocated for a strengthened and expanded Child Tax Credit, including ensuring that all children benefit from the credit regardless of their parents' immigration status. NPU has sought to be an organization that is open to all parents in the country, including those who are undocumented or otherwise potentially subject to deportation.

26.     Plaintiff National Korean American Service and Education Consortium ("NAKASEC") has a mission to organize Korean and Asian Americans to achieve social, racial, and economic justice. NAKASEC seeks to engage multigenerational Korean and Asian Americans and immigrants in support of a future in which low- and middle-income immigrants, people of color, and marginalized communities are working together as changemakers. It works

with 55,000 community members, including more than 400 who serve as active volunteers, particularly in Texas, Illinois, New York, New Jersey, Virginia, and Pennsylvania.

27.     Plaintiff UndocuBlack Network ("UBN") is a nonprofit membership organization incorporated in the state of Delaware and headquartered in the District of Columbia. Founded in 2016, UBN is a multigenerational network of Black immigrants that advances the rights and well-being of Black immigrant communities by promoting access to resources, amplifying stories, fostering organizing efforts, and supporting community wellness. UBN has members across the nation with chapters in New York, Los Angeles, and the D.C.-Maryland-Virginia region. UBN serves over 1,000 immigrant members through its organizational chapters with a national network across approximately thirty states.

28.     Defendant Department of the Treasury is a federal agency headquartered in Washington, D.C., responsible for managing federal finances, including collecting taxes, paying government bills, and enforcing finance and tax laws.

29.     Defendant Internal Revenue Service ("IRS") is a federal agency headquartered in Washington, D.C., and is responsible for the implementation of the internal revenue laws. It is a bureau of the Department of the Treasury.

30.     Defendant Scott Bessent is the Secretary of Treasury and Acting Commissioner of the IRS. As Treasury Secretary, he is responsible for the administration and enforcement of the Internal Revenue Code. 26 U.S.C. § 7801(a)(l). As Acting IRS Commissioner, he is responsible for execution and application of the internal revenue laws. 26 U.S.C. § 7803(a)(2). He is also responsible for ensuring that IRS employees "are familiar with and act in accord with taxpayer rights," including "the right to privacy" and "the right to confidentiality." 26 U.S.C. § 7803(a)(3)(G), (H).

8

31.     Defendant Social Security Administration ("SSA") is a federal agency headquartered in Washington, D.C. responsible for the administration of certain benefits, including federal Old-Age, Survivors, and Disability Insurance, which requires the handling of personal information.

32.     Defendant Frank Bisignano is the Commissioner of the Social Security Administration and has assumed a non-statutory role of "Chief Executive Officer" of the IRS.

33.     Defendant Department of Homeland Security ("DHS") is a department within the executive branch of the federal government, headquartered in Washington, D.C. DHS is responsible for immigration enforcement, among other programs.

34.     Defendant Bureau of Immigration and Customs Enforcement ("ICE") is a federal agency headquartered in Washington, D.C. and under the Department of Homeland Security.

35.     Defendant Kristi Noem is Secretary of the Department of Homeland Security. Along with those under her direction, she seeks to obtain taxpayer information and other information held by the IRS and SSA.

36.     Defendant Todd M. Lyons is Acting Director of Immigration and Customs Enforcement. He, and those under his direction, have sought and continue to seek to obtain taxpayer records.

## FACTS

### Congress established strong privacy protections for tax-related information.

37.     Everyone in the United States who earns income above a certain threshold is obligated to file and pay taxes, regardless of immigration status. 26 U.S.C. §§ 1, 2(d), 871. The Internal Revenue Code generally does not distinguish among noncitizens on the basis of

immigration status but instead imposes tax obligations based on a person's physical presence within the country. See 26 U.S.C. § 871(b).

38.    Until the 1970s, tax-related information was designated as public records, subject to limited protections against intra-governmental disclosure. However, President Richard Nixon exploited this designation to obtain tax information and use it against his political opponents. His staff approached the IRS with an "enemies list" and sought among other information, the tax history of opponents in the impending Presidential election.[5]

39.    After the details of President Nixon's efforts to access tax records came to light, Congress revised the statute governing tax-related records, 26 U.S.C. § 6103, to strictly limit the disclosure of information. For half a century, federal agencies have been required to maintain the confidentiality and privacy of taxpayer records.

40.    Section 6103(a) establishes that tax "returns and return information shall be confidential," and shall not be disclosed without specific statutory authorization. "Return information" is defined broadly to include not only tax returns themselves, but also "any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense." 26 U.S.C. § 6103(b)(2).

---

[5] Joseph J. Thorndike, Tax History: Did Richard Nixon Weaponize the IRS Against George Wallace?, TAX NOTES (Dec. 18, 2023), https://www.taxnotes.com/tax-history-project/tax-history-did-richard-nixon-weaponize-irs-against-george-wallace/2023/12/15/7hp6f; Joseph J. Thorndike, Tax History: Nixon Aide Tried to Weaponize the IRS by Pressuring the Commissioner, TAX NOTES (Mar. 13, 2023), https://www.taxnotes.com/tax-history-project/tax-history-nixon-aide-tried-weaponize-irs-pressuring-commissioner /2023/03/10/7g45r.

41.     Section 6103's prohibition on disclosure extends beyond the IRS, applying to any "officer or employee of the United States," among others. 26 U.S.C. § 6103(a)(l). Sections 7213 and 7213A impose criminal sanctions on willful disclosure in violation of § 6103 and on unauthorized inspection of return information.

42.     Congress and the IRS have repeatedly emphasized the importance of tax confidentiality, even apart from the statutory prohibitions on unlawful disclosure, inspection, and use.

43.     In July 2014, the IRS adopted a Taxpayer Bill of Rights, which included an enumerated right to confidentiality: "Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. Taxpayers have the right to expect appropriate action will be taken against employees, return preparers, and others who wrongfully use or disclose taxpayer return information."

44.     In 2015, further bolstering the Commissioner's commitment and responsibility to ensure the "right of confidentiality," Congress codified the Taxpayer Bill of Rights into the Internal Revenue Code itself. 26 U.S.C. § 7803(a)(3)(H).

45.     Like the IRS, the SSA regularly receives and uses return information to administer the Old Age, Survivor, and Disability Insurance and other programs. See 26 U.S.C. § 6103(*l*)(1) (providing for the disclosure and use of return information for this purpose). The limitations on disclosure, inspection, and use of return information from § 6103 apply when this information is in the possession of the SSA. See 26 U.S.C. § 6103(a)(l).

46.     When tax return information is disclosed to the SSA to administer SSA programs, the Social Security Act additionally prohibits its unlawful disclosure. 42 U.S.C. § 1306(a)(1).

47.    The privacy protections for return information, whether held by the IRS, SSA, or any other agency, contain no exception for civil immigration enforcement or limitation based on immigration status.

**The IRS and other government agencies have repeatedly promised to protect the information of immigrant taxpayers.**

48.    The IRS has reaffirmed the confidentiality of tax filings by citizens and noncitizens alike.

49.    As recently as the end of 2024, the IRS stated clearly and categorically: "***There is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws***." 89 Fed. Reg. 93,172, 93,174 (Nov. 26, 2024).

50.    The IRS made this affirmation in the context of regulatory changes providing for disclosure of data for statistical purposes, after a commenter raised a concern that the rule change could "result in the creation of a list of taxpayers . . . that could be used to target individuals presumed to be undocumented for immigration enforcement purposes." The commenter further raised concerns about the "chilling effect" that even the prospect of such a disclosure would cause. Id.

51.    The IRS previously proclaimed the separation between tax administration and immigration enforcement in 1996, when it created Individual Taxpayer Identification Numbers ("ITINs"). An ITIN is a tax processing number issued by the IRS for noncitizens who have a U.S. tax filing or reporting requirement but are not eligible for a Social Security Number ("SSN"). An ITIN does not create an inference about an individual's immigration status. For instance, ITIN holders include investors who rarely set foot in the country, frequent visitors, and long-term residents. 26 C.F.R. § 301.6109-1(b)(2), (d)(3).

52.     When proposing to create the ITIN, the IRS specifically emphasized that confidentiality protections would attach: "The IRS individual taxpayer identification numbers and the information obtained by the IRS as a result of issuing numbers **constitute confidential taxpayer information**. Section 6103 strictly prohibits the disclosure of this information to other government agencies, private entities, or citizens. Disclosure in violation of the restrictions under section 6103 may lead to civil or criminal penalties." 60 Fed. Reg. 30,211, 30,213 (June 8, 1995).

53.     During the notice and comment period, the IRS received comments suggesting that ITINs should be issued by immigration-enforcement agencies or the SSA. The IRS rejected those suggestions. "The IRS is the most appropriate federal agency to assign the ITIN because **the number is intended for tax use only**. Having the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding the immigration status of an alien individual or the right of that individual to be legally employed in the United States."[6] The IRS reached this conclusion after substantial interagency consultation.[7]

54.     In 2003 and 2004, the IRS, DHS, Government Accountability Office, and others reaffirmed that the **law did not permit data sharing between IRS and DHS**: "[C]urrent statutory restrictions on sharing tax data would need to be modified to permit sharing of IRS data with [Department of Homeland Security]" for immigration enforcement.[8] Congress has never made such modifications.

---

[6] Taxpayer Identifying Numbers (TINs), T.D. 8671, 1996-1 C.B. 314 (1996).

[7] Id.

