UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS; NATIONAL PARENTS UNION; NATIONAL KOREAN AMERICAN SERVICE AND EDUCATION CONSORTIUM; UNDOCUBLACK NETWORK, INC., | * * * * * * * * |
| Plaintiffs, | * * |
| v. | * * |
| SCOTT BESSENT, Acting Commissioner of the Internal Revenue Service and Secretary of the Treasury; INTERNAL REVENUE SERVICE; FRANK BISIGNANO, Commissioner of the Social Security Administration; SOCIAL SECURITY ADMINISTRATION; TODD M. LYONS, Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI L. NOEM, Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY, | * * * * * * * * * * * * * * * * |
| Defendants. | * |

Civil Action No. 1:25-cv-12822-IT

MEMORANDUM & ORDER

February 5, 2026

TALWANI, D.J.

This litigation concerns the sharing of taxpayer addresses by Defendants Internal Revenue Service ("IRS") and Social Security Administration ("SSA") with Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security ("DHS"). Plaintiffs, four community organizations with members based in Massachusetts and across the country,

1

contend that Defendants have entered and implemented data sharing agreements that violate the privacy protections of the Tax Reform Act of 1976, specifically 26 U.S.C. § 6103, and that this agency action, *inter alia*, is contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706, et seq. Am. Compl. ¶¶ 182–198 [Doc. No. 73].

Plaintiffs' Motion for Relief under 5 U.S.C. §§ 705, 706 or, in the alternative, for Preliminary Injunction [Doc. No. 27] seeks a stay or, in the alternative, a preliminary injunction, as to all Defendants. On January 27, 2026, the court denied the motion without prejudice as to Defendants IRS, Department of Treasury, and Treasury Secretary Bessent (the "IRS Defendants"), where a preliminary injunction limiting the IRS Defendants' implementation of data sharing agreements is in place through other litigation. Elec. Order [Doc. No. 72]; Ctr. for Taxpayer Rights v. Internal Revenue Serv., 2025 WL 3257096, at *1 (D.D.C. Nov. 21, 2025); see also Ctr. for Taxpayer Rights v. Internal Revenue Serv., 2025 WL 3251044, at *43 (D.D.C. Nov. 21, 2025).[1] The court also denied the motion without prejudice as to Defendants SSA and SSA Commissioner Frank Bisignano, where the record before the court was not sufficient to make a finding that sharing of tax information between SSA and ICE has or is likely to occur. Elec. Order [Doc. No. 72].

The court now turns to Plaintiffs' motion as to Defendants ICE, DHS, Secretary of DHS Kristi Noem, and Acting Director of ICE Todd M. Lyons (the "ICE Defendants") and, in

---

[1] Pursuant to the D.C. district court's Order, the IRS Defendants are now preliminarily enjoined "from disclosing any return information, including taxpayer return information, to [DHS] or any of its component agencies pursuant to [26 U.S.C.] Section 6103(i)(2), except in strict compliance with the requirements of that Section, including that the recipients of the information be "officers and employees of [the receiving] agency who are personally and directly engaged in" a relevant nontax criminal investigation or proceeding and that the recipients will use the information "solely for" that criminal investigation or proceeding. Ctr. for Taxpayer Rights, 2025 WL 3257096, at *1 (alteration in original).

particular, to Plaintiffs' request for an order not only staying information sharing between the agencies, but also enjoining the ICE Defendants and their agents "from inspecting, viewing, using, copying, distributing, relying on or otherwise acting upon any return information" obtained from the IRS, including "relying on such information in any way for the purposes of identifying, locating, arresting, detaining, or deporting any person." See Proposed Order 1–2 [Doc. No. 35-1]. For the reasons that follow, as to the ICE Defendants, Plaintiffs' Motion [Doc. No. 27] is GRANTED.

## I.    Background

All U.S. income-earners must report and pay taxes on their income, regardless of citizenship status. 26 U.S.C. §§ 1, 2(d), 871. The Internal Revenue Code, 26 U.S.C. §§ 1, et seq., sets forth the tax-filing process.

### A.  Section 6103

#### 1.   Overview

The Internal Revenue Code provides strong privacy protections for information submitted by taxpayers and/or obtained by the IRS. See 26 U.S.C. § 6103. In response to prior uses of taxpayer information for improper purposes, Congress amended Section 6103 through the Tax Reform Act of 1976, "to protect the privacy of tax return information and to regulate in minute detail the disclosure of this material." Lake v. Rubin, 162 F.3d 113, 115 (D.C. Cir. 1998); see Ctr. for Taxpayer Rights, 2025 WL 3251044, at *3 (describing the history of the Tax Reform Act, "passed in the wake of Watergate[.]") (quoting Tax Analysts v. I.R.S., 117 F.3d 607, 611 (D.C. Cir. 1997)); see also Church of Scientology of California v. I.R.S., 484 U.S. 9, 16 (1987) ("One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than [the IRS].").

As a general rule, "[r]eturn and return information shall be confidential[.]" 26 U.S.C. § 6103(a). As the accompanying Senate Report noted, "returns and return information should generally be treated as confidential and not subject to disclosure except in those limited situations delineated in the newly amended section 6103." S. REP. NO. 94–938, at 318 (1976), as reprinted in 1976 U.S.C.C.A.N. 2897, 3747.

Congress defined "return" and "return information" subject to the confidentiality restrictions very broadly. A "return" is "any tax or information return, declaration of estimated tax, or claim for refund . . . filed with the [IRS] by, or on behalf of, or with respect to any person[.]" 26 U.S.C. § 6103(b)(1). The statute defines "return information" as "a taxpayer's identity, the nature, source, or amount of [] income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments," and "any other data, received by, recorded by, prepared by, furnished to, or collected by the [IRS]" with respect to a return or the determination of a tax, penalty or fine; as well as any written determinations, background documents, and agreements with the taxpayer. Id. § 6103(b)(2). "Taxpayer identity" is defined, in turn, as "the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in [S]ection 6109), or a combination thereof." Id. § 6103(b)(6). The "taxpayer identifying number" is the taxpayer's Social Security Number ("SSN"), id. § 6109(a), or for taxpayers without an SSN, the Individual Tax Identification Number ("ITIN") assigned by the IRS, id. §§ 6109(d), (i).

Congress carefully delineated certain exceptions to Section 6103's general rule of confidentiality. Exceptions set forth in Section 6103(i) providing for limited disclosure by the IRS in connection with non-tax criminal matters are at issue here. Also at issue are restrictions on the use by the recipients of the disclosed information found in Sections 6103(i) and (p).

2.   <u>Section 6103(i) – IRS Disclosure of Records in Non-Tax Criminal Matters</u>

Section 6103(i) allows for limited disclosure of confidential tax information in

connection with federal non-tax criminal matters. 26 U.S.C. § 6103(i). Reflecting Congress'

policy objective of confidentiality, Section 6103(i) provides for disclosure of returns and return

information in connection with non-tax criminal matters only when constrained by significant

procedural safeguards. As explained in the IRS' Internal Revenue Manual, in enacting Section

6103(i), "Congress decided that federal law enforcement officials should not have easier access

to information about a taxpayer maintained by the IRS than they would have if they sought to

compel the production of that information from the taxpayer themselves." IRM § 11.3.28.1.1(1)

(Apr. 17, 2025).

The different subsections of Section 6103(i) provide different schemes, with varying

procedures required for disclosure, depending on the type and source of information sought, the

purpose for which federal employees and officers intend to use the information, and the stage of

the criminal proceeding.

Three subsections of Section 6103(i) are relevant here. The first two subsections address

obtaining information in connection with "criminal investigations." 26 U.S.C. §§ 6103(i)(1), (2).

Under both subsections (i)(1) and (i)(2), if other requirements are met, the IRS may disclose

certain information to federal officers and employees "personally and directly engaged in" (1)

preparing for a judicial or administrative criminal, but non-tax related, proceeding; (2) an

investigation that may result in such a proceeding; or (3) a grand jury proceeding regarding a

criminal, but non-tax, violation. 26 U.S.C. §§ 6103(i)(1)(A), (2)(A). Under both subsections, the

information sought must be "solely for the use of such officers and employees in such

preparation, investigation, or grand jury proceeding." <u>Id.</u> §§ 6103(i)(1)(A), (2)(A). These two

subsections differ significantly based on the source of the return information: more stringent protections apply to information that includes "taxpayer return information[,]" that is, "return information" filed by or on behalf of the taxpayer to whom the return information relates, 26 U.S.C. § 6103(b)(3), than to return information created by the IRS[2] or sourced from a third-party.[3] See IRM § 11.3.28.1.1(3) ("IRC [§] 6103(i) is the only code section where it may be necessary to distinguish between taxpayer return information and return information (other than taxpayer return information).").

