**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMUNITY ECONOMIC DEVELOPMENT
CENTER OF SOUTHEASTERN
MASSACHUSETTS *et al.*,

        *Plaintiffs*,

   *v.*

SCOTT BESSENT, in his official capacity as
Acting Commissioner of the Internal Revenue
Service, *et al.*,

        *Defendants*.

No. 1:25-cv-12822-IT

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

I.    PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS .................................................. 5

II.   PLAINTIFFS FAIL TO STATE A CLAIM TO RELIEF UNDER THE APA ...................................... 8

    A.    The Challenged Agreements Are Not Reviewable Agency Action...................... 8

    B.    An Alternate Remedial Scheme Divests Plaintiffs of the APA's Cause of Action ................................................................................................................. 10

    C.    Plaintiffs Fail to Plausibly Allege a Systemic Violation of § 6103 ..................... 11

    D.    Plaintiffs Identify No Arbitrary or Capricious Conduct ....................................... 15

III.  NO CHALLENGED ACTION AFFECTS CONDUCT PROTECTED BY THE FIRST AMENDMENT ................................................................................................................. 16

IV.   PLAINTIFFS FAIL ALL THREE REQUIREMENTS OF AN *ULTRA VIRES* CLAIM........................ 18

V.    PLAINTIFFS IDENTIFY NO IRS OR SSA REGULATIONS VIOLATED BY THOSE AGENCIES ...................................................................................................................... 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................ 5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................... 5, 13

*Bennett v. Spear,*
    520 U.S. 154 (1997)............................................................................................ 9

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988).......................................................................................... 10

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000).......................................................................................... 17

*Centro de Trabajadores Unidos v. Bessent,*
    No. 25-5181, 2026 WL 503310 (D.C. Cir. Feb. 24, 2026)............................. *passim*

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)............................................................................................ 7

*Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004).......................................................................................... 15

*Elec. Priv. Info. Ctr., v. IRS,*
    910 F.3d 1232 (D.C. Cir. 2018)........................................................................ 20

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021).......................................................................................... 15

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)...................................................................................... 5, 6

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons,*
    954 F.3d 118 (2d Cir. 2020)............................................................................. 19

*Giragosian v. Ryan,*
    547 F.3d 59 (1st Cir. 2008)................................................................................. 5

*Gordo-González v. United States,*
    873 F.3d 32 (1st Cir. 2017)................................................................................. 4

*Harper v. Werfel,*
    118 F.4th 100 (1st Cir. 2024)......................................................................... 8, 9

*Hernandez-Gotay v. United States*,
    985 F.3d 71 (1st Cir. 2021) ......................................................................... 16

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    110 F.4th 295 (1st Cir. 2024) .................................................................. 5, 6

*Nowicki v. Comm'r*,
    262 F.3d 1162 (11th Cir. 2001) ................................................................. 10

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ................................................................................... 18

*Renne v. Geary*,
    501 U.S. 312 (1991) ..................................................................................... 4

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ................................................................................... 16

*Rotinsulu v. Mukasey*,
    515 F.3d 68 (1st Cir. 2008) ....................................................................... 19

*Thornton v. Ipsen Biopharmaceuticals, Inc.*,
    126 F.4th 76 (1st Cir. 2025) ........................................................................ 5

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..................................................................................... 8

*Trump v. United States*,
    603 U.S. 593 (2024) ................................................................................... 17

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
    647 F.3d 377 (1st Cir. 2011) ....................................................................... 5

*United States v. Horne*,
    714 F.2d 206 (1st Cir. 1983) ..................................................................... 20

*United States v. Michaelian*,
    803 F.2d 1042 (9th Cir. 1986) ............................................................. 10, 11

*United States v. Orlando*,
    281 F.3d 586 (6th Cir. 2002) ..................................................................... 10

*URI Student Senate v. Town of Narragansett*,
    631 F.3d 1 (1st Cir. 2011) .......................................................................... 16

*Webster v. Doe*,
    486 U.S. 592 (2020) ................................................................................... 19

iv

*Welch v. United States*,
   750 F.2d 1101 (1st Cir. 1985) ................................................................................. 16

## Statutes

5 U.S.C. § 552a(b)(3) ................................................................................................. 18

5 U.S.C. § 704 ..................................................................................................... 8, 10

8 U.S.C. § 1253 ................................................................................................... 2, 14

8 U.S.C. § 1360 ................................................................................................ 3, 9, 18

8 U.S.C. § 1373 .......................................................................................................... 18

42 U.S.C. § 1306 ........................................................................................... 1, 3, 9, 18

I.R.C. § 6103 ...................................................................................................... *passim*

I.R.C. § 7213 .............................................................................................................. 10

I.R.C. § 7213A ........................................................................................................... 10

I.R.C. § 7431 ........................................................................................................ 10, 19

## Regulations

20 C.F.R. § 401.105(b) .............................................................................................. 20

20 C.F.R. § 401.125 ................................................................................................... 20

## Other Authorities

Social Security Administration, *Privacy Act System of Records Notices*,
   https://www.ssa.gov/privacy/sorn.html ................................................................. 13

## INTRODUCTION

Like many agencies, the Internal Revenue Service (IRS) and Social Security Administration (SSA) share data with their sister agencies when required to do so by law. As relevant here, § 6103 of the Internal Revenue Code generally prohibits IRS from sharing tax-return information, but then affirmatively *requires* the disclosure of certain properly requested information when relevant to a criminal investigation. Likewise, 42 U.S.C. § 1306 generally prohibits SSA personnel from disclosing information obtained in the course of official duties unless certain requirements in that statute are satisfied. Foreseeing that data in the possession of SSA and IRS would be relevant to law-enforcement operations conducted by Immigration and Customs Enforcement (ICE), IRS and SSA formalized their data-sharing relationships with ICE in documents outlining the statutory obligations of each agency.