[8] See Gov't Accountability Office, <u>Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used</u>, GAO-04-529T at 18 (Mar. 2004). Amid the GAO investigation, the IRS imposed stricter requirements to obtain an ITIN, <u>id.</u> at 11, and Congress later codified these and other strictures, Consol. Approps. Act, Pub. L. No. 114-113, Division Q, Title II,

55.    Around the same time, the Department of Treasury quelled public concern about immigrant taxpayers' information being used for immigration enforcement: "Neither the IRS nor [the Treasury Inspector General for Tax Administration] has a program or project to investigate unauthorized workers in an effort to have them deported. The core missions of IRS and TIGTA are, and must remain, focused on our tax system."[9]

56.    Amid anxiety regarding information sharing under the first Trump administration, the agency issued a statement affirming that "[t]he IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs . . . . ***There is no authorization under this provision to share tax data with ICE***."[10]

57.    The agency has also reaffirmed its commitment to taxpayer privacy through its VITA program. The VITA program offers "free basic tax return preparation to qualified individuals," which includes low-income communities and "[l]imited English-speaking taxpayers."[11] VITA services are free and are provided by IRS partners who "must take and pass tax law training," which "includes maintaining the privacy and confidentiality of all taxpayer information."[12]

---

§ 203, 129 Stat. 2242, 3078-81 (2015).

[9] Gregory F. Jenner, <u>Treasury Responds to Groups' Concern Over Targeting ITIN Users</u>, TAX NOTES (March 24, 2004), https://www.taxnotes.com/research/federal/other-documents/treasury-tax-correspondence/treasury-responds-to-groups-concern-over-targeting-itin-users/yqkt.

[10] Maria Sacchetti, <u>Undocumented and paying taxes, they seek a foothold in the American Dream</u>, WASH. POST (Mar. 11, 2017), https://www.washingtonpost.com/local/social-issues/undocumented-and-paying-taxes-they-seek-a-foothold-in-the-american-dream/2017/03/11/bc6a8760-0436-11e7-ad5b-d22680e18d10_story.html.

[11] IRS, <u>Free tax return preparation for qualifying taxpayers</u>, https://www.irs.gov/pub/irs-pdf/p5776.pdf.

[12] <u>Id.</u>

58.      The IRS enlists community-based organizations like Plaintiff CEDC to provide tax filing assistance through VITA and encourage tax compliance, including for immigrant taxpayers. In recruiting and training organizations to provide VITA and other services, the IRS repeatedly emphasizes the importance of taxpayer privacy.[13]

59.      The IRS has also specifically affirmed its commitment to ***immigrant*** taxpayer privacy via the VITA program. The agency has sought to broaden its VITA partnerships specifically to provide support for immigrant taxpayers, particularly those who must file with an ITIN. To obtain an ITIN, taxpayers must either mail their passports or other identity documents to the IRS or present them to a Certifying Acceptance Agent ("CAA"), who is trained and screened to provide certified copies of the documents to the IRS. As recently as October 2024, the IRS made a deliberate effort to expand its CAA services by enlisting VITA sites and similar community institutions: "The goal is to increase the availability of Individual Tax Identification Number (ITIN) services throughout the nation and within local communities, particularly communities with high ITIN usage."[14]

60.      The IRS and the federal government as a whole benefit from the credibility of VITA sites, such as Plaintiff CEDC, among immigrant communities. The organizations' reassurances about privacy protections for taxpayer information have encouraged millions of taxpayers around the country—and hundreds in the New Bedford community—to trust that they could file tax returns safely.

**In response to pressure to unlawfully aggregate and disclose taxpayer data and participate in immigration enforcement, key IRS officials have resigned in protest.**

---

[13] See, e.g., id.

[14] IRS, Fact Sheet: Becoming a Certified Acceptance Agent (CAA) for SPEC Partners (Oct. 2024).

61.     President Donald J. Trump and his administration have made it a priority to locate and deport noncitizens from the United States en masse. Before taking office, Trump pledged to conduct "the largest deportation operation in the history of our country."[15] The Trump administration first assigned ICE a daily quota of 1,200-1,400 arrests,[16] and these numbers were "a floor, not a ceiling."[17] Frustrated with even that level of mass arrests, the administration quickly raised its quota to 3,000 arrests per day.[18] As the agency has struggled to meet these demands, White House officials have reportedly berated its leadership, urging more aggressive measures.

62.     Building on unconstitutional and illegal enforcement activities implemented by prior administrations,[19] DHS has sought to enlist IRS agents' assistance in immigration enforcement. For example, in a February 7, 2025, letter to Secretary Bessent, Secretary Noem urged the use of limited IRS resources to track down employers of unauthorized workers and to assist with immigration arrests.[20]

---

[15] Joel Rose & Sergio Martinez-Beltran, Trump touts historic deportation plans, but his own record reveals big obstacles, NPR (Aug. 14, 2024), https://www.npr.org/2024/08/14/nx-s1-5037992/trump-immigrants-border-mass-deportation-presidential-race-migrants.

[16] Kristen Welker & Julia Ainsley, Trump is 'angry' that deportation numbers are not higher, NBC NEWS (Feb. 7, 2025), https://www.nbcnews.com/politics/national-security/trump-angry-deportation-numbers-are-not-higher-rcna191273.

[17] Priscilla Alvarez, White House pressures ICE to pick up pace of migrant arrests, sources say, CNN (Feb. 7, 2025), https://www.cnn.com/2025/02/07/politics/ice-arrests-pressure.

[18] Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, WALL ST. J. (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[19] See Shayak Sarkar, Internal Revenue's External Borders, 112 CAL. L. REV. 1645, 1650-64 (2024) (describing prior administrations' approaches).

[20] DHS Sec'y Kristi Noem, Letter to Scott Bessent, https://www.documentcloud.org/documents/25521913-25-07283-sl-signed-irs-letter-02072025/ (Erin Mansfield, DocumentCloud) (last modified Feb. 12, 2025) (on file with USA Today).

63.     On February 21, 2025, ICE officials took the request further: demanding the names and addresses of 700,000 taxpayers who filed tax returns to "assist with orders of removal." Doc. No. 28-1 at TD_3.

64.     The requested name and address information is "return information" and therefore, is "confidential" under 26 U.S.C. § 6103(a).

65.     IRS leadership resisted this request, informing ICE that its "request does not relate to a criminal investigation, because removal proceedings are generally civil in nature." Id. at TD_4. Soon after, the then-Acting Commissioner abruptly retired. President Trump replaced the departed officer with a new Acting Commissioner who expressed openness to complying with the request.[21]

66.     Another career IRS employee, Acting Chief Counsel William Paul, also resisted the request to share confidential taxpayer information with ICE, DHS, and other agencies, outside the Congressionally approved protections in 26 U.S.C. § 6103. By March 13, 2025, he was demoted from his position and replaced with Andrew De Mello, whom the Trump administration reportedly believed to be more amenable to its agenda.[22]

**The Treasury Department and DHS begin IRS-ICE Information Sharing.**

67.     On April 7, 2025, the Department of Treasury and Department of Homeland Security entered into a Memorandum of Understanding ("MOU") on behalf of the IRS and ICE,

---

[21] Jacob Bogage, Meryl Kornfield, & Patrick Svitek, What in the DOGE is happening at the IRS, WASH. POST (Mar. 3, 2025), https://www.washingtonpost.com/politics/2025/03/03/what-doge-is-happening-irs/ (noting the confirmation of these events by a White House official).

[22] IRS chief counsel is demoted and replaced with DOGE ally, MONEYWATCH (Mar. 13, 2025), https://www.cbsnews.com/news/andrew-de-mello-irs-william-paul-doge-trump/.

respectively, to commence the sharing of IRS data with ICE. A copy of the MOU is attached as Exhibit A.

68.    By its own terms, the MOU includes only limited information on how information sharing would occur, with further details provided in a separate document on implementation dated April 18, 2025. See Joint Mot. For Protective Order, Centro de Trabajadores Unidos, et al., v. Bessent, et al., No. 1:25-cv-00677 (D.D.C. April 21, 2025), Doc. No. 44.

69.    Shortly after the MOU was finalized, the new acting Commissioner announced that she would leave the agency.[23]

70.    The Chief Privacy Officer, Chief Financial Officer, Chief of Staff, and Chief Risk Officer also announced their decisions to leave the agency.[24] These departures were motivated by the decision to share information with ICE. For example, the then-Chief Privacy Officer has since remarked, "I was asked to do something and lead something and be part of something that, at the time, we had an opinion was not lawful . . . . It was related to sharing the immigrant data."[25]

71.    On June 25, 2025, ICE made an additional request for the addresses of over 7.6 million taxpayers. Doc. No. 28-1 at TD_86, TD_93.

72.    Even for then-Acting General Counsel De Mello, who had previously been installed because of his willingness to accommodate the IRS-ICE data sharing, the request went

---

[23] Nathan Layne & Kanishka Singh, Top IRS officials join chief in quitting following immigration data deal, REUTERS (Apr. 9, 2025), https://www.reuters.com/world/us/us-irs-chief-quit-over-deal-share-data-with-irnmigration-officials-report-says-2025-04-08/.

[24] Id.

[25] David Stewart, Paige Jones, and Kathleen Walters, Ex-IRS Official Talks Tax Data Sharing Deal, Agency Tenure, TAX NOTES (Sept. 4, 2025), https://www.taxnotes.com/tax-notes-live/tax-notes-talk/ex-irs-official-talks-tax-data-sharing-deal-agency-tenure/7szdf.

too far. He noted "deficiencies" in the agency's request, even under the MOU, and refused to allow the disclosure. Id. at TD_93. Two days later, De Mello was removed from his position.[26]

73.    That same day, on June 25, 2025, ICE submitted yet another request, this time for the last known addresses of approximately 1.28 million people. The request asserted that the criminal statute to be investigated for each individual was 8 U.S.C. § 1253(a). Doc. No. 28-1 at TD_115. On information and belief, this list included every person with a final order of removal in ICE's records.