Under the first subsection, if the information sought by the federal officers and employees personally involved in the criminal investigation includes taxpayer return information, a court order is required to permit the IRS to disclose the information. 26 U.S.C. § 6103(i)(1)(A); see IRM § 11.3.28.1.1(1) (in general, "a federal agency enforcing a non-tax criminal law must obtain court approval to obtain a return or return information submitted by the taxpayer or their representative."). The court may only authorize the IRS' disclosure of taxpayer return information if: (1) "there is reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed," (2) "there is reasonable cause to believe that the return or return information is or may be relevant to a matter relating to the commission" of the criminal act, and (3) "the return or return information is sought exclusively for use in a criminal investigation or proceeding . . . and the information sought to be disclosed cannot reasonably be obtained . . . from another source." 26 U.S.C. § 6103(i)(1)(B)(i)–(iii) (emphasis added).

---

[2] E.g., an agreement to finalize taxpayer liability. See 26 U.S.C. § 6103(b)(2)(D).

[3] E.g., financial documents seized from a taxpayer during a raid and sent by the police to the IRS. IRM § 11.3.28.1.5.2(3) (Apr. 17, 2025).

Under the second subsection, the IRS may "disclose return information (other than taxpayer return information)" to the federal officers and employees personally involved in the criminal investigation without a court order. Id. § 6103(i)(2). For the IRS to disclose return information under this provision, either the head or inspector general of an agency (or certain other enumerated officers) must submit a written request to the IRS for "return information other than taxpayer return information." Id. § 6103(i)(2)(A) (parentheses omitted). The request must meet specific requirements. Id.

First, the written request must identify the agency employee who is "personally and directly engaged in" the criminal investigation described in subsection 6103(i)(1)(A). Id.

Second, the written request must include:

(i)   the name and address of the taxpayer with respect to whom the requested information relates;

(ii)  the taxable period or periods to which return information relates;

(iii) the statutory authority under which the proceeding or investigation . . . is being conducted; and

(iv)  the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

26 U.S.C. § 6103(i)(2)(B).

Subsection 6103(i)(2) provides that "[f]or purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information." Id. § 6103(i)(2)(C). The "taxpayer's identity," including the taxpayer's address, is still protected, however, as "return information." Id. § 6103(b)(2).

The third relevant subsection of Section 6103(i) allows for disclosure following a criminal investigation resulting in an arrest warrant where the return or return information is sought to "locate fugitives from justice." Id. § 6103(i)(5). Under this subsection, an application must be made to the court, to allow disclosure to federal officers and employees "exclusively for

use in locating such individuals," <u>id.</u> § 6103(i)(5)(A). The court may grant the application if the applicant can show that:

> (i)   a Federal arrest warrant relating to the commission of a Federal felony offense has been issued for an individual who is a fugitive from justice,
>
> (ii)  the return of such individual or return information with respect to such individual is sought exclusively for use in locating such individual, and
>
> (iii) there is reasonable cause to believe that such return or return information may be relevant in determining the location of such individual.

<u>Id.</u> § 6103(i)(5)(B).

> 3. <u>Section 6103 – Use and Protection of Tax Information Disclosed by the IRS</u>

Section 6103 provides that "no officer or employee of the United States" may disclose "return or return information obtained by him" except as authorized under the Internal Revenue Code. <u>Id.</u> § 6103(a)(1). The statute does not merely apply to IRS employees, instead, it forbids <u>any officers and employees of the United States who obtain this information</u> from making an impermissible disclosure. <u>Id.</u> § 6109(a)(1). As noted above, under both subsections 6103(i)(1) and (2), the information sought for preparing for a judicial or administrative criminal proceeding; an investigation that may result in a criminal proceeding; or a grand jury proceeding regarding a non-tax criminal violation, must be "solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding." <u>Id.</u> §§ 6103(i)(1)(A), (2)(A). Subsection 6103(i)(5), which provides for disclosure for the purpose of locating an individual, is similarly limited to federal officers and employees' use for that specified purpose.[4]

---

[4] None of the three subsections discussed permits further disclosure to State and local law enforcement agencies. In contrast, subsection 6103(i)(3)(B)(i), which deals with emergency circumstances involving an imminent danger of death or physical injury; subsection 6103(i)(1)(C), which deals with missing children; and subsection 6103(i)(7), which deals with terrorist activities, include provisions for disclosure to state or local law enforcement officers and employees personally and directly engaged in the investigation as part of a team with federal law enforcement. Subsections 6103(a)(2) and (3) provide further that officers and employees of any state or local law enforcement agency who have access to returns or return information under

Section 6103(p), in turn, provides that any federal agency obtaining records under these three (and other provisions) must, to the satisfaction of the Secretary, (1) maintain a permanent system of standardized records, including any disclosures of return or return information made by the agency; (2) establish a secure area or place in which such returns or return information is stored; (3) "restrict . . . access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title[;]" (4) provide other safeguards as necessary to protect the confidentiality of the returns or return information; and (5) and upon completion of the use of the returns or return information, return them (and all copies) to the Secretary or otherwise make the records undisclosable. 26 U.S.C. § 6103(p)(4).

### B.  IRS Policy Regarding Disclosure of Addresses Prior to the Events at Issue here

Prior to the events at issue here, the IRS's stated policy was to reject address-only requests for confidential tax information pursuant to Section 6103(i)(2). IRM § 11.3.28 ("Material Changes") (2025), https://www.irs.gov/irm/part11/irm_11-003-028 (last visited Feb. 4, 2026) (Prior to April 17, 2025, the Manual stated "requests for addresses only cannot be honored because IRC § 6103(i)(2) requires that the requester provide an address.").

The IRS's construction was consistent with the White House Office of General Counsel's statement at the time of the 1982 amendment, which had added the provision "[f]or purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information" to subsection 6103(i)(2). 26 U.S.C. § 6103(i)(2)(C). In explaining this amendment, the White House Office of General Counsel noted that Congress had:

---

specific subsections of Section 6103 are also prohibited from disclosing such information. See id. §§ 6103(i)(3)(B)(i), 6103(i)(1)(C)(i), 6103(i)(7)(A)(ii).

> recognized that if [the IRS] was to respond to a written request for information which was not furnished by or on behalf of the taxpayer, it could not as a practical matter transmit the information without providing the name and address of the requested individual. Since the ultimate source of the name and address would have been the taxpayer's return, a technical argument existed that [the IRS] could not provide the information without an *ex parte* court order. This would, of course, have completely negated the purpose and operation of the written request provision. As a result, section 6103(i)(2) was amended so that if [the IRS] received a proper written request, it could disclose name and address information under the same circumstances that it could disclose <u>other information which was not received from or on behalf of the taxpayer</u>.

<u>See</u> Mem. from Fred F. Fielding, Couns. to the President, for Craig L. Fuller, White House Cabinet Sec'y (Aug. 6, 1982), at 1 (emphasis added). In other words, the purpose of the language, as stated by then-White House Counsel, was to ensure that, if an agency submitted a proper request for information not furnished by or on behalf of the taxpayer under Section 6103(i)(2), the information that was not furnished by or on behalf of the taxpayer could be disclosed even though it contained the taxpayer's name and address. By this reading, an address-only request falls outside the ambit of subsection 6103(i)(2) because it does not seek information obtained from a non-taxpayer source that might also contain the taxpayer's name and address.

The IRS's stated policy that addresses alone would not be provided under Section 6103(i)(2) was also consistent with another subsection, which sets forth the requirement of a court order for law enforcement agencies to obtain addresses when seeking to locate fugitives. <u>See</u> 26 U.S.C. § 6103(i)(5)(B).

### C.  IRS Data-Sharing with ICE as Set Forth in the Administrative Record[5]

#### 1.  ICE's Initial Request to Locate Noncitizen Taxpayers

As a component of President Trump's immigration policy agenda,[6] on February 18,

2025, ICE requested that the IRS "assist[] in an ICE led effort to locate approximately 700,000

individuals who are all under Final Orders of Removal." Defs.' Opp'n, Ex. A, at TD_0000001

("Admin. Record") [Doc. 39-1]. As noted, at the time, the IRS's stated policy was to reject

address-only requests under Section 6103(i)(2). See supra Section I.B.

#### 2.  IRS April 7, 2025 Memorandum of Understanding

Following negotiation between the agencies (and the departure of some IRS employees),

see Ctr. for Taxpayer Rights, 2025 WL 3251044, at *3–6 (describing interactions between

officials at the IRS and ICE during Spring 2025), on April 7, 2025, the IRS and ICE entered into

a Memorandum of Understanding (the "IRS-ICE MOU") regarding the sharing of tax

information across agencies to implement President Trump's direction that DHS "take

immediate steps to identify, exclude, or remove aliens illegally present in the United States."

Am. Compl., Ex. A, at ECF 3 ("IRS-ICE MOU") [Doc. No. 73-1]. The IRS-ICE MOU explained

that DHS "has identified numerous aliens illegally present in the United States . . . under final

orders to remove them from the United States[.]" Id.