Now, Plaintiffs challenge those documents and the data-sharing practices they contemplate. But they plead insufficient facts to show their standing to sue and plead no facts alleging anything unlawful about the data-sharing agreements. Indeed, the D.C. Circuit recently held that the very IRS-ICE agreement challenged here is both unreviewable under the APA and, in any event, lawful. *See Centro de Trabajadores Unidos v. Bessent*, No. 25-5181, 2026 WL 503310 (D.C. Cir. Feb. 24, 2026). Plaintiffs' sheer speculation of unlawful conduct cannot survive a motion to dismiss, and the Court should dismiss Plaintiffs' Amended Complaint in its entirety.

## BACKGROUND

Section 6103 of the Internal Revenue Code establishes a general rule that "[r]eturns" and "return information" shall not be disclosed "except as authorized by this title." I.R.C. § 6103(a). The term "return information" includes, among other things, "taxpayer return information," which is "return information" provided "by or on behalf of" the relevant taxpayer," § 6103(b)(3); and "a

taxpayer's identity," meaning the taxpayer's "name," "mailing address," "identifying number," "or a combination thereof." § 6103(b)(2)(A), (b)(6). Section 6103's broad prohibition on disclosure is subject to a series of statutory exceptions, including, as relevant here, § 6103(i)(2). That provision provides that, upon written request, IRS "*shall* disclose return information []other than taxpayer return information[] to officers and employees" of another agency "who are personally and directly engaged in … any investigation which may result in" "any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute." § 6103(i)(2)(A)(ii), (i)(1)(A)(i) (emphasis added). A valid request must be "in writing" and include "the name and address of the taxpayer," the relevant "taxable period," "the statutory authority" for the criminal investigation in question, and the "specific reason" that the information "*may* be[] relevant" to the investigation. § 6103(i)(2)(B) (emphasis added). Although the provision excludes "taxpayer return information" from the data IRS must provide, § 6103(i)(2)(A), it also specifies that for purposes of this provision, "a taxpayer's identity shall not be treated as taxpayer return information," § 6103(i)(2)(C).

On April 7, 2025, the Department of the Treasury and the Department of Homeland Security (DHS) entered into a Memorandum of Understanding memorializing the requirements of § 6103(i)(2) and governing the sharing of information, including address information, between IRS and ICE (their respective subcomponents). *See* ECF 73-1. The Memorandum provides that all ICE requests for information will conform to § 6103(i)(2), *id.* at 3 (§ 6(B)–(C)), and that IRS will disclose the information only if the terms of that statute are satisfied, *id.* at 2 (§ 5(B)). In keeping with § 6103(i)(2), the Memorandum specifically identifies 8 U.S.C. § 1253(a)(1) as the primary criminal provision ICE sought to enforce with the help of information to be obtained from IRS. *See generally id.* at 1–3. That provision imposes criminal penalties on "[a]ny alien against

whom a final order of removal is outstanding" and who, *inter alia*, "willfully fails or refuses to depart from the United States within … 90 days from … the final order of removal." § 1253(a)(1).

The Memorandum also provides that ICE will safeguard all information it receives, use the information only in connection with non-tax federal criminal investigations and proceedings, and return or destroy the information when it is no longer needed. ECF 73-1 at 3–4, 5–9 (§§ 6(D), 6(E), 8, 9). Shortly after signing the Memorandum, IRS and ICE also entered into an Implementation Agreement reaffirming compliance with § 6103(i)(2) and outlining, in more technical fashion, the records to be provided and maintained by each agency. *See* ECF 73-2.

Separately, SSA recorded its data-sharing arrangement with ICE via an August 2025 Letter noting that SSA would "provide identity and location information for each alien upon ICE requests in accordance with … []42 U.S.C. § 1306(a)[] and 8 U.S.C. § 1360(b)." ECF 73-4. Those statutes require SSA to make available "[a]ny information in any records" it keeps "as to the identity and location of aliens in the United States," § 1360(b), but only "as the [SSA Commissioner] may by regulations prescribe and except as otherwise provided by Federal law," § 1306(a)(1).