74.    For some individuals, ICE failed to provide the IRS with enough information to ensure that the taxpayer return information in its databases was a match for the person ICE sought. For others, ICE did not even provide scant evidence of a criminal investigation as described in the MOU. IRS did not produce information for those individuals.

75.    But the IRS did return the addresses for nearly 50,000 people in response to ICE's request. Decl. of John J. Walker, Center for Taxpayer Rights v. IRS, No. 1:25-cv-457 (D.D.C. filed Aug. 28, 2025), Doc. No. 31-1.

76.    Soon after the IRS's response to ICE's request, Commissioner Billy Long was removed from his office. Treasury Secretary Bessent now serves as Acting Commissioner.

77.    Secretary Bessent intends to require IRS staff to comply with ICE requests and share taxpayers' information, even where there is uncertainty about the accuracy of a match or where ICE does not provide all the information required by the MOU, and the law.

**The IRS-ICE information sharing is not properly restricted.**

---

[26] William Turton, Christopher Bing, and Avi Asher-Schapiro, The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE, PROPUBLICA (July 15, 2025), https://www.propublica.org/article/trump-irs-share-tax-records-ice-dhs-deportations.

78.    The purpose of the IRS-ICE MOU, which begins by quoting Executive Order 14161, is to carry out the President's Order to "to identify, exclude, or remove aliens illegally present in the United States." Ex. A at 1.

79.    To this end, ICE intends to access the most recent taxpayers' addresses contained in the IRS data to find and arrest more than 7 million individuals.[27]

80.    The MOU purports to rely on 26 U.S.C. § 6103(i)(2) to justify the sharing of taxpayer information. It specifically cites subsection (i)(2). Ex. A at 1. However, subsection (i)(2) provides for disclosure of certain return information in connection with the enforcement of non-tax federal criminal law.

81.    This presents a problem for ICE because the detention and removal of individuals is not a criminal but a civil process.

82.    To attempt the legally necessary connection between *criminal* law and immigration enforcement, the agreement focuses first on individuals with final orders of removal. It asserts that ICE seeks information regarding those taxpayers to support "criminal investigation under 8 U.S.C. § 1253(a)(1)." However, Defendants have conceded that they are seeking the taxpayers' most recent address to determine if a noncitizen taxpayer is present in the United States. Hr'g on Prelim. Inj. Tr. at 57:7-15, Doc. No. 27 (Dec. 19, 2025). Section 1253(a)(1), however, was enacted in 1996 to impose a criminal penalty for individuals who "willfully" remain in the United States 90 days after an order of removal becomes final, not merely those present in the country.

---

[27] Doc. No. 28-1 at TD_84-86, TD_118; Jacob Bogage, <u>DHS officials ask IRS to use tax data to locate up to 7 million immigrants</u>, WASH. POST (Apr. 5, 2025), https://www.washingtonpost.com/business/2025/04/05/irs-tax-data-immigration-enforcement/.

83.    The statute's criminal provisions have been rarely applied. From 1996, when §
1253 was enacted, until 2023, only 314 people were charged with violating any subsection of the
statute.[28] This number includes individuals prosecuted for the willful refusal to obtain travel
documents and affirmative efforts to resist removal, such as assaulting ICE officers. On November
17, 2025, the Acting Assistant Director of the Enforcement Division, within ICE, has confirmed
that criminal prosecution under § 1253 is a last resort, arising only when "the violations have a
serious negative impact on our society, members of the public, and agency operations[.]"
Declaration of Brian McShane ("McShane Decl."), Doc. No. 39-3 ¶ 8.

84.    There is also little case law interpreting this statute. For example, there has not
been a reported case explaining the effect of § 1253 for individuals who have a final order of
removal but who have been granted other forms *of immigration relief*, such as deferred action
(including Deferred Action for Childhood Arrivals), withholding of removal, relief under the
Convention Against Torture, Temporary Protected Status, and/or parole.

85.    When ICE submitted its request for 1.28 million addresses under § 1253, its
request included many people whose final removal order date did not yet surpass 90 days. Doc.
No. 28-1 at TD_145.

86.    The MOU does not limit its scope to § 1253. It explicitly provides for further
information sharing to locate immigrants who could be investigated under "another specifically
designated Federal criminal statute." Ex. A at 1.

---

[28] Bureau of Justice Statistics, Federal Criminal Case Processing Statistics Data Tool,
https://fccps.bjs.ojp.gov/home.html?dashboard=FJSP-
CriminalCodeStats&tab=CriminalCodeStatistics&ccm=1 (last visited Sept. 29, 2025).

87.    In connection with a related Freedom of Information Act ("FOIA") case in this district, <u>Cmty. Econ. Dev. Ctr. of Se. Mass. v. I.R.S.</u>, No. 25-cv-11949-IT (D. Mass., Aug. 18, 2025), the IRS recently produced the "implementation agreement" for its MOU with ICE to Plaintiff CEDC. The implementation agreement is attached here as Exhibit B.

88.    Notably, the implementation agreement requires the IRS to ***destroy records relating to ICE's requests*** for information. Ex. B at 2.

89.    The implementation agreement further provides for ICE to incorporate the address information obtained from the IRS into several general-purpose systems of records: the Alien File, Index, and National File Tracking (which is maintained by a different agency within DHS); External Investigations; and Criminal Arrest Records and Immigration Enforcement Records ("CARIER"). <u>Id.</u> at 3.

90.    There is no provision in the implementation agreement that limits the disclosure and use of taxpayer information strictly and solely to ICE officers or employees engaged in criminal investigations or preparation for criminal proceedings, as required by § 6103.

91.    Section 6103(i)(l) establishes a strict procedure that federal law enforcement must follow to obtain complete return information. Any disclosed information may be used solely for the specific purpose authorized and may be shared only with employees who are "***personally and directly engaged in***" the ***criminal*** investigation or proceeding. 26 U.S.C. § 6103(i)(1)(A). ICE dubiously asserts that ***one sole*** "officer[] or employee[] . . . [is] ***personally and directly engaged in***" the criminal investigations of nearly 50,000 people. Min. Order, <u>Center for Taxpayer Rights v. IRS</u>, No. 1:25-cv-457 (D.D.C. Sept. 5, 2025).

92.    On June 27, 2025, Defs.' Resp. to Court Order, <u>Center for Taxpayer Rights v. IRS</u>, No. 1:25-cv-457 (D.D.C. Sept. 18, 2025), Doc. No. 40-1, Defendant Lyons identified Jesse

J. Williams, the Assistant Director of the ICE Enforcement and Removal Operations Field
Operations, as the individual "personally and directly engaged" in preparing for any criminal
proceeding or investigation involving these thousands of individuals. Defs.' Resp. to Court Order,
Center for Taxpayer Rights v. IRS, No. 1:25-cv-457 (D.D.C. Sept. 18, 2025), Doc. Nos. 40, 40-1.
The Assistant Secretary of DHS, William Clark Barrow, reiterated that Jesse Williams alone was
"personally and directly engaged" in the criminal investigations of 7.3 million people, and made
the same representation again in a June 25, 2025, request for the addresses of 1.28 million people.
See Doc. No. 28-1 at TD_84-86, TD_100-102, TD_115. Then, as of November 5, 2025, ICE
representatives claim they replaced Jesse Williams with Brian McShane as the Assistant Director
of the Enforcement Division within ICE. McShane Decl., Doc. No. 39-3 ¶ 1. ICE asserts that, like
Williams, McShane alone is "personally and directly engaged" in all criminal investigations
related to ICE's information requests from the IRS.

93.    As of August 9, 2025, ICE and the White House were reportedly dissatisfied with
the IRS's reluctance to share more addresses than it already shared with ICE. Soon after the IRS
provided over 47,000 addresses to ICE, the Trump administration removed IRS Commissioner
Billy Long from his post. The White House even sought additional information about taxpayers,
beyond their last known address, such as whether taxpayers claimed the earned income tax
credit.[29]

94.    Defendants have confirmed that Homeland Security Investigations ("HSI") "made
the data available to the Enforcement Removal Operations, Law Enforcement Systems and

---

[29] Jacob Bogage & Kadia Goba, IRS, White House clashed over immigrants' data before tax
chief was ousted, WASH. POST (Aug. 9, 2025)
https://www.washingtonpost.com/business/2025/08/09/trump-administration-irs-data-dispute/.

Analytics team," without any identification of who within that team is personally and directly engaged in the criminal investigation of the taxpayers whose data were shared. Declaration of Richard S. Fitzgerald ("Fitzgerald Decl."), Doc. No. 51-2 ¶ 5.

95.    The agencies have arranged to conduct an automated data dump. The Integrated Data Retrieval System, designated in the implementation agreement, accepts queries one at a time, to ensure that each request satisfies the strict legal requirements of § 6103 and related controls. For ICE, this one-by-one process would be incompatible with the wholesale mission of the Executive Order, requiring instead data transfer in bulk.

96.    To that effect, ICE sends the IRS a spreadsheet with names, prior addresses, and other identifying information of targeted individuals. The request includes the date of a final removal order, a citation to a criminal statute, and a tax period. Doc. No. 28-1 at TD_125-28.

97.    ICE provides an SSN or ITIN for only approximately 10% of records. Id. at TD_126. Then, an automated system (not a human being) seeks to match these names and addresses to the SSN or ITIN. Id. at TD_125-26.

98.    If there is a match, the system then "scrapes" the resulting information into a spreadsheet, including the most recent address. That spreadsheet is provided to ICE.

99.    By eliminating an individualized confirmation of individuals' information, the automated matching system exacerbates the risk of "false positives," particularly where ICE has not provided an SSN or ITIN. ICE does not provide an SSN or ITIN for 90% of records, the overwhelming majority of requests are instead based on matching the name and address. Id. at TD_126.