Further, DHS asserted that "each of the above-referenced individuals is under criminal

investigation for violations of one or more" federal criminal statutes, "including 8 U.S.C.

---

[5] Defendants state that "Plaintiffs import limited portions of the Administrative Record ["AR"]
in Center for Taxpayer Rights v. IRS, No. 1:25-cv-00457-CKK (D.D.C. 2025), into this case[,]"
and that "[f]or completeness, Defendants [have] provide[d] more of that AR (i.e., all but the
'authorities' portion thereof) as Exhibit A [Doc. No. 39-1]." See Defs.' Opp'n 3 n.1 [Doc. 39].
The court cites to the AR, as submitted by the Defendants.

[6] See Exec. Order No. 14,161, Protecting the United States from Foreign Terrorists and Other
National Security and Public Safety Threats, 90 Fed. Reg. 8451 (Jan. 20, 2025).

§ 1253(a)(1)[.]" <u>Id.</u> The cited immigration statute subjects a noncitizen who "<u>willfully</u> fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court" to criminal penalties. 8 U.S.C. § 1253(a)(1) (emphasis added). The MOU described its purpose "to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) <u>requests for addresses</u> of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes." IRS-ICE MOU, at ECF 4 [Doc. No. 73-1] (emphasis added).

The IRS-ICE MOU provided an overview for the "duties and responsibilities" of both the IRS and ICE. <u>Id.</u> at ECF 4–5. Under the MOU, ICE stated its intent to "[s]end requests[7] for address information for specifically identified individuals . . . consistent with IRC [26 U.S.C. §] 6103(i)(2)(A)." <u>Id.</u> at ECF 5. As specified by the MOU, the requests must include:

1. The name and address of the taxpayer.

2. The taxable period or periods as to which the return information (address) they are seeking relates.

3. The specifically designated nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding regarding the individual is being conducted.

4. The date of the final order of removal and the related case number assigned to each such order.

5. The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding. Any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.

6. Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges

---

[7] ICE committed in the MOU to sending as part of ICE's request the following identification information: "CVID [e.g., SSN or ITIN]; [Alien Registration] Number; First, Middle and Last Name; Address Information; Date of Birth; Country of Citizenship; FBI Numbers; and Fingerprint Identification Number[.]" IRS-ICE MOU, at ECF 7 [Doc. No. 73-1].

against the individual under the specifically designated Federal criminal statute ICE has identified.

Id. The IRS-ICE MOU specified that the request must attest that "the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings[,]" and that "[r]eturn information disclosed . . . shall be open to inspection by or disclosure to ICE officers and employees personally and directly engaged in, and for their necessary use in, proceedings and investigations that may result in such proceedings, pertaining to the enforcement of a specifically designated nontax Federal criminal statute." Id.

Under the IRS-ICE MOU, the IRS agreed to screen ICE's request for "completeness and validity[,] and return to ICE any requests" not compliant with subsection 6103(i)(2). Id. at ECF 4. Should the IRS find a request to be legally sufficient, the IRS committed to "[s]earch for the last known address for each individual in each request." Id. Further, for "each individual the IRS is able to identify from the information provided by ICE, [the IRS agreed to] provide the IRS last known address for that individual [to ICE]." Id. If the IRS is unable to identify an individual based on the information ICE provided in its legally sufficient request, the IRS agreed to communicate to ICE that the IRS was unable to "identify [a taxpayer] from the information provided by ICE." Id.

On April 17, 2025, the IRS removed from its Manual its former policy to reject address-only requests for confidential tax information pursuant to § 6103(i)(2). IRM § 11.3.28 (2025) ("Material Changes"), https://www.irs.gov/irm/part11/irm_11-003-028 (last visited Feb. 4, 2026).

   3. ICE and IRS Implementing Agreement

On April 18, 2025, the IRS and ICE entered into an Implementing Agreement for the

IRS-ICE MOU. See Am. Compl. Ex. B ("ICE-IRS Implementing Agreement") [Doc. No. 73-2].

Pursuant to the Agreement, the IRS agreed to disclose information requested from six Systems of

Records to ICE: Treasury/IRS 22.060 Automated Non-Master File, 80 FR 54064 (Sept. 8, 2015);

Treasury/IRS 34.037 IRS Audit Trail and Security Records System, 80 FR 54064 (Sept. 8,

2015); Treasury/IRS 24.030 Customer Account Data Engine Individual Master File, 80 FR

54064 (Sept. 8, 2015); Treasury/IRS 24.046 Customer Account Data Engine Business Master

File, 80 FR 54064 (Sept. 8, 2015); Treasury/IRS 22.061 Individual Return Master File, 80 FR

54064 (Sept. 8, 2015); and Treasury/IRS 42.008 Audit Information Management System, 80 FR

54064 (Sept. 8, 2015). ICE-IRS Implementing Agreement, at ECF 3 [Doc. No. 73-2].

The Implementing Agreement states further that the information provided by the IRS

would be maintained by ICE in the following Systems of Records: Alien File, Index, and

National File Tracking, 82 F.R. 43556, (Sep. 18, 2017); External Investigations, 85 F.R. 74362

(Nov. 20, 2020); and Criminal Arrest Records and Immigration Enforcement Records

(CARIER), 89 F.R. 55638 (Jul. 5, 2024). ICE-IRS Implementing Agreement, at ECF 4 [Doc. No.

73-2].

   4. ICE and IRS Implementation of the IRS-ICE MOU

On June 5, 2025, ICE sent a request to the IRS for address information for "the full alien

population" of 7,615,279 individuals. See Admin. Record, at TD_0000086 [Doc. No. 39-1]. ICE

explained that a name was associated with each request "but there may not always be an address

available[.]" Id. at TD-0000084. ICE stated that it did not indicate a taxable period because ICE

did "not specifically know the tax filing status of any of these individuals." Id. ICE further

explained that "[t]he request is to enrich the data with relevant address data so the most recent address that IRS can identify associated with any of the individuals would be the primary goal." Id. As to the nontax criminal statute relevant to an active investigation or proceeding, ICE wrote "8 USC [§] 1325 – Improper entry by alien[.]" This request was rejected by the IRS on June 7, 2025. Id. at TD_0000083.

On June 24, 2025, ICE sent a second request for approximately 7.3 million records. Id. at TD–0000093. This request was also found "deficient" by IRS personnel, where it excluded four significant components, namely: "[a] written request from the head of Federal agency"; "[t]he specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding"; "[i]dentity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified"; and "[a]ttestation for each request - stating the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings." Id. IRS personnel explained that the requirements set forth in the IRS-ICE MOU were "derived from [S]ection 6103(i)(2)[]." Id.

On June 27, 2025, ICE sent a third request for approximately 1.2 million individuals to the IRS. Id. at TD_0000107–108, 112. This second submission was reviewed by the IRS and determined to substantially comply with the requirements laid out in 26 U.S.C. § 6103(i)(2), id. at TD_0000108, despite various deficiencies discussed below. After screening out those taxpayers who had not overstayed a Final Order of Removal by over ninety days, and, therefore, could not have violated 8 U.S.C. § 1253(a)(1), the IRS identified "match[ing]" records for

roughly 47,000 noncitizen taxpayers and disclosed those individuals' address information to ICE on August 7, 2025. Id. at TD_0000143–146.

### D.    Litigation in the D.C. District Court

Following the implementation of the IRS-ICE MOU, a different group of plaintiffs moved for injunctive relief against the IRS, Department of Treasury, and Secretary Bessent in the United States District Court for the District of Columbia. See Ctr. for Taxpayer Rights, 2025 WL 3251044.

In a detailed opinion, the Ctr. for Taxpayer Rights court found that the implementation of the IRS-ICE MOU, i.e. IRS' disclosure of 47,000 taxpayer addresses to ICE, constituted arbitrary and capricious final agency action. Id. at *29. The D.C. district court found that the IRS violated the Internal Revenue Code's requirement that confidential taxpayer information be disclosed only to Federal agency officers and employees "personally and directly engaged in" in a criminal investigation. Id. at *22, 29 (citing 26 U.S.C. § 6103(i)(2)(A)). The court found a further violation in IRS' disclosure of taxpayer addresses to ICE "[w]ithout first confirming that an address provided by ICE matched an address the IRS had in its system." Id. at *26 (citing 26 U.S.C. § 6103(i)(2)(B)(i)). The court also found that IRS' implementation of the IRS-ICE MOU failed to comport with Congress' purpose in enacting Section 6103(i)(2), i.e. to permit federal employees, engaged in the non-tax criminal investigations or proceedings, to have access to "return information other than taxpayer return information" for the limited purpose of assisting in those criminal investigations or proceedings. Id. at *28–29. The court pointed out that ICE's third amended request to the IRS on June 27, 2025, failed to adequately set forth the "specific, individualized reason" for which the taxpayer address information was relevant. Id. at *28 (citing 26 U.S.C. § 6103(i)(2)(B)(iv)). Finally, the court determined that ICE's June 27, 2025 request

failed to include "the taxable period or periods" to which the requested taxpayer information related. Id. at *29 (citing 26 U.S.C. § 6103(i)(2)(B)(ii)). The court found that the IRS' disclosure, despite these enumerated violations of Section 6103(i)(2), violated the Administrative Procedure Act, 5 U.S.C. § 706. Ctr. for Taxpayer Rights, 2025 WL 3251044 at *29. Additionally, the court determined that the IRS' disclosure of taxpayer addresses to ICE was a significant policy change, for which the agency failed to provide a reasoned explanation, and was therefore arbitrary and capricious. Id. at *30–31.