In September 2025, four organizations—Community Economic Development Center of Southeastern Massachusetts (CEDC), National Parents Union (NPU), National Korean American Service and Education Consortium (NKASEC), and UndocuBlack Network (UBN)—sued to vacate the Memorandum, Implementing Agreement, and Letter (together, the "Operative Documents"); enjoin SSA and IRS from disclosing address information to ICE; and prohibit ICE's use of any address data previously obtained from SSA and IRS. *See generally* Am. Compl. at 53–54 & ¶¶ 22–27. Each organization claims to consist of members whose data may have been, or may be, obtained by ICE. *Id.* ¶¶ 162–80. One—NKASEC—does not allege that any of its members have received a final order of removal but still remain in the United States. *Id.* ¶¶ 168–

73. Collectively, the organizations allege three past transfers of data to ICE: one in February 2025 from SSA, containing address information for roughly 98,000 individuals, *id.* ¶ 106; another in March 2025 from SSA, containing address information for roughly 1,000 individuals, *ibid.*; and another in August 2025 from IRS containing address information for fewer than 50,000 people (or 3.7% of the 1.28 million addresses ICE requested), *id.* ¶¶ 73, 75. Where IRS concluded that ICE's request did not satisfy the requirements of § 6103(i)(2), "IRS did not produce information for those individuals." *Id.* ¶ 74. After IRS's disclosure of last known addresses for 47,289 individuals, IRS learned that for "less than 5%" of those individuals, ICE's initial request for data had been potentially incomplete, but IRS explained that it provided notice of the issue to DHS, which agreed "to remediate the matter consistent with federal law." ECF 79-1 (Romo Decl.) at ¶¶ 10, 16, 18.

To remedy their alleged injuries, Plaintiffs offer five theories of relief: contrary-to-law and arbitrary-and capricious claims under the APA, a First Amendment claim, an *ultra vires* claim, and an "*Accardi* doctrine" claim. Am. Compl. ¶¶ 182–222. Defendants now move to dismiss the Amended Complaint, in its entirety, for lack of jurisdiction and for failure to state a claim.

## LEGAL STANDARD

Courts must "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation cleaned). On a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a district court must "accept the well-pleaded factual averments contained" in the complaint, but the "party seeking to invoke the jurisdiction of a federal court must bear the burden of demonstrating the existence of such jurisdiction." *Gordo-González v. United States*, 873 F.3d 32, 35 (1st Cir. 2017) (quotation cleaned).

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation cleaned).  Accordingly, the complaint must "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (quotation cleaned).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Ibid.* (quotation cleaned).  Instead, it "must plead facts sufficient to 'nudge the plaintiff's claims across the line from conceivable to plausible.'"  *Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 80 (1st Cir. 2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  As with a Rule 12(b)(1) motion, the court is "generally limited to considering facts and documents that are part of or incorporated into the complaint," plus matters "of public record" or "susceptible to judicial notice."  *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (quotation cleaned).

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS

Plaintiffs fail to allege sufficient facts showing standing to bring this suit.  To establish standing, Plaintiffs bear the burden of pleading three elements: that they have suffered an "injury in fact"; that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party"; and that the injury will likely be redressed by a favorable decision.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024).  Because Plaintiffs are organizations, two kinds of standing are available to them: either "organizational standing," whereby they may "sue on their own behalf for injuries they have sustained," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024); or "associational standing," whereby an organization may sue on behalf of its members, *see In re Fin. Oversight &*

*Mgmt. Bd.*, 110 F.4th at 308 & n.7.  On the latter theory, more requirements apply: that its members "would otherwise have standing to sue in their own right"; that "the interests it seeks to protect are germane to the organization's purpose"; and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Ibid.*

Here, Plaintiffs allege that CEDC itself has suffered harm sufficient to establish standing, and that Plaintiffs' members have suffered harm sufficient for each organization to establish standing on its members' behalf.  Am. Compl. ¶¶ 149–80.  Neither theory suffices.

*CEDC's organizational standing.*  CEDC alleges it has suffered three injuries: that its "credibility" and engagement with its members has declined, *id.* ¶¶ 154, 156, 158; that it will "los[e] grant funding," *id.* ¶ 161; and that it now "cannot associate, speak, or help petition the government," *id.* ¶ 159.[1]  But nothing about statutory inter-agency data-sharing remotely affects CEDC's credibility with its members, and CEDC has not plausibly alleged that its members would find *CEDC* less credible because *the Government* applied law that had long been on the books.  CEDC's credibility could only be tarnished by the application of those laws if it had failed to inform its members of the existence of those statutes—but that failure would hardly be "fairly traceable" to the challenged conduct.  *In re Fin. Oversight & Mgmt. Bd.*, 110 F.4th at 308.  And though CEDC alleges a downturn in demand for its social programming, Am. Compl. ¶¶ 156, 158, that can only be fairly traced to the choices of individual participants, not Defendants' actions.  It is black-letter law that a plaintiff attempting to show standing "cannot rely on speculation about the unfettered choices made by independent actors."  *FDA*, 602 U.S. at 383 (quotation cleaned).

Further, CEDC's allegation of monetary injury falls short.  It alleges merely that it "risks losing grant funding" because of a "reduction in the number of immigrants filing their tax returns"

---

[1] The First Amendment issues are addressed separately below.  *See infra* Part III.

and because "CEDC's funding is tied to the number of … tax returns" it files. Am. Compl. ¶¶ 157, 161. But CEDC fails to plead any facts regarding how much of that decline is attributable to the challenged conduct. Nor does it plead facts sufficient to make that causal link a plausible one, in light of obvious alternative explanations for the decline (e.g., that their members had moved, or sought help from another organization, or passed away, or simply filed returns without outside help). Such speculation cannot survive a motion to dismiss.