100.    When given the opportunity by the Court to explain how the data will be used only for criminal purposes, Defendants have merely stated that "ICE will collaborate closely with

the developers to ensure the IRS data is properly tagged and identified as IRS data, marked restricted, and designated for use in criminal investigations." See Fitzgerald Decl., Doc. No. 51-2 ¶ 7. Defendants have provided no further information explaining how the data is to be segregated and prevented from being used for civil enforcement.

101.    Now that the IRS has shared tax data with ICE, Defendants acknowledge having provided addresses to employees within "the Enforcement Removal Operations, Law Enforcement Systems and Analytics team," who were not identified as personally and directly engaged in the criminal investigation. Id. Doc. No. 51-2 ¶ 5. Former DHS Executive Secretary Deborah Fleischaker observed that "[d]uring my time at ICE and DHS, when ERO became aware of information that could give rise to criminal liability, it would work with staff of the ICE Office of the Principal Legal Advisor to make a referral to a U.S. Attorney's office or the Department of Justice to take any further steps. According to ICE's FY 2024 annual report, ERO pursued approximately 3,000 criminal matters, compared to more than 113,000 administrative arrests and 144,000 detainers issued for individuals in the custody of another agency." Doc. No. 30 ¶ 28.

**The SSA-ICE data sharing is not properly restricted.**

102.    In parallel to, but separate from, the IRS-ICE MOU and implementation agreement, the SSA and ICE have also cooperated on unlawful sharing of immigrants' information. Some of the information being shared is information that SSA has received from the IRS or from tax filings and therefore is specifically protected by § 6103.

103.    The SSA generally has access to information about two groups of people: those who pay into the Social Security system, known as "contributors," and those who receive benefits, including through disability or retirement programs, known as "beneficiaries."

104.    Contributors pay into Social Security through employment taxes, documented via employers' or employees' own tax returns. In other words, for contributors, the data SSA has access to is taxpayer return information, protected from disclosure by 26 U.S.C. § 6103.[30]

105.    To the extent that the data was provided via other means, SSA regulations **independently protect that information** as "program records," for which the agency applies "somewhat more strict confidentiality standards than those found in the Privacy Act" because that information "is often very sensitive, and claimants are required by statute and regulation to provide [SSA] with [it] in order to establish entitlement for benefits." 20 C.F.R. § 401.105(b).

106.    Despite these protections, the government acknowledged that, in February 2025, the then-Acting Social Security Administrator provided ICE with the last known addresses of 98,000 immigrants.[31] The SSA did not and has not ensured that none of this information came from tax filings. Nor did the SSA acknowledge that some of the requested information was protected by § 6103. Neither ICE nor the SSA explained how any exemption to § 6103 applied or how ICE would protect the confidentiality of the information as required by § 6103. In a recent court filing, the government further admitted that, on March 3, 2025, the SSA turned over to DHS the personal identifying information, including addresses, of an additional 1,000 immigrants. AFL-CIO et al. v. Social Security Administration et al., No. 1:25-cv-00596, Doc. No. 197 at 2, (D. Md. Jan. 16, 2026).

---

[30] See also 42 U.S.C. § 1306 (imposing additional restrictions and penalties on disclosure of returns in the possession of SSA); 20 C.F.R. § 401.125 (citing the confidentiality protections of § 6103 and noting that the agency "do[es] not disclose information when a law specifically prohibits it"); SSA's Program Operations Manual System 03301.005(B)(1); 03301.040(A); 03320.001–030 (same).

[31] Hr'g on Prelim. Inj. Tr. at 71:14-72:15 (Dec. 19, 2025); Alexandra Berzon, Hamed Aleaziz, Nicholas Nehamas, Ryan Mac, and Tara Siegel Bernard, Social Security Lists Thousands of Migrants as Dead to Prompt Them to 'Self-Deport', N.Y. TIMES (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/us/politics/migrants-deport-social-security-doge.html.

107.    In the related FOIA case in this district, <u>Cmty. Econ. Dev. Ctr. of Se. Mass. v. I.R.S.</u>, No. 25-cv-11949-IT (D. Mass., Aug. 18, 2025), the SSA maintained, through August 26, 2025, that there were no interagency arrangements to govern data sharing with ICE. <u>See</u> Exhibit C. On August 26, 2025, Charles Borges, Chief Data Officer of the SSA, submitted a protected whistleblower declaration to Congress, which revealed that the SSA political appointees (and related individuals) consistently violated statutory privacy protections, likely including violations of § 6103's protections. The declaration also revealed that at least one politically appointed individual had a particular interest in immigrants' information.

108.    On August 29, 2025, Borges resigned from the SSA. In his resignation letter, he noted that politically appointed officials had refused to inform him about a range of projects that he believed "constitute violations of federal statutes or regulations" and "may involve unauthorized data exchange with other agencies."[32]

109.    Subsequently, on September 15, 2025, SSA produced to Plaintiff CEDC a letter acknowledging its data sharing with ICE. <u>See</u> Exhibit D at 1 ("SSA Letter"). The SSA Letter was dated August 27, 2025, the day after Borges's whistleblower declaration was submitted to Congress.

110.    The SSA Letter documents an agreement for ICE to submit to SSA a monthly request for information on about 50,000 immigrants. The SSA will take that request and search its files for matches, and "will provide ICE identity and location information" for each matched file.

---

[32] Ashleigh Field, <u>Social Security's chief data officer resigns, cites 'culture of panic and dread'</u>, THE HILL (Aug. 29, 2025), https://thehill.com/homenews/administration/5478286-social-securitys-chief-data-officer-resigns-cites-culture-of-panic-and-dread/.

This includes, according to the SSA, "known alias(es), address, place of birth, banking data, known phone number(s), known email address(es), [and] names of known relative(s)." Id.

111.    The SSA Letter states that the information will be provided in accordance with 42 U.S.C. § 1306(a) and 8 U.S.C. § 1360(b), but nowhere mentions compliance with 26 U.S.C. § 6103. Nor does the SSA Letter explain that much of the requested information is taxpayer return information that the SSA is prohibited from disclosing unless the statutory exemptions are met. And neither does the SSA Letter mention any exemption that may apply, nor allude to facts suggesting any exemption is relevant.

112.    The SSA says the information "will be retained only as long as necessary to carry out the stated purpose." Id. at 2. The SSA Letter does not explicitly state the purpose of the monthly 50,000 data requests, although the purpose is clear from the first paragraph: to "identi[f]y," "locat[e]", and deport taxpaying immigrants. Id. at 1. The SSA has confirmed that, with ICE, it is "currently working to implement the technical connection that would transmit some or all of the data" described in the inter-agency letter. Myers Decl., Doc. No. 39-2 ¶ 4.

**The IRS's and SSA's information-sharing and disclosures with ICE violate § 6103's confidentiality protections.**

113.    Congress enacted 26 U.S.C. § 6103 to protect the confidentiality of tax-related information. It defines protected "return information" broadly and imposes a baseline assumption of confidentiality, which applies not only to the IRS but also across federal, state, and local governments. 26 U.S.C. § 6103. Indeed, in adopting the current form of § 6103, the Senate Finance Committee ensured that the information a taxpayer is compelled to disclose to the IRS is safeguarded to "the same degree of privacy as those private papers maintained in his home." Sen. Fin. Comm. Rep. on Tax Reform Act of 1976, S. Rep. No. 94-938-Part 1, at 328 (1976).

114.     Against this safeguard of confidentiality for return information, § 6103 identifies the precise and limited exceptions that permit disclosure and use of return information. As relevant here, subsection (i) allows for limited disclosure of return information for non-tax enforcement of federal criminal law, with strict limitations and procedures for the disclosure and use of that information.

115.     Subsection (i)(2) provides for disclosure of a subset of return information without a court order to prepare for a proceeding to enforce federal criminal law, to investigate in preparation for such a proceeding, or to prepare for a grand jury proceeding. (Generally, information that originated from a 1040, W-2, or 1099 or other tax filings, may be disclosed only if authorized under another provision and pursuant to a court order.) The receiving agency may use the information only for the purpose for which it was disclosed, and it may be disclosed only to employees who are "personally and directly engaged in" the criminal investigation or proceeding. The strict limit on the use and disclosure of subsection (i)(2) materials applies to any federal officer or employee in possession of the information, including in the IRS, SSA, ICE, or any other agency.

116.     Subsection (i) includes several *other* provisions to provide for information sharing in very specific circumstances, such as to address imminent death, physical injury, or flight from federal prosecution; in relation to terrorist activities; and to locate fugitives from justice.

117.     The IRS regulation implementing subsection (i) lays out several illustrative uses for such disclosures, including guiding forensic experts, preparing for suspect or witness interviews, and supporting plea bargaining. 26 C.F.R. § 301.6103(i)-1(b). The regulation further provides that disclosure "should be made, however, only if [the requesting agency's] purpose or

activity cannot otherwise properly be accomplished without making such disclosures." 26 C.F.R. § 301.6103(i)-1(b).

118.    Here, the IRS-ICE MOU purports on its face to abide by 26 U.S.C. § 6103(i)(2). Exhibit A at 1-3. But the actual implementation of IRS-ICE information sharing violates these statutory requirements.[33]

119.    *First*, the IRS-ICE information sharing contravenes § 6103 because its purpose is to locate and apprehend people, as evidenced by the agreements seeking the most recent addresses of tax filers.

120.    Return information cannot be used to locate or apprehend someone under subsection (i)(2), even if that individual is suspected of violating a federal criminal law. The permitted uses of return information for "investigation" and "preparation" for criminal law enforcement proceedings do not include apprehension.