The Ctr. for Taxpayer Rights court granted Plaintiffs' request for preliminary relief and (1) stayed IRS' policy to disclose address information pursuant to the terms of the IRS-ICE MOU; and (2) preliminarily enjoined the IRS from disclosing "any return information, including taxpayer information" to DHS and ICE, "except in strict compliance" with Section 6103(i)(2). See Ctr. for Taxpayer Rights, 2025 WL 3257096, at *1. The court ordered further that

> on or before November 24, 2025, Defendant Bessent, in his official capacity as Secretary of the Treasury, or his designee, shall notify Secretary Kristi Noem, in her official capacity as Secretary of Homeland Security, and Todd M. Lyons, in his official capacity as Senior Official Performing the Duties of the Director of ICE, that, consistent with Section 6103(p)(4) of the Internal Revenue Code, Defendant Bessent or his designee, in furtherance of his responsibilities under the Internal Revenue Code, shall require that ICE will:
>
> > 1. "restrict . . . access to the returns or return information" disclosed on August 7, 2025, "only to persons whose duties and responsibilities require access and to whom disclosure may be made" consistent with the requirements of Section 6103(i)(2), including the requirement that such persons be "personally and directly engaged" in a relevant nontax criminal investigation or proceeding and that the information be used "solely for" such investigation or proceeding, see 26 U.S.C. § 6103(p)(4)(C); (i)(2)(A); and
> >
> > 2. "upon completion of use of" the confidential return information received from the IRS on August 7, 2025, cause that information to be "return[ed] to the Secretary" or his designee or otherwise made "undisclosable," see id. § 6103(p)(4)(F).

Id. at *2.

On January 5, 2026, the government appealed the D.C. district court's order to the United

States Court of Appeals for the D.C. Circuit. See Ctr. for Taxpayer Rights v. Internal Revenue

Serv., No. 26-05006 (D.C. Cir. Jan. 13, 2026). The D.C. district court subsequently stayed

proceedings, but the injunction remains in effect pending the outcome of the D.C. Circuit's

decision. See Ctr. for Taxpayer Rights, No. 1:25-cv-00457-CKK, ECF No. 65 (Jan. 21, 2026).

### E.  Further Information as to ICE's Use of Return Information

In addition to the Administrative Record produced in the Ctr. for Taxpayer Rights

litigation, Defendants here have provided two declarations from ICE regarding ICE's operations

generally and its use of the return information. First, Brian McShane, the Acting Assistant

Director of the Enforcement Division within ICE's Enforcement and Removal Operations

("ERO") component, describes various functions performed by units within ERO to "identif[y],

investigate[], and arrest[] aliens subject to removal from the United States." Opp'n, Ex. C ¶ 2

("McShane Decl.") [Doc. No. 39-3]. According to the McShane Declaration, within ERO, "[t]he

Criminal Alien Program focuses on strategic planning and policy development to enhance ICE's

ability to apprehend and remove criminal aliens and supports ERO field offices in enforcing

violations of the United States Criminal Code against criminal offenders, in conjunction with the

United States Attorney's Office." Id.

The Declaration states that "ERO's focus on criminal prosecutions . . . is typically

performed by a specialized unit called ERO Criminal Prosecution (ECP) team," and asserts that

"[t]hese teams initiate prosecution of crimes under Title 8 and Title 18 of the United States Code

and execute criminal arrest warrants." Id. The Declaration describes further how the "Targeting

Operations" component consists of three centers that "leverage technical capabilities, analytical

tools, and law enforcement expertise to produce intelligence-driven leads on aliens subject to

removal." Id. The Declaration also describes how individual investigating officers collect

information for 8 U.S.C. § 1253 (willful overstay of a final order of removal) investigations and

that the officers will only present the case to a United States Attorney's Office for a

determination of whether the case would be accepted or declined for prosecution after

establishing that sufficient evidence exists to establish the elements of the criminal offence being

charged. Id. ¶¶ 7–8. If insufficient for a criminal prosecution, the officers will bring civil

enforcement actions, e.g. detention and removal. Id. ¶ 8.

In a second declaration,[8] Richard Fitzgerald, the Assistant Director for Cyber and

Operational Technology for Homeland Security Investigations in DHS, states that the

information received from the IRS was compared against "the list of 1.2 million individuals with

final removal orders[.]" Defs.' Notice, Ex. B ¶ 5 ("Fitzgerald Decl.") [Doc. No. 51-2]. According

to the Fitzgerald Declaration, ICE "identified approximately 33,000 updated addresses" and on

August 7, 2025, "made the data available to the Enforcement Removal Operations, Law

Enforcement Systems and Analysis Team." Id.[9] The Declaration states further that the IRS data

"has not been populated into any database covered by the Systems of Records" identified in the

Implementation Agreement. Id. ¶ 6; see supra Section I.C.3. Instead, "[t]he IRS data is currently

residing on the [Homeland Security Investigations] lead architect's government-issued

---

[8] In response to concerns raised by the court during the hearing on Plaintiffs' Motion for a
Preliminary Injunction, Defendants submitted the Fitzgerald Declaration and a declaration on
behalf of SSA regarding the sourcing, storage, use, and access of confidential taxpayer
information by ICE and SSA, respectively. See Defs.' Notice [Doc. No. 51].

[9] Defendants have not explained how the Enforcement Removal Operations, Law Enforcement
Systems and Analysis Team fits within the units and support centers detailed in the first
declaration. See McShane Decl. ¶ 2 [Doc. No. 39-3]. However, no ERO component described by
the McShane Declaration as conducting a criminal investigation is titled the "Law Enforcement
Systems and Analysis Team." Id.

computer." Fitzgerald Decl. ¶ 6 [Doc. No. 51-2]. The Declaration states that "[a]t this juncture,

only the lead architect[10] has access to the IRS data." Id.

The Declaration provides further that "[t]he lead architect is responsible for transferring

data between the operators and other stakeholders[,] and that "when the IRS data is to be

integrated into databases covered by the Systems of Records, ICE will collaborate closely with

the developers to ensure that the IRS data is properly tagged and identified as IRS data, marked

restricted, and designated for use in criminal investigations." Id. ¶¶ 6–7.

## F.  The Plaintiffs

Plaintiffs are four community organizations that "advocate for immigrants' rights and

support members with tax, legal, and community-based services." Pls.' Mem. ISO Mot. for

Prelim Inj. 4 ("Pls.' Mem.") [Doc No. 35]. Community Economic Development Corp. ("CEDC")

is a community-development organization based in New Bedford, Massachusetts, that works

with residents and businesses to develop and improve the local economy. Decl. of Corinn

Williams Executive Director, CEDC ¶¶ 2–3 ("CEDC Decl.") [Doc. No. 31]. CEDC also provides

general community support to immigrant communities in New Bedford. Id. ¶¶ 10–18. Since

2004, CEDC has served as a Volunteer Income Tax Assistance site under the IRS's Volunteer

Income Tax Assistance program, assisting its low- and moderate-income members, both citizens

and noncitizens, with tax filing. Id. ¶¶ 19-21. CEDC has assisted its noncitizen members with

filing their taxes in association with an ITIN. Id. ¶¶ 26–31.

The National Parents Union ("NPU") is a nationwide organization advocating "to

improve K-12 education" and for the "equitable treatment of all families," including advocating

---

[10] The Fitzgerald Declaration [Doc. No. 51-2] does not provide the name or title of the "lead architect" on whose computer the data resides and does not specify whether the lead architect is an employee or officer of DHS or an outside contractor.

for expanding the Child Tax Credit to immigrant families. Pls.' Notice, Ex. 1 ¶¶ 4, 11 ("NPU Decl.") [Doc. No. 37]. NPU has multiple members who file their taxes, with assistance from NPU, in association with an ITIN. Id. ¶¶ 14–18. The National Korean American Service and Education Consortium ("NAKASEC") is a national organization that advocates for Korean and Asian Americans and immigrants. Decl. of Rebecca Belcore Co-Executive Director, National Korean American Service & Education Consortium ¶ 1 ("NAKASEC Decl.") [Doc. No. 33]. The UndocuBlack Network ("UBN") advances the rights and well-being of Black immigrant communities. Decl. of Patrice Lawrence Executive Director, UndocuBlack Network ¶¶ 1-3 ("UBN Decl.") [Doc. No. 34].