*All Plaintiffs' associational standing.* As an initial matter, it is entirely speculative that the data of any of Plaintiffs' members has been, or will be, transferred from IRS or SSA to ICE. To satisfy Article III standing, the alleged injury must be "actual or imminent"—and if it has not yet occurred, it "must be *certainly impending*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). Plaintiffs fail to make any showing that unlawful civil detention or unlawful disclosure of data is "certainly impending" as to any of their members. From the face of their Amended Complaint, that is no surprise: in the one alleged instance of data-transfer from IRS to ICE, IRS did *not* return address information for *over 96%* of ICE's 1.28 million requests. *See* Am. Compl. ¶¶ 73–75. Plaintiffs collectively allege the membership of just four individuals who are active members of their organizations in the United States and subject to a prior order of removal, *id.* ¶¶ 167, 176, 179; it is sheer speculation that they are, out of 1.28 million individuals in ICE's request, among the mere 3.7% whose last known address IRS shared.[2] Plaintiffs likewise can only speculate as to SSA, where they do not allege—not even "on information and belief"— that any of their members' data is among that shared with ICE by that agency.

---

[2] NKASEC does not even allege the membership of such an individual *at all*. That alone warrants dismissal for lack of associational standing to challenge the ICE-IRS data-sharing arrangements. Because the prior-order element is a requirement of the Memorandum, ECF 73-1 at 3 (§ 6(C)(4)), NKASEC's members' data simply could not be at issue in the IRS transfer.

Plaintiffs also allege three other kinds of injuries on behalf of their members, *see generally id.* ¶¶ 162–80, none of which holds water. First, Plaintiffs fail to explain how their members' alleged hesitancy to comply with the law (here, by filing a tax return) constitutes a concrete, cognizable injury. Fulfilling a legal obligation can hardly be characterized as a legal injury where, as here, Plaintiffs do not contest that obligation. Second, the mere disclosure of data, even if in violation of a statute, does not constitute a "concrete" injury for standing purposes. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425–27 (2021) ("an injury in law is not an injury in fact" because "Article III standing requires a concrete injury even in the context of a statutory violation"). Third, Plaintiffs fail to explain how a reticence to participate in social programming is plausibly traceable to the data-sharing here: even if their members chose not to file their taxes to avoid being subject to the challenged data-sharing, that would not explain their decision not to "continue attending … meetings and events." Am. Compl. ¶ 162.

Because Plaintiffs fail to sufficiently plead their standing to sue, the Court should dismiss the Amended Complaint, in its entirety, for lack of jurisdiction.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM TO RELIEF UNDER THE APA

### A.    The Challenged Agreements Are Not Reviewable Agency Action

The APA expressly limits judicial review, as relevant here, to "final agency action." 5 U.S.C. § 704. Agency action is "final" if it satisfies "two conditions": "it must mark the consummation of the agency's decisionmaking process," and it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quotation cleaned). None of the inter-agency documents that Plaintiffs challenge satisfies those criteria.

*First*, the Operative Documents do not mark the consummation of agency decision-making.

8

To the contrary, each document simply outlines the technical framework by which some *future* agency action—namely, the transfer of data—might occur. And in each instance, the substance of the document is largely to recite and affirm pre-existing statutory obligations and authorities. The Memorandum and Implementing Agreement, for instance, do not establish a new basis for information-sharing; § 6103(i)(2) *already* requires IRS to provide certain information when statutory prerequisites are met. Likewise, the SSA Letter does not independently set out a new data-sharing policy; it simply embodies statutory data-disclosure requirements. *See* ECF 73-4 at 1 ("SSA will provide … information … in accordance with … 8 U.S.C. § 1360(b)," which already requires disclosure, and "42 U.S.C. § 1306(a)," which limits the circumstances thereof). Put differently, the Operative Documents are not *necessary* to the challenged data-sharing; they merely ensure that each agency is fully aware of and compliant with each of their statutory responsibilities.

*Second*, even if any of these documents marked the "consummation" of agency decision-making, none independently "determines" "rights or obligations," or serves as a source from which "legal consequences flow." *Harper*, 118 F.4th at 116. As the D.C. Circuit has already held, the Memorandum—which is indistinguishable from the SSA Letter for finality purposes—"is a nonbinding, nonfinal policy statement that is not reviewable under the APA." *Centro*, 2026 WL 503310, at *12. That is because again, each document "merely explains how [each agency] will administer a process established by statute and makes explicit existing requirements." *Ibid.* (quotation cleaned). And courts lack authority to review agency action that "merely expresses [the agency's] view of what the law requires." *Ibid.* Tellingly, Plaintiffs identify no "direct and appreciable legal consequences" imposed by the existence of the Operative Documents rather than the underlying statutes themselves. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

### B.    An Alternate Remedial Scheme Divests Plaintiffs of the APA's Cause of Action

The APA limits judicial review not only to "final agency action" but also to actions "for which there is no other adequate remedy." 5 U.S.C. § 704. That provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Here, Plaintiffs seek relief under the APA against data-sharing purportedly done in violation of I.R.C. § 6103—but Congress has created a different, comprehensive remedial scheme for violations of that statute.