121.    The distinction between "investigation" and "preparation," on one hand, and apprehension, on the other, is made clear by **separate** provisions in subsection (i) that specifically permit location and apprehension. The statute explicitly provides for the use of return information to locate missing or exploited children in subsection (i)(l), to prevent an "imminent flight" from federal prosecution in subsection (i)(3), and to **locate** fugitives from an arrest warrant for a federal felony in subsection (i)(5).

122.    In fact, during the Reagan administration, certain officials sought to use subsection (i)(2)'s exception to obtain addresses-taxpayer identity information under § 6103(b)(6)-"to locate and prosecute" people who had evaded Selective Service (draft)

---

[33] The SSA Letter does not even mention, much less provides for compliance with § 6103, despite the agencies agreeing to share taxpayer information.

registration.[34] The officials noted that then-pending legislation, which was ultimately enacted as current subsection (i)(5), would provide for the location of fugitives.[35] The Reagan administration ultimately determined that such a disclosure was improper under subsection (i)(2), relying instead on a specific provision authorizing such a disclosure by SSA.[36]

123.    In enacting subsection (i)(5), Congress intended that "taxpayer identity information be treated as [confidential] taxpayer return information unless return information (other than taxpayer identity information) is requested and disclosed pursuant to such written request." H.R. Conf. Rep. No. 97-760, at 674 (1982) (Conf. Rep.).

124.    Further, the statute requires the law enforcement agency (in this case, DHS or ICE) to provide a taxpayer's address as part of the request for taxpayer data. 26 U.S.C. § 6103(i)(2)(B)(i). It makes little sense for a law enforcement agency to be able to use this exception to obtain address information solely for the purpose of locating someone, since the agency is required to have the person's address to make the request.

125.    For this reason, longstanding IRS guidance, in the Internal Revenue Manual and separate publications, has consistently established that a request solely for address information is not a proper request under § 6103(i)(2).[37]

_____

[34] Memorandum from Joel Gerber, Deputy Chief Counsel, IRS to Roscoe L. Egger, Jr., Commissioner (Apr. 2, 1982), available at https://www.reaganlibrary.gov/public/2024-07/40-233-12008797-OA10601-004-2023.pdf.

[35] Id.

[36] Memorandum from Peter Wallison, General Counsel, Treasury to Donald Regan, Secretary (May 17, 1982), available at https://www.reaganlibrary.gov/public/2024-07/40-233-12008797-OA10601-004-2023.pdf.

[37] See Internal Rev. Manual § 11.3.28.4(5) (Apr. 17, 2025); Disclosure Litig. Reference Book, IRS Pub. 4369, at 5-4 (rev. Oct. 2012), available at www.google.com/books/edition/Disclosure_Litigation_Reference_Book/uumGnjISUOoC.

126.    In short, both the Executive Branch and Congress concluded that § 6103(i)(2) could not be used solely to obtain a taxpayer's address, not even for criminal fugitives, and Defendants' attempt to use it to locate noncitizens is therefore unlawful. The impropriety of Defendants' misinterpretation of subsection (i)(2) is underscored by Congress's enactment of § 6103(i)(5).

127.    *Second*, the arrangements are incompatible with § 6103 because the data will be used for civil immigration enforcement, in contravention of the strict limits in subsection (i)(2) restricting use to criminal investigations.

128.    The preamble to the IRS-ICE MOU recites the importance of **civil** immigration enforcement, showing that the agencies intend to use the information for civil enforcement and not criminal prosecution. Exhibit A at 1.

129.    In fact, the address information gleaned from the IRS and the SSA will be entered into the general databases used across DHS for immigration enforcement, namely the Alien File, Index, and National File Tracking, as well as CARIER. See Exhibit B at 3.

130.    And there is a long history of ICE using criminal search warrants and other criminal investigatory materials as a pretext, where the agency's real purpose is the removal of immigrants.[38]

---

[38] See, e.g., Perez-Cruz v. Barr, 926 F.3d 1128 (9th Cir. 2019) (describing use of pretextual criminal warrants to conduct civil immigration enforcement); Zelaya v. Hammer, 516 F. Supp. 3d 778 (E.D. Tenn. 2021) (certifying class of immigrant workers subject to civil immigration enforcement that originated with criminal warrant). Under this administration, ICE has reportedly used criminal warrants to enter private spaces from New York to Georgia to California, for the purpose of civil immigration enforcement.

131.    Moreover, once ICE has located the home of an individual with a final order of removal, ICE has adopted a faulty legal interpretation that would permit agents to enter that individual's home with only an administrative warrant issued by an executive-branch official.[39]

132.    Given that the initial subjects of the IRS and the SSA information sharing include individuals with final orders of removal, the civil immigration enforcement system provides no additional procedural steps before a person can be put on an airplane, including flights going to a completely unknown third country.[40]

**The information-sharing implementation is arbitrary and capricious.**

133.    In addition to contravening § 6103, the IRS-SSA information sharing is arbitrary and capricious because the agencies failed to acknowledge changes in policy and adequately consider several important interests.

134.    In April, the IRS substantially changed its policy manual to remove several safeguards relating to requests under § 6103(i)(2). These included procedures to ensure that each individual request meets the requirements of subsection (i)(2), and that audit trails for each request and the IRS's responses to it are recorded.[41] Nothing has replaced these procedures, and the IRS's implementation of information sharing with ICE is inconsistent with them.

135.    The IRS failed to adequately consider the effects of data sharing on the willingness of non-citizen taxpayers and their relatives to file tax returns. The risk that data

---

[39] Memorandum from Todd Lyons, Acting Director, ICE to All ICE Staff (May 12, 2025), as disclosed by Sen. Richard Blumenthal, https://www.hsgac.senate.gov/wp-content/uploads/2026-01-21-Letter-from-Blumenthal-to-FLETC.pdf

[40] See Dept. of Homeland Sec. v. D.V.D., 145 S. Ct. 2627, 2629 (2025) (staying a district court order that would require an opportunity to be heard on potential torture or other persecution in a third country before removal to that country).

[41] Internal Rev. Manual 11.3.28.2 (published Aug. 11, 2023), available at https://web.archive.org/web/20250403125859/https://www.irs.gov/irm/part11/irm_11-003-028.

sharing (and even the **_perception_** of data sharing) would chill tax filing was presented to the agency as recently as late 2024. 89 Fed. Reg. 93-172, 93-174 (to be codified at 26 C.F.R. pt. 301) (Nov. 26, 2024). Such a chilling effect would reduce revenue collection and frustrate the statutory goals of the Internal Revenue Code, including its tax-credit programs. But the IRS failed to consider or balance this risk.

136.    The IRS likewise failed to adequately consider the reasonable reliance of the millions of immigrant taxpayers, as well as that of relatives whose personal information appears on their tax returns, on the agency's prior representations that information would not be disclosed to immigration-enforcement agencies. As described above, these representations affirmed that § 6103 barred any disclosure to ICE whatsoever, let alone disclosures that will be used directly or indirectly for civil immigration enforcement.

137.    The IRS failed to adequately consider the effect of its information sharing on VITA and other partner organizations that had lent their credibility within immigrant communities to the agency when encouraging individuals to file tax returns, based on the IRS's promises of confidentiality.

138.    The IRS failed to adequately consider the effect of its information sharing on the First Amendment rights of VITA and other partner organizations, and of their members, including their association, speech, and petition rights. Defendants provided no explanation for, nor did they acknowledge their reversal of IRS assurances that immigrants' tax data would be protected. Now that immigrants' tax data is being shared, members of VITA organizations are hesitant to associate with the organization, like the members of CEDC. See Doc. No. 31 ¶ 38. Defendants' data-sharing has limited CEDC's members' ability to associate with CEDC.

139.    The IRS and the SSA also failed to adequately consider the consequences of errors in IRS, SSA, and/or ICE data, particularly for individuals whose names are common among immigrant communities, are not written in the Latin alphabet, and/or have dual-surname or other structures that fit poorly within government databases.

140.    Due to limitations in the IRS and SSA's data-storage systems, there are substantial risks of error among people with non-Anglo surnames or surnames associated with non-English languages. Such errors would expose incorrectly identified people, potentially including citizens, to dire consequences, up to and including detention and deportation.

141.    For example, Spanish and Portuguese naming conventions often provide for two surnames; government databases may be inconsistent with respect to which surname is identified.

142.    Names that originate in other writing systems, such as Arabic, Cyrillic, or Chinese, may be transliterated inconsistently in various locations. The same Chinese name is often pronounced entirely differently in Mandarin and Cantonese, leading to inconsistent transliterated records for people who speak both languages.

143.    The IRS has historically recognized these naming challenges, as reflected in the detailed instructions for name entry to VITA sites.[42]

144.    People with more common names, particularly names that are common in immigrant communities, are susceptible to false positives.

145.    Where the information that ICE seeks is the home address, one of the pieces of information that the IRS is instructed to use for identification, it is less likely that the agency will identify the correct individual.

---

[42] See IRS, Pub. 4012, 2024 Returns: VITAITCE Volunteer Resource Guide: Entering Last Name Correctly Bl9-B20 (rev. Oct. 2024).

146.    An administrative error could lead to dire consequences, particularly where there are no guaranteed procedural steps between a person's arrest and their removal from the United States.