Plaintiffs assert that interagency sharing of tax information harms their immigrant members, many of whom file their taxes because of or through the guidance of Plaintiffs. See CEDC Decl. ¶¶ 26–31 [Doc. 31]; NAKASEC Decl. ¶ 9 [Doc. No. 33] (To assist its members with complying with tax-filing obligations, NAKASEC "created a bilingual English-[Korean] guide" regarding ITINs, available on its website until the organization removed it recently); UBN Decl. ¶ 9 [Doc. No. 34]. One Plaintiff describes many of its members living in households with family members of "mixed-[immigration] status." NPU Decl. ¶ 6 [Doc. No. 37]. Further, Plaintiffs explain that some members have SSNs as a component of their "deferred action" status, under programs like Deferred Action for Childhood Arrivals ("DACA"). NAKASEC Decl. ¶¶ 7–8 [Doc. No. 33]; UBN Decl. ¶ 7 [Doc. No. 34]. When a noncitizen has "deferred action status," DHS may have issued an administratively final order of removal, however, that removal is "deferred" indefinitely and the noncitizen is eligible for an employment authorization document or work permit and social security card, through which they can file income taxes. See

Decl. of Bill Ong Hing ¶¶ 9, 33, 46 ("Ong Hing Decl.") [Doc. No. 29]; 8 C.F.R. §§ 236.21–36.25 (implementing the DACA policy).

Finally, Plaintiffs explain that for many immigrant communities, including their members, specific surnames are common. See NAKASEC Decl. ¶ 16 [Doc. 33] (nearly half the Korean American population shares one of three surnames and almost one quarter of Korean Americans share surname "Kim"). Additionally, family and community members often share home addresses and/or post office boxes or live in the same apartment complexes. See Pls.' Mem. 11 n.8 [Doc. 35]; NAKASEC Decl. ¶¶ 16–17 [Doc. No. 33].

## II.    Standing

Defendants contend that Plaintiffs lack Article III standing. Defs.' Opp'n 5–6. [Doc. No. 39]. Defendants argue that Plaintiff CEDC lacks organizational standing because CEDC's injury is causally disconnected from the agency action at issue and that all four Plaintiffs' alleged injuries are either too generalized or too remote to provide Plaintiffs with standing. Id.

To satisfy Article III's standing requirements, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)). "At the preliminary injunction stage . . . the plaintiff must make a clear showing that she is likely to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quotations omitted). To establish injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quotations omitted). "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not

only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731–32 (1st Cir. 2016).

Regarding CEDC, Defendants first contend that "nothing about inter-agency data-sharing remotely interferes with CEDC's ability to conduct its operations, build trust, or associate with its members." Defs.' Opp'n 5 [Doc. No. 39]. However, CEDC has alleged that the IRS' abrupt change in policy directly impacts CEDC's ability to appropriately counsel its members regarding their tax filing obligations. Am. Compl. ¶¶ 149–58 [Doc. No. 73]. Previously, CEDC could assure its citizen and noncitizen members that the confidentiality of their filings was protected by law and policy. The IRS's change in policy directly undermines CEDC's credibility and activities. CEDC not only cannot advise its members not to file tax returns (which would be unlawful, contrary to CEDC's purposes of providing tax filing assistance, and may undermine noncitizen members' opportunity to secure their immigration status) but also cannot encourage the filing of tax returns that may result in ICE arresting and detaining them or their household members. Id. ¶¶ 151–52. CEDC also has reported a decrease in membership and attendance based on the chilling effect caused by IRS' policy change. Id. ¶ 158. Finally, CEDC's decreased revenue, attributable to reduced tax return filings, comprises sufficient pecuniary injury, caused by agency action to share taxpayer identity information with ICE, and potentially redressable by this court's order to cease such sharing. Id. ¶ 161.Regarding the four Plaintiffs' associational standing based on their members' injuries, Defendants characterize these injuries as "hesitancy to comply with the law [i.e. file a tax return]." Defs.' Opp'n 6 [Doc. No. 39]. But the injuries complained of differ significantly from the mere "[f]ulfill[ment] of a legal obligation." Id. Plaintiffs' members—citizens and noncitizens—allege that they are at risk of arrest and detention

due to administrative errors tied to similarities between names, Am. Compl. ¶¶ 162 [Doc. No. 73], and noncitizen members are at risk of arrest, detention, and even deportation, due to legal error where ICE treats noncitizens as subject to criminal prosecution based on an administratively final order of removal that is either still pending judicial review or subject to deferred action, see Ong Hing Decl. ¶¶ 9, 46 [Doc. 29]; id. Ex. 1 [Doc. No. 29-1] (case involving removal due to administrative error).

Further, given the breadth of ICE's requests for taxpayer information, the likelihood that noncitizen members' information will be shared is high and the concomitant injury of that disclosure is "particularized" to those members. Lyman v. Baker, 954 F.3d 351, 361 (1st Cir. 2020) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 344 (2006)); see CEDC Decl. ¶¶ 48–50 [Doc. No. 31]; NPU Decl. ¶¶ 14–17 [Doc. No. 37]; NAKASEC Decl. ¶¶ 12–15 [Doc. No. 33]; UBN Decl. ¶¶ 18–22 [Doc. No. 34]. Further, the IRS has already disclosed taxpayer information to ICE and has committed to disclosing more information on a monthly or regular basis. See Admin. Record, at TD_0000143 [Doc No. 39-1]. Significantly, ICE has already used the information to identify "updated addresses" and intends to integrate the IRS data into its various databases, albeit with a limiting designation. Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. The court finds the Plaintiffs' injury is either likely to have already occurred or about to occur "imminent[ly.]" See Lyman, 954 F.3d at 360 (quotations omitted); IRS-ICE MOU [Doc. No. 73-1]; ICE-IRS Implementing Agreement [Doc. No. 73-2]. Therefore, CEDC has established organizational standing, and all Plaintiffs have established associational standing, sufficient for Article III and justiciability purposes. Accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *8–17 (finding both organizational and associational standing satisfied for plaintiffs with similar missions and services).

24

### III.    <u>Preliminary Injunction</u>

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." <u>Starbucks Corp. v. McKinney</u>, 602 U.S. 339, 346 (2024) (quoting <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981)). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movants] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

<u>Esso Standard Oil Co. v. Monroig-Zayas</u>, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting <u>Bl(a)ck Tea Soc'y v. City of Boston</u>, 378 F.3d 8, 11 (1st Cir. 2004)). The balancing of hardships and the analysis of the public interest merge when, as here, the government is the opposing party. <u>Does 1–6 v. Mills</u>, 16 F.4th 20, 37 (1st Cir. 2021) (citing <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)). The court addresses each of the factors in turn.

#### A.  Likelihood of Success on the Merits

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002) (citing <u>Weaver v. Henderson</u>, 984 F.2d 11, 12 (1st Cir. 1993)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." <u>Sindicato Puertorriqueño de Trabajadores</u>

v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

        1.   Final Agency Action

      The parties dispute whether the interagency data-sharing constitutes final agency action ripe for judicial review. See Pls.' Mem. 7 [Doc. No. 35]; Defs.' Opp'n 7–8 [Doc. No. 39]. The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. An agency action is "final" if: (1) it marks the "'consummation' of the agency's decision-making process," and (2) the action has determined rights or obligations or will create legal consequences. Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (citing Bennett v. Spear, 520 U.S. 154, 177 (1997)).

      First, the administrative record submitted by Defendants demonstrates that the IRS-ICE MOU and ICE-IRS Implementation Agreement have already resulted in substantial data-sharing between the two agencies. See Admin. Record, at TD_0000143–146 [Doc. No. 39-1] (IRS employees noting that they had shared roughly 47,000 addresses of noncitizens with ICE). The court finds that the IRS-ICE MOU, Implementation Agreement, and the data-sharing already effectuated are the "consummation" of the IRS and ICE decision-making processes. Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 91 (1st Cir. 2020). Neither the agreements nor the agencies' operationalization was in any way "tentative or interlocutory[.]" Bennett, 520 U.S. at 178.

      Further, the IRS-ICE Memo and the ICE-IRS Implementing Agreement clearly spell out the agencies' respective "rights or obligations" under the terms of the agreements. Id. Both agreements require the IRS to provide ICE with noncitizens' address information, something the IRS had not done prior or, minimally, had never done at the scale and breadth requested by ICE.

See IRS-ICE MOU [Doc. No. 73-1]; ICE-IRS Implementing Agreement, [Doc. No. 73-2]. If the interagency data-sharing was merely a recitation or affirmation of the agencies "obligations," no official memorandum or letter would be necessary. See Defs.' Opp'n 8 [Doc. No. 39]. Accordingly, the inter-agency data-sharing between the IRS and ICE is final agency action and ripe for judicial review. Accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *18–19 ("[T]he IRS has made a final decision to adopt and implement a policy of disclosing the confidential address information of tens of thousands of taxpayers to ICE[.]").