That scheme involves two parts: one civil, one criminal. First, Congress created a waiver of sovereign immunity for violations of § 6103 to allow "a civil action for damages against the United States" if "any officer or employee of the United States ... inspects or discloses any return or return information ... in violation of ... [§] 6103." I.R.C. § 7431(a)(1). The statute specifically sets out exceptions to the general rule, the amount of damages available, and a limitations period. § 7431(b)–(d). And notably, the statute, despite its detailed description of the remedies available in Article III courts, does not authorize injunctive relief. *See generally* § 7431.

Second, Congress imposed criminal penalties for the solicitation, unauthorized disclosure, or unauthorized inspection of information protected by § 6103. I.R.C. §§ 7213, 7213A. Those penalties include dismissal from office, fines, and imprisonment. §§ 7213A(a)–(b); 7213(a)(1).

Given that highly reticulated scheme, courts have acknowledged that the civil and criminal remedies discussed above represent the full scope of remedies Congress contemplated for violations of § 6103. *See United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002) ("Congress has provided civil and criminal remedies for violations of § 6103, but no statutory provision" authorized alternative relief sought); *Nowicki v. Comm'r*, 262 F.3d 1162, 1164 (11th Cir. 2001) ("Congress saw fit to provide only certain remedies for violations of § 6103"); *United States v.*

*Michaelian*, 803 F.2d 1042, 1049–50 (9th Cir. 1986) (noting "reluctance to imply a judicial remedy for violations of § 6103 given Congress' explicit provision of a remedy"). Likewise, the APA's prohibition on circumventing on-point remedial schemes precludes APA remedies in this case.

### C. Plaintiffs Fail to Plausibly Allege a Systemic Violation of § 6103

As the D.C. Circuit recently explained in a near-identical case, even if this Court reaches a merits review of the data-sharing practices under the APA, Plaintiffs cannot prevail. *See Centro*, 2026 WL 503310, at *7–14. Their contrary-to-law claim turns entirely on whether they sufficiently allege a violation of § 6103, Am. Compl. ¶¶ 182–93, but the vast majority of IRS's data-sharing complies with the exception codified at § 6103(i)(2). And the challenged SSA conduct is not subject to § 6103 because return information is not plausibly involved at all.

The plain terms of § 6103(i)(2) provide for IRS's disclosure of "return information (other than taxpayer return information) to officers and employees" of "any Federal agency" upon request from that agency, so long as the request and data-transfer satisfy certain conditions. If those requirements are met, then the statute *requires* disclosure of the requested data. § 6103(i)(2)(A) ("*shall* disclose" (emphasis added)). And although the return information disclosed must be that "other than taxpayer return information," *id.*, the statute expressly provides that, "[f]or purposes of [§ 6103(i)(2)], a taxpayer's identity shall *not* be treated as taxpayer return information," § 6103(i)(2)(C) (emphasis added). "[T]axpayer identity," in turn, means "the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number, … *or* a combination thereof." § 6103(b)(6) (emphasis added).

The statute's careful definition of terms mandates the disclosure of a specific kind of information under § 6103(i)(2): addresses provided by taxpayers in their filings with the IRS. The statute begins with the broadest kind of information: "return information," which includes a vast

array of data accrued both from a taxpayer's own filings and from any other sources "furnished to" or "prepared by" the IRS.  § 6103(b)(2).  It omits, however, a subset of that information from disclosure: "taxpayer return information," which means "return information" that has been specifically "filed with, or furnished to, the [IRS] *by or on behalf of the taxpayer*."  § 6103(b)(3) (emphasis added).  But then Congress makes an exception to that omission: "taxpayer identity," which includes a taxpayer's "mailing address," § 6103(b)(6), and must "not be treated as taxpayer return information" for purposes of § 6103(i)(2).  § 6103(i)(2)(C).  In other words, one's name and address are exceptions to the prohibition on disclosing data from a taxpayer's own filings.

The sharing of name and address information dovetails with the stated purpose of § 6103(i)(2): aiding law-enforcement officials in "any investigation" that "may result" in proceedings related to the enforcement of criminal law.  § 6103(i)(2)(A)(i)–(ii).  At the preliminary-injunction hearing in this case, the Court inquired as to why locating an individual needed not be accomplished through § 6103(i)(5) rather than § 6103(i)(2). While § 6103(i)(5) also permits the use of tax records to locate individuals, it serves a very different purpose: not investigating violations of criminal law, but rather locating "fugitive[s] from justice." § 6103(i)(5). It provides a different standard for both obtaining and accessing the information: it may be obtained only "upon the grant of an ex parte order" by a federal court, but is thereafter accessible not only, as in § 6103(i)(2), by individuals "personally and directly" involved in the investigation, but by "officers and employees" more broadly.  § 6103(i)(5)(A).  And perhaps most importantly, it makes available for inspection *all* "return information," without excepting "taxpayer return information." *Id.*  In other words, by comparison to the provision at issue in this case, § 6103(i)(5) permits broader dissemination of more information for a different purpose, but only after clearing a higher bar to access. *See Centro*, 2026 WL 503310, at *8–9.  That provision is ill-suited to

12

accomplishing the purpose of § 6103(i)(2): allowing limited personnel to gather limited information relevant to a criminal investigation.