147.    ICE's actions in other contexts illustrate the lack of safeguards to prevent the consequences of such errors. In the span of only five years, ICE arrested 674 U.S. citizens. Of those, 121 were confined in detention centers, and 70 were wrongfully deported, lives were uprooted and families torn apart, all due to administrative errors.[43] For example, an admitted "administrative error" led ICE to send Kilmar Abrego-Garcia to El Salvador despite an order withholding his removal to that country. Noem v. Abrego Garcia, 145 S. Ct. 1017, 1018 (2025). There, he experienced precisely the persecution that the withholding was intended to prevent.[44]

148.    ICE has also removed and attempted to remove children, based on administrative errors regarding parental wishes. Several American citizen children, including a toddler with cancer, have been removed without clear indications of parental wishes.[45] More recently, ICE attempted to remove several children to Guatemala in violation of the protections afforded to those children under the law.[46]

**HARM TO PLAINTIFFS**

---

[43] See Gov't Accountability Off., Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations, GAO-21-487 (Jul. 20, 2021), https://www.gao.gov/products/gao-21-487.

[44] Scott Neuman, Abrego Garcia says he was severely beaten in Salvadoran prison, NPR (July 3, 2025) https://www.npr.org/2025/07/03/g-s1-75775/abrego-garcia-el-salvador-prison-beaten-torture.

[45] Doha Madani, U.S. citizen children, including 4-year-old with cancer, taken to Honduras on mother's deportation flight, legal advocates say, NBC NEWS (April 27, 2025).

[46] See L.G.M.L. v. Noem, 800 F. Supp. 3d 100, 134 (D.D.C. 2025) (provisionally certifying class of minor children and granting preliminary injunction prohibiting the government from deporting the children).

149.    Plaintiff CEDC is harmed in several ways by the information sharing conducted between the IRS, SSA, and ICE. CEDC and its members—citizens and noncitizens alike—associate for the purpose of promoting economic equality, rights for immigrants, cultural cohesion, and educational opportunity for all low-income residents of the New Bedford area. CEDC is a certified Community Development Corporation under Massachusetts General Laws Chapter 40H.

150.    One way that CEDC advances those interests is by providing tax advice and legal advice to its members—citizens and noncitizens alike. CEDC serves as a Volunteer Income Tax Assistance ("VITA") provider, and directly assists its members in filing tax returns, and provides advice and support about the impact of tax laws on members and their families since 2004. The organization developed its tax-assistance program in reliance on IRS representations about the security of taxpayers' information. To become a VITA provider, CEDC committed to extensive IRS-mandated measures to protect the privacy and confidentiality of the information taxpayers provide to complete tax returns, including strict security provisions, document-destruction requirements, and periodic IRS audits. CEDC reinforced its commitment to immigrant taxpayers by becoming a Certifying Acceptance Agent, assisting members in applying for ITINs.

151.    As VITA tax preparers, CEDC has advised immigrant taxpayers of the importance of filing taxes. CEDC explains the tax system as an essential duty for residents living in the United States to help fund roads, healthcare, and schools. In addition, tax documents can be a demonstration of "good moral character" and proof of physical presence in the country in support of adjustments to immigration status or other immigration relief.

152.    Cognizant of its clients' and members' concerns about immigration enforcement, CEDC would not have invested resources in promoting tax filing if organizational leaders had

perceived a risk that the information would be disclosed. For years, CEDC staff confidently assured taxpayers that the confidentiality of their tax information would be protected, and specifically that information would not be disclosed for immigration enforcement. CEDC made these assurances to its clients and members based upon the consistent and repeated representations from the IRS that taxpayers' information was strictly prohibited from disclosure to immigration agencies.

153.    CEDC members associate with each other to pursue economic equality, immigrant rights, cultural and educational opportunities for themselves and their community, and to participate in community heritage events. Doc. No. 31 ¶¶ 4–9, 43, 47–50. CEDC members join CEDC and attend events to receive tax advice, filing assistance, and guidance related to immigration law and policy. CEDC members file tax returns, including returns that seek refunds of overpaid taxes and tax credits for which they may be eligible, with the help of CEDC.

154.    Having spent years assuring its clients and members that information provided to the IRS was safe, the organization's credibility within the community has been undermined, and CEDC staff must invest significant time to rebuild it. Organizational credibility is crucial to encourage the local community to trust the CEDC and its advice, including on how to file tax returns and otherwise participate in American society and economy.

155.    Moreover, when members approach CEDC with interest in filing tax returns or questions about tax-related matters, the organization now must devote substantial additional time explaining the change in the IRS's stance and conduct on information sharing and the attendant risks. Aware of the fraught nature of making the difficult decision to provide sensitive information to the IRS, CEDC staff have routinely discussed the organization's understanding of the IRS and ICE's information-sharing arrangement.

156.    Because of the unlawful data sharing, some immigrant CEDC members are more hesitant to attend events, to ask for tax or immigration advice, and to file their taxes. Now, when members and would-be members are considering filing tax returns, they are much more uncertain about sharing their information. This is reflected in the decrease in the number of immigrants applying for ITINs. In 2024, CEDC saw 131 applications. In 2025, there were only 41 ITIN applications—a nearly 70% decrease. ITIN applications must be filed along with a tax return for the applicant or her dependents. This decrease in ITIN applications is also a decrease in the number of tax returns filed.

157.    Additionally, CEDC saw a reduction in the number of immigrants filing their tax returns: in 2024, CEDC filed 1,666 returns for the prior tax year, but filed only 1,436 in 2025. In 2024, 145 tax returns were filed with ITINs through CEDC. In 2025, there were only 110 tax returns filed with ITINs—nearly a 25% decrease. CEDC staff have met with over 50 members on an individual basis, discussing CEDC's understanding of the data-sharing arrangements. Doc. No. 31 ¶ 37.

158.    Fewer people attend community-building events, and CEDC has canceled several events based on members' fears of attendance. Doc. No. 31 ¶ 38. CEDC has held a "Patio de Comida" event for 6 years, featuring 19-20 vendors selling their food on Saturdays for 8 weeks. The food vendors take advantage of the shared-use certified kitchen that CEDC operates with the goal of incubating new businesses. The event typically attracts between 350 and 400 attendees. In 2025, CEDC had fewer vendors, 14, and only about 170 attendees. CEDC has been told that people also want to spend less and save money in case they are deported. CEDC applied for a grant and hired an immigration attorney 2 months ago to respond to the community. CEDC holds an annual Festival Guatemalteco that attracts over 4,000 residents. The event was outright

canceled in 2025. During this festival's 8 years of occurrence, 2025 and 2021 are the only years in which the festival was canceled.

159.    When members are afraid to associate, speak, and petition the government, CEDC cannot associate, speak, or help petition the government.

160.    The unlawful information sharing places CEDC in a dilemma. As a government-supported site, it cannot advise immigrants *not* to file tax returns despite the immigration consequences. Simultaneously, as a mission-based organization committed to supporting the local community, CEDC cannot encourage immigrants *to* file tax returns knowing they will risk deportation. CEDC's organizational mission is to promote economic opportunity and build community, while providing tax-filing and other services. See Doc. No. 31 ¶¶ 4–7, 35–41. Despite CEDC staff's substantial efforts to inform members of the IRS' change in policy "rebuild trust and resolve this tension," CEDC members are still afraid to seek tax or immigration advice, or file taxes. See Doc. No. 31 ¶ 37–38.

161.    And because CEDC's funding is tied to the number of prepared tax returns (and available funds), each filing season, it risks losing grant funding if members do not file their taxes. CEDC participates in the VITA program as a subgrantee of the City of Boston, and each year, the organization must report the number of returns completed through the program, with its annual federal funding dependent on maintaining the number of returns completed. In 2025, CEDC received $85,600 from the IRS, the Massachusetts Department of Revenue, and private philanthropy to provide VITA services.

162.    CEDC's members are also harmed directly by information-sharing policies and procedures. CEDC has identified over a dozen members who turned to the organization for both tax and immigration assistance. These members have filed tax returns in recent years with the

assistance of CEDC, including several members with ITINs and several members with SSNs. It is common for CEDC members to move frequently, as most are renters and often face changing financial and family situations. For those members who have recently moved, the IRS may have their current address, while ICE may not. The IRS's disclosure of their information not only violates their trust and privacy, but also creates a heightened risk of arrest, detention, and/or deportation. The members are unsure whether to file tax returns this year and even whether to continue attending CEDC meetings and events, out of fear of the immigration-related consequences.

163.    As a result of fears that their personal information will be shared with immigration enforcement, many CEDC members have decided not to file federal and state income tax returns. By foregoing tax filing, these members have lost access to critical financial support. Some members may have owed federal and Massachusetts income taxes, which will now go unpaid.

164.    In addition, far more members, particularly those with U.S. citizen children, have now lost access to the Child Tax Credit, Child and Dependent Care Credit, and the Massachusetts Child and Family Tax Credit by not filing their taxes. These financial support measures provide hundreds of dollars in assistance per household and are intended to support the well-being of all taxpayers' children. The loss of these benefits impairs families' ability to meet basic needs, including securing food, purchasing school supplies, and maintaining stable housing.

165.    The circumstances of specific CEDC members demonstrate the potential harms and risks of the IRS's and SSA's information-sharing practices. M.P. is a CEDC member who lives in New Bedford. She has regularly attended CEDC events, and with the assistance of CEDC, she applied for her ITIN in 2019, in conjunction with filing her 2018 tax return. M.P.'s employers

have submitted W-2 forms to the IRS on her behalf. She regularly filed her taxes from 2019 to 2024. M.P. fears that the IRS and the SSA have shared or will share her information with ICE. She is anxious that ICE may arrest and detain her, exposing her children to that traumatic experience, and separating her from her children. After building a home for her family in the United States, she fears deportation to Guatemala.

166.    S.A. is a CEDC member who lives in New Bedford. He came to Massachusetts having fled persecution in Ecuador. With CEDC's assistance, he was referred to an immigration attorney, who helped him file a petition for asylum, which remains pending. CEDC further assisted him in applying for his ITIN in 2023, in conjunction with filing his 2022 tax return. S.A. fears that the IRS and the SSA will share his information with ICE, leading to his arrest, detention, and removal to the country from which he fled persecution.