2. Alternative Remedy

Defendants also assert that Plaintiffs claims are not reviewable by this court because "Congress has created a different, comprehensive remedial scheme for violations of" 26 U.S.C. § 6103. Defs.' Opp'n 8 [Doc. No. 39]. Plaintiffs contend that a suit under the APA is appropriate, given Plaintiffs' need for forward looking injunctive relief. Pls.' Reply 15–16 [Doc. No. 43]. The court finds Congress' civil damages and criminal penalties provisions, see 26 U.S.C. §§ 7213, 7431, to provide inadequate remedial mechanisms for the scope and breadth of ongoing identity and location disclosures involved in this case. See IRS-ICE MOU [Doc. No. 73-1]. While the court agrees that Congress recognized the severity of an impermissible disclosure of confidential tax information and accordingly created a responsive retrospective penalty, neither provision referenced by Defendants encompasses the prospective relief required to enjoin IRS and SSA's disclosures. Abbott Laboratories v. Gardner, 387 U.S. 136, 151 (1967) (explaining strong presumption of judicial review of agency action); accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *20 ("ex post penalties are [not] an adequate alternative to ex ante prohibitions."). Therefore, judicial review is available for Plaintiffs' claims, given that "no other adequate remedy" is available for the interagency data-sharing across IRS, SSA, and ICE. 5

U.S.C. § 704; see Abbott Laboratories, 387 U.S. at 140, abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

  3. APA Claims

  Plaintiffs allege that the inter-agency data sharing of confidential tax information between the IRS and ICE violates Section 6103 and is therefore agency action both contrary to law and arbitrary and capricious, in violation of 5 U.S.C. § 706. Am. Compl. ¶¶ 182–198 [Doc. No. 73].

  As previously discussed, Section 6103 represents Congress' efforts to balance important privacy considerations of taxpayers against other governmental priorities.[11] In the example of subsection 6103(i)(2), Congress weighed privacy against assisting law enforcement with criminal investigations and added substantial procedural protections in working out the balance. The parties do not dispute that ICE now possesses tax return data, and that Section 6103 governs the agencies' treatment of that data. See Pls.' Mem. 10 (Doc. No. 35); Defs.' Opp'n 12–13 [Doc. No. 39]; Pls.' Reply 9 [Doc. No. 43]. The court considers Plaintiffs' claims with respect to the IRS and ICE, separately.

---

[11] In amending the Tax Reform Act of 1976 to rework some of the exceptions to the general rule of confidentiality, the Conference Committee explained:

> The purpose of these modifications to the disclosure law is to facilitate the disclosure of tax information for legitimate law enforcement needs while, at the same time, preserving the basic principle that a taxpayer's return should generally be treated as confidential and should be disclosed, in only a limited number of circumstances, where those law enforcement needs outweigh the needs to preserve taxpayer confidentiality. In agreeing to these provisions, the conferees have fulfilled a commitment made by the conferees on the Economic Recovery Tax Act of 1981 to take appropriate legislative action in this area.

H.R. REP. No. 97-760, at 677 (1982) (Conf. Rep.).

a) <u>IRS</u>

As previously discussed, a D.C. district court has enjoined the IRS from sharing taxpayer addresses with ICE, in violation of 26 U.S.C. § 6103(i)(2). <u>See</u> <u>Ctr. for Taxpayer Rights</u>, 2025 WL 3257096, at *1–3. That court found that IRS' implementation of the IRS-ICE MOU constituted a significant change in IRS policy, for which the agency was unable to provide a reasonable explanation. <u>See</u> <u>Ctr. for Taxpayer Rights</u>, 2025 WL 3251044, at *30–31. Further, that court found that this unexplained policy change, set against the substantial reliance interests at stake, was arbitrary and capricious. <u>Id.</u> This court agrees. <u>See</u> <u>FCC v. Prometheus Radio Project</u>, 592 U.S. 414, 423 (2021); <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009). Taxpayers have long been counseled that their data is confidential and will not be shared or used for immigration enforcement. <u>See, e.g.</u>, 60 Fed. Reg. 30,211, 30,213 (June 8, 1995) (in Notice of Proposed Rulemaking relating to ITINs, the IRS stated ITINs "are intended for tax use only. For example, the numbers will create no inference regarding the immigration status of a foreign person or the right of that person to be legally employed in the United States. The [ITIN] and the information obtained by the IRS as a result of issuing numbers constitute confidential taxpayer information. Section 6103 strictly prohibits the disclosure of this information to other government agencies, private entities, or citizens."). Millions of noncitizen taxpayers file under an ITIN or SSN in reliance on this assurance and thereby generate tens of billions of dollars for federal tax revenue. <u>See</u> Lam Decl., Ex. 2, at 3 ("Tax Payments by Undocumented Immigrants News Article") [Doc. 28-2]. Further, the record is replete with evidence that the IRS' policy did not permit usage of subsection 6103(i)(2)'s process to permit disclosure of taxpayer's address information alone. <u>See</u> IRM § 11.3.28 (2025) ("Material Changes"), https://www.irs.gov/irm/part11/irm_11-003-028 (last visited February 4, 2026).

Therefore, given the federal government's prior protective policy and the "serious reliance interests" of taxpayers, it was incumbent upon the IRS to carry out a reasoned decision-making process before changing its policy to provide for and enable disclosure of previously considered confidential information. See Fox Television Stations, Inc., 556 U.S. at 515. The IRS' lack of explanation for such a substantial change in policy falls outside any "zone of reasonableness" and reflects arbitrary and capricious agency action. Prometheus Radio Project, 592 U.S. at 423; see 5 U.S.C. § 706(2)(A).

Additionally, like the Ctr. for Taxpayer Rights court, this court finds that the IRS' disclosure to ICE violated Section 6103 in multiple ways even if the requested addresses are treated only as "return information" under subsection 6103(i)(2), with its less onerous requirements, rather than "taxpayer return information," for which a court order would have been required under subsection 6103(i)(1). See 2025 WL 3251044, at *22–29.

First, when ICE requested address information for 1.2 million individuals from the IRS in June 2025, the request included one person as the recipient of such information: the Assistant Director of the ICE ERO, Enforcement Division. See Admin. Record, at TD_0000077, TD_0000084, TD_0000088 [Doc. 39-1]. However, the statutory provision requires that the request identify the officers and employees "personally and directly" with the criminal investigation and proceedings, and that the information be provided only to them. The assertion that one individual could be "personally and directly" involved with the investigation and prosecution of 1.3 million people ignores the plain meaning of those words, which convey direct involvement in those criminal proceedings. See Fleischaker Decl. ¶¶ 28–31 [Doc. No. 30] (describing that, in her experience as a long-time career employee and political appointee at DHS

and ICE, the ERO Assistant Director "generally would not make decisions about individual cases.").

Defendants contend that the Assistant Director of the ICE ERO, Enforcement Division is "personally engaged in overseeing and managing the enforcement initiatives related to, and components involved in, carrying out" by ERO officers. McShane Decl. ¶ 8[Doc. No. 39-3]. Neither "overseeing" nor "managing" others would fall within the narrow strictures of the statutory language. Accord Ctr. for Taxpayer Rights, 2025 WL 3251044, at *24 ("[A]n officer or employee 'personally and directly engaged' in a criminal matter under Section 6103(i)(2) is someone working on the substance of the relevant criminal matter who will be able to apply to the criminal matter the information obtained through the IRS's disclosure.").

Assistant Director McShane describes the investigatory process of the ERO Officers he oversees. McShane Decl. ¶¶ 5–8 [Doc. No. 39-3] (describing evidence-gathering in DHS databases, establishing identity and location information, and reviewing court information). But those ERO Officers were not identified in the June 2025 request. See Admin. Record, at TD_0000107–108 [Doc. No. 39-1]. Assistant Director McShane, the substituted-recipient designated on ICE's request, as a practical matter is unable to do more than "oversee[] and manage[]" a criminal investigation by sheer limitation of volume, and is therefore an impermissible recipient of confidential tax return information for purposes of a criminal investigation. McShane Decl. ¶ 8 [Doc. No. 39-3].

In addition to the "personally and directly engaged" recipient violation, the Ctr. for Taxpayer Rights court found that the contents of ICE's request further violated subsection 6103(i)(2). 2025 WL 3251044, at *25–29. The subsection requires that the request include "a 'specific reason' that justifies the agency's entitlement to taxpayer information." Id. at *28

(citing 26 U.S.C. § 6103(i)(2)(B)(iv)). This court makes a similar and slightly broader finding. Not only did ICE's June 2025 address request exclude a "specific reason" for the disclosure, but the record lacks sufficient information to demonstrate that ICE is seeking the addresses to assist with criminal investigations or proceedings under 8 U.S.C. § 1253(a)(1).