Plaintiffs plead no facts plausibly alleging that the Operative Documents violate the careful scheme set out in § 6103(i)(2) or any other part of that statute. As the D.C. Circuit has explained, the Memorandum expressly incorporates the requirements of that provision, rendering that data-sharing agreement lawful on its face. *See* ECF 73-1 at 1–4; *Centro*, 2026 WL 503310, at *12 (Memorandum's provisions "taken almost word-for-word from § 6103(i)(2)"). The Implementing Agreement consists only of a technical framework by which to transmit data upon compliance with the Memorandum, and therefore with § 6103. *See* ECF 73-2. And the SSA Letter at no point suggests that tax information would be shared at all. *See* ECF 73-4. That is no surprise: SSA is among the largest repositories of information in the federal government, including both tax and nontax elements, all stored in numerous systems of records noticed in the Federal Register.[3]

For that reason, Plaintiffs' single conclusory allegation that "[s]ome of the information being shared is information that SSA has received from the IRS or from tax filings" simply does not suffice to survive a motion to dismiss. Am. Compl. ¶ 102. They provide no support at all for their claim that relevant SSA data could come only from tax records in SSA's possession. While the sheer amounts of data in SSA's possession may make it *conceivable* that SSA would draw on tax information, Plaintiffs have pleaded no facts sufficient to "nudge" that claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. And of course, information other than tax "[r]eturns and return information" is not covered by § 6103. *See* § 6103(a); *see also* § 6103(b)(2)(A) (defining return information). Simply put, the SSA Letter needed not invoke any

---

[3] *See* Social Security Administration, *Privacy Act System of Records Notices*, https://www.ssa.gov/privacy/sorn.html (last accessed Feb. 27, 2026).

exception to § 6103 because all SSA information would be shared from non-tax sources.[4]

As for actual transfers of data, Plaintiffs' allegations focus largely on the sheer size and frequency of ICE's requests for data. *See* Am. Compl. ¶¶ 63, 71, 73. But the relevant conduct regulated by § 6103(i)(2) is the *transfer* of data, not mere requests. On that point, the Amended Complaint itself highlights that where a transfer would *not* comply with § 6103(i)(2), IRS largely ensured that it "did not produce information for those individuals." *Id.* ¶ 74. And when IRS erred as to a small fraction of the transfer, it worked with DHS to address the matter. *See* ECF 79-1 at ¶¶ 18–19. With respect to SSA, Plaintiffs simply make the conclusory allegation that in a single transfer of data to ICE in February 2025, "SSA did not … ensure[] that none of this information came from tax filings" or "acknowledge that some of the requested information was protected by § 6103." Am. Compl. ¶ 106. Again, that threadbare allegation does not render plausible that, of all the information in SSA's possession, SSA has shared tax information in violation of § 6103.

Plaintiffs also allege—again without any supporting facts—that all return information obtained by ICE "will be used for civil immigration enforcement." *Id.* ¶ 127. But by its own terms, the Memorandum "establish[es] the procedures and requirements for … requests for addresses of persons *subject to criminal investigation*." ECF 73-1 at 2 (§ 3) (emphasis added). It also lists 8 U.S.C. § 1253(a)(1) as the relevant criminal statute, which applies, in relevant part, when an alien ordered removed "willfully fails … to depart from the United States." It makes logical sense that an agency investigating a violation of that provision would investigate whether the alien is still in the United States. And information about that alien's whereabouts—like an address—certainly "may be[] relevant to such … [an] investigation." § 6103(i)(2)(B)(iv). That

---

[4] The Court may also take judicial notice of the SSA declarations filed earlier in this case to that effect. *See* ECF 39-2 (Myers Decl.) ¶¶ 5–7; ECF 51-1 (Peltier Decl.) ¶¶ 5–9.

suffices here.  Nothing in the Amended Complaint makes it plausible that ICE will use IRS information for *civil* enforcement, or that ICE will obtain return information from SSA *at all*.

### D.    Plaintiffs Identify No Arbitrary or Capricious Conduct

Judicial review under the arbitrary-and-capricious standard is "deferential": "[a] court simply ensures that the agency has acted within a zone of reasonableness" while evaluating whether the agency "has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Here, the Operative Documents fall squarely within the "zone of reasonableness": the Memorandum and Letter each articulate the governing provisions of law and affirmatively require compliance with those provisions.  It cannot be unreasonable for an agency to do what is *required* by law.  *See Centro*, 2026 WL 503310, at *14 (rejecting arbitrary-or-capricious challenge to Memorandum because statute "requires" address disclosure in response to valid request).  And neither Plaintiffs nor their members can reasonably rely on federal agencies *declining* to abide by statutory obligations.

Still, Plaintiffs allege that in conducting the mandatory data-sharing, Defendants "failed to consider important factors, including reliance interests, [the] credibility of [Plaintiffs] and their ability to provide tax services, the impact of decreased tax contributions, the history and development of the tax laws, and the possibility and consequences of data errors."  Am. Compl. ¶ 197.  But in rejecting that exact argument, the D.C. Circuit observed that "this is not one of those cases[] in which the question is whether the agency has reasonably exercised its discretion." *Centro*, 2026 WL 503310, at *14.  No matter the factors Plaintiffs recite, "[t]he agency must act pursuant to the court's best reading of the statute."  *Ibid.*  And because Congress's mandatory language leaves agencies "no discretion," those agencies "need not consider [the] … effects arising from" the challenged data-sharing.  *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004).