167.    H.M. is a CEDC member who lives in New Bedford. H.M. had a prior removal order, was deported, but returned to the United States, fleeing extortion by gangs. He now has work authorization and an SSN. On information and belief, H.M. was among the 1.28 million individuals whose information ICE requested from the IRS. Because he has a SSN, he also fears that his information has been or will be disclosed by SSA fears that his prior removal order particularly exposes him to IRS-ICE information sharing.

168.    NAKASEC's members are also harmed by these practices. NAKASEC's members promote equality for immigrants and educate one another about their rights. Doc. No. 33 ¶¶ 3–9. NAKASEC "engages members both locally and nationally. At the local level, NAKASEC's five affiliates offer critical social services and educational programs to members[, helping to] connect members to public benefits like food stamps and energy assistance, run English language classes, participate in workforce development, and educate people on their

rights." Id. ¶ 5. Much of NAKASEC's work "focuses on know-your-rights presentations for immigrants that seek to inform immigrants about the constitutional and legal protections afforded to them." Id.

169.     J.R. is an active NAKASEC member, DACA recipient, and Ph.D. candidate. After they obtained work authorization through DACA, J.R. obtained a Social Security Number, and they have worked with that Social Security Number for several years. J.R. has diligently filed their annual taxes.

170.     R.R. is another active NAKASEC member in New Jersey who entered the United States as a child on their parents' visa, later aged out of that status, and was unable to obtain deferred action or work authorization. Since college, R.R. has worked as an independent translator and consultant, filing annual tax returns and quarterly estimates using an ITIN. R.R. is afraid to continue filing tax returns because the risk of data sharing could lead to their arrest, detention, or deportation.

171.     A.D. is a long-time NAKASEC member in California who came to the United States as a child and was unable to obtain lawful status upon turning 21. Since college, A.D. has worked as a tutor and consultant and runs a small retail business, filing taxes using an ITIN. A.D. is unsure how to or whether to comply with their tax obligations now that they fear the IRS will share their personal information.

172.     NAKASEC's members face a heightened risk of being misidentified in the information-sharing process due to the prevalence of common Korean surnames. About 45% of Koreans share one of three surnames—Kim, Lee, or Park[47]—with Kim alone accounting for about

---

[47] Moon Ki-hoon, What's in a name? How Koreans faked their way to Kim, Lee, and Park, KOREA HERALD (Oct. 22, 2024), https://www.koreaherald.com/article/3829184.

22% of all Korean surnames.[48] The high incidence of common surnames increases the risk of false positives during information sharing. If ICE's searches use only an individual's name and former address when they do not have an ITIN or SSN, there is a substantial risk of mismatching. That is, there is a substantial risk that the IRS will incorrectly match a taxpayer to a name in responding to ICE's requests, which could lead to the arrest, detention or deportation of the wrong person.

173.     NAKASEC's members face serious consequences from ICE's misidentification and information-sharing arrangements. Many of NAKASEC's members have their entire family in the United States, with their U.S.-citizen children and spouses. NAKASEC's members have gone to school in the U.S., built careers, built lives, and even served in the U.S. military. The information-sharing arrangements jeopardize all that NAKASEC's members have built. NAKASEC has routinely encouraged people to file their taxes to demonstrate that they are responsible members of our communities. Now, the organization faces a dilemma because telling members to file their taxes could expose them to arrest, detention, and removal.

174.     NPU's members are also harmed by the practices. NPU members promote shared values of caregiver rights, regardless of immigration status. Doc. No. 32 ¶¶ 3–10.  NPU works to advocate for and empower families "to become leaders and advocates for children and their communities." Id. ¶ 9. By providing resources, training, and support to families, NPU helps "build skills, knowledge, and confidence." Id. "NPU also works to bring these families together to

---

[48] Choi Sung-jin, Kim, Lee, Park remain three most common surnames, KOREA TIMES (Sept. 17, 2016), https://www.koreatimes.co.kr/southkorea/20160917/kim-lee-park-remain-three-most-common-surnames.

build diverse coalitions across communities to address issues related to equity and access for a more inclusive and equitable education system." Id. ¶ 10.

175.    One of NPU's members, P.P., is an active community leader and an ITIN holder who has children who are U.S. citizens. She is an integral part of her community as a respected and trusted leader, information and resource conduit, organizer, and most of all, a champion for children with special needs. She previously filed tax returns but is afraid to do so again because of the information-sharing arrangements, and she fears deportation would leave her children without care. Her husband, who also has an ITIN, continues to file tax returns and claim their children as dependents. The family receives Social Security disability benefits for their U.S.-citizen children. P.P. and her family continue to reside at the address the IRS and the SSA have on file, exposing them to arrest, detention, and removal.

176.    P.O. and C.O. are NPU members who live in New Bedford. While living in the United States without permission to leave and reenter, they accidentally crossed into Canada while on vacation. Upon reentering, they were arrested and received final orders of removal. Nonetheless, they have continued to live and work in Massachusetts for twenty years and have filed tax returns regularly. On information and belief, P.O. and C.O. were among the 1.28 million individuals whose information ICE requested from the IRS. Further, P.O. is owed a substantial tax refund for the 2025 tax year, but fears that if he files taxes with his current address, the IRS will share that information with ICE.

177.    UndocuBlack Network's members are also harmed by these practices. UBN members promote equality for immigrants, and their members educate each other about their rights. Doc. No. 34 ¶¶ 3–9.

178.    J.D. is an active member of UBN with an ITIN who has a prior final removal order. J.D. initially came to the United States from Kenya on their spouse's work visa. Through the visa, J.D.'s spouse had work authorization and obtained a Social Security Number, while J.D. obtained an ITIN. More than 10 years ago, J.D.'s spouse's visa expired. A few years later, J.D. and their spouse founded a cleaning company together, and through that company continued to work, file, and pay their taxes.

179.    ICE then began removal proceedings against both of them, which ultimately resulted in final orders of removal for each of them more than five years ago. J.D.'s spouse returned to Kenya, but J.D. remained in the United States and continues running the cleaning company and filing and paying taxes. J.D. has two children who are permanent residents, has a grandchild who is a U.S. citizen, and owns their own home. J.D. is not certain that ICE has a record of their spouse's departure from the United States. On information and belief, J.D. was among the 1.28 million individuals whose information ICE requested from IRS. J.D. further fears that ICE may seek or has sought their spouse's former address from the SSA, as their spouse had an SSN. Since J.D. still resides at this address with one of their children, such data sharing further exposes them to arrest, detention, and removal. J.D. is afraid to continue filing their tax returns this year, given the risk that the data sharing may lead to their arrest, detention, or deportation, ripping them away from their business, home, and family in the United States.

180.    Another UndocuBlack Network active member, S.S. received work authorization and an SSN through DACA and has regularly filed tax returns for years. S.S. currently works for a company that provides a W-2. S.S. used to live with their parent who holds a green card, but S.S. recently moved to a new residence, which has a different address from what they previously put on their tax filings. S.S. fears that filing tax returns this year will mean that the IRS and the

SSA will share their personal information with ICE and expose them and family members to arrest, detention, or removal.

181.    The Internal Revenue Code does not provide an adequate remedy for these harms. Though 26 U.S.C. § 7431 provides for damages for data sharing in violation of § 6103, monetary damages do not address, alleviate, or terminate ongoing privacy violations, First Amendment harms, or fears from—and the risk itself of—arrest, detention, and deportation.

## CLAIMS FOR RELIEF

### COUNT ONE
**Against All Defendants**
**Administrative Procedure Act**
**Agency Action Contrary to Law**

182.    The foregoing allegations are realleged and incorporated herein.

183.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

184.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and SSA, and ICE's policies and procedures regarding treatment of such disclosed information, are final agency actions.

185.    Section 6103 establishes a strong presumption of confidentiality for taxpayer returns and return information, providing exceptions for disclosure under only precisely defined and limited circumstances. See, e.g., 26 U.S.C. § 6103(i)(l), (i)(2).

186.    Even when information is permissibly disclosed under Section 6103, its use and further disclosure are tightly restricted. See, e.g., 26 U.S.C. § 6103(i)(l)(A), (i)(2)(A).

187.    Both the IRS-ICE and the SSA-ICE data sharing contravene the strict limitations on disclosure in § 6103.

188.    The DHS and ICE Defendants have sought and will soon again seek taxpayer returns and return information from the Treasury and the IRS.

189.    The DHS and ICE Defendants have sought and will again (monthly according to the SSA Letter) seek taxpayer returns and return information from the SSA.

190.    Absent judicial intervention, the Treasury, the IRS, and the SSA Defendants are likely to disclose the return information of immigrant taxpayers to DHS, ICE, and other persons.

191.    Such disclosures themselves constitute individual agency actions that are contrary to law. Moreover, the IRS disclosures are made pursuant to misinterpretations of § 6103 to permit disclosure of address information. And the SSA disclosures are made pursuant to unlawful commitments to disclose taxpayer return information, without regard for § 6103.

192.    Absent judicial intervention, the DHS and ICE Defendants, and those under their direction or control, are likely to further disclose and use the returns and return information for the direct or indirect purpose of civil immigration enforcement.

193.    The unlawful data sharing between the IRS, SSA, and ICE should be barred, and corresponding implicit or explicit policies should be set aside.

## COUNT TWO
### Against All Defendants
### Administrative Procedure Act
### Arbitrary and Capricious Agency Action

194.    The foregoing allegations are realleged and incorporated herein.

195.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and/or "capricious." 5 U.S.C. § 706(2)(A).

196.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and SSA, and ICE's policies and procedures regarding treatment of such disclosed information, are final agency actions.