To the extent that ICE seeks addresses not as part of a criminal investigation but to locate taxpayers so that they may be civilly arrested, that purpose would grossly misread the statute. Section 6103(i) does allow the IRS to disclose addresses to assist Federal officers and employees to "locate fugitives from justice[.]" 26 U.S.C. § 6103(i)(5) (capitalization omitted). But this subsection requires an application to a court and a court order to allow disclosure to federal officers and employees of return information (including taxpayer furnished information) "exclusively for use in locating such individuals." Id. § 6103(i)(5)(A). The court may only grant the application if (1) the applicant shows that a Federal arrest warrant relating to the commission of a Federal felony offense has been issued for an individual who is a fugitive from justice; (2) the return of such individual or return information with respect to such individual is sought exclusively for use in locating such individual; and (3) there is reasonable cause to believe that such return or return information may be relevant in determining the location of such individual. Id. § 6103(i)(5)(B). No such showing has been made here.

b)  ICE

Unlike the D.C. litigation, this case is also brought against the ICE Defendants. Because, as explained above, ICE's request failed to comply with even with the lesser requirements of subsection 6103(i)(2), the confidential taxpayer information should not have been disclosed to ICE.

Moreover, whether the request was sufficient or not, the court must now address the merits of Plaintiffs' claims with respect to ICE's use and protection of the confidential taxpayer information disclosed by IRS. Whether confidential information is disclosed pursuant to subsection 6103(i)(1) or (2), the information is still "return information," and remains subject to Section 6103's proscriptions on use and storage. 26 U.S.C. §§ 6103(i), (p).

At the outset, the court notes an irreconcilable issue with Section 6103's statutory framework and the implementation of the IRS-ICE MOU. Both subsection 6103(i)(1) and 6103(i)(2)'s strictly confined processes require that, at a bare minimum, federal officials or employees have commenced an investigation regarding specific non-tax criminal activity of a taxpayer. Id. §§ 6103(i)(1), (2). Pursuant to those processes, disclosure of return information (including taxpayer-furnished identity information) is limited to the agency officers and employees who are investigating the taxpayer.

However, in this circumstance, IRS did not provide its disclosure to the ICE officers personally and directly engaged in criminal investigations. See McShane Decl. ¶ 8 [Doc. No. 39-3]. First, the scope and breadth of ICE's request rendered it impossible for IRS, as a practical matter, to disclose the 47,000 taxpayer addresses to investigatory officers without an intermediary. Indeed, the Fitzgerald Declaration describes how, in August 2025, the IRS sent taxpayer information to the ICE Homeland Security Investigations ("HSI") Cyber and Operational Technology Division. Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. That ICE component not only viewed the confidential data but "use[d] the IRS data to compare it with the list of 1.2 million individuals with final removal orders and identified approximately 33,000 updated addresses." Id. The ICE component then sent the data to the ERO Law Enforcement Systems and Analysis team. Id. Neither the ICE HSI Cyber and Operational Technology Division nor the

ERO Law Enforcement Systems and Analysis team include the specific employees or officers directly participating in the 8 U.S.C. § 1253 investigations and prosecutions of the taxpayers' whose information was shared. McShane Decl. ¶ 8 [Doc. No. 39-3]; Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. Because the data transfer was so large (rather than being limited to specific investigations, as contemplated by the statutory scheme), the data transfer necessitated two intermediary ICE components not statutorily authorized to receive the information. McShane Decl. ¶ 8 [Doc. No. 39-3]; Fitzgerald Decl. ¶ 5 [Doc. No. 51-2].

Second, the ICE ERO Enforcement Division does not appear to be organizationally capable of segregating the taxpayer addresses (which may only be used in association with a criminal investigation) from use in potential civil enforcement matters. See McShane Decl. ¶¶ 2, 4 [Doc. No. 39-3]. The McShane Declaration explains that an investigating ERO officer "must evaluate the evidence at hand and determine if it is sufficient to establish the elements of the contemplated criminal charge." Id. ¶ 8. "Once an ERO officer establishes that sufficient evidence exists . . ., the ERO officer will present the case to the appropriate USAO[.]" Id. The United States Attorney's Office will then review the case worked up by the ERO officer and determine whether to prosecute. Id. Throughout the initial investigatory process, the ERO officer determines "whether administrative remedies can satisfactorily resolve a case, or whether . . . criminal prosecution should be pursued." Id. Accordingly, ERO officers use the initial investigatory process to determine whether to pursue civil enforcement or recommend criminal prosecution. Id. This process presents insurmountable challenges with respect to Section 6103. The court fails to understand how an ERO officer could segregate the data and only use taxpayer addresses for the latter.

Third, there is nothing before the court to suggest that ERO officers are engaged in any specific criminal investigations regarding 8 U.S.C. § 1253 violations. The McShane Declaration details numerous preliminary steps, typically taken by ERO officers <u>before</u> even determining that a crime has been committed. <u>See id.</u> ¶¶ 6, 8 (referencing "the initial investigation"); <u>id.</u> ¶ 6 (explaining that an "investigation" includes establishing a noncitizen's identity, "all known addresses," and immigration status); <u>id.</u> ¶ 7 (describing that, for 8 U.S.C. § 1253 investigations, "relevant database checks are . . . conducted to determine whether the alien has a final executable order of removal and whether the alien has departed or has been removed from the United States pursuant to the final order of removal" and appellate databases are reviewed to ensure that no ongoing appeals might stay the proceedings); <u>id.</u> ¶ 8 (detailing steps taken by the ERO officer before presenting the case to the appropriate United States Attorney's Office, where the case will be "accepted or declined for prosecution."). The McShane Declaration demonstrates that the decision to prosecute under 8 U.S.C. § 1253 is a deliberative one, arrived at some point "during the initial investigation." <u>Id.</u> ¶ 8. Therefore, ICE's desired use of the taxpayer information belies the purpose of Section 6103's statutory scheme. Instead of initiating a criminal investigation, determining that prosecution requires a taxpayer's return information, and requesting such information from the IRS, ICE requested taxpayer addresses and then attempted to ascertain which of those taxpayers may have potentially violated a criminal statute.

In addition to these structural issues preventing compliance with Section 6103, the Fitzgerald Declaration demonstrates that impermissible use of the addresses by ICE has already occurred. After receiving the data from the IRS, ICE HSI "identified approximately 33,000 updated addresses." Fitzgerald Decl. ¶ 5 [Doc. No. 51-2]. The court understands this statement as follows: ICE compared the IRS data to its own and noted that 33,000 out of the IRS-provided

47,000 addresses were different than the addresses for people with the same or similar names in its own records. Id. Even accepting that "nothing further was done with the data," ICE's cross-reference of its records against the taxpayer addresses constitutes an impermissible use of taxpayer addresses because it was conducted by employees not "personally and directly engaged" in a criminal investigation or proceeding. 26 U.S.C. §§ 6103(i)(1)(A). Further, the storage of the taxpayer addresses on the computer of the ICE HSI lead architect, an unnamed individual, constitutes impermissible storage, in contravention of subsection 6103(p). Id. § 6103(p)(4)(C) (requiring, *inter alia*, that the recipient federal agency "restrict . . . access to the returns or return information only to persons . . . to whom disclosure may be made under the provisions of" Section 6103).

In sum, Plaintiffs have established a high likelihood that ICE's handling, use, and storage of taxpayer addresses violated and continues to violate Section 6103, and therefore, the APA.

### B. Irreparable Harm to Plaintiffs

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005). "[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). Further, "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." Id. (internal quotations omitted). "[T]he issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties." CMM Cable Rep., Inc.

v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis in original). Moreover,

"plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely

in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original).

      Plaintiffs have sufficiently demonstrated irreparable harm to their members as well as to

CEDC as an organization. First, Plaintiffs describe members fearful of filing taxes due to the

likely consequence of their addresses being provided to ICE. See, e.g., CEDC Decl. ¶ 48 [Doc.

No. 31] (describing noncitizen member who consistently filed taxes with an ITIN or SSN from

2019–2024 who fears that IRS and SSA will share their information with ICE, deport them to

their country of origin, and separate them from their children). Many of Plaintiffs' members are

not subject to criminal prosecution because of their deferred action status. Nonetheless, these

members too are fearful of filing taxes. See, e.g., UBN Decl. ¶¶ 21–22 [Doc. No. 34] (describing

DACA recipient who has filed taxes since 2021 through an SSN but is fearful that continued

filing will expose themself and their parents to arrest, detention, or removal). Because these

members have been chilled from filing taxes, they are deprived of necessary tax credits and

further complicate their immigration statuses. See NPU Decl. ¶ 25 [Doc. No. 37]; see also Ctr.

for Taxpayer Rights, 2025 WL 3251044, at *38 ("Plaintiffs have shown that the imminent risk

that their members' address information will be misused impedes [their members'] ability to

safely participate in the tax system[.]") (internal citation omitted) (alteration in the original).