### III. NO CHALLENGED ACTION AFFECTS CONDUCT PROTECTED BY THE FIRST AMENDMENT

Plaintiffs bring a "First Amendment" claim alleging a "chill on petition, speech, and associational rights." Am. Compl. ¶ 205. They allege insufficient facts to support that claim.

First, Plaintiffs allege that the challenged data-sharing "directly penalizes individual immigrants for exercising their right to petition the government[] by filing tax returns and seeking refunds or credits." *Id.* ¶ 204. But the challenged conduct "in no way hinders [Plaintiffs] from complaining to any government official" nor "preclude[s] taxpayers from expressing their views to the IRS or other agencies of the Executive Branch, to the Legislative Branch or to the Judicial Branch." *Welch v. United States*, 750 F.2d 1101, 1110 (1st Cir. 1985). In fact, any alien entitled to a tax refund remains fully able to claim it. Any law-enforcement action experienced by an alien would be fairly traceable not to the filing of that claim (or any after-the-fact data-sharing), but rather to that alien's violation of a criminal statute (here, § 1253(a)(1)).

Second, the First Amendment provides various levels of protection against infringement of free-speech rights. But Plaintiffs plead no facts alleging that the challenged conduct has inhibited their ability to speak freely at all. And while "[c]onduct sufficiently imbued with elements of communication is also protected under the First Amendment," Plaintiffs cannot plausibly allege that the inter-agency transfer of data constitutes a restriction on their communicative conduct. *Hernandez-Gotay v. United States*, 985 F.3d 71, 80 (1st Cir. 2021) (quotation cleaned).

Third, the challenged conduct violates none of Plaintiffs' associational rights. There are "two types of 'freedom of association' that merit constitutional protection: (i) 'choices to enter into and maintain certain intimate human relationships' and (ii) association 'for the purpose of engaging in those activities protected by the First Amendment.'" *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 12–13 (1st Cir. 2011) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609,

617–18 (1984)).  Those rights have "never been expanded to include purely social gatherings"; rather, constitutional protection turns on "the presence of underlying individual rights of expression protected by the First Amendment."  *Id.* at 12.

Here, only the second of the theories described in *Jaycees* is at issue.  But Plaintiffs fail to plausibly allege that data-sharing infringes on their rights, or those of their members, to gather, promote their beliefs, or otherwise freely associate with whomever they choose.  That's because the existence of a cognizable First Amendment violation turns on whether the challenged action "would significantly affect [one's] ability to advocate public or private viewpoints" or otherwise engage in protected associational conduct.  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650 (2000). And nothing about Plaintiffs' efforts to "associate for the purpose of promoting economic equality, rights for immigrants, cultural cohesion, and educational opportunity," Am. Compl. ¶ 149, is remotely—much less "significantly," *Dale*, 530 U.S. at 650—affected by the data-sharing arrangements, which touch no part of that activity.

Further, even if the Court were to conclude that the challenged data-sharing arrangements do infringe on free-association rights, those rights are "not absolute" and "could be overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Id.* at 648 (quotation cleaned).  The enforcement of federal law—*i.e.*, the animating purpose behind the challenged data-sharing arrangements—constitutes just such an interest.  *See, e.g., Trump v. United States*, 603 U.S. 593, 614 (2024) (noting "compelling public interest in fair and effective law enforcement" because "[f]ederal criminal laws seek to redress a wrong to the public" (quotation cleaned)).  And the data-sharing is neither related to the suppression of ideas nor aimed at Plaintiffs' associational conduct.

## IV.    PLAINTIFFS FAIL ALL THREE REQUIREMENTS OF AN *ULTRA VIRES* CLAIM

Obtaining *ultra vires* review requires clearing a notoriously high bar. Such review is limited to "painstakingly delineated procedural boundaries" so as to prevent plaintiffs from obtaining "an easy end-run around the limitations of … judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Those boundaries have been articulated as three governing principles. First, *ultra vires* review "applies only when an agency has taken action entirely in excess of its delegated powers *and* contrary to a *specific prohibition* in a statute." *Ibid.* (quotation cleaned; first emphasis added). Second, "it does not apply simply because an agency has arguably reached a conclusion which does not comport with the law." *Ibid.* (quotation cleaned). Third, it is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or … forecloses all other forms of judicial review." *Ibid.* (quotation cleaned).

Plaintiffs fail to satisfy any of those prerequisites of an *ultra vires* claim. For the reasons explained in Part II.C–D, *supra* pp. 11–15, Defendants cannot have acted "entirely in excess of … delegated powers" because federal law *does* contemplate inter-agency sharing of taxpayer data.[5] No "specific prohibition" to the data-sharing agreements exists; in fact, § 6103(i)(2) "requires" disclosure under the circumstances outlined in the Memorandum, *Centro*, 2026 WL 503310, at *14, and federal law likewise contemplates data-sharing between ICE and SSA, *see* 8 U.S.C. § 1360; 42 U.S.C. § 1306(a)(1); 5 U.S.C. § 552a(b)(3), (b)(7). Even if Plaintiffs' entreaties to the contrary rendered Defendants' conduct "arguably" unlawful (they do not), *ultra vires* review still would not apply for failure to satisfy the second element. And the third element bars non-statutory

---

[5] *See also* 8 U.S.C. § 1373 (mandating information-sharing between federal, state, and local government entities regarding the citizenship or immigration status of any individual).

review because under either side's theory of the case, an existing statutory scheme provides meaningful opportunity for review: either the APA itself, as Plaintiffs argue; or, more appropriately, § 7431, *see supra* pp. 10–11.