197.     In undertaking these final agency actions, the Treasury, the IRS, SSA, DHS, and ICE failed to consider important factors, including reliance interests, credibility of VITA sites and their ability to provide tax services, the impact of decreased tax contributions, the history and development of the tax laws, and the possibility and consequences of data errors.

198.     The IRS-ICE MOU and implementation agreement, and the parallel SSA-ICE arrangement set forth in the SSA Letter, and corresponding implicit or explicit policies and procedures should accordingly be set aside, and information sharing as contemplated by the arrangements should be barred.

## COUNT THREE
### Against All Defendants
### First Amendment

199.     The foregoing allegations are realleged and incorporated herein.

200.     The First Amendment to the United States Constitution protects Plaintiffs' and their members' "right . . . peaceably to assemble, and to petition the Government for a redress of grievances."

201.     The First Amendment protects the "right to associate with others." Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 606 (2021). Expressive association is constitutionally protected when it is "for the purpose of engaging in those activities protected by the First Amendment." URI Student Senate v. Town of Narragansett, 631 F.3d 1, 12–13 (1st Cir. 2011); see also Boy Scouts of Am. v. Dale, 530 U.S. 640, 658 (2000).

202.     "The right to petition is one of the most precious liberties safeguarded by the Bill of Rights." BE & K Const. Co. v. N.L.R.B., 536 U.S. 516, 517 (2002). It "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, and is generally concerned with expression directed to the government seeking redress of a

grievance." <u>Franchini v. Investor's Bus. Daily, Inc.</u>, 981 F.3d 1, 8 (1st Cir. 2020). The Supreme

Court has "explicitly held that Petition Clause guarantees citizens the ability to seek relief with

courts, but it has also made clear that these protections extend to 'other forums established by the

government for the resolution of legal disputes.'" <u>Ryan, LLC v. Lew</u>, 934 F. Supp. 2d 159, 172

(D.D.C. 2013) (quoting <u>Borough of Duryea, Pa. v. Guarnieri</u>, 564 U.S. 379, 387 (2011)).

203.    The threat that the IRS and the SSA will share return information with ICE

induces individual immigrants to forego tax filing and limit engagement with tax-preparation and

related organizations. It has also interfered with the ability of tax-preparation organizations, like

Plaintiff CEDC, to provide accurate professional advice to their current and potential clients.

204.    Moreover, the information sharing directly penalizes individual immigrants for

exercising their right to petition the government, by filing tax returns and seeking refunds or

credits through an accurate income-tax filing. When a taxpayer files a return, the taxpayer

petitions the government for a redress of grievances, specifically, a claim for a refund of overpaid

taxes to which the taxpayer is entitled. The information-sharing arrangements infringe upon the

petition rights of Plaintiffs' members. Taxpayers, including immigrant members of Plaintiff

organizations, are chilled from filing tax returns and seeking refunds to which they may be legally

entitled by the threat that their personal information will be shared with ICE. Where government

action causes individuals who "may have formerly filed" claims with the government to refrain

from doing so, such circumstances "at least raise[] the specter of chilled speech." <u>Ryan, LLC</u>, 934

F. Supp. 2d at 168–9.

205.    Defendants' information-sharing arrangements also intimidates members and

chills them from gathering, promoting shared values, seeking guidance, petitioning, and filing

taxes. This chill on petition, speech, and associational rights is an objectively reasonable reaction to the threat of arrest, detention, and deportation that information-sharing portends.

206.    The information sharing between ICE, the IRS, and the SSA is not narrowly tailored to any compelling government interest in lawful immigration enforcement.

207.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and the SSA, and ICE's policies and procedures regarding treatment of such disclosed information, should accordingly be set aside, and information sharing as contemplated by the arrangements should be barred.

## COUNT FOUR
### Against All Defendants
### *Ultra Vires* Action

208.    The foregoing allegations are realleged and incorporated herein.

209.    Plaintiffs may state a non-statutory cause of action for an injunction to prevent an agency from acting outside its statutory authority.

210.    No statute authorizes the IRS or the SSA to use agency resources in furtherance of immigration enforcement.

211.    No statute authorizes the IRS or the SSA to disclose return information for the purpose of location and apprehension of individuals without a judicial order.

212.    No statute authorizes ICE to use taxpayer return information for the purpose of civil immigration enforcement. ICE's prior conduct establishes a significant risk that the agency will use the addresses gleaned from return information for the purpose of civil immigration enforcement.

213.    No statute authorizes the IRS and ICE to create a matching system to collect address information from taxpayers' files for the purpose of civil immigration enforcement.

214.    Congress also cabined the authority it granted the IRS and the SSA to collect taxpayer data, by prohibiting data sharing absent strict requirements. See 26 U.S.C. § 6103(a), (i)(2)(B). For example, subsection 6103(i)(2)(B)(iv) requires a written explanation of the data's connection to a criminal proceeding. Because the MOU expressly links data requests to *civil* immigration authority, it directly contravenes a prohibition enacted by Congress.

215.    The commitment to and implementation of such disclosures to ICE by the IRS and the SSA, and ICE's policies and procedures regarding treatment of such disclosed information, are *ultra vires*. This includes both initial disclosures by the IRS and the SSA and any subsequent disclosures within and from DHS and ICE.

216.    An injunction is proper to prevent such disclosure and use of return information.

### COUNT FIVE
### Against the IRS and the SSA Defendants
### *Accardi* Doctrine

217.    "An agency has an obligation to abide by its own regulations." <u>Rotinsulu v. Mukasey</u>, 515 F.3d 68, 72 (1st Cir. 2008) (citing <u>Accardi v. Shaughnessy</u>, 347 U.S. 260, 265-67 (1954)). "The failure to follow an applicable regulation may be a sufficient ground for vacation of an agency's decision." <u>Id.</u>

218.    The IRS maintained extensive and longstanding internal procedures to protect the privacy of taxpayers' information, including restrictions on the sharing of taxpayer information with immigration-enforcement agencies.

219.    The SSA likewise established regulations to protect individuals' data.

220.    The commitment to and implementation of disclosing taxpayer information to ICE by the IRS and the SSA flout these internal procedures, without explanation or formal change to the procedures.

221.    This commitment to and implementation of disclosing taxpayer information, contrary to the IRS and the SSA's own internal procedures, prejudices, harms, and presents an imminent threat to Plaintiffs' members.

222.    An injunction is proper to prevent such disclosure and use of tax return information.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1.    Stay and postpone the information-sharing agreements, policies, and procedures, including the IRS-ICE MOU and the SSA Letter (together, the "information-sharing arrangements") between Defendants pursuant to 5 U.S.C. § 705;

2.    Preliminarily and permanently vacate and set aside the information-sharing arrangements, pursuant to 5 U.S.C. § 706(2);

3.    Declare that 26 U.S.C. § 6103(i)(2) does not permit the disclosure of return information for the purpose of location and apprehension of individuals, or for the direct or indirect purpose of civil immigration enforcement;

4.    Enter a preliminary and permanent injunction prohibiting the IRS and the SSA Defendants, including their employees, agents, contractors, and any other person acting under their authority, from disclosing any return information to an officer, employee, or agent of ICE or to a person who will foreseeably disclose the information to an officer, employee, agent, contractor, or any other person acting under their authority of ICE;

5.    Enter a preliminary and permanent injunction directing ICE and DHS to sequester, refrain from access, use, inspection, distribution, relying on, or otherwise acting upon any return information, and delete, and destroy all information obtained from the IRS and the

SSA in physical and electronic forms;

6.      Enter a preliminary and permanent injunction prohibiting civil detention, initiation of removal proceedings, or removal of any individual located, identified, or arrested via information disclosed by the IRS and the SSA;

7.      Enter a preliminary and permanent injunction prohibiting all Defendants, including their employees, agents, contractors, and any other person acting under their authority, from disclosing any individual's return information to a person who will use such information in connection with civil detention, removal proceedings, or physical removal from the United States;

8.      Require Defendants, including their employees, agents, contractors, and any other person acting under their authority, to give 48 hours' advance notice to this Court regarding any disclosures of return information pursuant to an exception within 26 U.S.C. § 6103, in connection with the enforcement of any immigration-related criminal provision;

9.      Award reasonable attorney's fees and costs to Plaintiffs; and

10.     Provide any other relief that this Court deems just and proper.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  January 30, 2026

By:  */s/ Sarah Salomon*
Leo L. Lam (*Admitted Pro Hac Vice*)
llam@keker.com
Laurie Carr Mims (*Admitted Pro Hac Vice*)
lmims@keker.com
Sarah Salomon (*Admitted Pro Hac Vice*)
ssalomon@keker.com
Charlotte Kamai (*Admitted Pro Hac Vice*)
ckamai@keker.com
Kelly M. Hernandez (*Admitted Pro Hac Vice*)
khernandez@keker.com
Leia Walker (*Admitted Pro Hac Vice*)
lwalker@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188

ASIAN LAW CAUCUS
Joshua Rosenthal (*Admitted Pro Hac Vice*)
joshr@asianlawcaucus.org
Dorothy Chang (*Admitted Pro Hac Vice*)
dorothyc@asianlawcaucus.org
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

GREATER BOSTON LEGAL SERVICES
Luz Arevalo BBO 564011
larevalo@gbls.org
Angela Divaris (*Admitted Pro Hac Vice*)
adivaris@gbls.org
Gary Klein BBO 560769
gklein@gbls.org
197 Friend Street
Boston, MA 02114
Telephone: (617) 461-4944

*Attorneys for Plaintiffs*

55

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF). Any counsel for other parties who are not registered participants are being served by first class mail.

*/s/ Sarah Salomon*

Sarah Salomon