      Second, Plaintiffs have been and will continue to be harmed by the data-sharing due to

the erosion of trust between the organizations and their members. See UBN Decl. ¶ 17 [Doc. No.

34]. All four organizations previously advised their members to obtain an ITIN and file taxes,

regardless of immigration status, because of the IRS' assurance and practice to keep tax

information confidential. See, e.g., NAKASEC Decl. ¶¶ 9–10 [Doc. 33]. Similarly, Plaintiff

organizations encouraged its members to apply for programs like DACA and obtain SSNs, based on the reasonable assumption, consistent with the DACA program, that no adverse immigration consequences would flow from the application process. See, e.g., UBN Decl. ¶¶ 16–17 [Doc. No. 34]. Because of the interagency data-sharing, Plaintiffs' trustworthiness and reputations are being irreparably harmed as organizations, no matter how difficult that harm may be to measure. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996) (Irreparable harm can occur when "the plaintiff suffers a substantial injury that cannot be accurately measured or adequately compensated by money damages" or other legal remedies.); see also Ctr. for Taxpayer Rights, 2025 WL 3251044, at *32 (As an organization, the D.C. plaintiff's "harm resulting from this loss of trust is irreparable because it is difficult to replace or measure and one the [plaintiff] should not be expected to suffer." (internal citations omitted)).

### C.   Balance of Hardships and Public Interest

The balance of hardships and public interest factors merge when the government is the opposing party. See Nken, 556 U.S. at 435 (stating factors merge in stay context); accord Massachusetts v. Nat'l Institutes of Health, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (holding factors merge in preliminary injunction context). Here, Plaintiffs argue that those factors favor preliminary injunctive relief because of the "public's strong 'interest in preventing [noncitizens] from being wrongfully removed[.]'" Pls.' Mem. 18 [Doc. No. 35] (citing A.B.-B. v. Morgan, 548 F. Supp. 3d 209, 222 (D.D.C. 2020)). Defendants contend that the government's ability to assist "law-enforcement officers to perform" the task of "enforcing federal law" outweighs "'the interests of individuals who are illegally in the country in avoiding . . . law enforcement.'" Defs.' Opp'n. 19 [Doc. No. 39] (citing Noem v. Vasquez Perdomo, __ U.S. __, 2025 WL 2585637, at *4 (Sept. 8, 2025) (Kavanaugh, J., concurring)).

In this instance, both the balance of the hardships and the public interest tilt heavily towards enjoining the implementation of the interagency data-sharing agreements. First, the federal tax system is built upon a foundation of the taxpayer's systemic trust and confidence. See IRS' Taxpayer Bill of Rights, https://www.irs.gov/taxpayer-bill-of-rights ("Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. Taxpayers have the right to expect appropriate action will be taken against [those] who wrongfully use or disclose taxpayer return information.") (last visited February 4, 2026). The implementation of agreements contrary to law erodes that foundation and undermines the public interest in a functioning tax system. Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth., 791 F.2d 183, 184 (D.C. Cir. 1986) ("The assurance of privacy secured by § 6103 is fundamental to a tax system that relies upon self-reporting.").

Second, there is significant hardship in the potential misidentification of noncitizens and citizens alike that could lead to wrongful arrests, detention and even removal. See Nken, 556 U.S. at 435 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). Because the information sought was not for any specific criminal investigation, the data-sharing will necessarily include both the data of noncitizens subject to criminal prosecution and those who are not subject to criminal prosecution because of their deferred action status. See IRS-ICE MOU [Doc. No 73-1]; ICE-IRS Implementing Agreement [Doc. No. 73-2]. Further, Plaintiffs have demonstrated that a significant portion of immigrant communities not only share common last names, see NAKASEC Decl., at ¶ 16 [Doc. 33] (nearly half of the Korean-American population share one of three surnames), but also live in shared homes or in the same apartment complexes. See Pls.' Mem. 11 n.8 [Doc. 35]. These factual circumstances significantly raise the

risk of misidentification of taxpayers by IRS and ICE, and subsequent arrest by ICE. See, e.g.,

Maia Coleman, ICE Arrest of a Citizen, Barely Dressed, Sows Fear in Twin Cities, N.Y. TIMES

(Jan. 20, 2026).

Misidentifications due to administrative error also present significant danger to citizens

and noncitizens alike given the DHS General Counsel's opinion that "illegal aliens aren't entitled

to the same Fourth Amendment protections as U.S. citizens." Jimmy Percival, How the Deep

State Thwarted Ice Administrative Warrants, WALL STREET J. (Jan. 22, 2026). The DHS General

Counsel described ICE's practice to use administrative warrants (i.e. warrants signed by an

Immigration Judge rather than a federal magistrate or district judge) to enter noncitizens' homes

and arrest them. Id. The DHS General Counsel claimed this practice is lawful because "[a]liens

in this context are fugitives from justice[.]" Id. Given the high potential for misidentification,

ICE's arrests and detention practices (including, as affirmed by DHS counsel, the

misapprehension that homes of individuals suspected to be noncitizens may be searched without

a judicial warrant), and the absence of procedural safeguards, the court finds that the public

interest is not served by ICE's use of the confidential taxpayer information provided despite

ICE's failure to satisfy the statutorily required procedures for obtaining such information.

Third and finally, the government has failed to show that the provision of taxpayer

addresses is integral to law enforcement, let alone to the President's promise to start enforcement

with the "worst of the worst."[12] As discussed above, Defendants failed to identify in their request

to the IRS, and have offered no further demonstration here, how the use of taxpayer addresses

---

[12] See Department of Homeland Security, Arrested: Worst of the Worst,
https://www.dhs.gov/wow, (last visited Feb. 4, 2026) ("Under Secretary Noem's leadership, the
hardworking men and women of DHS and ICE are fulfilling President Trump's promise and
carrying out mass deportations - starting with the worst of the worst[.]").

serves ICE in its efforts to prosecute specific criminal offenders under 8 U.S.C. § 1253. The

court finds no basis to conclude that enjoining the data-sharing, until that sharing complies with

the law and includes statutorily-mandated procedural protections, will interfere with ICE's

ability to enforce the law. See Ala. Ass'n of Realtors v. Dep't of Health and Human Servs., 594

U.S. 758, 766 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit

of desirable ends."); see also Ctr. for Taxpayer Rights, 2025 WL 3251044, at *38 (describing the

likelihood that plaintiffs' "members' address information will be impermissibly used for civil

immigration enforcement" as an "imminent risk.").

## IV.    Conclusion

After carefully considering Plaintiffs' likelihood of success on the merits of their APA

claims,[13] the threat of irreparable harm, and the balance of the equities and public interest, the

court finds that relief is warranted to preliminarily enjoin ICE's use of taxpayer addresses

provided by IRS pursuant to the IRS-ICE MOU during the pendency of this litigation.[14]

Therefore, the court GRANTS Plaintiffs' Motion for a Preliminary Injunction as to the ICE

Defendants as follows:

It is hereby ORDERED that:

---

[13] Given that the court finds that Plaintiffs' APA claims are likely to succeed on the merits, the
court need not analyze Plaintiffs' remaining claims at this preliminary procedural juncture. See
Am. Compl. ¶¶ 199–222 (Counts 3–5) [Doc. No. 73].

[14] Neither party addresses whether the court should impose bond on Plaintiffs pursuant to Federal
Rule of Civil Procedure 65(c). Given this omission, the court exercises its discretion to waive the
bond requirement. See Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc.,
925 F.2d 6, 9 (1st Cir. 1991) (explaining that "a district court retains substantial discretion to
dictate the terms of an injunction bond."); Liu v. Noem, 780 F. Supp. 3d 386, 405 (D.N.H. 2025)
(waiving bond requirement where defendants requested that plaintiff post bond but did not
"request a specific amount," "explain any costs they will incur by complying with the
preliminary injunction," or describe "any damages they will have sustained" if the preliminary
injunction was later found to be erroneous).

1.      The implementation and/or enforcement of the IRS-ICE MOU, the ICE-IRS

Implementing Agreement, as well as related agreements, policies, practices, and

procedures (together, the "information sharing arrangements") are stayed and

preliminarily vacated, pursuant to the Administrative Procedure Act, 5 U.S.C. § 705,

pending disposition of this litigation on the merits.

2.      Defendants DHS, Secretary Noem, ICE, Acting Director Lyons, and their agents,

are enjoined from inspecting, viewing, using, copying, distributing, relying on, or

otherwise acting upon any return information that had been obtained from or disclosed by

the IRS Defendants pursuant to the information sharing arrangements, including the

information received August 7, 2025.

3.      The ICE Defendants shall provide a copy of this Order to the individual whose

government-issued computer holds the information received from the IRS on August 7,

2026, and shall file confirmation that a copy of this Order has been provided to that

individual, no later than February 10, 2026. That individual, as a DHS agent, is bound by

this Order.


IT IS SO ORDERED.

February 5, 2026                          /s/ Indira Talwani
                                          United States District Judge