## V. PLAINTIFFS IDENTIFY NO IRS OR SSA REGULATIONS VIOLATED BY THOSE AGENCIES

Plaintiffs' last theory of relief invokes the "*Accardi* doctrine," which provides simply that "[a]n agency has an obligation to abide by its own regulations." *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008). That theory is best understood as a kind of APA claim. *See, e.g., Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) ("the APA (as developed by caselaw) gives aggrieved parties a cause of action to enforce compliance" when an agency violates its own regulations); *cf. Webster v. Doe*, 486 U.S. 592, 602 n.7 (2020). Accordingly, it fails for the same preliminary reasons as Plaintiffs' other APA claims. *See supra* pp. 8–11.

Separately, Plaintiffs' *Accardi* claim also fails on its own terms because they fail to plead any facts showing a single instance in which IRS or SSA violated their own regulations. As to IRS, Plaintiffs cite various sources purportedly reflecting IRS's position that it would not abide by its statutory mandate to disclose tax information under those circumstances articulated in § 6103(i)(2). None of those sources supports an *Accardi* claim. First, Plaintiffs cite a sentence from a passage in the Federal Register in which IRS provided written responses to commenters on proposed regulatory changes. Am. Compl. ¶ 49. But a response to a commenter is not a "regulation"; it is simply part of an agency's interaction with the public *about* a regulation not at issue in this case. Second, Plaintiffs cite a passage from an IRS notice of *proposed* rulemaking, *id.* ¶ 52; likewise, that passage is not a "regulation," and in any event, simply states that tax information obtained from a taxpayer using an ITIN is subject to the strictures of § 6103, which IRS has followed here. Third, they cite a sentence from a report by the Government Accountability

19

Office, *id.* ¶ 54; fourth, a statement to the press, *id.* ¶ 56.  Again, neither constitutes a "regulation."

Plaintiffs also cite IRS's Internal Revenue Manual, which discusses those circumstances under which IRS must disclose information pursuant to § 6103(i)(2).  *Id.* ¶ 125.  But as the First Circuit has expressly held, "[w]hether or not" the IRS "complied with the rules contained in the [Manual] has no bearing on [the] validity" of the challenged conduct.  *United States v. Horne*, 714 F.2d 206, 207 (1st Cir. 1983).  That is because "[t]he provisions in the Manual are not codified in the Code of Federal Regulations," and "[e]ven if they were codified, the provisions would not be mandatory": "their purpose is to govern the internal affairs of the" IRS, and "[t]hey do not have the force and effect of law."  *Ibid.* (quotation cleaned); *see also Centro*, 2026 WL 503310, at *10 ("well settled" that Manual's "provisions are directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law" (quotation cleaned)).  Accordingly, the Manual "cannot impose on [IRS] an enforceable duty to act," *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1245 (D.C. Cir. 2018), and therefore cannot support an *Accardi* claim.

Finally, as to SSA, Plaintiffs cite two regulations but plead insufficient facts to plausibly allege a violation of either.  First, they cite 20 C.F.R. § 401.125 as requiring that SSA abide by § 6103.  Am. Compl. ¶ 104 n.30.  But an *Accardi* claim on that basis is no different from a claim that SSA has violated § 6103, and thus fails for reasons already discussed above.  *See supra* pp. 13–14.  Second, Plaintiffs cite 20 C.F.R. § 401.105(b) as requiring SSA to abide by "strict confidentiality standards" with respect to nontax information.  Am. Compl. ¶ 105.  But they go on to plead no facts regarding the standards they allege SSA to have violated—other than again pointing to § 6103, which, again, fails.

## CONCLUSION

The Court should dismiss Plaintiffs' Amended Complaint in its entirety.

FEBRUARY 27, 2026                          *Respectfully submitted,*

                                                        BRETT A. SHUMATE
                                                         Assistant Attorney General
                                                         Civil Division

                                                         ELIZABETH J. SHAPIRO
                                                         Deputy Director
                                                         Federal Programs Branch

                                                         */s/ Cesar Azrak*
                                                         CESAR AZRAK
                                                         Trial Attorney
                                                         United States Department of Justice
                                                         Civil Division, Federal Programs Branch
                                                         1100 L Street, NW
                                                         Washington, DC 20005
                                                         Telephone: (202) 538-3491
                                                         cesar.e.azrak@usdoj.gov

                                                         *Counsel for Defendants*

21

**CERTIFICATE OF SERVICE**

I, Cesar Azrak, hereby certify that on February 27, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which automatically serves this document upon all counsel of record, in keeping with Local Rules 5.2 and 5.4.


*/s/ Cesar Azrak*
CESAR AZRAK

*Counsel for Defendants*