## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT of MASSACHUSETTS

COMMUNITY ECONOMIC DEVELOPMENT
CENTER OF SOUTHEASTERN
MASSACHUSETTS *et al.*,

        *Plaintiffs,*

    *v.*

SCOTT BESSENT, in his official capacity as
Acting Commissioner of the Internal Revenue
Service, *et al.*,

        *Defendants.*

No. 1:25-cv-12822-IT

## CERTIFICATION OF ADMINISTRATIVE RECORD

I, Michael L. Russo, Chief Information Officer for the Social Security Administration (SSA) hereby certify, to the best of my knowledge, that the attached Administrative Record is true, correct, and complete of the documents that were directly or indirectly considered in connection with SSA's 2025 decision to provide records to U.S. Immigration and Customs Enforcement.

Dated: 5/29/2026

Michael L. Russo
Chief Information Officer
Social Security Administration
Woodlawn, Maryland

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT of MASSACHUSETTS**

| | |
|---|---|
| COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS *et al.*, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> SCOTT BESSENT, in his official capacity as Acting Commissioner of the Internal Revenue Service, *et al.*, <br><br> *Defendants*. | No. 1:25-cv-12822-IT |

**SOCIAL SECURITY ADMINISTRATION (SSA)**
**ADMINISTRATIVE RECORD INDEX**

| Date | Title | Bates Nos. |
|---|---|---|
| Feb. 11, 2025 to Feb. 20, 2025 | Emails between U.S. Immigration and Customs Enforcement (ICE) and SSA, and SSA internally, regarding initial request on approximately 98k individuals | 000001-000008 |
| Feb. 22, 2025 | 6:28PM Approval from SSA Acting Commissioner to provide data in response to ICE's law enforcement request | 000009 |
| Feb. 22, 2025 | Attachment to Feb. 22, 2025, Email: Agreement between SSA and Department of Homeland Security, U.S. Customs and Border Protection, Agreement No. 10243 | 000010-000022 |
| Feb. 22, 2025 | Attachment to Feb. 22, 2025, Email: Agreement between SSA and Department of Homeland Security, Match No. 1010 | 000023-000048 |
| Feb. 22, 2025 | Agreement referenced in Feb. 22, 2025, Email Attachment Titling but not Attached: Agreement between SSA and Department of Homeland Security, E-Verify | 000049-000072 |
| Feb. 22, 2025 | Attachment to Feb. 22, 2025, Email: Agreement between SSA and Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS) | 000073-000084 |
| Feb. 22, 2025 | Attachment to Feb. 22, 2025, Email: Agreement Fact Sheet | 000085 |

| Feb. 22, 2025 | 8:46PM Approval from SSA Acting Commissioner to provide data in response to ICE's law enforcement request | 000086 |
|---|---|---|
| Feb. 23, 2025 | Law Enforcement Request from ICE to SSA and SSA Acting Commissioner approval | 000087 |
| Feb. 23, 2025 to Feb. 24, 2025 | Emails between ICE and SSA about data request and transmission | 000088-000091 |
| Feb. 23, 2025 to Feb. 24, 2025 | Emails between ICE and SSA about data request and transmission, with Acting General Counsel approval to proceed without disclosure of federal tax information | 000092-000094 |
| Feb. 28, 2025 | Email from SSA to ICE confirming DHS received SSA's data transfer on records located for 98k population | 000095 |
| Mar. 3, 2025 | Email from SSA to ICE transmitting matches on 700k population | 000096 |
| Apr. 9, 2025 | Email Transmitting Acting Commissioner Decision Memorandum, entitled *Providing Information to Department of Homeland Security, U.S. Immigration and Customs Enforcement for Identifying and Locating Aliens*, and Acting Commissioner Response Approving | 000097-000098 |
| Apr. 9, 2025 | Enclosure to Apr. 9, 2025, Email Transmitting Acting Commissioner Decision Memorandum (matching both PDF and Word document attachments) | 000099-000102 |
| Aug. 27, 2025 | SSA Letter Documenting Agreement for Ongoing Data Sharing with ICE | 000103-000104 |
| Nov. 9, 2023 to Apr. 28, 2025 | SSA Policy, GN 03313.095 Disclosure to the Department of Homeland Security – Obsolete/Archived | 000105-000108 |
| Apr. 29, 2025 to Current | SSA Policy, GN 03313.095 Disclosure to the Department of Homeland Security | 000109-000112 |
| Feb. 6, 2020 to Dec. 2, 2025 | SSA Policy, GN 03316.140 Disclosure Without Consent Under Ad Hoc Disclosure Situations – Obsolete/Archived | 000113 |
| N/A | 5 U.S.C. § 552a | 000114-000128 |
| N/A | 20 C.F.R. Part 401 | 000129-000156 |
| N/A | 42 U.S.C. § 1306 | 000157-000160 |
| N/A | 8 U.S.C. § 1360 | 000161-000162 |

**From:** ███████████
**Subject:** FW: [EXTERNAL] RE: ICE ERO Connect
**To:** ████████████████████████████
**Cc:** ██████████████████
**Sent:** February 20, 2025 2:18 PM (UTC-05:00)

Below is the explanation of the request. Please review.

███████, Associate Commissioner
SSA/OCIO/OEIS
████████ (Iphone)
████████ (desk)



**From:** ███████████
**Sent:** Wednesday, February 19, 2025 4:36 PM
**To:** ████████████████ @ssa.gov>; ████████████████ @ssa.gov>
**Subject:** FW: [EXTERNAL] RE: ICE ERO Connect

Who do we need besides you ████ ?

███████, Associate Commissioner
SSA/OCIO/OEIS
████████ (Iphone)
████████ (desk)



**From:** ████████████████████████████████ @ssa.gov>
**Sent:** Wednesday, February 19, 2025 2:38 PM
**To:** ████████████████ @ssa.gov>
**Subject:** FW: [EXTERNAL] RE: ICE ERO Connect

████ ,

See below. DHS is ready to proceed with technical discussions. We will float a memo to see if we need to charge. Can you provide a list of names on your side to get us started?

████

**From:** ████████████████████████ @ice.dhs.gov>
**Sent:** Wednesday, February 19, 2025 2:36 PM
**To:** ████████████████████████████ @ssa.gov>

CEDC Case 000001

**Cc:** ████████████ @ice.dhs.gov>; ████████████ @ssa.gov>; ██ ████████████ @ssa.gov>

**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

Thank you ██ ,

Yes ERO is ready to move forward with next steps in order to determine potential costs. ██████ and his team will take lead on the necessary technical discussions.

---

**From:** ████████████ @ssa.gov>
**Sent:** Wednesday, February 19, 2025 1:14 PM
**To:** ████████████ @ice.dhs.gov>
**Cc:** ████████████ @ice.dhs.gov>; ████████████ @ssa.gov>; ██ ████████████ @ssa.gov>
**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

<div style="background:yellow">

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

</div>

 ,

Thank you again for the conversation. We reviewed the Department of Homeland Security's (DHS) request to obtain information from SSA to assist in locating and arresting removable aliens.

**Request for Data**
DHS indicated it would send SSA a file of 98,000 aliens and requests SSA to provide last known address, employer information, and "other data points that may indicate the location of the alien."  We determined we can provide the listed data elements as identified in the below chart concerning aliens depending on the type of SSN assigned to the alien (i.e., work authorized or not work authorized).

| Alien SSN Not Authorized To Work (8 USC 1360(b) and (c)) | Alien SSN Authorized To Work (8 USC 1360(b)) |
|---|---|
| Name<br>SSN<br>Date of Birth<br>Place of Birth<br>Address<br>Employer Name *<br>Employer Address*<br>Amount of Earnings* | Name<br>SSN<br>Date of Birth<br>Place of Birth<br>Address |

* SSA may provide employer name, address, and earnings from wage reports that SSA processes on behalf of the Internal Revenue Service in the annual wage reporting process.  Please be aware that SSA processes the bulk of wage reports in the first few months of a calendar year for the proceeding tax year.  Accordingly, the employer data that we have could be months to a year old when SSA receives it (e.g., If an individual worked for a few weeks in January 2024, the employer is not required to file a W-2 until January 2025 for tax year 2024 filings).

**Reimbursement**
SSA will need to determine whether it must seek reimbursement to furnish this requested information to DHS.  Under the purpose statute, SSA may spend its funds only for the purposes for which it is appropriated. 31 U.S.C. § 1301(a).  Congress provides the Limitation on Administrative Expenses (LAE) appropriation, as authorized by section 201(g)(1) of the Social Security Act, for the necessary expenses of administering Social Security's programs.  The agency may not spend LAE funds for purposes other than the necessary

expenses of administering our programs.  Therefore, to the extent that the agency would incur a cost to provide DHS the requested information, then DHS should reimburse SSA for such cost so that SSA's appropriation does not bear such cost.

**Next Steps**
If you agree with receiving the data we have outlined here, the next step will be for SSA to facilitate technical discussions so we may begin determining the potential cost and how the agency can build the file. Alternatively, if you are seeking additional or different data, please let us know.

Please let us know if you have questions or if we can be of further assistance.

█████

██████████████

Associate Commissioner
Office of Data Exchange, Policy Publications, and International Negotiations (ODEPPIN)
Social Security Administration
o: ██████████ | m: ████████████
View me on OrgChart


Securing today and tomorrow

---

**From:** ██████████████
**Sent:** Tuesday, February 18, 2025 11:57 AM
**To:** █████████████████ @ice.dhs.gov>
**Cc:** ██████████████████ @ice.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

████,

Thank you for the call. We'll get this moving right away.

████

---

**From:** ██████████████
**Sent:** Friday, February 14, 2025 4:01 PM
**To:** █████████████████ @ice.dhs.gov>
**Cc:** ██████████████████ @ice.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

████ – Thanks for the introduction. Moving to bcc.

████ – It's a pleasure to meet you. Please let me know when you have a moment to chat, and we can get the ball rolling. You can reach me anytime at ██████████ .

██████████████

Associate Commissioner
Office of Data Exchange, Policy Publications, and International Negotiations (ODEPPIN)

CEDC Case 000003

Social Security Administration
o: ▮▮▮▮▮▮▮▮▮ | m: ▮▮▮▮▮▮▮▮
View me on OrgChart


Securing today
and tomorrow

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮ @ssa.gov>
**Sent:** Friday, February 14, 2025 3:59 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮ @ice.dhs.gov>
**Cc:** ▮▮▮▮▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ @ssa.gov>
**Subject:** Re: [EXTERNAL] RE: ICE ERO Connect

—▮▮▮ to BCC

Hi everyone,

Thanks for all of the information.

To help move this process forward, I've included ▮▮▮▮▮▮▮, Associate Commissioner from our Office of Data Exchange, Policy, Publications, and International Negotiations.  He will discuss with you our options moving forward to accommodate your needs.  As things progress I assume we will be in additional communication.

Thanks.

▮▮▮

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮ @ice.dhs.gov>
**Sent:** Wednesday, February 12, 2025 12:49:55 PM
**To:** ▮▮▮▮▮▮▮▮▮▮ @ssa.gov>
**Cc:** Russo, Michael L <▮▮▮▮▮▮▮ @ssa.gov>; ▮▮▮▮▮▮▮▮▮ @ice.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

- What data are you expecting back? Pertinent information to ICE ERO include mailing address, physical addresses, employer information.  Any other information that would be helpful in locating an individual who has absconded from ICE ERO.

- How often are you planning to send this to SSA or is this a one time process? This list of 98K which includes individuals with a known SSN would be a one time thing.  As a second phase, we would like to explore other unique identifiers shared by ICE ERO and SSA that would help us correlate and identify any individual who has absconded from ICE ERO.

- Will you send us a excel file and how will we receive in a secure way? Defer to ▮▮▮▮.

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮ @ssa.gov>
**Sent:** Wednesday, February 12, 2025 12:07 PM

CEDC Case 000004

**To:** ██████████████████████ @ice.dhs.gov>; ████████████████████████ @ssa.gov>; ████████████
█████████████ @ice.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hi ████,

Thanks for the information below.

I do have some additional questions so we make sure we know the intent and can provide the data you need. See below.

- What data are you expecting back?
- How often are you planning to send this to SSA or is this a one time process?
- Will you send us a excel file and how will we receive in a secure way?

Any questions please let me know.

Thanks.

████████████
Deputy CIO - Strategy
Office of the Chief Information Officer
**desk** ████████████ | **work cell** ████████████



## View me on OrgChart

---

**From:** ████████████████████████ @ice.dhs.gov>
**Sent:** Wednesday, February 12, 2025 10:00 AM
**To:** ██████████████████ @ssa.gov>; Russo, Michael L ████████████████ @ssa.gov>; ████████
█████████████ @ice.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

I have an excel sheet with columns that have the following headers. I can probably strip out and/or explain some of these if it would help.
- EARM_CASE_ID
- EARM_CASE_AOR_CODE
- EARM_CASE_AOR_NAME
- LAST_NAME
- FIRST_NAME
- SEX
- BIRTH_DATE
- A_NUMBER
- CASE_CAT_CODE
- CASE_CAT_DESC
- FINAL_ORDER_Y_N
- FINAL_ORDER_DATE
- FINAL_ORDER_EXECUTABLE
- REASON_PREVENTING_REMOVAL
- LATEST_ADDRESS_STREET

- LATEST_ADDRESS_CITY
- LATEST_ADDRESS_STATE
- LATEST_ADDRESS_ZIP
- SSN

████████████

Deputy Assistant Director for Technology and Transformation
Law Enforcement Systems and Analysis Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
████████████ @ice.dhs.gov

**From:** ████████████ @ssa.gov>
**Sent:** Tuesday, February 11, 2025 5:08 PM
**To:** Russo, Michael L ████████████ @ssa.gov>; ████████████ @ice.dhs.gov>; ████████████ @ice.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: ICE ERO Connect

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hi everyone,

We are going to triple check on receiving the file to prevent any legal issues on our side.  While we wait to get a response, can you provide us the file format so we can begin to prepare and parse the information?

We will expedite the requests to move quickly on the ask.

Thanks.

████████████

Deputy CIO - Strategy
Office of the Chief Information Officer
**desk** ████████████ | **work cell** ████████████



**View me on OrgChart**

**From:** Russo, Michael L < ████████████ @ssa.gov>
**Sent:** Tuesday, February 11, 2025 3:55 PM
**To:** ████████████ @ice.dhs.gov>; ████████████ @ice.dhs.gov; ████████████ @ssa.gov>
**Subject:** FW: [EXTERNAL] RE: ICE ERO Connect

Adding ████████ ….(our office is closing due to weather, we will get to you later today….

**From:** ████████████ @ice.dhs.gov>
**Sent:** Tuesday, February 11, 2025 2:14 PM
**To:** Russo, Michael L < ████████████ @ssa.gov>

**Cc:** ███████████████████ @ice.dhs.gov>
**Subject:** [EXTERNAL] RE: ICE ERO Connect

Mike:

It was great meeting you this morning. Per our conversation, here is a summary of our current effort. Let me know if you have questions.  Otherwise, I am ready to send over an encrypted excel sheet with the 98k cases for your team to run.

Let me know if you think it would be useful to have a follow up chat to discuss logistics of next steps.



In an effort to obtain actionable information on removable aliens, Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations(ERO) and the Social Security Administration (SSA) are assessing an information sharing arrangement.  This effort is separate and distinct from the existing effort where ERO discloses data with SSA on known removed/repatriated aliens for the purposes of suspension of payments or nonpayment of benefits, and recovery of overpayments. The purpose of this effort is to assess whether various data points in SSA holdings can assist ERO with locating and arresting removable aliens.

An alien may obtain a Social Security Number (SSN) legally, such as a Legal Permanent Resident (LPR) who is now removable or was previously on Temporary Protected Status (TPS),  or via fraudulent means. If a removable alien is processed by ERO and an SSN exists, the ERO office will document this information in the system of record, the Enforcement Integrated Database (EID).  On February 11, 2025, ERO queried EID and identified approximately 98,000 records with information entered the SSN field in EID. The file contains biographic (name, date of birth, A-Number) and residential information for the aliens.

SSA has agreed to compare those SSNs against its holdings to yield information that may be relevant to ERO pursing enforcement action against the alien.  Information could include last known addresses, bank deposit records, or other data points that may indicate location of the alien. Once the results of the SSA query is complete, an ERO targeting center will analyze the results, assess data for viability, and develop a lead packet for field action.  ERO is also exploring options to track these cases from arrest to removal, to assess long term viability of a permanent solution.

████████

Deputy Assistant Director for Technology and Transformation
Law Enforcement Systems and Analysis Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

███████████████         @ice.dhs.gov

-----Original Appointment-----
**From:** ████████████████████ @ice.dhs.gov>
**Sent:** Tuesday, February 11, 2025 7:28 AM
**To:** ████████████████████ @ssa.gov; ███████████████
**Subject:** ICE ERO Connect
**When:** Tuesday, February 11, 2025 11:00 AM-12:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

Purpose: The purpose of the meeting is to enhance the existing collaboration between ICE and SSA.

_____

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 237 799 781 226

Passcode: eJ3q9d2N

_____

**Dial in by phone**

+1 332-249-0712,,897067583# United States, New York City

Find a local number

Phone conference ID: 897 067 583#

For organizers: Meeting options | Reset dial-in PIN

_____

CEDC Case 000008

**From:**      Dudek, Leland C.
**Subject:**   Use of DHS Agreements for Law Enforcement Purposes
**To:**        ███████████████████████████; rachelle.b.henderson@ice.dhs.gov
**Cc:**        Russo, Michael L; ███████████████ Office of the Inspector General; Kim, Grace OGC
**Sent:**      February 22, 2025 6:28 PM (UTC-05:00)
**Attached:**  CBP IEA 10243.pdf, USCIS DHS SAVE 22-0004 MOA.pdf, USCIS E-VERIFY MOU.pdf, DHS Legal
               Agreements Fact Sheet.docx

Rachelle,

SSA has three interagency agreements in place with DHS. We have attached a summary Word doc.

I have determined that Immigration and Customs Enforcement has a law enforcement purpose that necessitates access to SSA data and information.

You have SSA's permission, to use SSA data, transmitted through these agreements, for all Law Enforcement purposes, consistent with applicable law.

Thank you for your service, and helping the USDS team with their work.

Warm Regards,

Lee Dudek
Acting Commissioner

CEDC Case 000009

**MEMORANDUM OF AGREEMENT**

**Between**

**U.S. Department of Homeland Security**
**U.S. Customs and Border Protection**

**and**

**Social Security Administration**

**Regarding Sharing of Alien and U.S. Citizen Arrival and Departure Data**

**SSA Information Exchange Agreement #10243**

## I.    Participants

The U.S. Department of Homeland Security (DHS), through U.S. Customs and Border Protection (CBP), and the Social Security Administration (SSA), each a "Participant," and collectively the "Participants."

## II.    Purpose

This Memorandum of Agreement (MOA) facilitates the sharing of certain alien and U.S. Citizen arrival and departure data derived by CBP from its Arrival and Departure Information System (ADIS) with SSA. CBP will provide real-time, online query access of ADIS to SSA, which SSA will use to request ADIS information concerning claimants and recipients under Title XVI of the Social Security Act (Act). SSA will then use ADIS data as a lead to identify claimants and recipients who may have improperly received Supplemental Security Income (SSI) payments under Title XVI of the Act while they were Absent from the U.S.

SSA suspends SSI payments to both citizen and non-citizen recipients who remain Absent from the U.S. for a full calendar month, or for 30 or more consecutive days. SSA will use ADIS data as a lead to help identify instances of foreign travel. Upon development of evidence indicating such travel, SSA will determine whether an SSI claimant or recipient was Absent from the U.S. a full calendar month or 30 or more consecutive days. If SSA develops evidence showing that the claimant or recipient was Absent from the U.S. for a period of time deemed by SSA to be material to SSA programs, then SSA will determine whether suspension of payments, nonpayment, or recovery of overpayments is appropriate.

CEDC Case 000010

## III.    Legal Authority

Certain individuals may be subject to suspension or nonpayment of their SSI payments under section 1614(a)(1)(B)(i) of the Act (42 U.S.C. § 1382c(a)(1)(B)(i)), which provides, in part, that an SSI recipient must be a resident of the United States.

Pursuant to sections 1611(f), and 1631(f) of the Act (42 U.S.C. §§ 1382(f), and 1383(f)), SSA is authorized to collect information from other Federal agencies to determine compliance with U.S. lawful presence.  SSA will disclose information to CBP from the Master Files of Social Security Number Holders (SSN) and SSN Applications, 60-0058, published at 75 Federal Register (Fed. Reg.) 82121 (December 29, 2010), as amended at 78 Fed. Reg. 40542 (July 5, 2013), 79 Fed. Reg. 8780 (February 13, 2014), 83 Fed. Reg. 31250 and 31251 (July 3, 2018), and 83 Fed. Reg. 54969 (November 1, 2018) and Claims Folders Systems, 60-0089, last fully published on April 1, 2003 (68 Fed. Reg. 15784), and amended on December 10, 2007 (72 Fed. Reg. 69723) and July 3, 2018 (83 Fed. Reg. 31250).  These systems of records have the appropriate routine uses permitting SSA to disclose information to CBP to determine eligibility for Social Security benefits.

Pursuant to the Privacy Act of 1974 (5 U.S.C. § 552a(b)(3)) and Department of Homeland Security/U.S. Customs and Border Protection-021 Arrival and Departure Information System, 80 Fed. Reg. 72081 (Nov. 18, 2015), CBP is authorized to disclose ADIS data to SSA, including under routine use L, which permits disclosure to federal, state, and local government agencies for any legally mandated purpose in accordance with an authorizing statute and when an approved Memorandum of Agreement (MOA) or Computer Matching Agreement is in place between DHS and the agency.

## IV.    <u>Definitions</u>

A. <u>Absent from the U.S.</u>: An individual is outside the U.S. for a full calendar month or 30 or more consecutive days.  For the purposes of this definition, the U.S. includes the 50 States and the District of Columbia.

B. <u>Alien</u>:  Any person not a citizen or national of the United States, as defined in section 101(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. § 1101(a)(3)).

C. <u>Information Protected by 8 C.F.R. § 208</u>:  Any information contained in or pertaining to any asylum or refugee application, records pertaining to any credible fear determination conducted pursuant to 8 C.F.R. § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to 8 C.F.R. § 208.31.  This includes information that indicates that a specific alien has applied for asylum or refugee status, received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear interview, such as Class of Admission and Document Type.

D. <u>Information Protected by 8 C.F.R. § 244.16</u>: Any information contained in an application for Temporary Protected Status under 8 U.S.C. § 1254, which includes

2

supporting documents. This includes any information that indicates that a specific alien has applied for or is a beneficiary of Temporary Protected Status, such as Class of Admission and Document Type. However, this does not include information independently obtained by CBP not from the TPS application, provided it does not identify that the alien has applied for or is a beneficiary of Temporary Protected Status.

E. <u>Personally Identifiable Information (PII)</u>: Any information that permits the identity of an individual to be directly or indirectly inferred, including any information which is linked or linkable to that individual.

F. <u>Section 1367 Information</u>: Any information protected pursuant to 8 U.S.C. § 1367 relating to aliens who are seeking or have been approved for immigrant status as battered spouses, children and parents under provisions of the Violence Against Women Act (VAWA), as victims of a severe form of human trafficking who generally are cooperating with law enforcement authorities, or as aliens who have suffered substantial physical or mental abuse and are cooperating with law enforcement authorities. This definition includes records or other information that do not specifically identify the individual as an applicant or beneficiary of the T Visa, U Visa, or VAWA protections. Unlike information protected by 8 C.F.R. §§ 208.3, 244.16, as defined above, this includes any information pertaining to the alien.

G. <u>SSI</u>: Supplemental Security Income. SSI is the Federal program established under Title XVI of the Act to provide payments to certain aged, blind, and disabled individuals, subject to the eligibility requirements established under that Title.

## V. <u>Responsibilities of Parties</u>

A. CBP's Responsibilities

1. CBP will provide SSA with online access to the ADIS Web Service, which will provide SSA authorized personnel with query access of specified ADIS data elements (as described in section VI.B.).

2. CBP will not retain for operational use SSA claimant or recipient information sent to query the ADIS Web Service. All transactions in ADIS are documented in a log used strictly for auditing purposes. The retention period of this log is 75 years. The log is not accessible to the public.

3. CBP will not use information provided by SSA for any purpose other than the scope of this MOA. SSA recognizes that CBP may need to disclose information from the log pursuant to an audit by appropriate government oversight authorities. In the event CBP needs to disclose SSA data, CBP shall endeavor to coordinate with SSA in advance of such dissemination, to the extent practicable and consistent with applicable law and policy. CBP will take steps to ensure that any disclosures taken in these circumstances are limited to information that is relevant and necessary for the

3

CEDC Case 000012

identified purpose.

B.  SSA's Responsibilities

1.  SSA will query the ADIS Web Service using the SSI claimant's or recipient's information (as described in section VI.B.1.) to access specified ADIS data elements (as described in section VI.B.2.).

2.  SSA will consider that a match occurs when the SSI claimant's or recipient's first name, last name, date of birth (DOB), and social security number (SSN) or alien registration number (ARN) matches CBP's ADIS records.

3.  SSA will use CBP traveler border crossing data obtained through the ADIS Web Service as a lead to identify instances that need further development with the SSI claimant or recipient to determine if suspension of payments, nonpayment, or recovery of overpayments is applicable.  If SSA identifies ADIS data that indicates a possible instance when an SSA claimant or recipient has been Absent from the U.S. for a material period, then SSA will send the SSI claimant or recipient a notice that he or she must call or visit his or her local SSA field office.

4.  SSA will not rely on the data obtained through the ADIS Web Service to take any adverse action to the claimant's or recipient's SSI eligibility or payment amount, or both.  SSA will only rely on the information disclosed by the claimant or recipient in response to the notice described in the previous paragraph.

5.  SSA will notify individuals at the time of application for SSI payments that other agencies' records may be accessed to verify their eligibility or payment amounts. SSA's notice consists of appropriate language printed on its application forms or on a separate handout when necessary.

6.  SSA will only query the ADIS Web Service when there is a need in processing a claim or taking post-entitlement actions.  SSA will dispose of data in accordance with this MOA.

## VI.  Description of Matched Records

A.  Systems of Records

CBP will disclose information to SSA through ADIS, as authorized in the ADIS System of Records Notice (SORN), published on November 18, 2015 (80 Fed. Reg. 72081).

4

CEDC Case 000013

SSA will use information from the Master Files of Social Security Number Holders (SSN) and SSN Applications, 60-0058, published at 75 Fed. Reg. 82121 (December 29, 2010), as amended at 78 Fed. Reg. 40542 (July 5, 2013), 79 Fed. Reg. 8780 (February 13, 2014), 83 Fed. Reg. 31250 and 31251 (July 3, 2018), and 83 Fed. Reg. 54969 (November 1, 2018), to access information through CBP's ADIS.

SSA will also use information from its Claims Folders Systems, 60-0089, last fully published on April 1, 2003 (68 Fed. Reg. 15784), and amended on December 10, 2007 (72 Fed. Reg. 69723) and July 3, 2018 (83 Fed. Reg. 31250), to access information through CBP's ADIS.

During the lifetime of this MOA, SSA will develop the capability to maintain the ADIS data that CBP provides SSA in SSA's Travel and Border Crossing Records, 60-0389, system of records, published on March 13, 2019 (84 Fed. Reg. 9195). However, SSA will not be considered the record owner of ADIS data which may be maintained in its system consistent with this MOA. Rather, SSA will refer any requests for ADIS data to CBP for processing or guidance regarding disclosure (e.g., requests under the Freedom of Information Act (5 U.S.C. § 552)).

B. Specified Data Elements

1. SSA will include the following data elements concerning SSI claimants and recipients when submitting an online query:

   a. Social Security Number (SSN) (optional)
   b. First name
   c. Middle name (optional)
   d. Last name
   e. Suffix (optional)
   f. Date of birth (DOB)
   g. Alien Registration Number (ARN) (optional)

2. When data elements used by SSA to query the ADIS Web Service match data in ADIS, the following data elements from ADIS will be returned to SSA for each individual (as applicable and to the extent available in ADIS):

   a. First name
   b. Middle initial (optional)
   c. Last name (suffix)
   d. Date of birth (DOB)
   e. Event type (arrival or departure)
   f. Country of arrival
   g. Country of departure
   h. Date of departure from the U.S.
   i. Time of departure from the U.S.
   j. Date of arrival in the U.S.

5

CEDC Case 000014

    k. Time of arrival in the U.S.
    l. Alien Registration Number (ARN) (optional)
    m. Country of citizenship
    n. Travel mode code
    o. Location code (port of entry)
    p. Air carrier code
    q. Flight number
    r. Vessel name
    s. Vessel number

C. Data Exclusions

CBP will not share Information Protected by 8 C.F.R. § 208 or Information Protected by 8 C.F.R. § 244.16, each of which is defined in this MOA.

CBP may share Section 1367 Information, provided this information falls within the exception set out in 8 U.S.C. § 1367(b)(5), and is used by SSA solely in making determinations of eligibility for benefits pursuant to 8 U.S.C. § 1641(c).

D. Number of Records

The total number of SSI recipients is approximately 8.5 million. See section E for an explanation of how we will query these established recipients and new claimants.

E. Frequency of Matching

SSA will query the ADIS Web Service with information (as described in section VI.B.1.) concerning approximately 350,000 SSI claimants or recipients each month. SSA will query individuals on as-needed basis, which may include evaluating new claimants or work redeterminations on existing claimants. When data elements from an SSA query match data elements from events in ADIS, a response from the ADIS Web Service will be sent back to SSA in real-time with elements described in section VI.B.2.

## VII. Records Usage, Duplication, and Redisclosure Restrictions

Each Participant will adhere to the following limitations on the use of the information.

A. Participants will use and access the data shared only for the purposes described in this MOA.

B. Participants will not use the data to extract information concerning individuals therein for any purpose not specified by this MOA.

C. Neither Participant will duplicate or disseminate the online query response screen or shared data, within or outside of that Participant agency, without the prior written permission of the other Participant, except as necessary for the purpose set forth in

6

CEDC Case 000015

Section II or as required by Federal law.  To request such permission, the Participant must specify in writing what data it is requesting be duplicated or disseminated, to whom it is being disseminated, and the reasons that justify duplication or dissemination.

D. SSA will view and use the information obtained from an ADIS Web Service query only for the period of time required for any processing related to the case.  Specifically, upon the receipt of the results of the ADIS travel history query, SSA will contact SSI claimants and recipients to independently verify the ADIS data.  The contacted individuals may confirm or reject the data SSA received through the ADIS Web Service query.  SSA will document its records with the travel information as confirmed or provided by the claimant or recipient.  SSA will continue to generate and send notices under existing business processes.

E. SSA will implement its system functionality for handling the ADIS data in multiple phases.  In the initial phase of query-only access to the ADIS data, SSA will not store the ADIS travel history data.  Rather, SSA systems receiving the data will discard the query results when the employee exits the query display.  However, in a subsequent phase, SSA will store the ADIS data.  At that time, SSA systems receiving the data will save the ADIS travel history data in the Travel and Border Crossing Records when the employee exits the query display.  SSA will retain the ADIS travel history data in accordance with the General Records Schedule and will dispose of the data 2 years after the date of creation.

SSA field office personnel will dispose of information provided to it under this MOA in accordance with the applicable Federal Records Retention Schedule.  44 U.S.C. Chapter 33, Records Management Schedule:  N1-47-95-4 Computer Privacy Act 1988.

## VIII.  Security Procedures

Participants will comply with applicable requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, Subchapter II, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. 113-283); related OMB circulars and memoranda, such as Circular A-130, *Managing Information as a Strategic Resource* (July 28, 2016) and Memorandum M-17-12 *Preparing for and Responding to a Breach of Personally Identifiable Information* (Jan. 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including any applicable amendments published after the effective date of this MOA.  These laws, directives, and regulations include requirements for safeguarding federal information systems and PII used in Federal agency business processes, as well as related reporting requirements. Both agencies recognize, and will implement, the laws, regulations, NIST standards, and OMB directives including those published subsequent to the effective date of this MOA.

FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency.  Each Participant is responsible for oversight of, and compliance by, their contractors and agents.

CEDC Case 000016

A. Incident Reporting

If either Participant experiences an incident involving the loss or breach of data provided by SSA or CBP under the terms of this MOA, that Participant will follow incident reporting guidelines issued by OMB. In the event of a reportable incident under OMB guidance, the agency experiencing the incident is responsible for following its established procedures, including notification to the proper organizations (e.g., United States Computer Emergency Readiness Team and the agency's privacy office). If a Participant determines that the risk of harm requires notification to affected individuals or other remedies, such Participant will carry out these remedies without cost to the other Participant.

In addition, the Participant experiencing the incident (e.g., electronic or paper) will notify the other agency's Systems Security Contact named in this MOA. If CBP is unable to speak with the SSA Systems Security Contact within one hour or if for some other reason notifying the SSA Systems Security Contact is not practicable (e.g., it is outside of the normal business hours), CBP will call SSA's National Network Service Center toll free at 1-877-697-4889. If SSA is unable to speak with CBP's Systems Security Contact within one hour, SSA will contact the CBP Technology Service Desk at 1-800-927-8729.

B. Administrative Safeguards

The Participants will restrict access to the data matched and to any data created by the match to only those users (e.g., employees, contractors, etc.) who need it to perform their official duties in connection with the uses of the data authorized in this MOA. Further, the Participants will advise all personnel who have access to the data matched and to any data created by the match of the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

C. Physical Safeguards

Participants will store the data matched and any data created by the match in an area that is physically and technologically secure from access by unauthorized persons at all times. Only authorized personnel will transport the data matched and those created by the match. Participants will establish appropriate safeguards for such data, as determined by a risk-based assessment of the circumstances involved.

D. Technical Safeguards

Participants will process the data matched and any data created by the match under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means. Systems personnel must enter personal identification numbers when accessing data on the agencies' systems. Participants will

8

CEDC Case 000017

strictly limit authorization to those electronic data areas necessary for the authorized analyst to perform his or her duties.

E.  Application of Policies and Procedures

Participants will adopt policies and procedures to ensure that each Participant uses the information contained in their respective records or obtained from each other solely as provided in this MOA.  Participants will comply with these policies and procedures and any subsequent revisions.

F.  Security Assessments

NIST Special Publication 800-37, as revised, encourages agencies to accept each other's security assessments in order to reuse information system resources and/or to accept each other's assessed security posture in order to share information.  NIST 800-37 further encourages that this type of reciprocity is best achieved when agencies are transparent and make available sufficient evidence regarding the security state of an information system so that an authorizing official from another organization can use that evidence to make credible, risk-based decisions regarding the operation and use of that system or the information it processes, stores, or transmits.  Consistent with that guidance, the parties agree to make available to each other upon request system security evidence for the purpose of making risk-based decisions.  Requests for this information may be made by either Participant at any time throughout the duration or any extension of this MOA.

## IX.  Reimbursement

Each Participant will pay its own costs for all activities conducted under this MOA.  This MOA does not obligate funds or create a financial obligation between the Participants.  All activities contemplated by this MOA are subject to the availability of funds and other necessary resources.

## X.  Duration, Modification, and Termination

A.  Effective Date

The effective date of this MOA is May 20, 2019.

B.  Duration

This MOA will be in effect for a period of five years.  The Participant shall mutually review the MOA within five years from the effective date, to determine if cooperation hereunder should continue or be terminated, or if the terms should be modified by mutual agreement.

9

CEDC Case 000018

C. Modification

The Participants may modify this MOA at any time by a written modification agreed upon by both Participants and approved by the designated official of each Participant.

D. Termination

Participants may terminate this MOA at any time upon mutual agreement. Either Participant may unilaterally terminate this MOA upon written notice to the other Participant, in which case the termination shall be effective 90 days after the date of the notice, or at a later date specified in the notice.

Either Participant may immediately and unilaterally terminate or suspend this MOA if it has determined that there has been: 1) an unauthorized use of the information by the other Participant, or 2) a violation of, or failure to follow, the terms of this MOA.

Either Participant may immediately and unilaterally suspend activities under this MOA if that Participant suspects that the other Participant breached the terms for security of data until such time as the suspending Participant makes a definitive determination regarding a breach. If either Participant unilaterally and immediately terminates or suspends this MOA, it will notify the other Participant in writing within three business days, including the basis for that action. If a Participant suspends the data flow in accordance with this subsection, the suspension will be effective until there is a final determination of a breach. In the event of a suspension or termination, each Participant shall treat data it receives pursuant to this MOA in a manner consistent with its terms.

## XI.    No Private Right of Action

This MOA sets forth the intentions of the undersigned Participants. It is not intended to create or confer any right or benefit of any kind, either substantive or procedural that may be enforceable by any third-party against the Participants or the officers, employees, agents, or associated personnel thereof. Nothing in this MOA is intended to restrict the authority of any Participant to act as provided by law, statutes, or regulation, or to restrict any Participant from administering or enforcing any laws within its authority or jurisdiction.

## XII.    Entire Agreement

This MOA constitutes the entire agreement of the Participants with respect to its subject matter and supersedes all other data exchange agreements between the Participants that pertain to the disclosure of the data specified under this MOA for the purposes described in this MOA. Participants have made no representations, warranties, or promises outside of this MOA. This MOA takes precedence over any other documents that may be in conflict with it.

10

CEDC Case 000019

## XIII.     Persons to Contact

The Participants identified the following officials as points of contact for purposes of this MOA.  The Participants will promptly notify each other of any changes in the contact information during the effective period of this MOA.

A.  SSA Contacts:

### Systems Issues
Jennifer Cullinane
Branch Chief DBIAE/Data Exchange and Verification Branch
Office of IT Programmatic Business Support Office of Systems
Robert M. Ball Building
6401 Security Boulevard
Baltimore, MD  21235
Telephone:  (410) 966-8044
Fax:  (443) 253-6019
Email:  Jennifer.Cullinane@ssa.gov

### Systems Security Issues
Jennifer Rutz, Director
Office of Information Security
Division of Compliance and Assessment
Suite 3208 Annex
6401 Security Boulevard
Baltimore, MD  21235
Telephone:  (410) 966-8253
Fax:  (410) 597-0845
Email:  Jennifer.Rutz@ssa.gov

### Matching Agreement Issues
Kelvin Chapman
Government Information Specialist
Office of the General Counsel
Office of Privacy and Disclosure
6401 Security Boulevard, 400 WHR
Baltimore, MD  21235
Telephone:  (410) 965-9312
Fax:  (410) 966-0869
Email:  Kelvin.Chapman@ssa.gov

11

CEDC Case 000020

**Project Coordinator**
Rona Demb, Data Exchange Liaison
Office of Data Exchange, Policy Publications, and International Negotiations
6401 Security Boulevard, 4-B-9-F Annex
Baltimore, MD 21235
Telephone: (410) 965-7567
Email: Rona.Demb@ssa.gov

B. CBP Contacts

**Matching Program Issues – CBP**
Management and Program Analyst
Traveler Compliance Division - ADIS
Planning, Program Analysis and Evaluation
Entry/Exit Transformation
Office of Field Operations
U.S. Customs and Border Protection

**Primary Contact/Operational Issues**
CBP Officer (Program Manager)
Traveler Compliance Division - ADIS
Planning, Program Analysis and Evaluation
Entry/Exit Transformation
Office of Field Operations
U.S. Customs and Border Protection

**Policy/Agreement Issues**
Supervisory Program Manager
Traveler Compliance Division - ADIS
Planning, Program Analysis and Evaluation
Entry/Exit Transformation
Office of Field Operations
U.S. Customs and Border Protection

**Information Security Issues (Systems Security Contact)**
Information System Security Officer
U.S. Customs and Border Protection

CEDC Case 000021

## XIV.    Authorized Signatures

The signatories below warrant and represent that they have the competent authority on behalf of the Participant to enter into the obligations set forth in this MOA.

**Electronic Signature Acknowledgement:** The signatories may sign this document electronically by using an approved electronic signature process. Each signatory electronically signing this document agrees that his/her electronic signature has the same legal validity and effect as his/her handwritten signature on the document, and that it has the same meaning as his/her handwritten signature.

SOCIAL SECURITY ADMINISTRATION

Monica Chyn
Acting Deputy Executive Director
Office of Privacy and Disclosure
Office of the General Counsel

Date        5/17/19

U.S. CUSTOMS AND BORDER PROTECTION

(b) (6), (b) (7)(C)

Colleen Manaher
Executive Director
Planning, Program Analysis, and Evaluation
Office of Field Operations
U.S. Customs and Border Protection

Date        5/20/19

13

CEDC Case 000022

**COMPUTER MATCHING AGREEMENT
BETWEEN THE
THE SOCIAL SECURITY ADMINISTRATION
AND
THE DEPARTMENT OF HOMELAND SECURITY**

SSA Match # 1010

## I.    Parties

The parties to this Computer Matching Agreement (Agreement) are the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (DHS-USCIS) and U.S. Immigration and Customs Enforcement (DHS-ICE) and the Social Security Administration (SSA).

## II.    Purpose

This Agreement sets forth the terms, conditions, and safeguards under which DHS will disclose information to SSA in order to identify noncitizens[1] who leave the United States voluntarily and noncitizens who are removed from the United States.[2] These noncitizens may be subject to suspension of payments or nonpayment of benefits or both, and recovery of overpayments.  SSA will use DHS data to determine if suspension of payments, nonpayment of benefits, and/or recovery of overpayments, is applicable.

## III.    Legal Authority

This Agreement is executed under the Privacy Act of 1974, 5 U.S.C. § 552a, as amended by the Computer Matching and Privacy Protection Act (CMPPA) of 1988, Public Law (Pub. L.) 100-503, 102 Stat. 2507 (1988), as amended, and the Computer Matching and Privacy Protection Amendments of 1990, and the regulations and guidance promulgated thereunder.

The CMPPA applies when computerized comparisons of Privacy Act-protected records contained within a Federal agency's databases and the records of another organization are made in order to determine an individual's eligibility to receive a Federal benefit.  The CMPPA requires the parties participating in a matching program to execute a written agreement specifying the terms and conditions under which the matching program will be conducted.

---

[1] For purposes of this Agreement, "noncitizen" is synonymous with "alien" as defined in section 101(a)(3) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)(3)), meaning "any person not a citizen or national of the United States."

[2] This Agreement does not apply to removals of individuals based on participation in Nazi persecutions under the No Social Security for Nazis Act, Pub. L. 113-270, to which different standards and procedures apply.

1

CEDC Case 000023

Various sections of the Social Security Act (Act) comprise the legal authorities for the disclosures under this Agreement.

Section 202(n)(1) of the Act [42 U.S.C. §§ 402(n)] requires the Secretary of Homeland Security to notify the Commissioner of Social Security when certain individuals are removed from the United States under sections 212(a)(6)(A) and 237(a) of the Immigration and Nationality Act (INA) (8 U.S.C. §§ 1182(a)(6)(A) or 1227(a).

Section 1611(a)(1) of the Act [1382c(a)(1)] concerns the definition of eligible individuals.

8 U.S.C. § 1611 mandates that non-qualified noncitizens (as defined in 8 U.S.C. § 1641) do not receive Federal public benefits.

8 U.S.C. § 1612 also places some limits on qualified noncitizens' ability to receive public benefits.

Section 1631(e)(1)(B) of the Act [42 U.S.C. § 1383(e)(1)(B)] requires SSA to verify declarations of applicants for and recipients of Supplemental Security Income (SSI) payments before making a determination of eligibility or payment amount.

Section 1631(f) of the Act [42 U.S.C. § 1383(f)] requires Federal agencies to provide SSA with information necessary to verify SSI eligibility or benefit amounts or to verify other information related to these determinations.

A.  Noncitizens Who Leave the United States, without regard to immigration proceedings.

Resident noncitizens eligible for SSI may receive payments for any month in which they reside in the United States.  For purposes of SSI, the United States means, geographically, the 50 States, the District of Columbia, and the Northern Mariana Islands.  20 C.F.R. § 416.1603(c).  Under section 1611(f) of the Act, an individual is ineligible for SSI benefits for any month during all of which he or she is outside the United States.[3]  Section 1611(f) of the Act further states that if an individual is absent from the United States for 30 consecutive days, SSA will treat the individual as remaining outside the United States until he or she has been in the United States for a period of 30 consecutive days. See 42 U.S.C. § 1382(f) and 20 C.F.R. § 416.1327.

B.  Noncitizens Who are Removed, Voluntarily Depart, or Voluntarily Return to Their Home Country from the United States

---

[3]  The Act provides for limited exceptions to the general rule. *See*, *e.g.*, 42 U.S.C. § 1382(f)(1) (providing an exception for United States citizen children living with a parent who is a member of the military assigned to permanent duty outside the United States) and also 42 U.S.C. § 1382(f)(2) (providing an exception for certain students who are temporarily studying abroad).

CEDC Case 000024

The Social Security Protection Act of 2004, Pub. L. No. 108-203, amended the Act to expand the number of individuals who are subject to nonpayment of Social Security benefits.  Thus, section 202(n)(1)(A) of the Act (42 U.S.C. § 402(n)(1)(A)) prohibits payment of retirement or disability insurance benefits to number holders (NH) who have been removed from the United States on certain grounds specified under section 237(a) or section 212(a)(6)(A) of the INA (8 U.S.C. §§ 1182(a)(6)(A), 1227(a)).  SSA will not pay monthly retirement or disability benefits to such NHs for the month after the month in which the Secretary of Homeland Security notifies SSA of the NH's removal or before the month in which the NH is subsequently lawfully admitted to the United States for permanent residence.

Section 202(n)(1)(B) of the Act (42 U.S.C. § 402(n)(1)(B)) prohibits payment of auxiliary or survivors benefits to certain individuals who are entitled to such benefits on the record of a NH who has been removed from the United States on certain grounds as specified in the above paragraph.  Nonpayment of benefits is applicable for any month such auxiliary or survivor beneficiary is not a citizen of the United States and is outside the United States for any part of the month.  Benefits cannot be initiated (or resumed) to such auxiliary or survivor beneficiaries who are otherwise subject to nonpayment under these provisions until the removed NH has been subsequently lawfully admitted for permanent residence to the United States.

In addition, certain individuals may be subject to suspension of their SSI payments under section 1614(a)(1)(B)(i) of the Act (42 U.S.C. § 1382c(a)(1)(B)(i)), which provides, in part, that an SSI recipient must be a resident of the United States.

## IV.    Definitions

A. "Noncitizen" means any person not a citizen or national of the United States; this term is synonymous with "alien" as defined in section 101(a)(3) of the INA (8 U.S.C. § 1101(a)(3)).

B. The "Benefit Information System" (BIS) is the system of records that includes the Computer Linked Application Information Management System (CLAIMS 3), a DHS system that contains information on noncitizens who have applied for "Advance Parole" or permission to re-enter the country in the event they elect to leave the United States.

C. "EID" means the Enforcement Integrated Database, a DHS system that contains information on noncitizens whom DHS removes from the United States.

D. "NH" means the number holder or the owner of the Social Security number (SSN).

E. "Qualified noncitizen" has the same meaning as "qualified alien" as described in

3

CEDC Case 000025

8 U.S.C. § 1641(b).

F.   "Removed" means, for purposes of this Agreement, confirmed movement of an inadmissible or deportable noncitizen out of the United States based on the compulsory execution of the noncitizen's order under 8 U.S.C. § 1231(a) (section 241(a) of INA) in effect before April 1997, or under 8 U.S.C. §§ 1227(a) or 1182(a)(6)(A) (section 237(a) or section 212(a)(6)(A) of the INA) in effect as of April 1997.  For example, a noncitizen is considered "removed" after verification of their departure followed issuance of a final order of removal. A noncitizen who is removed has administrative or criminal consequences placed on subsequent reentry owing to the fact of the removal. Ineligibility to remain in the United States is based on grounds of inadmissibility (INA § 212) or deportability (INA § 237).

G.   "Resident Noncitizen" means an individual who is a resident of the United States (See 1614(a)(1)(B)(i) of the Act (42 U.S.C. § 1382c(a)(1)(B)(i))) and is either a "qualified noncitizen" or is a noncitizen permanently residing in the United States under color of law (PRUCOL) who was receiving SSI on 08/22/1996.  Such PRUCOL noncitizens include those who entered the United States either lawfully in a status other than lawful permanent residence or unlawfully, who are residing in the United States with the knowledge and permission of DHS and whose departure from the United States DHS does not contemplate enforcing.

H.   "RSDI" means Retirement, Survivor and Disability Insurance Program. Beneficiaries, survivors, and auxiliaries may receive benefits under RSDI under Title II of the Act.

I.   "SSI" means the Supplemental Security Income Program.  SSI is the Federal program established under Title XVI of the Act to provide benefits to aged, blind, and disabled individuals with income and resources below levels established under that Title.  (See also 1614(a)(1)(B)(i) of the Act (42 U.S.C. § 1382c(a)(1)(B)(i)))

J.   "United States" means the 50 states, the District of Columbia, and the Northern Mariana Islands.

## V.   <u>Responsibilities of the Parties</u>

A.   DHS

1.   DHS will disclose information to SSA to identify those resident noncitizens who may be ineligible for SSI benefits because they have been or plan to be outside the United States for 30 consecutive days.

2.   DHS will disclose information to SSA of those NHs whom DHS has removed from the United States on certain grounds specified under the INA and, thus, may be subject to nonpayment of their Social Security retirement benefits and

4

CEDC Case 000026

Social Security disability benefits, suspension of their SSI payments, and recovery of overpayments.

3. USCIS' Service Center Operations Directorate provides the data file described in paragraph 1 above, and ICE's Office of Enforcement and Removal Operations provides the data file described in paragraph 2 above.  Both are the responsible components for DHS.

4. DHS-USCIS may provide SSA with instructional materials required for the proper use of information that it provides to SSA under this Agreement. If provided, these instructional materials will reflect provisions in this Agreement and applicable legal authorities and guidance (e.g., Office of Management and Budget (OMB) circulars) regarding topics such as (1) access, (2) verification procedures, (3) disclosure of information and privacy protections, (4) non-discrimination requirements, and/or (5) DHS-USCIS records correction procedures for individuals that may be subject to nonpayment of Social Security retirement benefits, Social Security disability benefits, or both (and under certain conditions the benefits of their dependents or survivors), suspension of SSI payments, and/or recovery of overpayments.

5. Customs and Border Protection (CBP), while not a party to this Agreement, provides SSA online query access that SSA uses to obtain departure information concerning claimants and recipients under Title XVI of the Act. The CBP data allows SSA to verify that identified noncitizens have left the United States.  A Memorandum of Agreement between CBP and SSA addresses this information exchange.

B. SSA

1. SSA will use the data file provided by DHS (identified in paragraph V.A.1. above) to identify resident noncitizens who are SSI recipients and who have left or plan to leave the United States for any period of 30 consecutive days, and thus, may be subject to suspension of their SSI payments and recovery of overpayments.

2. SSA will use the data file provided by DHS (identified in paragraph V.A.2. above) to identify NHs whom DHS has removed from the United States on certain grounds specified under the INA and based on the data file and other information, will make a determination regarding payment because such individuals may be subject to nonpayment of their Social Security retirement benefits, Social Security disability benefits, or both (and under certain conditions the benefits of their dependents or survivors), suspension of their SSI payments, and recovery of overpayments.

3. The Office of Privacy and Disclosure is the responsible component for the matching activity.  The Office of Income Security Programs is the responsible component for noncitizen policy questions for voluntary absences from the

5

CEDC Case 000027

United States and removals involving SSI recipients.  The Office of Income Security Programs is the responsible component for noncitizen policy questions for removals questions for removals involving Retirement, Survivors and Disability Insurance (RSDI) claimants and recipients.

4. SSA will provide Congress and the OMB with notice of this program and will publish the required matching notice in the Federal Register (Fed. Reg.).

## VI.    Justification and Anticipated Results

A. Justification

Data exchange under this Agreement is necessary for SSA to determine eligibility for Federal benefits for noncitizens who have left the United States voluntarily or been removed from the United States.  SSA and DHS have determined that computer matching is the most efficient, economical, and comprehensive method of collecting, comparing, and transferring this information.  No other administrative activity can efficiently accomplish this purpose.

B. Anticipated Results

1. Noncitizens Who Leave the United States Voluntarily

We found retroactive overpayments in 5.42 percent of the Title XVI sample cases for noncitizens who left the U.S.  The average retroactive overpayment per overpaid case was $2,058.  The total overpayments detected from the match are $37,042.  Using the average historical recovery rate for Title XVI recipients, we would expect to recover 65 percent of the overpaid dollars, for a total of approximately $24,077 in benefits.

Development of the match alerts also resulted in a suspension of the recurring monthly payment amount in about 5.12 percent of the Title XVI sample cases for noncitizens who left the U.S.  The average suspended monthly payment amount was $672.  In FY 2021, the monthly benefits suspended totals $11,425.  If the match had not occurred, we assume this incorrect payment would have continued for at least six additional months.  Therefore, the estimated savings by preventing erroneous future monthly payments would be approximately $68,549 when projected to the universe of alerts released in FY 2021.

2. Noncitizens Who are Removed from the United States

We found retroactive overpayments for some of the Title II and Title XVI alerts for noncitizens who DHS removed from the U.S.  However, using the conservative assumption that recovery of retroactive overpayments from individuals removed from the country might be highly unlikely, we did not include an estimate of retroactive overpayments recovered in removal cases in

6

CEDC Case 000028

the calculation of benefits.

Development of the Title II alerts resulted in a suspension of the recurring monthly payment amount in 7.74 percent of the cases for noncitizens who DHS removed from the U.S.  The average suspended monthly payment amount was $868 for a total monthly benefit suspension of $11,285.  If the match had not occurred, we assume that this incorrect payment would have continued for 12 additional months.  Therefore, the estimated savings by preventing erroneous future monthly payments would be approximately $135,420 for the Title II alerts released in FY 2021.

The total estimated Title II savings from this matching operation are $135,420.  The total estimated Title XVI savings are $106,786.  The combined savings are $242,206.

3.  Matching Agreement Benefits and Costs

This matching program benefits the United States Treasury and the RSDI trust funds through the correction and recovery of overpayments and the prevention of future overpayments.

For Title II, the benefits are $135,420 with costs of $20,151 resulting in a benefit-to- cost ratio of 6.72 to 1.

For Title XVI, the benefits are $106,786 with costs of $93,783 resulting in a benefit-to-cost ratio of 1.14 to 1.

Overall, the total benefits of this matching operation are $242,206 with costs of $113,935 resulting in a benefit-to-cost ratio of 2.13 to 1.

VII.    **Description of Matched Records**

A.  Systems of Records

1.  Noncitizens Who Leave the United States Voluntarily (SSI)

DHS will disclose to SSA BIS data that includes records covered by the following USCIS system of records, DHS/USCIS-007, 81 Fed. Reg. 72069 (October 19, 2016), to the extent those records pertain to individuals under the Privacy Act or covered persons under the Judicial Redress Act of 2015, 5 U.S.C. § 552a, note.  DHS will electronically format the BIS data for transmission to SSA.  BIS data is comprised of data collected from USCIS immigration systems.  USCIS data used to accomplish this Agreement currently comes from the CLAIMS 3 database.

For this part of the match, SSA will match the DHS information with the following two SSA's system of records:

7

CEDC Case 000029

1. Master Files of SSN Holders and SSN Applications, 60-0058, last fully published at 87 Fed. Reg. 263 (January 4, 2022); and

2. Supplemental Security Income Record and Special Veterans Benefits (SSR) (60-0103) last fully published at 71 Fed. Reg. 1830 (January 11, 2006), and amended at 72 Fed. Reg. 69723 (December 10, 2007), and at 83 Fed. Reg. 31250-31251 (July 3, 2018), and at 83 Fed. Reg. 54969 (November 1, 2018).

2. Noncitizens Who are Removed from the United States (RSDI and SSI)

DHS will retrieve information on removed noncitizens from the DHS/ICE database known as the Enforcement Integrated Database (EID) and electronically format it for transmission to SSA, and as covered by the following DHS/ICE system of records, DHS/ICE-011 – Criminal Arrest Records and Immigration Enforcement Records (CARIER), 81 Fed. Reg. 72080 (October 19, 2016), to the extent that those records pertain to individuals under the Privacy Act or covered persons under the Judicial Redress Act of 2015, 5 U.S.C. § 552a, note.

For this part of the match, SSA will match the DHS information with the following four SSA's system of records:

1. Master Files of SSN Holders and SSN Applications 60-0058, last fully published at 87 Fed. Reg. 263 (January 4, 2022).

2. Supplemental Security Income Record and Special Veterans Benefits (SSR) (60-0103), last fully published at 71 Fed. Reg. 1830 (January 11, 2006), and amended at 72 Fed. Reg. 69723 (December 10, 2007), 83 Fed. Reg. 31250-31251 (July 3, 2018), and 83 Fed. Reg. 54969 (November 1, 2018).

3. Master Beneficiary Record (MBR) (60-0090), last fully published at 71 Fed. Reg. 1826 (January 11, 2006), and updated at 72 Fed. Reg. 69723 (December 10, 2007), 78 Fed. Reg. 40542 (July 5, 2013), 83 Fed. Reg. 31250-31251 (July 3, 2018), and 83 Fed. Reg. 54969 (November 1, 2018); and

4. Prisoner Update Processing System (PUPS) 60-0269, last fully published at 64 Fed. Reg. 11076 (March 8, 1999), and updated at 72 Fed. Reg. 69723 (December 10, 2007), 78 Fed. Reg. 40542 (July 5, 2013), and 83 Fed. Reg. 54969 (November 1, 2018).

The Unverified Prisoner System (UPS) is a subsystem of PUPS.  UPS users perform a manual search of fallout cases where the Enumeration and Verification System is unable to locate an SSN for a noncitizen who has been

CEDC Case 000030

removed.

B. Specified Data Elements

    1. Noncitizens Who Leave the United States Voluntarily

The data elements furnished by the DHS/USCIS's BIS System are the individual's name, SSN, date of birth (DOB), DHS identifier ("A" number), date of departure, and expected length of stay.  To verify the SSN, SSA will match BIS data against the names, DOB, and SSNs in SSA's Enumeration System.  SSA will store and match verified SSNs against the same elements in the SSR files.

    2. Noncitizens Who Are Removed From the United States

The data elements furnished from DHS/ICE's EID system are the individual's name and alias (if any), SSN (if available), DOB, country of birth, country to which removed, date of removal, the final removal charge code, and DHS identifier ("A" number).

To verify the SSN, SSA will match EID data against records in its Enumeration System.  SSA matches the verified SSNs against the existing MBR and SSR records to locate removals (and their dependents or survivors, if any) who have already claimed and are currently receiving RSDI or SSI benefits, or both.  SSA will retain the data verified through this matching program on the MBR and SSR, to be associated with future claims activity.

C. Records Relating to U.S. Citizens and Lawful Permanent Residents

All safeguards and protections provided by the Privacy Act, CMPPA, Judicial Redress Act (JRA) of 2015, and this Agreement regarding the use, disclosure, and security of DHS-USCIS records apply to DHS records regarding U.S. citizens, lawful permanent residents (LPRs), and certain designated foreign nationals. U.S. citizens and LPRs covered by the Privacy Act of 1974 and those covered persons covered by the JRA are provided with privacy protections and legal redress (for example, access and amendment) required by law. With respect to persons who are not covered by the Privacy Act or JRA, DHS, by policy, will still analyze official sharing requests under the Fair Information Practice Principles. However, for those individuals, no privacy rights or benefits, substantive or procedural, are intended, or should be construed, to be created by this Computer Matching Agreement, and are not enforceable at law against the United States, its agencies, officers, or employees.

D. Number of Records Involved

    1. Noncitizens Who Leave the United States Voluntarily

9

The electronic files DHS provides to SSA will annually contain approximately 85,000 records of noncitizens who have left or plan to leave the United States voluntarily for matching against 11 million records on the SSR.

2. Noncitizens Who are Removed from the United States

The electronic files DHS provides to SSA will annually contain an estimated 400,000 records of removed noncitizens for matching against an estimated 78 million active records on the MBR and 11 million records on the SSR.

E. Frequency of Matching

DHS will transmit data to SSA via an encrypted monthly batch process.

**VIII. <u>Accuracy Assessment</u>**

The SSA Enumeration System used for SSN matching is 100 percent accurate based on SSA's Office of Analytics, Review, and Oversight (FY 2018 Enumeration Accuracy Review Report, April 2019).

SSA does not have an accuracy assessment specific to the data elements listed in this Agreement. However, SSA conducts periodic, statistically valid, stewardship (payment accuracy) reviews, in which the benefits or payments listed in this Agreement are included as items available for review and correction. SSA quality reviewers interview the selected RSDI and SSI beneficiaries/recipients and redevelop the non-medical factors of eligibility to determine whether the payment was correct. Based on the available study results, we have a reasonable assurance that SSA's accuracy assumptions of a 95 percent confidence level for the monthly benefits or payments listed in this Agreement.

DHS-USCIS currently estimates that information within its CLAIMS 3 database is 90-95 percent accurate in reflecting immigration status, but continues to undertake various actions to further improve the quality of the CLAIMS 3 database. In addition, per standard operating procedures, USCIS adjudication officers conducting the queries may consult the USCIS Central Index System for additional information to correct errors. This process includes procedures for DHS-USCIS to correct any errors detected in the CLAIMS 3 immigration status information.

ICE currently estimates that removal information recorded in the EID is 99 percent accurate. ICE continues to undertake various actions, such as maximizing automation, to further improve the quality of data submitted to the EID database and thus minimize human error that can occur during manual data entry. ICE law enforcement personnel conduct biometric validation and submit record checks against multiple systems, in addition to comprehensive interviews, to ensure that a subject's identity is properly captured as part of the enforcement lifecycle.

10

CEDC Case 000032

IX.    **Procedures for Individualized Notice**

A.  Applicants

SSA will provide direct notice, in writing, to all applicants at the time of application for SSI or RSDI benefits that SSA will match their records against those of other agencies to verify their eligibility or payment amount.  SSA will provide such notice in English or Spanish with alternative options available for the blind or visually impaired consistent with Section XVI of this Agreement.

B.  Beneficiaries

SSA will provide similar periodic notices to all SSI and RSDI benefit recipients at least once during the life of the match.  SSA provides periodic notification in a variety of ways, such as computer matching notification included in the annual Cost of Living Adjustment notices to SSI recipients.  SSA will provide such notice in English or Spanish with alternative options available for the blind or visually impaired consistent with Section XVI of this Agreement.

SSA will also publish specific notices of this matching program in the Federal Register, in accordance with the requirements of the Privacy Act and applicable OMB guidelines.

X.    **Verification Procedure and Opportunity to Contest**

A.  Verification Procedures

SSA will take no adverse action regarding individuals identified through the matching process without first conducting verification procedures.

SSA will also contact the beneficiary or recipient to verify discrepant information obtained through the matching results in accordance with the requirements of the Privacy Act and applicable OMB guidelines. In both RSDI and SSI cases, the affected individual will have an opportunity to contest the accuracy of the information provided by DHS as described below.

B.  Opportunity to Contest

Before taking any adverse action based on the information received from the match, SSA will provide all individuals for whom SSA decides such adverse action is necessary with the following information:

1.  SSA has received information from DHS pertaining to the noncitizen's voluntary absence or removal from the United States that indicates specified adverse action is necessary.

2.  SSA will provide information that indicates the necessity for an adverse action

11

CEDC Case 000033

to the individual receiving Title XVI payments or Title II benefits and the effective date of any adjustment or overpayment that may result.
- Notice language for absences related to Title XVI.[4]
- Notice language for absences related to Title II.[5] [6]

3.  The individual has 60 days from the date of the notice to contact SSA and contest the adverse decision.  SSI recipients who file an appeal within 10 days of receiving the notice will automatically receive payment continuation.

4.  Unless the individual notifies SSA within the time period specified, SSA will conclude that the data provided by DHS is correct and will make the necessary adjustment to the individual's RSDI or SSI benefits. To ensure SSA does not act without verification, the agency also has a policy in place for incorrect, missing or questioning removal data even if the individual does not contest.[7]  The N03 or N23 policy would apply for Title XVI recipients, as Claims Specialists would have a high level of confidence in the third-party report via this Agreement.[8]

**XI.  <u>Procedures for Retention and Timely Destruction of Identifiable Records</u>**
SSA will retain the electronic files received from DHS only for the period of time required for any processing related to the matching program and then will destroy all such data by electronic purging, unless SSA or DHS is required to retain the information in order to meet evidentiary requirements.

SSA may retain information verified as a result of this match in the individual's file folders in order to meet evidentiary requirements.  In case of such retention for evidentiary purposes, SSA will retire the retained data in accordance with the applicable Federal Records Retention Schedule (44 U.S.C. § 3303a) N1-047-05-001 (applicable sections based on the type of claim).  SSA will not create permanent files or separate systems comprised solely of the data provided by DHS.  DHS may retain one copy of the information provided to SSA as its record of disclosure in accordance with the disclosure accounting and retention requirements of the Privacy Act, as amended, 5 U.S.C. § 552a(c)(1) and (2).

Under applicable legal retention requirements for records pertaining to noncitizens who are removed from the United States in accordance with the INA, SSA will retain the identifiable records verified through this matching program (i.e., records that were generated due to a match of the DHS and SSA records and verified as required under this Agreement) on the MBR and SSR unless SSA deletes them because:

1.  It is established that the DHS/SSA data match was incorrect and the NH on the SSA record is not the same person as the individual reported by DHS to have

---

[4] SSA - POMS: NL 00804.170
[5] SSA - POMS: NL 00703.124
[6] SSA - POMS: NL 00703.554
[7] SSA - POMS: RS 02635.015
[8] SSA - POMS: SI 02301.225

12

been removed; or

2. Documentation is submitted to establish that the NH was lawfully admitted to the United States for permanent residence subsequent to the removal.

## XII.    Records Usage, Duplication, and Redisclosure Restrictions

SSA will adhere to the following limitations on the use, duplication, and redisclosure of the electronic files and data that DHS provides to SSA:

A. SSA will use and access the data DHS provides only for the purposes described in this Agreement.

B. SSA will not use the data to extract information concerning individuals therein for any purpose not specified by this Agreement.

C. SSA will not duplicate or disseminate the files DHS provides, within or outside SSA, without the written permission of DHS, except as required by Federal law. Prior to making such redisclosure, SSA will give notice to DHS and obtain approval of DHS's Data Integrity Board (DIB).  DHS will not give such permission unless the law requires disclosure, or if the disclosure is essential to the matching program.  For such permission, SSA must specify in writing which data it requests be duplicated or disseminated and to whom, the reasons that justify such duplication or dissemination, and identify the statutory authority requiring redisclosure, or explain how the redisclosure meets the "essential" standard established under the Privacy Act and interpreted in OMB guidance.

## XIII.    Security Procedures

SSA and DHS will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, Subchapter II, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. 113-283); related OMB circulars and memoranda, such as Circular A-130, *Managing Information as a Strategic Resource* (July 28, 2016), and Memorandum M-17-12, *Preparing for and Responding to a Breach of Personally Identifiable information* (January 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including any applicable amendments published after the effective date of this Agreement.  These laws, directives, and regulations include requirements for safeguarding Federal information systems and personally identifiable information (PII) used in Federal agency business processes, as well as related reporting requirements.  Both agencies recognize and will implement the laws, regulations, NIST standards, and OMB directives including those published subsequent to the effective date of this Agreement.

FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency.  Both agencies are responsible for

13

CEDC Case 000035

oversight and compliance of their contractors and agents.

A.  Breach Reporting

If SSA or VA suspects or confirms a breach, as defined by OMB M-17-12 or suspects or experiences an incident involving the loss or breach of PII provided by SSA or VA under the terms of this Agreement, they will follow the breach reporting guidelines issued by OMB and agency policy.  In the event of a reportable breach under OMB guidance involving PII, the agency experiencing the breach is responsible for following its established procedures, including notification to the proper organizations (e.g., United States Computer Emergency Readiness Team, the agency's privacy office).  In addition, the agency experiencing the breach (e.g., electronic or paper) will notify the other agency's Systems Security Contact named in this Agreement.  If VA is unable to speak with the SSA Systems Security Contact within one hour or if for some other reason notifying the SSA Systems Security Contact is not practicable (e.g., it is outside of the normal business hours), VA will call SSA's National Network Service Center toll free at 1-877-697-4889.  SSA must also notify VA's Systems Security Contact and the VA Network and Security Operations Center (1-800-877-4328) within one hour.

B.  Breach Notification

SSA and DHS will follow PII breach notification policies and related procedures issued by OMB.  If the agency that experienced the breach determines that the risk of harm requires notification to affected individuals or other remedies, that agency will carry out these remedies without cost to the other agency.

C.  Administrative Safeguards

SSA and DHS will restrict access to the data matched and to any data created by the match to only those users (e.g., employees, contractors) who need it to perform their official duties in connection with the uses of the data authorized in this Agreement.  Further, SSA and DHS will advise all personnel who have access to the data matched and to any data created by the match of the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

D.  Physical Safeguards

SSA and DHS will store the data matched and any data created by the match in an area that is physically and technologically secure from access by unauthorized persons at all times (e.g., door locks, card keys, biometric identifiers).  Only authorized personnel will transport the data matched and any data created by the match.  SSA and DHS will establish appropriate safeguards for such data, as determined by a risk-based assessment of the circumstances involved.

14

E.  Technical Safeguards

SSA and DHS will process the data matched and any data created by the match under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means.  Systems personnel must enter personal identification numbers when accessing data on the agencies' systems.  SSA and DHS will strictly limit authorization to those electronic data areas necessary for the authorized analyst to perform his or her official duties.

F.  Application of Policies and Procedures

SSA and DHS will adopt policies and procedures to ensure that each agency uses the information contained in their respective records or obtained from each other solely as provided in this Agreement.  SSA and DHS will comply with these policies and procedures, as well as any subsequent revisions.

G.  Security Assessments

NIST Special Publication (SP) 800-37, as revised, encourages agencies to accept each other's security assessments in order to reuse information system resources and/or to accept each other's assessed security posture in order to share information.  NIST SP 800-37 further encourages that this type of reciprocity is best achieved when agencies are transparent and make available sufficient evidence regarding the security state of an information system so that an authorizing official from another organization can use that evidence to make credible, risk-based decisions regarding the operation and use of that system or the information it processes, stores, or transmits.  Consistent with that guidance, the parties agree to make available to each other upon request system security evidence for the purpose of making risk-based decisions.  Requests for this information may be made by either party at any time throughout the duration or any extension of this Agreement.

H.  Monitoring and Compliance

DHS and SSA agree that each agency may monitor compliance with the terms of this Agreement, including all privacy protections and non-discrimination requirements.   Both agencies have the right to monitor and review (1) transactions conducted pursuant to this Agreement, (2) the use of information obtained pursuant to this Agreement, and (3) policies, practices, and procedures related to this Agreement.  Both agencies also have the right to make onsite inspections to audit compliance with this Agreement for the duration or any extension of this Agreement. DHS and SSA will cooperate with each other to ensure the success of each agency's monitoring and compliance activities.  To the extent monitoring or inspection requires involvement of both DHS and SSA, the

15

CEDC Case 000037

parties agree to mutually coordinate in advance (e.g., regarding timing, planning, etc.).

## XIV.  Comptroller General Access

The Government Accountability Office (Comptroller General) may have access to all SSA and DHS data it deems necessary, in order to monitor or verify compliance with this Agreement, including those contained and covered by an SSA and DHS system of records disclosure pursuant to 5 U.S.C. § 552a(b)(10).

## XV.  Reimbursement

The parties agree that DHS will not charge SSA for any services performed or data provided under this Agreement.  DHS waives recovery of the costs pursuant to the Economy Act (31 U.S.C. § 1535).  Therefore, there will be no exchange of federal funds between the parties to this Agreement.

## XVI.  Non-Discrimination

Any action required or permitted under this Agreement shall be conducted in a manner that does not discriminate against an individual based upon his or her national origin, race, color, sex, religion, age, or disability in accordance with Section 705 of the Homeland Security Act of 2002, as amended (6 U.S.C. § 345); Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 701, et seq.); and related agency implementing regulations, 6 CFR Part 15 and 45 CFR Part 85.

In fulfilling their obligations under Executive Order 13166 ("Improving Access to Services for Persons with Limited English Proficiency" (Aug. 11, 2000)), SSA and DHS will take reasonable steps to provide limited English proficient (LEP) persons with meaningful access to federally conducted programs and activities, including services and benefits.  Meaningful access includes providing timely language assistance services to ensure effective communication with LEP persons and providing language services that are sufficient to provide the same level of access to services received by persons who are not LEP.  Language assistance services may be oral and/or written, and must be provided at no charge to the individual.  Vital documents, including notices relating to consent, verification of status, and contesting status determinations should be translated.

In accordance with Section 504 of the Rehabilitation Act of 1973, as amended, and related agency implementing regulations, SSA and DHS will provide reasonable modifications to individuals with disabilities to ensure effective communication, including providing qualified sign language interpreters, providing accessible electronic and information technology, and producing notices and publications in alternate formats, at no charge to the individual.  Persons with disabilities who may require accommodation and provision of alternative communication methods to ensure effective communication include persons who are deaf or hard of hearing, persons with vision impairments, and persons with psychiatric and/or developmental

16

CEDC Case 000038

disabilities.

**XVII.    Duration and Modification of Agreement**

A. Effective Date

The effective date of this Agreement is July 19, 2022, provided that SSA reported the proposal to reestablish this matching program to the Congressional committees of jurisdiction and OMB in accordance with 5 U.S.C. § 552a(o)(2)(A) and OMB Circular A-108 (December 23, 2016), and SSA published notice of the matching program in the Federal Register in accordance with 5 U.S.C. § 552a(e)(12).

B. Duration

This Agreement will be in effect for a period of 18 months.

C. Renewal

The DIBs of DHS and SSA may, within 3 months prior to the expiration of this Agreement, renew this Agreement for a period not to exceed 12 months if DHS and SSA can certify to their DIBs that:

1. The matching program will be conducted without change; and
2. DHS and SSA have conducted the matching program in compliance with the original Agreement.

If either agency does not want to continue this program, it must notify the other agency of its intention not to continue at least 90 days before the end of the period of Agreement.

D. Modification

The parties may modify this Agreement at any time by a written modification, agreed to by both parties, and approved by the DIB of each agency.

E. Termination

The parties may terminate this Agreement at any time with the consent of both parties. Either party may unilaterally terminate this Agreement upon written notice to the other party, in which case the termination will be effective 90 days after the date of such notice or at a later date specified in the notice.

17

CEDC Case 000039

XVIII.    <u>Persons to Contact</u>

A. **Department of Homeland Security:**

**<u>Matching Agreement Issues - DHS</u>**
Leslie Opsahl
DHS Privacy Office
Computer Matching Agreements
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528
Telephone: (202) 981-4646
Leslie.Opsahl@hq.dhs.gov

**<u>Matching Program Issues – USCIS</u>**
Shannon DiMartino
Technology Oversight Branch Chief
Office of Privacy
U.S. Citizenship and Immigration Services
5900 Capital Gateway Drive
Camp Spring, MD 20588-0009
Telephone:  (202) 999-8665
Email:  shannon.k.dimartino@uscis.dhs.gov

**<u>Matching Program Issues - ICE</u>**
Tadgh Smith
Deputy Assistant Director Law Enforcement Systems and Analysis
Enforcement and Removal Operations
United States Immigration and Customs Enforcement
Department of Homeland Security
Potomac Center North
500 12th Street, SW
Washington, DC 20024
Telephone: (202) 732-3917
Email: Tadgh.Smith@ice.dhs.gov

**<u>Systems Security Issues</u>**
Shane M. Barney
Chief Information Security Officer
Information Security Division
Office of Information Technology
United States Citizenship and Immigration Services
Office:  (202) 721-1354
Mobile:  (202) 304-2743
Email:  Shane.Barney@uscis.dhs.gov

18

CEDC Case 000040

**Systems Issues - USCIS**

Dawn Stephens
Benefits Systems Branch Chief
Systems Delivery Division
USCIS Nebraska Service Center – Star Building
850 S Street
Lincoln, NE  68508
Phone:  (402) 650-5541
Email:  Dawn.M.Stephens@uscis.dhs.gov

**DHS Privacy Office**

Bradley E. White
Executive Director, Data Integrity Board
Senior Director, Privacy Policy and Oversight, Privacy Office
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528
Telephone:  (202) 573-4071
Email: Bradley.White@hq.dhs.gov

**ICE Privacy Office**

Jordan Holz
Privacy Officer
United States Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street, SW
Mail Stop 5004
Washington, DC  20536
Telephone:  (202) 732-4373
Email:  Jordan.Holz@ice.dhs.gov

**USCIS Privacy Office**

Angela Y. Washington
Privacy Officer (Acting)
United States Citizenship and Immigration Services
Department of Homeland Security
5900 Capital Gateway Drive – Mailstop 2050
Camp Spring, MD 20588-0009
Telephone:  (202) 570-8327
Email:  Angela.Y.Washington@uscis.dhs.gov

19

CEDC Case 000041

**B. Social Security Administration:**

**Matching Agreement Issues**
Neil Etter
Government Information Specialist
Office of the General Counsel
Office of Privacy and Disclosure
Social Security Administration
6401 Security Boulevard, G-401 WHR Building
Baltimore, MD  21235
Telephone:  (410) 965-8028
Email:  Neil.Etter@ssa.gov

**Systems Security Contact**
Jennifer Rutz
Director
Office of Information Security
Division of Compliance and Assessments
Suite 3208 Annex
6401 Security Boulevard
Baltimore, MD  21235
Telephone:  (410) 966-8253
Email:  Jennifer.Rutz@ssa.gov

**Computer Systems**
Angil Escobar
Branch Chief
OEIS/DDE/Verifications and Exchanges Analysts Branch
Enterprise Information Systems
Office of Systems
Social Security Administration
6401 Security Boulevard
3-E-2-F Robert M. Ball Building
Baltimore, MD  21235
Telephone:  (410) 965-7213
Email:  Angil.Escobar@ssa.gov

**Project Coordinator**
Rona Demb
Program Analyst
Office of Data Exchange
Office of Data Exchange, Policy Publications and
International Negotiations
4-B-9-F Annex Building
6401 Security Boulevard
Baltimore, MD  21235
Telephone:  (410) 965-7567

20

CEDC Case 000042

Email:  Rona.Demb@ssa.gov

**SSA Policy and Program Issues**
Michael Bittinger
Program Analyst
Office of Income Security Programs/OAESP
Social Security Administration
2500 Robert M. Ball Building
6401 Security Boulevard
Baltimore, MD  21235
Telephone:  (410) 966-0457
Email:  Michael.Bittinger@ssa.gov

**International Policy**
Phyllis Mathers
Social Insurance Specialist
Office of Income Security Programs
Social Security Administration
2513C Robert M. Ball Building
6401 Security Boulevard
Baltimore, MD 21235
Telephone: 410-965-3549
Email: Phyllis.Mathers@ssa.gov

## XIX.    Integration Clause

This Agreement constitutes the entire Agreement of the parties with respect to its subject matter and supersedes all other data matching between the parties that pertain to the disclosure of the specified identification of resident noncitizen data made between DHS and SSA for the purposes described herein.  DHS and SSA have made no representations, warranties, or promises outside of this Agreement.  This Agreement takes precedence over any other documents that may be in conflict with it.

CEDC Case 000043

XX.    **Signatures**[9]

    A.  **DEPARTMENT OF HOMELAND SECURITY:**

Source Agency Certification:

As the authorized representative of the source agency named above, I certify that: (1) the subject-matching program was conducted in compliance with the existing computer matching agreement between the parties; and (2) the subject-matching program will continue without any changes for an additional 12 months, subject to the approval of the respective Data Integrity Boards of the parties.

**U.S. Citizenship and Immigration Services:**

Digitally signed by ELIZABETH A PUCHEK
Date: 2022.03.15 11:09:12 -04'00'

_____

Elizabeth Puchek
Chief Data Officer
U.S. Citizenship and Immigration Services

Date:  March 15, 2022

Digitally signed by OPEYEMI B OSHINNAIYE
Date: 2022.03.16 15:56:01 -04'00'

_____

Opeyemi Oshinnaiye
Deputy Chief Information Officer
U.S. Citizenship and Immigration Services

Date_____

---

[9] **Electronic Signature Acknowledgement:**  The signatories may sign this document electronically by using an approved electronic signature process.  Each signatory electronically signing this document agrees that his/her electronic signature has the same legal validity and effect as his/her handwritten signature on the document, and that it has the same meaning as his/her handwritten signature.

CEDC Case 000044

**U.S. Immigration and Customs Enforcement:**

DANIEL A BIBLE

Digitally signed by
DANIEL A BIBLE
Date: 2022.03.14
14:15:18 -05'00'

Daniel Bible
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

Date_____

23

CEDC Case 000045

<u>Data Integrity Board Certification</u>

As Chair of the Data Integrity Board of the source agency named above, I certify that:  (1) the subject-matching program was conducted in compliance with the existing computer matching agreement between the parties; and (2) the subject-matching program will continue without any changes for an additional 12 months.

_____

Lynn Parker Dupree
Chief Privacy Officer
Department of Homeland Security
Data Integrity Board Chair

Date_____

24

CEDC Case 000046

**B.  SOCIAL SECURITY ADMINISTRATION SIGNATURES:**

Recipient Agency Certification:

As the authorized representative of the recipient agency named above, I certify that:  (1) the subject-matching program was conducted in compliance with the existing computer matching agreement between the parties; and (2) the subject-matching program will continue without any changes for an additional 12 months, subject to the approval of the respective Data Integrity Boards of the parties.

MARY ZIMMERMAN

Digitally signed by MARY ZIMMERMAN
Date: 2022.03.08
13:36:05 -05'00'

_____
Mary Ann Zimmerman
Deputy Executive Director
Office of Privacy and Disclosure
Office of the General Counsel

Date_____


Data Integrity Board Certification:

As Chair of the Data Integrity Board of the recipient agency named above, I certify that:  (1) the subject-matching program was conducted in compliance with the existing computer matching agreement between the parties; and (2) the subject-matching program will continue without any changes for an additional 12 months.

_____
Matthew D. Ramsey
Chair, Data Integrity Board
Social Security Administration

Date_____

25

CEDC Case 000047



CBA FY 2021 Final
Copy CMA 1010.docx

26

CEDC Case 000048

REIMBURSABLE AGREEMENT

BETWEEN

THE DEPARTMENT OF HOMELAND SECURITY (DHS)
U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS)

AND THE

SOCIAL SECURITY ADMINISTRATION (SSA)

REGARDING SSA SERVICES FOR E-VERIFY



(b) (6), (b) (7)(C), (b) (7)(F)

I.  PURPOSE:

This Agreement sets forth the terms and conditions governing the arrangement
between DHS' USCIS and the SSA (collectively, the "parties") for work that SSA
will perform on behalf of USCIS, in connection with the E-Verify, Self Check, and
Fraud Alert initiatives.  USCIS administers the E-Verify, Self Check, and Fraud Alert
programs with assistance from SSA.

Both the E-Verify and Self Check processes (see descriptions below) electronically
verify an individual's work eligibility by conducting verification checks of SSA and
USCIS-accessed databases.  When the verification check results in a mismatch
between the information submitted by an E-Verify participant and the information in
the SSA database, the individual must contact or visit an SSA office to resolve the
mismatch.

E-Verify's Fraud Alert tool assists with identifying cases where someone stole,
borrowed, or purchased identity documents to gain employment.  USCIS may now
lock SSNs in E-Verify that appear to have been used fraudulently.  When an
employer enters a Social Security Number (SSN) into E-Verify with a Fraud Alert
attached to it, E-Verify generates a mismatch and the individual must contact or visit
an SSA office to provide identity documents for review before USCIS will unlock the
number in E-Verify.

II.  BACKGROUND:

A. E-Verify:

The Immigration Reform and Control Act (IRCA) of 1986 requires employers to hire
only individuals who may legally work in the United States.  To strengthen the

employment verification process, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) established a pilot program called Basic Pilot (now called E-Verify) to electronically confirm employment eligibility for employers. Title IV of IIRIRA requires SSA to provide confirmation or non-confirmation that the identity and employment eligibility information an employee provides matches or does not match SSA's records. USCIS' E-Verify program allows participating employers to electronically confirm and verify the employment eligibility of their newly hired employees via an online system that checks SSA and USCIS-accessed databases. On September 8, 2009, the Federal Acquisition Regulation (FAR) final rule implemented amended Executive Order 12989, which expands the scope of E-Verify. This rule requires certain Federal contractors to use E-Verify to confirm the work eligibility of their newly hired employees and their existing employees. Originally, Congress only authorized E-Verify to operate for four years. Congress then extended E-Verify's authorization several times. On March 23, 2018, Pub. L. 115-141 provided appropriations and reauthorized the E-Verify program through September 30, 2018 and continuing.

SSA supports USCIS' E-Verify by matching data submitted through E-Verify to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications, System of Record Notice 60-0058, 87 Fed. Reg. 263 (January 4, 2022) ("Enumeration System"). Specifically, employers input information into E-Verify from the Form I-9, DHS' Employment Eligibility Verification Form, and USCIS sends the information to SSA to confirm or not confirm that the SSN, name, and date of birth match information in SSA records. SSA also provides USCIS an indication of United States citizenship, if available (United States citizens are inherently work authorized). For all non-citizens, if there is a match with SSA records, USCIS confirms the employee's current work authorization by checking USCIS-accessed databases. Additionally, USCIS will confirm certain U.S. citizens' identity and work authorization by verifying Form I-9, List A, information input by employers against DHS-accessed information.

After E-Verify checks the SSA and USCIS-accessed databases, USCIS sends a message to the employer in E-Verify indicating that the person is employment authorized or that there is a mismatch with SSA or USCIS data. A mismatch with SSA data is called a SSA Tentative Non-confirmation (TNC).

To resolve a SSA TNC, an employee must contact SSA or visit a Social Security field office (FO) or Social Security Card Center (SSCC) and bring documentary evidence to resolve the discrepancy and update the employee's name, date of birth, SSN, or citizenship status in the SSA's database.

FOs and SSCCs must access and record E-Verify case status in the Employment Verification SSA Tentative Non-confirmation Automation Response system (EV-STAR). EV-STAR is a subsystem of E-Verify that electronically communicates the status of the case to the employer via USCIS's Verification Information System (VIS). VIS is a component of the E-Verify system that translates information input by SSA staff and sends case status updates to the employers.

2

CEDC Case 000050

B.  Self Check:

In March 2011, USCIS launched Self-Check.  Self-Check, a service of E-Verify, allows workers to check their own employment eligibility status online before formally seeking employment.  Initially, Self-Check was limited to workers residing in certain states but expanded on February 9, 2012 to all 50 states, Washington, D.C., Guam, Puerto Rico, the U.S. Virgin Islands, and the Commonwealth of Northern Mariana Islands.  It is a free, Internet-based application that uses the same SSA and USCIS-accessed databases as E-Verify to check employment status.

SSA supports USCIS's Self-Check service by matching an individual's data entered into Self-Check against the information in SSA's Enumeration System.  If there is a mismatch and the individual contacts or visits an SSA office for resolution, FOs or SSCCs assist the individual with updating or correcting his or her data in SSA records.  Updating the Enumeration System record generally resolves the mismatch.

For E-Verify and Self-Check, in accordance with the Privacy Act, USCIS has established a systems of records entitled, "Department of Homeland Security/United States Citizenship and Immigration Services – SORN DHS/USCIS-011 E-Verify Program System of Records," 84 Fed. Reg. 28326 (June 18, 2019) and "Department of Homeland Security/ALL-037 E-Authentication Records System of Records," 79 Fed. Reg. 46857 (Aug. 11, 2014).

C.  Fraud Alert:

In November 2013, USCIS implemented Fraud Alert.  USCIS created Fraud Alert to identify suspected cases of identity fraud in which individuals stole, borrowed, or purchased genuine identity documents to fraudulently gain work authorization.  The USCIS' Fraud Alert program places a lock on SSNs in E-Verify and Self-Check that appear to be compromised.  A compromised case, for example, may be an SSN entered repeatedly by more than one employer over a short period of time.  USCIS developed system algorithms to assist with determining which cases receive a "lock." Prior to "locking" an SSN, USCIS analyzes the case for a final determination.  USCIS only locks cases suspected of fraud.

When an employer enters a locked SSN into E-Verify, the system generates an SSA TNC.  As with other E-Verify SSA TNC cases, the individual must contact or visit an SSA office with documentary evidence for resolution.  After analyzing the documents presented, SSA's FO staff must enter the case status into EV-STAR.  The Verification Information System (VIS) then sends the case to USCIS to unlock the SSN, if appropriate. E-Verify then provides a case status notification to the employer.

CEDC Case 000051

III.    <u>SCOPE OF WORK</u>:

The responsibilities of the parties to this Agreement are:

A.  <u>SSA's Responsibilities</u>:

1.  Under USCIS' E-Verify process, which includes Fraud Alert and Self-Check, SSA will provide electronic response codes to USCIS' E-Verify queries. These codes report which data elements sent to SSA by E-Verify (name, SSN, and date of birth) match data elements in the Enumeration System. The codes also report if there is a death or fraud indicator in the Enumeration System and the person's citizenship status, as recorded in the Enumeration System.

2.  As set forth in the Service Level Agreement (SLA) (Attachment A), SSA will provide responses to the E-Verify and Self-Check queries within five seconds or less.

3.  SSA will safeguard any personally identifiable information (PII) obtained from employers or employer agents through the E-Verify process, including Fraud Alert, and from individuals through Self-Check in accordance with the Privacy Act (5 U.S.C. § 552a), the Social Security Act (42 U.S.C. § 1306(a)), and SSA regulations (20 C.F.R. Part 401). SSA will limit access to this information to SSA employees involved in resolving E-Verify cases, USCIS employees who administer E-Verify, and individuals or entities authorized by the U.S. Government to evaluate E-Verify.

4.  SSA will direct callers with SSA TNCs to the appropriate SSA FO, SSSC, or other available avenues that are mutually acceptable to SSA and USCIS.

5.  SSA will review cases for employees referred to SSA for the purpose of resolving an E-Verify SSA TNC. SSA's review may include:

    a.  Verifying documentary evidence with the entity that issued the documentation;
    b.  Processing an application for an original or replacement SSN card;
    c.  Updating SSA's records, as appropriate;
    d.  Recording E-Verify case status in EV-STAR. (VIS interprets the case status selected and notifies the employer or employer agent that the case is either employment authorized, in pending status, or in final non-confirmation (FNC) status); and,
    e.  Completing the review within the ten-day time limit unless SSA determines that more time is needed.

6.  SSA will review cases for individuals who receive a mismatch result from the E-Verify Self-Check service. SSA's review may include:

    a.  Verifying documentary evidence with the entity that issued the documentation;
    b.  Processing an application for an original or replacement SSN card for the employee; and

4

CEDC Case 000052

    c.  Updating SSA's records, as appropriate.

7. SSA will review cases for employees who receive a mismatch result from an E-Verify Fraud Alert. SSA's review may include:

    a.  Obtaining and reviewing evidence of identity for authenticity, and as appropriate, verify the evidence with the entity that issued the documentation;

    b.  Updating SSA's records, as appropriate; and

    c.  Recording E-Verify case status in EV-STAR. (USCIS determines whether to unlock the SSN and E-Verify then notifies the employer or employer agent that the case status is employment authorized, in pending status, or in FNC status.)

8. SSA will comply with the provisions of the SLA.

9. SSA will provide USCIS with quarterly statements showing updated quarterly transaction charges, remaining funding, and an updated case fallout rate. The reports will be submitted to the USCIS Project Coordinator on or before the 15th day quarterly.

B. USCIS' Responsibilities:

1. USCIS will pay SSA in advance in the amounts and at the times designated in the "Funding" section (XII) of this Agreement.

2. USCIS will only submit verification requests to SSA for the purposes authorized by this Agreement.

3. USCIS will notify SSA of any pending or final changes in the statutory or regulatory requirements concerning E-Verify, Self-Check, and Fraud Alert.

4. USCIS will inform SSA when the E-Verify system or other related connectivity system has a scheduled outage or planned maintenance that may negatively affect service. USCIS will follow the process established for problem reporting in the attached SLA at Section 5c Service Scope – Continuity of Service – Problem Reporting.

5. After discovering a connectivity issue that may negatively affect E-Verify service, USCIS will follow the process established for problem reporting in the attached SLA at Section 5c Service Scope – Continuity of Service – Problem Reporting.

5

CEDC Case 000053

IV.    DESCRIPTION OF MATCHED RECORDS:

A. Systems of Records

SSA will disclose to USCIS data from Master Files of Social Security Number (SSN) Holders and SSN Applications (Enumeration System), 60-0058, last fully published and 87 Fed. Reg. 263 (January 4, 2022).

USCIS will maintain information provided by SSA in its system of records entitled, "Department of Homeland Security/United States Citizenship and Immigration Services – SORN DHS/USCIS-011 E-Verify Program System of Records."

The Systems of Records involved in this exchange have routine uses permitting the disclosures needed to conduct this exchange (at E-Verify Program System of Records Routine Use L).

B. Specified Data Elements

1. USCIS will provide SSA with the individual's name, including other names used as applicable, SSN, and date of birth.

2. SSA will provide USCIS a "match" or "no match" response and in the case of a "no match" response, the reason for the "no match."  SSA's responses are as follows:

| Code | Description |
|---|---|
| 1 | SSN is not contained on the Enumeration System or SSN is not assigned (failed High-Group Table check). |
| 2 | Name matches the Enumeration System record.  Date of birth does not match. |
| 3 | Date of birth matches the Enumeration System record.  Name does not match. |
| 4 | Neither name nor date of birth matches the Enumeration System record. |
| 5 | Both name and date of birth match the Enumeration System record. Death data exists. |
| 6 | Name and Date of birth match the Enumeration System record.  Death data does not exist.  Citizenship Code = B (with Evidence-Interview Code (IDN) $\neq$ H), C, D, E, or F. |
| 7 | Name and date of birth match the Enumeration System record.  Death data does not exist.  Citizenship Code = A, B (with IDN = H), or blank with Place of Birth Foreign Indicator = blank. |
| 8 | The system is not available at the time of inquiry (system failure). |
| 9 | SSN is contained in the Celebrity Block file. |
| A | Name and date of birth match the Enumeration System record.  Death data does not exist.  Citizenship Code = blank with a Place of Birth Foreign Indicator = *. |
| B | SSN Not Verified; Other Reason |

6

CEDC Case 000054

V.      RECORDS USAGE, DUPLICATION, AND REDISCLOSURE RESTRICTIONS:

For purposes of this Agreement, the parties acknowledge that information sent by USCIS to SSA for verification requests will be matched against existing SSA-accessed data holdings which may contain the same information. As such, the information provided about an individual within a verification request by USCIS to SSA will not be considered SSA-owned information. Information that identifies a verification request as being generated by USCIS or associated with a USCIS program will be protected as set forth in this Agreement and as required by law.

USCIS and SSA agree to the following limitations on the access to, and disclosure and use of information that identifies a verification request as being generated by USCIS or associated with an USCIS program:

1. Data or information that identifies a verification request as being generated by USCIS or associated with a USCIS program will remain information owned by USCIS.

2. USCIS will use the verification responses generated by SSA only for the purposes described in this Agreement.

3. Data or information that identifies a verification request as being generated by USCIS or associated with a USCIS program will be used only as provided in this Agreement by SSA.

4. Data or information that identifies a verification request as being generated by USCIS or associated with a USCIS program provided by SSA will not be duplicated or disseminated outside SSA without prior written approval from USCIS.  USCIS will not give such approval unless the redisclosure is required by law or is essential to the conduct of the exchange.  In such cases, SSA, the agency redisclosing the records, must specify in writing what records will be redisclosed, to whom they will be redisclosed, and the reasons that justify redisclosure.

5.  USCIS will not duplicate or disseminate the verification responses for a purpose not covered by this Agreement, within or outside of its agency, without the written permission of SSA, excepted as required by Federal law. SSA will not give such permission, unless Federal law requires disclosure or disclosure is essential to the purpose of this Agreement.  For such permission, USCIS must specify in writing what data it is requesting to duplicate or

7

CEDC Case 000055

disseminate and to whom, and the reasons that justifiy such duplication or dissemination.

6. All USCIS verification requests will be documented in a SSA electronic log. The retention period of this log is 2 years. The log is not accessible to the public, except as permitted by law.

7. USCIS and SSA recognizes that they may need to disclose information pursuant to an audit by appropriate government oversight authorities. In the event USCIS or SSA needs to disclose information that identifies a verification request or a verification response covered by this Agreement for purposes of appropriate government oversight, the audited agency shall endeavor to coordinate with source agency in writing in advance of such dissemination, to the extent practicable and consistent with applicable law and policy. USCIS and SSA will take steps to ensure that any disclosures taken in these circumstances are limited to information that is relevant and necessary for the identified purpose.

VI.    SECURITY PROCEDURES:

SSA and USCIS will comply with the Federal Information Security Management Act (FISMA), 44 U.S.C. § 3551 et seq., as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. 113-283); FIPS, Mandatory Security Processing Standards 199 & 200; related OMB circulars and memoranda, including revised Circular A-130, Management of Federal Information Resources (July 28, 2016); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations (FAR). These laws, regulations, and directives provide requirements for safeguarding Federal information systems and PII used in Federal agency business processes, as well as related reporting requirements.

FISMA requirements apply to all Federal contractors, organizations, or sources that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Each agency receiving information under this DSA is responsible for oversight and compliance of its contractors and agents with FISMA requirements.

A. Loss Reporting

If either SSA or USCIS experiences an incident involving the loss or breach of PII provided by SSA or USCIS under the terms of this agreement, they will follow the incident reporting guidelines issued by the OMB. In the event of a reportable incident under OMB guidance involving PII, the agency experiencing the incident is responsible for following its established procedures, including notification to the proper organizations (e.g., United States Computer Emergency Readiness Team, the agency's privacy office). In addition, the agency experiencing the incident (e.g., electronic or paper) will notify the other agency's Systems Security Contact named in this agreement. If USCIS is unable to speak with the SSA Systems Security Contact within one hour or if for some other reason notifying the SSA Systems Security Contact is not practicable (e.g., it is outside of the

8

CEDC Case 000056

normal business hours), USCIS will call SSA's National Network Service Center toll free at 1-877-697-4889. If SSA is unable to speak with USCIS's Systems Security Contact within one hour, SSA will contact Paul Stanard at (b) (6), (b) (7)(C), (b) (7)(F).

If SSA experiences or suspects that there is a loss or breach of USCIS information, it will notify: USCIS Security Operations Center (SOC) at (b) (6), (b) (7)(C), (b) (7)(F) or (b) (6), (b) (7)(C), (b) (7)(F) and the USCIS Office of Privacy (b) (6), (b) (7)(C), (b) (7)(F) within one hour of suspecting or confirming an incident.

B. Breach Notification

SSA and USCIS will follow PII breach notification policies and related procedures issued by OMB. If the agency that experienced the breach determines that the risk of harm requires notification to affected individuals or other remedies, that agency will carry out these remedies without cost to the other agency.

C. Administrative Safeguards

SSA and USCIS will restrict access to the data matched and to any data created by the match to only those users, e.g., employees, contractors, etc., who need it to perform their official duties in connection with the uses of the data authorized in this agreement. Further, SSA and USCIS will advise all personnel who have access to the data matched and to any data created by the match of the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

Parties, including all personnel with access to the information, will be appropriately educated and trained regarding the proper handling of PII and proper care of the information systems to ensure the overall safeguarding and security of the information. SSA and USCIS will ensure that its employees, including contractors with the access to any of the information, have completed privacy training on the handling of PII which includes information on applicable laws, regulations, and policies related to information privacy and security.

D. Physical Safeguards

SSA and USCIS will store the data matched and any data created by the match in an area that is physically and technologically secure from access by unauthorized persons during duty hours as well as non-duty hours or when not in use (e.g., door locks, card keys, biometric identifiers, etc.). Only authorized personnel will transport the data matched and any data created by the match. SSA and USCIS will establish appropriate safeguards for such data, as determined by a risk-based assessment of the circumstances involved.

E. Technical Safeguards

9

CEDC Case 000057

SSA and USCIS will process the data matched and any data created by the match under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means. Systems personnel must enter personal identification numbers when accessing data on the agencies' systems. SSA and USCIS will strictly limit authorization to those electronic data areas necessary for the authorized analyst to perform his or her official duties.

F.  Application of Policy and Procedures

SSA and USCIS will adopt policies and procedures to ensure that each agency uses the information contained in their respective records or obtained from each other solely as provided in this agreement. SSA and USCIS will comply with these guidelines and any subsequent revisions.

G.  Onsite Inspection

NIST Special Publication 800-37, Revision 1, encourages agencies to accept each other's security assessments in order to reuse information system resources and/or to accept each other's assessed security posture in order to share information. NIST 800-37 further encourages that this type of reciprocity is best achieved when agencies are transparent and make available sufficient evidence regarding the security state of an information system so that an authorizing official from another organization can use that evidence to make credible, risk-based decisions regarding the operation and use of that system or the information it processes, stores, or transmits. Consistent with that guidance, the parties agree to make available to each other upon request system security evidence for the purpose of making risk-based decisions. Requests for this information may be made by either party at any time throughout the duration or any extension of this agreement.

VII.  PROCEDURES FOR RETENTION AND TIMELY DESTRUCTION:

A  USCIS will destroy the response file generated through this data exchange as soon as the information has served the matching program purpose and all legal retention requirements established in conjunction with the National Archives and Records Administration under applicable procedures have been met. In case of such retention for evidentiary purposes, USCIS will retire the retained data in accordance with the applicable Federal Records Retention Schedule (44 U.S.C. § 3303a).

B.  The information provided by USCIS is not used by SSA for any purpose other than data exchange. USCIS's electronic request files are a transitory nature, or 'transitory records', specifically 'intermediate input files' as defined in General Records Schedule 5.2, Item 010. SSA will protect transitory records in the same manner that it protects SSA records. The Input/Tickler file will be destroyed when no longer needed for business use.

10

CEDC Case 000058

VIII.   ACCURACY ASSESSMENTS:

The SSA Enumeration System used for SSN matching is 96.5 percent accurate based on SSA's Office of Quality Review "FY 2022 Enumeration Accuracy Report (March, 2023)."

SSA is not the custodian of citizenship information and derives its citizenship information from the initial application of the individual. Some individuals applying for SSNs report their citizenship status at the time they apply for their SSNs. However, there is no obligation for the SSN number holder to report a subsequent change in status to SSA unless that number holder files a claim for benefits or requests a replacement SSN card. Therefore, as part of E-Verify, USCIS will automatically check its naturalization data for individuals whose SSA record does not indicate U.S. citizenship. For all non-citizens, if there is a match with SSA records, USCIS confirms the employee's current work authorization by checking USCIS- accessed databases. Additionally, USCIS will confirm certain U.S. citizen's current work authorization by verifying Form I-9, List A information input by employers against DHS-accessed information.

IX.   DURATION OF AGREEMENT:

The base period of performance of this Agreement is October 1, 2023 through September 30, 2024 (FY 2024). The parties may renew this Agreement for four successive one year periods (option years) that coincide with the federal fiscal year. If the parties agree to renew this Agreement for additional option years, they will execute a FS Form 7600B manifesting said Agreement on or before the start of each option year assuming there is a 7600A in place. The terms and conditions set forth in this Agreement will remain in effect during the option years unless those terms and conditions are modified by the FS Form 7600B or by other written modification signed by the parties.

X.   MODIFICATION AND TERMINATION:

Modifications to this Agreement must be in writing and agreed to by the parties, except for updating the following sections of Attachment A entitled, "Service Level Agreement."
- Section 4 (Scheduled Outages) - outage dates (determined by SSA).
- Section 5.c (Continuity of Service – Problem Reporting) - telephone numbers and email address.
- Section 6.f (Service Performance Reporting) - email address.

This Agreement may be terminated by either party upon 30 days advance written notice. If USCIS cancels the order, SSA is authorized to collect costs incurred prior to cancellation of the order plus any termination costs.

If legislation is enacted that affects E-Verify, Self-Check, or Fraud Alert program functions or provides for new functionality, the parties agree to modify this Agreement as appropriate to cover, in advance, SSA's full costs associated with any

11

new provisions, and to adjust and remit to USCIS any excess funding paid by USCIS for services no longer needed under new legislation.  Under no circumstances can USCIS use funds not appropriated as E-Verify funds to fund this agreement, nor can SSA use SSA's Limitation on Administrative Expenses fund or Social Security trust funds be used to support E-Verify.

12

CEDC Case 000060

XI.    CONTACTS:

| SSA Project Officer: | USCIS Project Coordinators: |
|---|---|
| Rona Demb<br>Office of Data Exchange, Policy Publications, and International Negotiations<br>Office of Retirement and Disability Policy<br>Social Security Administration<br>6401 Security Blvd.<br>4-B-7-D Annex Building<br>Baltimore, MD 21235<br>Phone: (410) 965-7567<br>Email:  Rona.Demb@ssa.gov | (b) (6), (b) (7)(C), (b) (7)(F)<br>Project Coordinator<br>U.S. Citizenship and Immigration Services<br>Department of Homeland Security<br>5900 Capital Gateway Drive, Mail Stop 2600<br>Camp Springs, MD  20588-0009<br>Phone: (b) (6), (b) (7)(C), (b) (7)(F)<br>Email: (b) (6), (b) (7)(C), (b) (7)(F) |
| **SSA Billing Contact:** | **USCIS Billing Contact:** |
| (b) (6), (b) (7)(C)<br>Office of Financial Policy and Operations<br>Office of Budget, Finance, Quality and Management<br>Social Security Administration<br>P.O. Box 17042<br>Baltimore, MD 21235<br>Phone: (b) (6), (b) (7)(C)<br>Email: (b) (6), (b) (7)(C) | (b) (6), (b) (7)(C), (b) (7)(F)<br>MPA-Accountant<br>U.S. Citizenship and Immigration Services<br>Department of Homeland Security<br>100 Interstate Corporate CTR<br>Williston, VT  05495<br>Phone: (b) (6), (b) (7)(C), (b) (7)(F)<br>Email: (b) (6), (b) (7)(C), (b) (7)(F) |

| SSA Contracting Officer / Signing Authority for new Reimbursable Agreements | USCIS Signing Authority |
|---|---|
| Chad Poist<br>Deputy Commissioner for Budget, Finance, and Management<br>Social Security Administration<br>939 Altmeyer Building<br>6401 Security Blvd.<br>Baltimore, MD 21235<br>Phone: (b) (6), (b) (7)(C)<br>(b) (6), (b) (7)(C) | (b) (6), (b) (7)(C), (b) (7)(F)<br>U.S. Citizenship and Immigration Services<br>Department of Homeland Security<br>Associate Chief, Operations Management<br>5900 Capital Gateway Drive, Mail Stop 2600<br>Camp Springs, MD  20588-0009<br>Phone: (b) (6), (b) (7)(C), (b) (7)(F)<br>(b) (6), (b) (7)(C), (b) (7)(F)<br><br>(b) (6), (b) (7)(C), (b) (7)(F)<br>U.S. Citizenship and Immigration Services<br>Department of Homeland Security<br>Deputy Chief, Budget and Planning Division<br>5900 Capital Gateway Drive, Mail Stop 2600<br>Camp Springs, MD  20588-0009<br>Phone: (b) (6), (b) (7)(C), (b) (7)(F)<br>Email: (b) (6), (b) (7)(C), (b) (7)(F) |

13

CEDC Case 000061

XII.    <u>FUNDING</u>:

This Agreement does not authorize SSA to incur obligations through the performance of the services described herein.  Performance of such services is authorized only by execution of Fiscal Service (FS) Forms 7600A and 7600B.  Moreover, SSA may incur obligations by performing services under a reimbursable agreement only on a fiscal year basis.  Accordingly, attached to, and made a part of this Agreement, is an executed FS Forms 7600A and 7600B that provides the authorization for SSA to perform services under this Agreement in FY 2024.  USCIS agrees to provide funding in advance of SSA performing any work under this Agreement or otherwise incurring any costs for E-Verify systems and operation.  The parties must sign modified FS Form 7600A and FS Form 7600B if actual costs exceed the estimated cost.  SSA's ability to perform work for fiscal years beyond FY 2024 is subject to the availability of funds.

A.  <u>Tasks Covered by Funding</u>

This Agreement is for direct and indirect E-Verify, Self Check, and Fraud Alert transaction costs incurred by SSA for FY 2024.  The Systems costs include support staff time, hardware, and software expenditures.  Operations costs include field office and National 800 Number staffs time used to assist visitors or callers with E-Verify issues.  The following workloads comprise the costs that will be incurred by SSA in performing E-Verify services on behalf of USCIS for FY 2024:

1. **SSA FO and SSCC Workloads**
Employers refer their employees who receive an E-Verify SSA TNC to SSA FOs and SSCCs for resolution.  These offices assist the employees with resolving their TNCs.  Specific functions for this workload are listed in Section III.A paragraphs 5 and 7 above.

Self Check users who entered data that did not match SSA's information are advised by Self Check to contact or visit an SSA office to resolve the mismatch.  Specific functions for this workload are listed in Section III.A paragraph 6 above.

2. **Regular National 800 Number Calls**
Employees with an SSA TNC may contact SSA's National 800 Number for information.  When this happens, the SSA National 800 representative will advise the caller to contact or visit an SSA FO or SSCC to resolve the discrepancy.  The National 800 representative will provide the office address and hours of operation as well as instruct callers to bring the E-Verify SSA notice and the appropriate documents (e.g., birth certificate, marriage certificate, citizenship papers) with them to the SSA office.

3. **SSA Systems**
SSA Systems components provide and maintain both hardware and software to receive E-Verify queries electronically, compare the query data against the Enumeration System data, and return results to USCIS in real time.  The funding from USCIS covers SSA's Office of Systems' personnel time and machine costs for E-Verify as well as Self Check and Fraud Alert maintenance and support,

CEDC Case 000062

including any such costs SSA incurs for any update or change to SSA Systems necessary to support E-Verify.

If USCIS requests SSA to perform services in excess of the fiscal year estimate and SSA agrees to do so, USCIS and SSA will enter into a modification to reflect the additional work and reimbursement before any additional work is performed. Under no circumstances shall SSA's Limitation of Administrative Expenses fund or Social Security trust funds bear the cost of supporting E-Verify.

B. Payment Method

SSA will bill and collect reimbursements for usage through Treasury's G-Invoicing system which will generate an Intra Governmental Payment and Collection (IPAC) on a quarterly basis, sufficient to reimburse SSA for the costs it has incurred for performing services through the date of billing. SSA will provide documentation supporting all charges to USCIS's POC as shown on the 7600B. The SSA High Level Identifier, the Agency Locator Codes, appropriate accounting code(s), and associated dollar amounts will be referenced on all IPAC transactions. SSAwill bill USCIS on an advanced quarterly basis. Additionally, upon completion of each fiscal quarter, SSA shall provide USCIS with a billing statement that details transaction costs incurred and work performed, including the costs shown by electronic and manual query responses during the preceding quarter. The parties will reconcile balances related to revenue and expenses for work performed under this Agreement upon the completion of each fiscal quarter based on funding and transaction costs. SSA will coordinate with USCIS regarding funds usage and make every effort to return any excess funds, based on usage and projections, at the end of the fiscal year.

A copy of the SSA's billing statement and all original supporting documentation will attached to the performance transaction in G-Invoicing.

The USCIS' mailing address for these documents is:

> Department of Homeland Security
> U.S. Citizenship and Immigration Services
> Attention:
> 5900 Capital Gateway Drive, Mail Stop 2600
> Camp Springs, MD 20588-0009

USCIS's accounting system shall record advance payments as an asset, then liquidate the asset and record an expense upon receiving notice of performance or billings, as required by the Agreement.

SSA's accounting system will record advance payments as a liability, then liquidate the liability and record revenue, as progress is made by SSA in the performance of the services set forth in this Agreement.

15

CEDC Case 000063

C.  Lapse In Funding/Appropriations

The Antideficiency Act, 31 U.S.C. § 1341, prohibits agencies from incurring obligations that are in advance of, or that exceed, an appropriation. In the event funding for the E-Verify program no longer exists by virtue of a lapse in appropriations, USCIS will no longer make payments to the SSA for services rendered after the date the lapse in funding began.

XIII.  AUTHORITY:

The authority for SSA to provide the services described herein is 31 U.S.C. § 1535, the Economy Act; the Privacy Act of 1974, 5 U.S.C. § 552a(b)(3) and (d); 8 U.S.C. § 1324a(d)(4); Title IV of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended; the Social Security Act, 42 U.S.C. § 1306; and Social Security regulations, 20 C.F.R. §§ 401.35, 401.65, 401.150.

XIV.  DISCLAIMERS:

SSA is not liable for any damages or loss resulting from errors in information provided to USCIS under this Agreement.  Furthermore, SSA is not liable for damages or loss resulting from the destruction of any materials or data provided by USCIS.  All information furnished to USCIS will be subject to the limitations and qualifications, if any, transmitted with such information.  If, because of any such error, loss, or destruction attributable to SSA, the services must be re-performed by SSA, the additional cost thereof will be treated as a part of the full costs incurred in compiling and furnishing such information and will be paid by USCIS.

USCIS is not liable for any damages or loss resulting from errors in SSA information provided to USCIS under this Agreement. All information furnished to SSA will be subject to the limitations and qualifications, if any, transmitted with such information. If, because of any such error, loss, or destruction attributable to SSA, the services must be re-performed by SSA, the additional cost thereof will not be treated as a part of the full costs incurred in compiling and furnishing such information and will not be paid by USCIS.

The performance or delivery by SSA of the goods and/or services described herein and the timeliness of said delivery are authorized only to the extent that they are consistent with proper performance of the official duties and obligations of SSA.  If for any reason SSA delays or fails to provide services, or discontinues the services or any part thereof, SSA is not liable for any damages or loss resulting from such delay or for any such failure or discontinuance.

The performance or delivery by USCIS of the goods and/or services described herein and the timeliness of said delivery are authorized only to the extent that they are consistent with proper performance of the official duties and obligations of USCIS.  If for any reason USCIS delays or fails to provide services, or discontinues the services or any part thereof, USCIS is not liable for any damages or loss resulting from such delay or for any such failure or discontinuance.

CEDC Case 000064

XV.    <u>INTEGRATION</u>:

This Agreement, the accompanying FS Forms 7600A and 7600B, and the SLA constitute the entire Agreement of the parties with respect to its subject matter and supersede all other agreements between the parties regarding its subject matter. There have been no representations, warranties, or promises made outside of this Agreement.  This Agreement shall take precedence over any other documents that may be in conflict with it.

XVI.    <u>RESOLUTION MECHANISM</u>:

Disagreements on the interpretation of the provisions of this MOA that cannot be resolved between USCIS and the SSA point of contact should be provided in writing to the authorized officials at both agencies for resolution.  If settlement cannot be reached at this level, the disagreement will be elevated to the next level in accordance with DHS-USCIS procedures for final resolution.

Disputes related to funding and payment under this Agreement shall be resolved in accordance with instructions provided in the Treasury Financial Manual (TFM) Volume I, Part 2, Chapter 4700, Appendix 5, *Intragovernmental Transaction Guide.*

CEDC Case 000065

XVII.  AUTHORIZING SIGNATURES AND DATES:

The signatories below warrant and represent that they have the competent authority on behalf of their respective agencies to enter into the obligations set forth in this Agreement.

**Electronic Signature Acknowledgement:**  The signatories may sign this document electronically by using an approved electronic signature process.  By signing this document electronically, the signatory agrees that the signature they provide has the same meaning and legal validity and effect as a handwritten signature.

SOCIAL SECURITY ADMINISTRATION

**Chad Poist** Date: 2023.09.06 16:54:21
Digitally signed by Chad Poist
-04'00'

Chad Poist
Deputy Commissioner of Budget,
Finance,and Management
Social Security Administration

Date: _____

DEPARTMENT of HOMELAND SECURITY
U.S. Citizenship and Immigration Services

(b) (6), (b) (7)(C), (b) (7)(F)

Associate Chief, Business Operations
U.S. Citizenship and Immigration Services

Date: _____

(b) (6), (b) (7)(C), (b) (7)(F)

Budget Officer, Budget and Planning Division
Office of the Chief Financial Officer
U.S. Citizenship and Immigration Services

Date: _____

18

CEDC Case 000066

**Attachment A**
**Service Level Agreement**

## 1. Purpose of Agreement

The purpose of this Service Level Agreement (SLA) between the Social Security Administration (SSA) and the Department of Homeland Security (DHS) is to outline the expected level of service, including system availability, hours of operation, performance, and reporting, SSA will provide to the Verification Division of the U.S. Citizenship & Immigration Services (USCIS), an agency of DHS, for the Employment Eligibility Verification (E-Verify) program via Verification Information System (VIS) under the Reimbursable Agreement between SSA and DHS.  The E-Verify program also includes Self Check and Fraud Alert.

## 2. Service Provided

SSA will provide Social Security Number (SSN) verification services for USCIS' E-Verify program by comparing USCIS' E-Verify data with SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications ("Enumeration System"), System of Record Notice 60-0058, last fully published and 87 Fed. Reg. 263 (January 4, 2022).

## 3. Service Availability Schedule

Except for the scheduled outages specified in Section 4 (Scheduled Outages) below, SSA will provide SSN verification services to DHS during the following hours of operation:
- Monday through Friday:  5:00 a.m. – 1:00 a.m. Eastern Time
- Saturday:  5:00 a.m. – 11:00 p.m. Eastern Time
- Sunday:  8:00 a.m. – 11:30 p.m. Eastern Time
- Federal Holidays:  Same availability hours as Monday – Sunday for the day on which the Holiday occurs.

Performance Standard:  No deviation from above availability
Quality level:  99.5% of time

## 4. Scheduled Outages

SSA provides our highest level of availability for E-Verify utilizing two data centers, automation, and procedures to avoid any disruption.  There are two annual events that affect availability for up to four hours each:

- March, Second Sunday (Begin Daylight Savings Time) – 12:01am – 4:00am
- November, First Sunday (End DST) – 12:01am – 4:00am

SSA will announce any non-emergency maintenance activities affecting availability, at least one week in advance.  SSA will notify all business partners of emergency maintenance events as soon as possible. Changes to these scheduled outages or any future scheduled outages do not require modification of, or amendment to, this SLA.

19

When SSA's Office of Systems Operations (OSO), Division of National Network Services & Operations (DNNSO) publishes their scheduled outages each year, SSA will send a copy of the outage dates via email to USCIS at (b) (6), (b) (7)(C), (b) (7)(F) .

## 5. Service Scope

### a. Average Response Time to VIS Queries

SSA will operate and maintain the Enumeration System to ensure system response time to end users.

Performance Standard #1: SSA will provide responses to the SSN verification requests (E-Verify queries) received from DHS/USCIS within two seconds or less.
Quality level #1: 99.5% of time

Performance Standard #2: SSA will provide response to the SSN verification requests (E-Verify queries) received from DHS/USCIS within five seconds or less.
Quality level #2: 99.9% of time

### b. Transaction Volume Fulfillment

SSA will operate and maintain the Enumeration System to ensure response time to VIS queries meets the standards defined within this SLA.

Performance Standard: SSA will ensure that up to 60 million transactions per year can be processed within the average response time.
Quality level: 99.9% of the time

### c. Continuity of Service – Problem Reporting

In the event of a DHS problem or outage, DHS will contact SSA by telephone as noted below.
1. First Call – Network Operations Center: 877-697-4978
If there is no response,
2. Second Call – CICS Monitoring Room: (b) (6), (b) (7)(C)
3. An SSA email distribution list for alerts and reactive reports is also provided for additional communications: (b) (6), (b) (7)(C)

Similarly, SSA will report any problems, unscheduled outages, or observed security breaches to USCIS in the following ways:
1. First Call – DHS OneNET Support (Helpdesk): (b) (6), (b) (7)(C), (b) (7)(F)
2. Second Call – Operations Manager, (b) (6), (b) (7)(C), (b) (7)(F)
3. Outage Notification Email list: (b) (6), (b) (7)(C), (b) (7)(F) and (b) (6), (b) (7) .

SSA and its components will adhere to the following definitions, terminology, and response times in responding to reported problems or outages:

#### Sev1
Sev1 is the highest possible priority as these tickets address sites with a critical problem(s) affecting 50% or more of the office's operations or an issue affecting

20

multiple offices, an entire region, or the entire nation and there is no alternative method for performing the inoperative function (e.g., widespread, region-wide, and national network problems, single site outages, exchange issues causing loss of communications, 3270 sessions are inoperative, email is inoperative, server is down or malfunctioning, ring or segment service failure, degraded performance, mass equipment loss and/or critical applications).  When SSA monitoring tools or probes detect a system event specific to E-Verify that causes greater than 50% query failures, SSA will notify the customer within 15 minutes of the discovery via the #VISNotice distribution list.  Notifications for catastrophic system events affecting multiple applications and services including E-Verify will be distributed to #VISNotice within 30 minutes of the discovery.

1. Respond to customer within 30 minutes from receipt of the problem ticket
2. Update customer/ticket every two hours from receipt of the problem ticket
3. Inform customer of the problem resolution within 30 minutes from the time of resolution

Sev1 issues require immediate corrective actions and are reported to all management in specialized reporting.  This report is a key function in ensuring that the critical problems are being addressed by the proper personnel and in a timely manner.  These reports are created directly from the documentation information within the SSA CAPRS tickets.

**Priority 1**
Priority 1 is the second highest possible priority ticket.  The difference between Priority 1 and Sev1 is the percentage of an office's affected staff.   In Priority 1, the critical problem(s) affects less than 50% of the office's operations or E-Verify queries.
1. Respond back to customer within one hour from receipt of the problem ticket
2. Update customer/ticket every four hours from receipt of the problem ticket
3. Inform customer of the problem resolution within one hour from the time of resolution

**Priority 2**
Priority 2 is a problem affecting multiple users where there is an alternative method of performing the inoperative function.  Performance using the alternate method is degraded compared to the inoperative method.  Operations are still significantly affected.
1. Respond back to customer within 24 hours from receipt of the problem ticket
2. Update customer/ticket every 24 hours from receipt of the problem ticket
3. Inform customer of the problem resolution within 24 hours from the time of resolution

**Priority 3**
Priority 3 is a shared device that is inoperable or when multiple users are unable to perform a function, but an alternative method of performing the same function is available.  Operations are not significantly affected.
1. Respond back to customer within 24 hours from receipt of the problem ticket
2. Update customer/ticket every 24 hours from receipt of the problem ticket

21

CEDC Case 000069

3. Inform customer of the problem resolution within 24 hours from the time of resolution

**Priority 4**

Priority 4 is an inoperable device affecting one user or when a single user is unable to perform a function.

1. Respond back to customer within 24 hours from receipt of the problem ticket
2. Update customer/ticket every 24 hours from receipt of the problem ticket
3. Inform customer of the problem resolution within 24 hours from the time of resolution

Where communication and documentation in accordance with business impact and priority listed above are not practical or not in the customer's best interests, the ticket-owning component will contact the customer and negotiate an appropriate time and method for the next update or contact. The results will be documented in text and the target date field.

6. **Service Monitoring, Tracking, and Reporting**

    a. **Service Availability Defined**

    The SSN verification services under this SLA are considered "available" when the end users can successfully execute or perform the service. SSA will keep the system fully operational according to the Service Availability Schedule specified in Section 3 above.

    b. **Service Performance Measurement Points Defined**

    SSA's performance of the SSN verification services under this SLA will be measured from the time when the incoming DHS request for SSN verification is logged into SSA's UNI log file. The transaction will be considered completed when SSA's outbound response is logged into SSA's UNI log file.

    c. **Service Performance Exclusions**

    Transaction performance in or through the Internet cloud, as well as within the DHS network, is not within the scope of this SLA.

    d. **Service Performance Dependencies and Responsibilities**

    SSA's measurement of service performance depends on the communications and network links between DHS and SSA. DHS is responsible for establishing, monitoring, and maintaining the operational integrity and status of the Verizon circuit. This responsibility includes ensuring that the link has sufficient capacity to support the expected number of transactions within the limits of SSA's performance requirements.

    e. **Service Performance Monitoring**

    SSA will use the Tivoli NPM monitoring tools for Network, Host Transit for non-CICS, and Host Transit for CICS (110SMF records). SSA will use the UNI UTB028 report to monitor, track, and report service response performance. SSA will use HP's Real User Monitor (RUM) probe to monitor the transactions sent to SSA through the E-Verify

CEDC Case 000070

application. SSA will provide validation for the amount of time spent for the E-Verify transaction from the time the transaction enters into SSANET until it leaves SSANET. The RUM probe will provide SSA with near real time reporting on the defined transactions. It will provide alerts to SSA's Division of National Network Services Operations (DNNSO) when the specified time frames are exceeded. Depending on the level of severity determined by DNNSO, SSA will implement the appropriate problem escalation procedure in Section 5.c. above.

### f.  Service Performance Reporting

On a monthly basis, SSA will provide a Systems' Service Performance Report to DHS via email to **(b) (6), (b) (7)(C), (b) (7)(F)** . This Systems' Service Performance Report will include the following data: Service Availability, Service Response Time, and Transaction Volume.

## 7.  Stakeholders

| Stakeholder | Title/Role | Contact Information |
|---|---|---|
| **DHS USCIS** | | |
| (b) (6), (b) (7)(C), (b) (7)(F) | Chief Verification Division U.S. Citizenship and Immigration Services Department of Homeland Security | (b) (6), (b) (7)(C), (b) (7)(F) 5900 Capital Gateway Drive Mailstop 2600 Camp Springs, MD 20588-0009 (b) (6), (b) (7)(C), (b) (7)(F) (office) |
| (b) (6), (b) (7)(C), (b) (7)(F) | Associate Chief Operations Management, Verification Division U.S. Citizenship and Immigration Services Department of Homeland Security | (b) (6), (b) (7)(C), (b) (7)(F) 5900 5900 Capital Gateway Drive Mailstop 2600 Camp Springs, MD 20588-0009 (b) (6), (b) (7)(C), (b) (7)(F) |
| **SSA** | | |
| Monica Nolan | Director Office of Earnings, Enumeration, and Medicare Policy Office of Income Security Programs Office of Retirement and Disability Policy Social Security Administration | Monica Nolan@ssa.gov 6401 Security Blvd. Mail Location: Robert M. Ball Building  2410 Baltimore, MD 21235 (410) 965-2075 (office) |

CEDC Case 000071

| Stakeholder | Title/Role | Contact Information |
|---|---|---|
| Sandra Fry | Enumeration andEvidence Team Lead<br>Office of Earnings, Enumeration, and Medicare Policy<br>Office of Income Security Programs<br>Office of Retirement and Disability Policy<br>Social Security Administration | (b) (6), (b) (7)(C)<br>6401 Security Blvd.<br>2-O-19-B Robert M. Ball Bldg.<br>Baltimore, MD 21235<br>(b) (6), (b) (7)(C) (office) |
| Derek Simms | Director<br>Division of Data Exchange<br>Social Security Administration | (b) (6), (b) (7)(C)<br>6401 Security Blvd.<br>Robert.M. Ball BldgBaltimore, MD 21235<br>(b) (6), (b) (7)(C) (office) |
| Angil Escobar | Branch Chief<br>Data Exchange and Verification Branch<br>Social Security Administration<br>Analyis Branch | Angil.Escobar@ssa.gov<br>6401 Security Blvd.<br>Robert M. Ball Building 3-D-1-C<br>Baltimore, MD 21235<br>(410) 965-7213 (office) |
| Rona Demb | Federal Liaison<br>Federal Agreements Branch<br>Office of Data Exchange, Policy Publications, and International Negotiations<br>Office of Retirement and Disability Policy<br>Social Security Administration | Rona.Demb@ssa.gov<br>6401 Security Blvd.<br>4-B-9-F Annex<br>Baltimore, MD 21235<br>(410) 965-7567 (office) |

24

CEDC Case 000072

<u>**MEMORANDUM OF AGREEMENT**</u>

**BETWEEN THE DEPARTMENT OF HOMELAND SECURITY,
U.S. CITIZENSHIP AND IMMIGRATION SERVICES
AND
THE SOCIAL SECURITY ADMINISTRATION**

## I.  PARTIES.

The parties to this Systematic Alien Verification for Entitlements (SAVE) Memorandum of Agreement (MOA) are the Department of Homeland Security, U.S. Citizenship and Immigration Services (DHS-USCIS), and the Social Security Administration (User Agency).

## II.  AUTHORITY.

The authorities governing this MOA include, but are not limited to, the following:

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, as amended.

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended.

Privacy Act, 5 U.S.C. § 552a, as amended.

The Economy Act, 31 U.S.C. § 1535, as amended.

The Social Security Act, 42 U.S.C. § 1306.

Based on a determination and findings, and in accordance with the authority of the Economy Act (31 U.S.C. § 1535), as implemented in subpart 17.5 of the Federal Acquisition Regulation, the User Agency certifies that it is entering into this MOA with DHS-USCIS because (1) the services provided under this MOA cannot be obtained as conveniently or economically by contracting directly with a private source, and (2) that this MOA is in the best interest of the Government.

1

CEDC Case 000073

**III.  PURPOSE.**

The purpose of this MOA is to establish the terms and conditions for the User Agency's participation in SAVE to verify the citizenship and immigration status information of non-citizen and naturalized or derived U.S. citizen applicants (applicant); for Original or Replacement Social Security number (SSN) cards, Social Security benefits, Supplemental Security Income (SSI) benefits, Special Age 72 benefits, and Hospital Insurance/Supplemental Medical Insurance (HI/SMI) for the uninsured (benefit).  SAVE will provide information to the User Agency by:

1) Initial response (initial verification) to an on-line inquiry by the User Agency; and

2) Additional verification procedures where applicable; or

3) A response to a properly submitted manual additional verification request with scanned documents and other electronically submitted information, as indicated in IV.B(1)(c).

The verifications are referred to collectively herein as "verification requests."

"Citizenship and immigration status information" includes, as applicable, the data layout detailed in the Interface Control Agreement (ICA) between SAVE and User Agencies and addenda, including but not limited to Affidavit of Support-related (Form I-864/I-864EZ and I-864A) sponsorship information.  The ICA, which is available as Appendix A to this MOA, may be updated and amended by the parties independent of the terms of this MOA. The data layout in the SAVE web browser interface is reflected in the ICA, with changes to the SAVE web browser sometimes occurring in advance of the corresponding ICA.

**IV.  RESPONSIBILITIES.**

**A.  DHS-USCIS agrees to:**

(1) Provide to the User Agency, in a manner determined by DHS-USCIS, naturalized or derived citizenship and immigration status information verification system under SAVE;

(2) Respond to properly submitted verification requests from the User Agency by providing the limited information noted in the **PURPOSE** section above;

(3) Process and respond to properly submitted additional verification requests from the User Agency.  Response time to additional verification requests may vary depending upon DHS-USCIS workload, available resources, and the applicant's specific circumstances;

(4) Provide to the User Agency operating instructions necessary for the User Agency to designate Users within the agency;

CEDC Case 000074

(5) Provide to the User Agency SAVE point of contact information for questions or problems regarding the User Agency's participation in SAVE;

(6) Provide access to training and information regarding the laws, policies, and procedures that govern verifying, safeguarding, using, maintaining, and disclosing certain citizenship and immigration status information, and alien sponsor information;

(7) Recover no more than its actual costs.  The total estimated cost of the agreement is specified on the attached USCIS Anticipated Collections from Federal Sources Addendum. The User Agency certifies that it has obligated at least the amount specified on the USCIS Anticipated Collections from Federal Sources Addendum to pay for its SAVE usage. DHS-USCIS will not provide services that would result in the amount paid plus the amount owed for unpaid usage exceeding the amount specified on the USCIS Anticipated Collections from Federal Sources Addendum.  In this instance, DHS-USCIS will be excused from further performance of the work unless and until the User Agency's authorized official increases estimated total cost of this MOA by modification pursuant to Section VIII;

(8) Bill and collect reimbursements for SAVE usage through the Intra-governmental Payment and Collection (IPAC) system.  DHS-USCIS will provide documentation supporting all charges to the User Agency's IPAC POC as shown on the USCIS Anticipated Collections from Federal Sources Addendum.  The SAVE High Level Identifier, the Agency Locator Codes, appropriate accounting code(s), and associated dollar amounts will be referenced on all IPAC transactions;

(9) Not assess the User Agency for any prompt payment interest; and

(10) Promptly initiate year-end and closeout adjustments once final costs are known.

**B.  User Agency agrees to:**

(1)  <u>System Use</u>.

(a) Establish the identity of the applicants and require each applicant to present the applicant's immigration or naturalization documentation that contains the information (e.g., alien registration number/USCIS number) required by SAVE;

(b) Physically examine the documentation presented by the applicant and determine whether the document(s) reasonably appear(s) to be genuine and relates to the individual;

(c) Provide the information SAVE requires to respond to User Agency requests for verification of immigration or naturalized or derived citizenship status information, and alien sponsor information, including (1) information from the applicant's immigration or naturalization documentation for initial automated verification, (2) additional information obtained from the alien's immigration or naturalization documentation for automated additional verification, and (3) scanned documents and other electronically submitted

3

CEDC Case 000075

information required for manual additional verification. User agency consents to electronic-only submission of all verification requests and additional information, including information submitted for SAVE additional manual verification (formerly submitted on paper Form G-845 and G-845 Supplement). SAVE will reject non-electronic (i.e., paper) verification requests and information submissions;

(d) Ensure that, prior to using SAVE, all Users performing verification procedures complete SAVE-required training including: reviewing the SAVE Program Guide, taking the latest version of Web tutorial(s) and maintaining a working knowledge of requirements contained therein and in this MOA, as updated;

(e) Ensure Users are provided with, maintain, and use SAVE User IDs only while they need them to perform verification procedures and promptly terminate the User's access as requested by SAVE, if the User separates from the User Agency or otherwise no longer needs SAVE access;

(f) Ensure all Users performing verification procedures only use SAVE with respect to verification of applicant immigration and naturalized or derived citizenship status for the specified benefit and comply with all other requirements contained in the SAVE Program Guide, web-based tutorial, and this MOA, and updates to these requirements;

(g) Ensure that all Users performing verification procedures have proper contact information for SAVE and DHS-USCIS;

(h) Ensure all Users perform any additional verification procedures SAVE requires, as described in the SAVE Program Guide, and/or the applicant requests after the User Agency initiates a verification request;

(i) Use any information provided by DHS-USCIS under this MOA solely for the purpose of determining the eligibility of persons applying for an SSN or the benefit issued by the User Agency, and limit use of such information in accordance with this and all other provisions of this MOA;

(j) Comply with the requirements of the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283, as amended) and Office of Management and Budget (OMB) guidance as applicable to electronic storage, transport of records between agencies, and the internal processing of records received by either agency under the terms of this MOA;

(k) Safeguard such information and access methods to ensure that it is not used for any other purpose than described in this MOA and protect its confidentiality; including ensuring that it is not disclosed to any unauthorized person(s) without the prior written consent of DHS-USCIS;[1]

---

[1] Each applicant seeking access to information regarding himself/herself may do so by submitting a written signed request to DHS-USCIS. Instructions for submitting such requests may be found on the Freedom of Information/Privacy Act page of www.uscis.gov.

4

(l) Comply with the Privacy Act, 5 U.S.C. Section 552a, and other applicable laws, regulations, and policies, including but not limited to all OMB and DHS privacy guidance (DHS privacy guidance is found at https://www.dhs.gov/privacy-policy-guidance), in conducting verification procedures pursuant to this MOA, and in safeguarding, maintaining, and disclosing any data provided or received pursuant to the MOA;

(m) Comply with federal laws prohibiting discrimination against applicants and discriminatory use of SAVE based upon the national origin, color, race, sex, religion, or disability of the applicant;

(n) Provide all benefit-applicants who are denied benefits based solely or in part on the SAVE response with adequate written notice of the denial and the information necessary to contact DHS-USCIS (see attachment 1: Fact Sheet, which is subject to revision and reposting on the SAVE Website and Online Resources) so that such individual may correct their records in a timely manner, if necessary;

(o) Provide all benefit-applicants who are denied benefits based solely or in part on the SAVE response with the opportunity to use the User Agency's existing process to appeal the denial and to contact DHS-USCIS to correct their records prior to a final decision, if necessary; and

(p) Refrain from using SAVE, or assisting any person or entity, to comply with the employment eligibility verification requirements of section 274A of the Immigration and Nationality Act, 8 U.S.C. Section 1324a.

(2) <u>Monitoring and Compliance</u>.

(a) Provide DHS-USCIS with the current e-mail, U.S. postal service address, physical address, name and telephone number of the User Agency authorized representative for any notifications, questions or problems that may arise in connection with the User Agency's participation in SAVE and with notification of changes in the benefit offered by the User Agency;

(b) Notify DHS-USCIS immediately whenever there is reason to believe a violation of this MOA has occurred;

(c) Notify DHS-USCIS immediately whenever there is reason to believe a breach of personal information has occurred as a result of User Agency action or inaction pursuant to OMB Memorandum M-17-12, "Preparing for and Responding to a Breach of Personally Identifiable Information" or successor guidance;

(d) Allow DHS-USCIS to monitor and review all records and documents related to the use, abuse, misuse, fraudulent use or improper use of SAVE by the User Agency, including, but not limited to original application information, to the extent disclosure of that information is permitted by law;

5

CEDC Case 000077

(e) Cooperate and coordinate with DHS-USCIS, to the extent permitted by law, with regard to desk audits and/or site visits to review User Agency's compliance with this MOA and all other SAVE-related policy, procedures, guidance and law applicable to conducting verification and safeguarding, maintaining and disclosing any data provided or received pursuant to this MOA;

(f) Cooperate and coordinate with DHS-USCIS, to the extent permitted by law, to allow DHS-USCIS to perform audits of User Agency's User IDs use and access, SAVE Training Records, SAVE financial records, SAVE biographical information, system profiles and usage patterns and other relevant data;

(g) Allow DHS-USCIS to interview any and all User Agency SAVE system Users and any and all contact persons or other personnel within the User Agency regarding any and all questions or problems which may arise in connection with the User Agency's participation in SAVE;

(h) Allow DHS-USCIS to monitor SAVE system access and usage and to assist SAVE Users as necessary to ensure compliance with the terms of this MOA and SAVE requirements by its authorized agents or designees; and

(i) Take corrective measures in a timely manner to address all lawful requirements and recommendations on every written finding including but not limited to those of DHS-USCIS regarding waste, fraud, and abuse, and discrimination or any misuse of the system, non-compliance with the terms, conditions and safeguards of this MOA, SAVE procedures or other applicable law, regulation or policy.

(3) Reimbursement.

(a) Pay the transaction prices provided in the attached current standard billing rates, which along with methods of payment are subject to change upon prior written notification to the User Agency.  Each year, the User Agency will obligate funds sufficient to reimburse DHS-USCIS under a current appropriation upon execution of the attached USCIS Anticipated Collections from Federal Sources Addendum; and

(b) Pay in full within 30 days of the end of the month for which it incurs the expense. Failure to timely pay may result in suspension or termination of services.


**V.  RECORDS USAGE, DUPLICATION, AND REDISCLOSURE RESTRICTIONS.**

For purposes of this agreement, the parties acknowledge that information sent by SSA to DHS-USCIS for verification requests will be matched against existing DHS-USCIS-accessed data holdings which may contain the same information.  As such, the information provided about an individual within a verification request by SSA to DHS-USCIS will not

6

CEDC Case 000078

be considered SSA-owned information. Information that identifies a verification request as being generated by SSA or associated with an SSA benefit will be protected as set forth in this agreement and as required by law.

DHS-USCIS and SSA agree to the following limitations on the access to, and disclosure and use of information that identifies a verification request as being generated by SSA or associated with an SSA benefit:

A. Data or information that identifies a verification request as being generated by the SSA or associated with an SSA benefit will remain the property of the source agency.

B. Data or information that identifies a verification request as being generated by SSA or associated with an SSA benefit will be used only as provided in the MOA by the recipient agency.[2]

C. Data or information that identifies a verification request as being generated by SSA or associated with an SSA benefit provided by the source agency will not be duplicated or disseminated outside the recipient agency without prior written approval from the source agency. The source agency will not give such approval unless the redisclosure is required by law or is essential to the conduct of the exchange. In such cases, the agency redisclosing the records must specify in writing what records will be redisclosed, to whom they will be redisclosed, and the reasons that justify redisclosure. Under DHS-USCIS's "One DHS" policy, DHS-USCIS is considered one agency under law and USCIS may share information obtained through this MOA with other DHS components possessing a documented valid mission need for such information. Any information exchanged between or among the parties pursuant to this Agreement will be handled in a manner consistent with the terms set forth in this MOA, including the provision that DHS-USCIS shall endeavor to coordinate with SSA in advance of such dissemination, to the extent practicable and consistent with applicable law and policy. DHS-USCIS will contact SSA's Office of Privacy and Disclosure in the event that they need to re-disclose data associated with SSA. DHS-USCIS will contact Keisha Mahoney Jones (410-966-9048; Keisha.Mahoney-Jones@ssa.gov) or Matthew Burch (410-965-8845; Matthew.Burch@ssa.gov).

D. All SSA verification requests will be documented in a log. The retention period of this log is 10 years. The log is not accessible to the public, except as permitted by law.

E. SSA recognizes that DHS-USCIS may need to disclose information pursuant to an audit by appropriate government oversight authorities or other third parties outside of DHS. In the event DHS-USCIS needs to disclose information that identifies a verification request as being generated by SSA or associated with an SSA benefit, DHS-USCIS shall endeavor to coordinate with SSA in advance of such dissemination, to the extent practicable and consistent with applicable law and policy. DHS-USCIS will take steps to ensure that any disclosures taken in these circumstances are limited to information that is relevant and necessary for the identified purpose.

---

[2] For examples of SAVE Routine Uses associated with this MOA see the SAVE System of Records Notice (DHS/USCIS-004, as amended).

CEDC Case 000079

## VI.  POINTS OF CONTACT.

DHS-USCIS SAVE MS 2620, U.S. Citizenship and Immigration Services, Department of Homeland Security, Washington, DC  20529-2620, (b) (6), (b) (7)(C), (b) (7)(F) Attn: SAVE Operations. E-mail: (b) (6), (b) (7)(C), (b) (7)(F).

USER AGENCY- Social Security Administration, Annex 4-B-8-A, 6401 Security Blvd., Baltimore, MD  21235-6401, Attn: Fern Parson-Hill, Email: Fern.Parson-Hills@ssa.gov; Financial POC: Lisa Smith, Email: (b) (6), (b) (7)(C)

## VII.  OTHER PROVISIONS.

(A) MOA Responsibilities.  Only authorized employees, agents, or designees of DHS-USCIS and the User Agency will carry out the requirements of this MOA.  In carrying out these responsibilities, they will operate within the scope of applicable regulations, specifically delegated authorities, the program authorities and funding limitations and terms and conditions of this MOA.

(B) Determining Benefit and Enumeration Eligibility.  This MOA is limited to the provision of verification services.  DHS-USCIS will verify limited citizenship and immigration status information and alien sponsorship information, but will not recommend to the User Agency whether to issue the benefit.  The DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency.  The User Agency has the responsibility to determine the applicant's eligibility for the benefit and enumeration.

(C) Criminal Penalties.

(1) DHS-USCIS reserves the right to use information from the User Agency including information that identifies a verification request as being generated by SSA or associated with an SSA benefit for any purpose permitted by law, including, but not limited to, the prosecution of violations of Federal administrative or criminal law, to the extent permitted by 20 CFR 401.155 and other controlling legal authorities.  As stated above, DHS-USCIS shall endeavor to coordinate with SSA in advance of such dissemination and/or use, to the extent practicable and consistent with applicable law and policy.  DHS-USCIS will contact SSA's Office of Privacy and Disclosure by reaching out to the contacts listed above in section V.C.  DHS-USCIS will take steps to ensure that any disclosures taken in these circumstances are limited to information that is relevant and necessary for the identified purpose.

(2) The User Agency acknowledges that the information it receives from DHS-USCIS is governed by the Privacy Act, 5 U.S.C. Section 552a(i)(1), and that any person who obtains

8

this information under false pretenses or uses it for any purpose other than as provided for in this MOA may be subject to criminal penalties.

(D) Third Party Liability.

(1) Each party to this MOA shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution and/or performance of this MOA, whether civil or criminal, and retain responsibility for the payment of any corresponding liability.

(2) Nothing in this MOA is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any third party against the United States, its agencies, officers, or employees or the User Agency.

(E) Disputes.  Disagreements on the interpretation of the provisions of this MOA that cannot be resolved between SAVE and the User Agency point of contact should be provided in writing to the authorized officials at both agencies for resolution.  If settlement cannot be reached at this level, the disagreement will be elevated to the next level in accordance with DHS-USCIS procedures for final resolution.

(F) Conflicts.  This MOA, its attachments and addenda constitute the full MOA on this subject between DHS-USCIS and the User Agency.  Any inconsistency or conflict between or among the provisions of this MOA, will be resolved in the following order of precedence: (1) this MOA and (2) other documents incorporated by reference in this MOA, i.e., the USCIS Anticipated Collections from Non-Federal Sources Addendum, and standard billing rates.

(G) Severability.  Nothing in this MOA is intended to conflict with current law or regulation or the directives of DHS, DHS-USCIS, or the User Agency.  If a term of this MOA is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOA shall remain in full force and effect.  In the event of a conflict that prevents either party from fulfilling its obligations, this MOA may be immediately canceled without providing the 30 day notice period referenced in Section IX.

(H) Assignment.  The User Agency may not assign this MOA, nor may it assign any of its rights or obligations under this MOA.  To the extent allowable by law, this MOA shall inure to the benefit of, and be binding upon, any successors to DHS-USCIS and the User Agency without restriction.

(I) Waiver.  No waiver by either party of any breach of any provision of this MOA shall constitute a waiver of any other breach.  Failure of either party to enforce at any time, or from time to time, any provision of this MOA shall not be construed to be a waiver thereof.

(J) Security Assessments.  The National Institute of Standards and Technology (NIST) Special Publication 800-37, as revised, encourages agencies to accept each other's

CEDC Case 000081

security assessments in order to reuse information system resources and/or to accept each other's assessed security posture in order to share information.  NIST 800-37 further encourages that this type of reciprocity is best achieved when agencies are transparent and make available sufficient evidence regarding the security state of an information system so that an authorizing official from another organization can use that evidence to make credible, risk-based decisions regarding the operation and use of that system or the information it processes, stores, or transmits.  Consistent with that guidance, the parties agree to make available to each other upon request system security evidence for the purpose of making risk-based decisions, to the extent feasible and permitted by law.  Requests for this information may be made by either party at any time throughout the duration or any extension of this agreement.

## VIII.  EFFECTIVE DATE.

The base period of performance of this Agreement is October 1, 2020 to September 30, 2021 (FY2021). This MOA shall be effective when the DHS-USCIS authorized official and User Agency authorized official have both signed the MOA.  This MOA shall continue in effect unless modified or terminated in accordance with the provisions of this MOA.

The parties may renew this MOA for four (4) successive one-year periods (option years) that coincide with the federal fiscal year.  If the parties agree to renew this Agreement for additional option years, they will execute the USCIS Anticipated Collections from Federal Sources Addendum and Form SSA-429 manifesting said Agreement on or before the start of each option year.  The terms and conditions set forth in this agreement will remain in effect during the option years unless those terms and conditions are modified by the USCIS Anticipated Collections from Federal Sources Addendum and Form SSA-429 or by other written modification signed by the parties.

## IX.  MODIFICATION.

(A) This MOA is subject to periodic review by DHS-USCIS, its authorized agents or designees, and, if necessary, periodic modification and/or renewal to assure compliance with current law, policy, and standard operating procedure(s).  This MOA and the attached USCIS Anticipated Collections from Non-Federal Sources Addendum constitute the complete MOA between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of both parties evidenced in writing and signed by both parties and appended to this agreement; and

(B) The User Agency may accomplish a unilateral administrative modification to add funds to the MOA, and either party may accomplish a unilateral administrative modification to change POC information.  A written bilateral modification (i.e., agreed to and signed by authorized officials of both parties) is required to change any other term of this MOA.

CEDC Case 000082

## X.  TERMINATION.

Either party may terminate this MOA at any time by providing 30 days written notice of intent.  DHS-USCIS, when feasible, will consult with the User Agency and attempt to reconcile issues before terminating this MOA.  Notwithstanding any other provision in the MOA, DHS-USCIS may suspend or terminate this MOA, and thereby the Agency's use of SAVE,  without prior notice if deemed necessary because of a requirement of law or policy, upon a determination by DHS-USCIS that there has been a breach of system integrity or security by the User Agency or a failure by the User Agency to comply with established procedures or legal requirements, including but not limited to failure to pay.

Written notices shall be sent to the addresses of the POCs listed herein and shall be effective upon receipt.  Either party may change its POC by written notice to the other party.

The foregoing, in conjunction with the referenced and incorporated attachments, constitutes the full agreement on this subject between DHS-USCIS and the User Agency.  This MOA supersedes all previous agreements governing the provision of verification services.  Those agreements are explicitly acknowledged to be null and void.

The undersigned represent that they are authorized to enter into this MOA on behalf of DHS-USCIS and the User Agency, respectively.

**Electronic Signature Acknowledgement:**  The signatories may sign this document electronically by using an approved electronic signature process.  Each signatory electronically signing this document agrees that his/her electronic signature has the same legal validity and effect as his/her handwritten signature on the document, and that it has the same meaning as his/her handwritten signature.

(b) (6), (b) (7)(C), (b) (7)(F)

**Chief, SAVE**
**U.S. Citizenship and Immigration Services**
**Department of Homeland Security**

**Michelle King**
**Deputy Commissioner for Budget,**
**Finance, and Management**
**Social Security Administration**

09/30/2020

**Date**

9/29/2020

**Date**

11

CEDC Case 000083





# Records: Fast Facts for Benefit Applicants

## What is SAVE?
The Systematic Alien Verification for Entitlements (SAVE) Program provides a fast, secure and efficient verification service that allows federal, state, and local benefit-granting and licensing agencies to verify your status when you apply for a license or government benefit. To learn more, visit uscis.gov/save.

## What does SAVE need to verify your immigration status?
The benefit-granting or licensing agency must provide SAVE with your current biographic information (first name, last name, and date of birth) **and** a numeric identifier (such as an Alien Number (A#/USCIS#); Form I-94, Arrival/Departure Record Number; Student and Exchange Visitor Information System (SEVIS) ID number; or unexpired foreign passport number).

## What happens if SAVE cannot verify your status?
You may correct or update your immigration record with the Department of Homeland Security (DHS). **SAVE cannot correct, renew, or replace records.**

## Where do you go to correct, obtain, renew or replace a record?
You must contact the DHS agency that issued your record.

### U.S. Citizenship and Immigration Services (USCIS)

For instructions and forms on how to obtain, correct, renew, or replace a:
• Certificate of Citizenship, visit uscis.gov/N-565.
• Certificate of Naturalization, visit uscis.gov/n-600.
• Form I-551, Permanent Resident Card, visit uscis.gov/I-90.
• Form I-766, Employment Authorization Card, visit uscis.gov/I-765.
• Form I-94 issued by USCIS, visit uscis.gov/I-102.

For questions and assistance:
• Call the National Customer Service Center (NCSC) at 800-375-5283 (TTY 800-767-1833 for deaf or hard of hearing).
• For information about scheduling an appointment to talk to a USCIS officer in-person at a local USCIS office using INFOPASS visit: https://my.uscis.gov/appointment.

### Custom Border Protection (CBP)

Contact CBP if you need to replace or correct your Form I-94, Arrival-Departure Record.

• To correct the Form I-94 records that originated at CBP's Deferred Inspection Sites (DIS), visit the CBP website at cbp.gov/document/guidance/deferred-inspection-sites for a list of all DIS's

If you have questions or need information on the I-94 automation process, visit the CBP INFO Center at https://help.cbp.gov.

### Student and Exchange Visitor Program (SEVP)

If you are a student or exchange visitor and need to correct your record, contact your designated school official (DSO) or responsible officer (RO).

If they cannot help you, contact the SEVP Response Center (SRC) at 703-603-3400 or sevp@dhs.gov.

CEDC Case 000084

# Department of Homeland Security (DHS)

| | |
|---|---|
| **CMA #1010**<br><br>**01/19/25 – 07/18/27** | • **Purpose/Service Category:** DHS discloses data on aliens who leave the country voluntarily via the U.S. Citizenship and Immigration Services (USCIS) BIS System, and aliens who are removed via the Immigration and Customs Enforcement (ICE) EID System. SSA will use DHS' data to determine if suspension of payments, nonpayment of benefits, and/or recovery of overpayments, is applicable.<br>• **CBA Ratio:** 7.96 to 1<br>• **Frequency:** Monthly<br>• **Direction of data:** Incoming<br>• **Cost** – Due to nominal costs, DHS waives recovery of costs pursuant to the Economy Act<br>• **Connection:** ISA |
| **E-Verify MOU**<br><br>**10/01/23 – 9/30/28** | • **Purpose/Service Category:** This agreement is between the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) and SSA. SSA verifies employment eligibility of new employees for employers.<br>• **Frequency:** Daily<br>• **Direction of data**: Outgoing<br>• **Cost:** FY 25 Cost Estimate: $12,107,645.86 (reimbursed to SSA)<br>• **Connection:** ISA |
| **IEA 10243**<br><br>**05/20/24 – 05/19/30** | • **Purpose/Service Category:** This agreement is between the Department of Homeland Security's (DHS) U.S. Customs and Border Protection (CBP) and SSA. CBP shares alien and U.S citizen arrival and departure from the Arrival and Department Information System (ADIS). SSA will use DHS' data to determine if suspension of payments, nonpayment of benefits, and/or recovery of overpayments, is applicable.<br>• **Frequency:** Online Access as needed<br>• **Direction of data**: Outgoing<br>• **Cost:** No cost<br>• **Connection:** ISA |
| | |

**From:** Dudek, Leland C.
**Subject:** RE: Use of DHS Agreements for Law Enforcement Purposes
**To:** ████████████████████████████; rachelle.b.henderson@ice.dhs.gov
**Cc:** Russo, Michael L; ████████████ Office of the Inspector General; Kim, Grace OGC
**Sent:** February 22, 2025 8:46 PM (UTC-05:00)

I understand this is an urgent Law Enforcement matter. You have SSA's permission, to use SSA data, for all Law Enforcement purposes, consistent with applicable law.

Please consider this email as authority for the data exchange agreement. We will work to put in place the formal agreement memorializing the outcomes and transfer at a later date.

Lee Dudek
Acting Commissioner

---

**From:** Dudek, Leland C.
**Sent:** Saturday, February 22, 2025 6:28 PM
**To:** ████████████ @ssa.gov>; ████████████ @ssa.gov>; ████████████
████████ @ssa.gov>; rachelle.b.henderson@ice.dhs.gov
**Cc:** Russo, Michael L <Michael.L.Russo@ssa.gov>; ████████████ Office of the Inspector General
████████████ @ssa.gov>; Kim, Grace OGC <Grace.Kim@ssa.gov>
**Subject:** Use of DHS Agreements for Law Enforcement Purposes

Rachelle,

SSA has three interagency agreements in place with DHS. We have attached a summary Word doc.

I have determined that Immigration and Customs Enforcement has a law enforcement purpose that necessitates access to SSA data and information.

You have SSA's permission, to use SSA data, transmitted through these agreements, for all Law Enforcement purposes, consistent with applicable law.

Thank you for your service, and helping the USDS team with their work.

Warm Regards,

Lee Dudek
Acting Commissioner

CEDC Case 000086

**From:** Dudek, Leland C.
**Subject:** RE: [EXTERNAL] DOGE ICE Info Sharing request
**To:** Vitello, Caleb; Kim, Grace OGC
**Cc:** ▮▮▮▮▮▮▮▮
**Sent:** February 23, 2025 3:09 PM (UTC-05:00)

Approved. Please proceed.

---

**From:** Vitello, Caleb <▮▮▮▮▮@ice.dhs.gov>
**Sent:** Sunday, February 23, 2025 1:29 PM
**To:** Dudek, Leland C. <▮▮▮▮▮@ssa.gov>; Kim, Grace OGC <▮▮▮▮▮@ssa.gov>
**Cc:** ▮▮▮▮▮▮▮@ssa.gov>
**Subject:** [EXTERNAL] DOGE ICE Info Sharing request

Hello,

The Department of Homeland Security has a list of approximately 700 thousand criminal illegal aliens who have standing deportation orders. For each alien, we have a name, as well as other identifying information such as SSN, alien number, date of birth, and in some cases, address.

For each alien in our list, we would like the SSA to provide all possible information, and the date that information was collected, including but not limited to:
  1. Known aliases
  2. Known home addresses
  3. Known employers' information
  4. Known phone numbers
  5. Known relatives
  6. Known emails
  7. Known Bank Name
  8. Known IP information
  9. SSN or TIN

Please confirm that this is acceptable and provide the name of the Directly Responsible Individual is the SSA we can collaborate with to retrieve this data. We would like to have this data within one week.

Thank you for your cooperation,


*Caleb Vitello*
Acting Director
U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington, D.C. 20536
▮▮▮▮▮@ice.dhs.gov
(202) ▮▮▮▮▮ (cell)

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information. Please inform the sender that you received this message in error and delete the message.

CEDC Case 000087

**From:** ███████████
**Subject:** FW: [EXTERNAL] RE: SSA Data Request Email
**To:** ███████████
**Sent:** February 24, 2025 4:47 PM (UTC-05:00)

---

**From:** ██████████████████ @hsi.dhs.gov>
**Sent:** Monday, February 24, 2025 4:10 PM
**To:** ██████████████████ @ssa.gov>
**Subject:** RE: [EXTERNAL] RE: SSA Data Request Email

Hi ████,

I hope things are well.  I wanted to check with you to see if you were able to have someone retrieve the data.  Also, I know you were asking about what data we were specifically looking for.  Below is a list which would be helpful in location those with a Final Order.  Please don't hesitate to reach out to me.

Requested Data:

Full Name
Alias if any
DOB (see if it matches to SSN)
Place of Birth
Address (Date of Address)
Email
Phone
Others linked to the account
Employers name
Employer address
Bank Name re Direct Deposit (not specific account info but more company info to subpoena if needed)
Company re Direct Express (not specific account info but more company info to subpoena if needed)
If they access SSA systems via a portal - IP data etc. and date of IP entry
Master Death Index checks.

V/R



██████████████
Acting Deputy Assistant Director
HSI Office of Intelligence
████████ Office

---

**From:** ██████████████████ @ssa.gov>
**Sent:** Monday, February 24, 2025 12:36 PM
**To:** Henderson, Rachelle B <Rachelle.B.Henderson@ice.dhs.gov>
**Cc:** ██████████████████ @hsi.dhs.gov>; ██████████████████ @ssa.gov>
**Subject:** RE: [EXTERNAL] RE: SSA Data Request Email

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Thanks for coordinating Rachelle!
████, its good to meet you. Please let me know if you have time to sync today.

We are ready to go on our end, we just need a means of receiving and transmitting this data to your team.

---

**From:** Henderson, Rachelle B <Rachelle.B.Henderson@ice.dhs.gov>
**Sent:** Sunday, February 23, 2025 9:33 PM
**To:** ███████████████ @ssa.gov>
**Cc:** ███████████████████████ @hsi.dhs.gov>; ██████████████████ @ssa.gov>
**Subject:** RE: [EXTERNAL] RE: SSA Data Request Email

Good evening,

The first list will be ready tomorrow morning. ████, cc'd above is our point of contact who will advise on the access and list tomorrow morning.

Thanks for everything.

Rachelle

---

**From:** ███████████████████ @ssa.gov>
**Sent:** Sunday, February 23, 2025 4:09 PM
**To:** Henderson, Rachelle B <Rachelle.B.Henderson@ice.dhs.gov>; Vitello, Caleb ██████████ @ice.dhs.gov>
**Cc:** ██████████████████ @ice.dhs.gov>; ██████████████████████ @ice.dhs.gov>; ████████████ @hsi.dhs.gov>; ████████████████████ @hsi.dhs.gov>; ████████ █████████ @ssa.gov>
**Subject:** RE: [EXTERNAL] RE: SSA Data Request Email

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Rachelle,

That sounds good.
Let me know as soon as possible about the point of contact, access, and timeline.

████████

---

**From:** Henderson, Rachelle B <Rachelle.B.Henderson@ice.dhs.gov>
**Sent:** Sunday, February 23, 2025 3:38 PM
**To:** ███████████████ @ssa.gov>; Vitello, Caleb ██████████ @ice.dhs.gov>
**Cc:** ██████████████████ @ice.dhs.gov>; ██████████████████████ @ice.dhs.gov>; ████████████ @hsi.dhs.gov>; ████████████████████ @hsi.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: SSA Data Request Email

Good afternoon,

Two updates: The operational team is working on getting their list. They are compiling some additional data about which we were made aware today.   We also can use external access to our Homeland Security Information Network (HSIN) to securely provide this file which is standard practice for these incident command / task force type groups. (it's basically an external-facing secure collab environment).   We will send the operational point of contact, additional access information, and timing on that as soon as it is known.

For expectations setting, we are all treating this as a #1 priority, so while it may not be tonight, it won't be days

either.

More to follow.
If you need additional information, my contact information is below.

Thanks,
Rachelle
█████████

---

**From:** ███████████████████ @ssa.gov>
**Sent:** Sunday, February 23, 2025 2:52 PM
**To:** Henderson, Rachelle B <Rachelle.B.Henderson@ice.dhs.gov>; Vitello, Caleb ██████████ @ice.dhs.gov>
**Cc:** ███████████████████ @ice.dhs.gov>; ███████████████████ @ice.dhs.gov>
**Subject:** RE: [EXTERNAL] RE: SSA Data Request Email

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

████ , thanks for connecting us!

Rachelle, how can I securely receive the list of SSNs from you and return SSA data. I recall being told that there was a secure FTP server/portal that contained the SSNs from your team.

Do you know if I can get access to read and write to that location securely?

████

---

**From:** Henderson, Rachelle B <Rachelle.B.Henderson@ice.dhs.gov>
**Sent:** Sunday, February 23, 2025 2:39 PM
**To:** Vitello, Caleb < ██████████ @ice.dhs.gov>; ███████████████ @ssa.gov>
**Cc:** ███████████████████ @ice.dhs.gov>; ███████████████████ @ice.dhs.gov>
**Subject:** [EXTERNAL] RE: SSA Data Request Email

Thank you, Sirs.  We have the information related to the information sharing agreement (thanks!) from last night. Our operational team is working on the specifics of their ask and current status.  More to follow shortly.

Thanks,
Rachelle

**From:** Vitello, Caleb < ██████████ @ice.dhs.gov>
**Sent:** Sunday, February 23, 2025 2:32 PM
**To:** ███████████████ @ssa.gov>
**Cc:** ███████████████████ @ice.dhs.gov>; ███████████████████ @ice.dhs.gov>
**Subject:** RE: SSA Data Request Email

████

Please see the ICE SME's on info sharing and thanks for clearing the path with SSA.

Caleb

*Caleb Vitello*
Acting Director
U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington, D.C.  20536
████████@ice.dhs.gov
(202) ████████ (cell)

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message.

CEDC Case 000091

**From:** Kim, Grace OGC
**Subject:** RE: [EXTERNAL] DOGE ICE Info Sharing request
**To:** ███████████████████████████; Dudek, Leland C.
**Cc:** Evangelista, Stephen
**Sent:** February 24, 2025 11:51 AM (UTC-05:00)

█████,

I have no concerns with the outstanding request.  Thanks for checking.

Grace


Grace M. Kim
Acting General Counsel
Social Security Administration

CONFIDENTIALITY NOTICE: This e-mail message, including attachments, if any, may contain confidential or privileged material, including attorney-client privileged information, attorney work product information, and information subject to a Government privilege.  If you believe you received this e-mail in error, please notify the sender immediately, delete this e-mail message including attachments, and destroy any copies of it.  Please do not forward or disseminate this e-mail or its attachments without discussing with the sender.

---

**From:** ████████████████████████████ @ssa.gov>
**Sent:** Monday, February 24, 2025 8:35 AM
**To:** Kim, Grace OGC <Grace.Kim@ssa.gov>; ███████████████████ @ssa.gov>; Dudek, Leland C. <Leland.C.Dudek@ssa.gov>
**Cc:** Evangelista, Stephen <████████████████ @ssa.gov>
**Subject:** RE: [EXTERNAL] DOGE ICE Info Sharing request

Grace,

I confirmed with ██████ that DHS is working directly with IRS to get FTI, so none is needed here. Can you confirm there are no outstanding concerns with the amended request (i.e., sharing with DHS all the data below except for FTI)?

Also, I confirmed with ██████ that the 90k are included in this universe, so it will satisfy both requests from ICE. Very efficient.

██████

---

**From:** Kim, Grace OGC <Grace.Kim@ssa.gov>
**Sent:** Monday, February 24, 2025 11:07 AM
**To:** ███████████████ @ssa.gov>; Dudek, Leland C. <Leland.C.Dudek@ssa.gov>
**Cc:** ██████████████████████████ @ssa.gov>
**Subject:** RE: [EXTERNAL] DOGE ICE Info Sharing request

█████:

Can you please touch base with ████████████ since is working directly with ICE on our agreement.  He and his team are actively working on this.  I've included ████ on my response.  I want to make sure we're all coordinating so there is no duplication of effort or confusion.

Thank you,
Grace


Grace M. Kim
Acting General Counsel
Social Security Administration

CONFIDENTIALITY NOTICE: This e-mail message, including attachments, if any, may contain confidential or privileged material, including attorney-client privileged information, attorney work product information, and information subject to a Government privilege. If you believe you received this e-mail in error, please notify the sender immediately, delete this e-mail message including attachments, and destroy any copies of it. Please do not forward or disseminate this e-mail or its attachments without discussing with the sender.

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮ @ssa.gov>
**Sent:** Monday, February 24, 2025 8:01 AM
**To:** Kim, Grace OGC <Grace.Kim@ssa.gov>; Dudek, Leland C. <Leland.C.Dudek@ssa.gov>
**Subject:** RE: [EXTERNAL] DOGE ICE Info Sharing request

Hi Lee and Grace,

I need to amend my request from earlier to the following:

Do I have the authority to fulfill this request?
I will receive the SSNs from ICE through a secure data exchange mechanism they setup, will query the Numident, *Person Information (aka Integrated Client Database), Master Beneficiary Record, and Supplemental Security Record* database to produce results, and return data through that secure exchange.

Do I still have the authority to fulfill this request?

▮▮▮

---

**From:** Kim, Grace OGC <Grace.Kim@ssa.gov>
**Sent:** Sunday, February 23, 2025 2:26 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮ @ssa.gov>; Dudek, Leland C. <Leland.C.Dudek@ssa.gov>
**Subject:** Re: [EXTERNAL] DOGE ICE Info Sharing request

ATTORNEY-CLIENT PRIVILEGE COMMUNICATION

Good afternoon, ▮▮▮▮ yes you may proceed

Lee: we're still finalizing the updated agreement with DHS and should have that sorted out by the time we provide ICE with the SSA data. Not sure we have all the info ICE requesting however

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮ @ssa.gov>
**Sent:** Sunday, February 23, 2025 11:00 AM
**To:** Dudek, Leland C. <Leland.C.Dudek@ssa.gov>; Kim, Grace OGC <Grace.Kim@ssa.gov>
**Subject:** RE: [EXTERNAL] DOGE ICE Info Sharing request

Hi Lee and Grace,

Do I have the authority to fulfill this request?
I will receive the SSNs from ICE through a secure data exchange mechanism they setup, will query the Numident database to produce results, and return data through that secure exchange.



---

**From:** Vitello, Caleb <███████@ice.dhs.gov>
**Sent:** Sunday, February 23, 2025 1:29 PM
**To:** Dudek, Leland C. <Leland.C.Dudek@ssa.gov>; Kim, Grace OGC <Grace.Kim@ssa.gov>
**Cc:** ███████@ssa.gov>
**Subject:** [EXTERNAL] DOGE ICE Info Sharing request

Hello,

The Department of Homeland Security has a list of approximately 700 thousand criminal illegal aliens who have standing deportation orders. For each alien, we have a name, as well as other identifying information such as SSN, alien number, date of birth, and in some cases, address.

For each alien in our list, we would like the SSA to provide all possible information, and the date that information was collected, including but not limited to:
1. Known aliases
2. Known home addresses
3. Known employers' information
4. Known phone numbers
5. Known relatives
6. Known emails
7. Known Bank Name
8. Known IP information
9. SSN or TIN

Please confirm that this is acceptable and provide the name of the Directly Responsible Individual is the SSA we can collaborate with to retrieve this data. We would like to have this data within one week.

Thank you for your cooperation,

*Caleb Vitello*

Acting Director
U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington, D.C. 20536
███████@ice.dhs.gov
(202) ███████ (cell)

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information. Please inform the sender that you received this message in error and delete the message.

CEDC Case 000094

**From:** ▉
**Subject:** RE: SSA <> DHS Data Transfer
**To:** ▉
**Cc:** ▉ @hsi.dhs.gov; ▉ @hsi.dhs.gov; ▉ @hsi.dhs.gov; ▉ @associates.ice.dhs.gov; ▉ @associates.ice.dhs.gov
**Sent:** February 28, 2025 3:20 PM (UTC-05:00)

Hi All,

DHS has received and validated the data on their end. We can "close out" this work stream.
Thank you for the fast turnaround and helping get this done toward the end of the day on a Friday.

Have a great weekend,

▉

-----Original Appointment-----
**From:** ▉ @ssa.gov>
**Sent:** Friday, February 28, 2025 12:53 PM
**To:** ▉
**Cc:** ▉ @hsi.dhs.gov; ▉ @hsi.dhs.gov; ▉ @hsi.dhs.gov; ▉ @associates.ice.dhs.gov; ▉ @associates.ice.dhs.gov
**Subject:** SSA <> DHS Data Transfer
**When:** Friday, February 28, 2025 2:00 PM-2:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 251 249 025 563

Passcode: vf6sM3aK

---

### Dial in by phone

+1 443-840-7262,,511294367# United States, Catonsville

Find a local number

Phone conference ID: 511 294 367#

### Join on a video conferencing device

Tenant key: teams@pexip.ssa.gov

Video ID: 117 169 620 7

More info

For organizers: Meeting options | Reset dial-in PIN

---

**From:** (b) (6)
**Subject:** SSA Data Updates
**To:** (b) (6) @hsi.dhs.gov
**Cc:** (b) (6) @dol.gov; steven.m.davis@doge.eop.gov
**Sent:** March 3, 2025 11:46 PM (UTC-05:00)
**Attached:** matches.xlsx

Hey (b) (6) ,

Here's a password protected excel workbook with the enriched data. Here's how it was prepared:
* (b) (7)(A), (b) (5) .
* (b) (5), (b) (7)(A) . There turns out to be 971 such beneficiaries. Note: (b) (5), (b) (7)(A)

* Get the address history of those 971 beneficiaries. (b) (5), (b) (7)(A)
.
* Produce a sheet with the beneficiaries and one row for each of their addresses (this means [redacted] rows – each beneficiary will appear as many times as they have addresses).

Notes:
* There's a column called "last_name_match" which indicates whether a beneficiary's last name according to SSA matches their last name according to DHS. (b) (7)(A), (b) (5)
.
* There's a worksheet named "columns" with a description of each column.
* (b) (5), (b) (7)(A)

Best,
(b) (6)

| | |
|---|---|
| **From:** | Dudek, Leland C. |
| **To:** | ███████████ LP Law |
| **Cc:** | Steffensen, Mark LP Law; Harris, Christopher LP Law; ███████████ LP Law; Ramsey, Matthew LP Law |
| **Subject:** | RE: ACTION - Decision Memo: Identity and Location Disclosures to ICE Under Ad Hoc and 8 USC 1360(b) |
| **Date:** | Wednesday, April 09, 2025 3:59:17 PM |

approved

---

**From:** ███████████ OGC <███████████@ssa.gov>
**Sent:** Wednesday, April 9, 2025 3:10 PM
**To:** Dudek, Leland C. <Leland.C.Dudek@ssa.gov>
**Cc:** Steffensen, Mark <███████████@ssa.gov>; Harris, Christopher OGC <███████████@ssa.gov>; ███████████ OGC ███████████@ssa.gov>; Ramsey, Matthew OGC <███████████@ssa.gov>
**Subject:** ACTION - Decision Memo: Identity and Location Disclosures to ICE Under Ad Hoc and 8 USC 1360(b)

Leland:

In February, you approved under the *ad hoc* authority (20 C.F.R. 401.195) and 8 U.S.C. 1360(b) disclosure of information that U.S. Immigration and Customs Enforcement (ICE) requested concerning the identity and location of 700,000 aliens. In addition to the standard information SSA would normally provide in response to a section 1360(b) request, ICE requested banking information, phone number(s), email address(es), names of known relative(s), and IP address(es). We have been working with ICE to develop an agreement to cover the data that was provided. ICE indicated in its revisions to the agreement that it intends to submit ongoing request files to SSA for identity and location information concerning aliens. We are taking immediate action to update the agency's POMS at GN 03313.095 to remove restrictive language. In the meantime, we believe it is beneficial for the agency to have formal documentation of your decision to exercise the *ad hoc* authority to cover the disclosure of data elements that fall outside of SSA's long-standing, public policy before the changes to the POMS are effective.

Please see the attached decision memo seeking your approval to disclose the requested information to ICE under the *ad hoc* authority and in keeping with 8 U.S.C. 1360(b). I am including a PDF and Word version of the memo. Let us know if you have questions.

 << File: ICE Alien Request - Ad Hoc Memo.docx >>  << File: ICE Alien Request - Ad Hoc Memo.pdf >>

Thank you,

██████

██████████

CEDC Case 000097

Senior Attorney

Disclosure Law

Office of General Law Division 1

Office of the General Counsel

Social Security Administration

Telephone: ██████████

For more information about OGL Division 1, please visit our Client Component Site.

*This e-mail message, including attachments, if any, may contain confidential or privileged material, including attorney-client privileged information, attorney work product information, and information subject to a Government privilege. If you believe you received this e-mail in error, please notify the sender immediately, delete this e-mail message including attachments, and destroy any copies of it. Please do not forward or disseminate this e-mail or its attachments without discussing with the sender.*

CEDC Case 000098



# SOCIAL SECURITY

MEMORANDUM

Date:    April 9, 2025                                                      Refer To:

To:     Leland Dudek
        Acting Commissioner

From:   Mark Steffensen
        Acting Deputy Commissioner
        Acting General Counsel
        Office of Law and Policy

Subject: Providing Information to Department of Homeland Security, U.S. Immigration and Customs
        Enforcement for Identifying and Locating Aliens

**ISSUE:**
Whether to approve the Department of Homeland Security (DHS) U.S. Immigration and
Customs Enforcement's (ICE) request for information, to be shared on an ongoing basis,
concerning the identity and location of aliens that goes beyond the data elements the Social
Security Administration (SSA or agency) has historically provided under the agency's policy at
POMS GN 03313.095.B.1 under the *ad hoc* regulatory authority.

**BACKGROUND:**
ICE has broad legal authority to enforce an array of federal statutes, including responsibility for
enforcing customs laws, federal criminal laws, and immigration laws.  Under Executive Order,
Protecting the American People Against Invasion, the President established that "[i]t is the policy
of the United States to faithfully execute the immigration laws against all inadmissible and
removable aliens, particularly those aliens who threaten the safety or security of the American
people."

On February 11, 2025, ICE submitted a request to obtain information from SSA to assist ICE
with locating and arresting removable aliens.  ICE requested a list of data elements, including
banking data, phone number(s), email address(es), names of known relative(s), internet protocol
(IP) address(es).  On February 22, 2025, you approved of this data sharing based on law

ATTORNEY WORK-PRODUCT PREPARED IN ANTICIPATION OF LITIGATION AND/OR CONTAINING CONFIDENTIAL INFORMATION SUBJECT TO THE
ATTORNEY-CLIENT PRIVILEGE.  DO NOT RELEASE WITHOUT DISCUSSING WITH THE AUTHOR.  THIS DOCUMENT ALSO MAY BE SUBJECT TO
CLAIMS OF PRIVILEGE IF COVERED BY A DISCOVERY OR FREEDOM OF INFORMATION ACT REQUEST, 5 U.S.C. § 552.  IN SUCH INSTANCES, DO
NOT RELEASE WITHOUT DISCUSSING WITH LITIGATION COUNSEL OR THE AUTHOR OF THIS DOCUMENT.

1

enforcement needs.  In the original request, it was unclear that this would constitute an ongoing data sharing, as ICE has in recent comments signaled it seeks.

**ANALYSIS:**
SSA's disclosure of personally identifiable information must be in accordance with the Social Security Act.[1]

*Social Security Act – Ad Hoc Authority*
Under the Social Security Act, SSA established privacy regulations, which set forth when SSA will disclose personal information.  SSA's privacy regulations mirror the Privacy Act to some degree but are more restrictive in its requirements to disclose information pursuant to a law enforcement request.[2]  However, SSA's regulations also permit the Commissioner (or designee) to disclose information when no other portion of the regulation would permit it so long as the disclosure is not prohibited by Federal law.[3]

*8 U.S.C. § 1360(b)*
Under Federal law, SSA may provide DHS information concerning the identity and location of an alien in the U.S.[4]  The statute does not provide any direction or guidance as to what data is considered "identity and location" data.  Moreover, the Court of Appeals for the 9th Circuit recognized when comparing the language at section 1360 with other provisions of Title 8 that Congress "used more expansive phrases" in section 1360 "to reach broader swaths of information."[5]

*POMS GN 03313.095 – Disclosures to the Department of Homeland Security*
SSA's long-standing, public policy provides that when DHS submits a request under section 1360(b) that SSA will provide the alien's SSN, name, date of birth, place of birth, and address information.[6]  The policy specifies that SSA will "not disclose any other information in response to these types of requests."[7]  Accordingly, SSA's policy narrowly defines what data elements SSA will provide when DHS pursuant to a request under section 1360(b), which does not include all of the data elements ICE requested.

---

[1] 42 U.S.C. § 1306(a).  SSA originally published its disclosure regulations in 1937, which pre-dates the Privacy Act and its protections by approximately 40 years. They are the cornerstone of SSA's disclosure policy and, again, are more restrictive in some cases than the Privacy Act (e.g., law enforcement, court order exceptions).  Congress recognized that the data SSA would be responsible for holding was among the most sensitive data maintained in the Federal government.

[2] 20 C.F.R. § 401.155.

[3] 20 C.F.R. § 401.195.

[4] 8 U.S.C. § 1360(b).  As of March 1, 2003, in accordance with Section 1517 of title XV of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, many references in the INA to the "Attorney General" "shall be deemed to refer to the Secretary [of Homeland Security]."  *See* 6 U.S.C. § 557 (codifying the Homeland Security Act of 2002, title XV, Section 1517); *Clark* v. *Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

[5] *United States v. California*, 921 F.3d 865, 892 (9th Cir. April 19, 2019).

[6] POMS GN 03313.095.B.1.

[7] *Id.*

ATTORNEY WORK-PRODUCT PREPARED IN ANTICIPATION OF LITIGATION AND/OR CONTAINING CONFIDENTIAL INFORMATION SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE.  DO NOT RELEASE WITHOUT DISCUSSING WITH THE AUTHOR.  THIS DOCUMENT ALSO MAY BE SUBJECT TO CLAIMS OF PRIVILEGE IF COVERED BY A DISCOVERY OR FREEDOM OF INFORMATION ACT REQUEST, 5 U.S.C. § 552.  IN SUCH INSTANCES, DO NOT RELEASE WITHOUT DISCUSSING WITH LITIGATION COUNSEL OR THE AUTHOR OF THIS DOCUMENT.

CEDC Case 000100

Given the expansive language in section 1360(b) to generally cover "identity and location" of an alien in the U.S., we are comfortable that SSA's disclosure of the information DHS requested that goes beyond SSA's stated policy (i.e., banking data, phone number(s), email address(es), names of known relative(s), internet protocol (IP) address(es)) is authorized by Federal law.  The requested information may be helpful to locate an alien in the U.S.

**RECOMMENDATION:**

In conclusion, we have identified legal authority under 8 U.S.C. § 1360(b) and *ad hoc* authority for you to approve the ongoing disclosure of the "identity and location" data requested to assist ICE in its ongoing efforts to locate aliens in the U.S.  Further, we recommend the agency update policy at POMS GN 03313.095.B.1 to remove unnecessary restrictions to the data that SSA will provide DHS when requested under section 1360(b).

ATTORNEY WORK-PRODUCT PREPARED IN ANTICIPATION OF LITIGATION AND/OR CONTAINING CONFIDENTIAL INFORMATION SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE.  DO NOT RELEASE WITHOUT DISCUSSING WITH THE AUTHOR.  THIS DOCUMENT ALSO MAY BE SUBJECT TO CLAIMS OF PRIVILEGE IF COVERED BY A DISCOVERY OR FREEDOM OF INFORMATION ACT REQUEST, 5 U.S.C. § 552.  IN SUCH INSTANCES, DO NOT RELEASE WITHOUT DISCUSSING WITH LITIGATION COUNSEL OR THE AUTHOR OF THIS DOCUMENT.

CEDC Case 000101

**DECISION:**

I approve the disclosure of the ongoing "identity and location" data requested to assist ICE in its efforts to locate aliens in the U.S.  Further, I direct the agency to update policy at POMS GN 03313.095.B.1 to remove unnecessary restrictions to the data that SSA will provide DHS when requested under section 1360(b).

Approve: _____     Non-concur: _____     Date: _____

Comments: _____

_____

ATTORNEY WORK-PRODUCT PREPARED IN ANTICIPATION OF LITIGATION AND/OR CONTAINING CONFIDENTIAL INFORMATION SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE.  DO NOT RELEASE WITHOUT DISCUSSING WITH THE AUTHOR.  THIS DOCUMENT ALSO MAY BE SUBJECT TO CLAIMS OF PRIVILEGE IF COVERED BY A DISCOVERY OR FREEDOM OF INFORMATION ACT REQUEST, 5 U.S.C. § 552.  IN SUCH INSTANCES, DO NOT RELEASE WITHOUT DISCUSSING WITH LITIGATION COUNSEL OR THE AUTHOR OF THIS DOCUMENT.

CEDC Case 000102



# SOCIAL SECURITY

August 27, 2025

████████

Chief
Government Information Law Division
Office of the Principal Legal Advisor
Immigration and Customs Enforcement
Email: ████████████████████


████████ :


This letter is in response to the Department of Homeland Security, U.S. Immigration and Customs Enforcement's (ICE) request to obtain from the Social Security Administration (SSA) identity and location information concerning aliens in the United States in accordance with the Immigration and Nationality Act (8 U.S.C. § 1360(b)).  This letter recognizes that SSA will provide identity and location information for each alien upon ICE requests in accordance with section 1106(a) of the Social Security Act (42 U.S.C. § 1306(a)) and 8 U.S.C. § 1360(b).

On a monthly basis, ICE projects that it will submit to SSA a file concerning approximately 50,000 aliens, that includes the alien's full name, Social Security number (SSN), alien registration number, date of birth, and address (if available).  When SSA identifies a match of submitted information, SSA will provide ICE identity and location information for each requested alien (i.e., known alias(es), address, place of birth, banking data, known phone number(s), known email address(es), names of known relative(s), known internet protocol (IP) address(es)).  We understand that ICE will use the provided information in a manner consistent with all relevant laws, regulations, and policies and maintain the information in DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER) System of Records, 89 Fed. Reg. 55638 (July 5, 2024).  The Commissioner of Social Security has directed that the fee be set to zero for this arrangement.  To the extent ICE needs to increase the record requests size or the frequency, ICE should consult with SSA to ensure that SSA's systems are prepared to timely process the file.

We understand that SSA and ICE will provide proper safeguards to the personally identifiable information (PII) exchanged:

- SSA and ICE will comply with the current requirements of the Federal Information Security Management Act, as amended, (44 U.S.C. § 3551 *et. seq.*), related Office of Management and Budget (OMB) circulars and memoranda, such as OMB Circular A-130, *Managing Information as a Strategic Resource* (July 28, 2016) and Memorandum M-17-12, *Preparing for and Responding to a Breach of Personally Identifiable Information* (January 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including any applicable amendments.

CEDC Case 000103

- If either SSA or ICE experiences an incident involving the suspected or confirmed breach (i.e., loss) of PII provided by SSA or ICE, the agency experiencing the incident will follow the breach reporting guidelines issued by OMB.

- The information obtained is sensitive controlled unclassified information provided for official use only, consistent with applicable law, regulation, and policy. The information should only be used or disclosed for the official purpose(s) specified herein. SSA and ICE will limit access to the information shared to only those authorized personnel who have a need to know to carry out their official duties.

- We recognize that nothing precludes the use or disclosure of information obtained by the receiving agency to the extent that there is an obligation to do so pursuant to applicable law, regulation, or policy. The receiving agency will give advance notice of any proposed use or disclosure that goes beyond the original purpose to the disclosing agency, unless otherwise prohibited by law, regulation, or policy.

- SSA and ICE may, by way of protective marking or otherwise, apply additional restrictions to those already set out with respect to the use or disclosure of information which it has provided hereunder, to include treatment of the information in a manner consistent with each.

- Information obtained will be retained only as long as necessary to carry out the stated purpose(s) and in accordance with applicable law, regulation, and policy, and applicable record retention schedules.

We are pleased to work constructively with ICE in order to accomplish your mission. If you have questions, please contact Christopher Harris at ███████████.

Sincerely,

*Mark Steffensen*

Mark Steffensen
Chief of Law and Policy/General Counsel
Social Security Administration

2

CEDC Case 000104

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 108 of 165

This section is no longer current. It appears here for historical purposes only.
Click here to go to the current version of this section.

## OBSOLETE POLICY

**Effective Dates:
11/09/2023 - 04/28/2025**

**TN 9 (11-23)**

# GN 03313.095 Disclosure to the Department of Homeland Security (DHS)

We provide general instructions for disclosing information from our systems of records to other Federal agencies and officials and a link to our systems of records and their applicable routine uses in GN 03313.001. If you receive a request from DHS, please forward the request directly to the Office of Privacy and Disclosure at OGC.OPD.LE.Requests@ssa.gov.

## A.  Disclosure to DHS administered programs

DHS offices and agencies request Social Security Number (SSN) and number holder information from our records. We often receive requests from U.S. Citizenship and Immigration Services (USCIS), Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE). We share information with DHS through centralized data exchange agreements. DHS uses the information we provide to identify and locate aliens living in the United States.

We also share information about potential employees with employers and USCIS through the centralized E-Verify process, which has its own routine use in the Master Files of SSN Holders and SSN Applications system of records (Numident). The E-Verify process screens job applicants in order to verify their authorization to work in the United States. The Immigration Reform and Control Act of 1986 requires employers to verify the identity and employment authorization of individuals they hire for employment, to preclude the unlawful hiring of aliens who are not authorized to work in the United States. For more information about the E-Verify process, see RM 10245.015.

## B.  Disclosure for DHS, USCIS purposes

We may honor a request for information received from DHS and any of its related offices if the request meets the criteria for disclosure. A request from DHS must:
*   involve identifying and or locating aliens in the United States; or

*   meet the law enforcement criteria for disclosure found in GN 03312.080; or

*   meet the limited criteria under which we may disclose tax return information discussed in item A.2 below.

### 1.  Aliens

CEDC Case 000105

The Immigration and Nationality Act (8 U.S.C. 1360(b)) requires us to disclose to DHS information concerning the identity and location of aliens in the United States. Such information includes:

- SSN,

- name,

- date of birth,

- place of birth, and

- address information.

**NOTE:**     We may disclose the above information only if the information will help DHS identify and or locate aliens in the United States. We do not disclose any other information in response to these types of requests.

The request must also contain enough identifying information, (e.g., SSN, first and last name, date of birth, place of birth, mother's maiden name, and father's first and last name), to help us search for the requested information. If a request does not indicate that the subject of the request is an alien and the information is contained in our records, we may disclose information if our records indicate that the subject of the request was an alien at the time we issued a SSN to that person. In this case, an entry other than "A" will appear in the citizenship (CSP) field on the Numident record.

## 2. Earnings

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (codified at 8 U.S.C. 1860(c)(2)) authorizes us to disclose to DHS certain information concerning an alien to whom we issued an SSN for non-work purposes and for whom earnings are reported. Specifically, we are authorized to disclose the name and address of the alien, the name and address of the employer, and the amount of the earnings.

### a. Pre-1997 earnings posted to SSN issued for non-work purposes

The IRC prohibits disclosure of pre-1997 earnings posted to SSNs issued for non-work purposes. The *only* exception is when we initiate the disclosure. Refer requests for pre-1997 earnings information to OPD

### b. Post-1997 earnings posted to SSN issued for non-work purposes

The Immigration and Nationality Act (8 U.S.C. § 1360(c)(2)) requires us to disclose certain information to DHS about aliens who have earnings posted to SSNs that were issued for non-work purposes *after* January 1, 1997. The information that we may disclose is the:

- name and address of the alien;

- name and address of the person reporting the earnings; and

- amount of the earnings posted.

We make these disclosures annually to DHS in electronic format. Refer requests for post-1997 earnings posted to SSNs issued for non-work purposes to OPD.

### c. Educational and decentralized correspondence letters

CEDC Case 000106

DHS has responsibility for making determinations regarding an employee's legal status. We do not disclose information regarding our W-2 suspense file or any information concerning whether a particular employer would have received, did receive, or was qualified to receive, an Educational Correspondence (EDCOR) letter or a Decentralized Correspondence (DECOR) letter identifying employees whose names and SSNs may not match our records. For general questions relating to EDCOR, consult the Business Services Branch (BSB) in the Office of Central Operations (OCO) at the phone number provided in the EDCOR letters, 1-800-772-6270 (TTY 1-800 325-0778). DECOR letters are currently suspended. For additional information on these letters, see RM 01105.027 - Educational Correspondence (EDCOR) and Decentralized Correspondence (DECOR) Letters Mailed when Names and SSNs Do Not Match Our Records.

## 3. Law enforcement

DHS usually requests information for the purpose of identifying and locating aliens in the United States. However, we may also receive requests from DHS' CBP and ICE that relate to law enforcement. These requests must meet the criteria for a valid law enforcement request, as described in GN 03312.080. Although uncommon, CBP, ICE, or other DHS components may request information about a U.S. citizen.

The DHS United States Secret Service (USSS) protects the President and other high-level officials and investigates counterfeiting and other financial crimes, including financial institution fraud, identity theft, computer fraud, and computer-based attacks on our nation's financial, banking, and telecommunications infrastructure. We may disclose information to the USSS in response to requests involving national security or threats to the lives of government officials. Refer these requests directly to OPD.

Field offices and other agency components also get involved with and maintain certain investigatory records when developing fraud cases. These cases, Program Integrity Case Files, are under the jurisdiction of the Office of the Inspector General (OIG), Office of Investigations.

## 4. Requests received in a Teleservice Center (TSC)

We may receive calls from the DHS in the TSC. Advise the caller that the request must be in writing on official agency letterhead. The request must specifically state that the subject person is an alien. Provide the address below to the caller for mailing the request to the appropriate office for processing:

*Social Security Administration*

*Office of the General Counsel*

*Office of Privacy and Disclosure*

*ATTN: Keisha Mahoney-Jones*

*Disclosure and Data Support Division 1*

*Mailstop G-401 West High Rise Building*

*6401 Security Boulevard*

*Baltimore, MD 21235*

Please do not link to or bookmark this section. It is obsolete.

CEDC Case 000107

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 111 of 165

*GN 03313.095 - Disclosure to the Department of Homeland Security (DHS)*
*Batch run: 12/27/2024*
*Rev:11/09/2023*

CEDC Case 000108

**Effective Dates: 04/29/2025 - Present  (Go to History)**

**TN 11 (04-25)**

# GN 03313.095 Disclosure to the Department of Homeland Security (DHS)

We provide general instructions for disclosing information from our systems of records to other Federal agencies and officials and a link to our systems of records and their applicable routine uses in GN 03313.001. If you receive a request from DHS, please forward the request directly to the Office of Privacy and Disclosure at OGC.OPD.LE.Requests@ssa.gov.

## A.  Disclosure to DHS administered programs

DHS offices and agencies request Social Security Number (SSN) and number holder information from our records. We often receive requests from U.S. Citizenship and Immigration Services (USCIS), Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE). We share information with DHS through centralized data exchange agreements. DHS uses the information we provide to identify and locate aliens living in the United States.

We also share information about potential employees with employers and USCIS through the centralized E-Verify process, which has its own routine use in the Master Files of SSN Holders and SSN Applications system of records (Numident). The E-Verify process screens job applicants in order to verify their authorization to work in the United States. The Immigration Reform and Control Act of 1986 requires employers to verify the identity and employment authorization of individuals they hire for employment, to preclude the unlawful hiring of aliens who are not authorized to work in the United States. For more information about the E-Verify process, see RM 10245.015.

## B.  Disclosure for DHS, USCIS purposes

We may honor a request for information received from DHS and any of its related offices if the request meets the criteria for disclosure. A request from DHS must:

- involve identifying and or locating aliens in the United States; or

- meet the law enforcement criteria for disclosure found in GN 03312.080; or

- meet the limited criteria under which we may disclose tax return information discussed in item A.2 below.

### 1.  Aliens

The Immigration and Nationality Act (8 U.S.C. 1360(b)) requires us to disclose to DHS, when requested, information concerning the identity and location of aliens in the United States.

NOTE:          We may only disclose SSA information that will help DHS identify and or locate aliens in the United States. We may disclose information such as, but not

CEDC Case 000109

limited to: SSN verification, address, telephone number, banking information (routing number, account type, and account number), email address, internet protocol (IP) addresses, etc.

The request should contain enough identifying information, (e.g., SSN, first and last name, date of birth, place of birth, mother's maiden name, and father's first and last name) for us to identify the correct record. If a request does not indicate that the subject of the request is an alien and the information is contained in our records, we may disclose information if our records indicate that the subject of the request was an alien at the time we issued an SSN to that person. In this case, an entry other than "A" will appear in the citizenship (CSP) field on the Numident record.

## 2. Earnings

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (codified at 8 U.S.C. 1860(c)(2)) authorizes us to disclose to DHS certain information concerning an alien to whom we issued an SSN for non-work purposes and for whom earnings are reported. Specifically, we are authorized to disclose the name and address of the alien, the name and address of the employer, and the amount of the earnings.

### a. Pre-1997 earnings posted to SSN issued for non-work purposes

The IRC prohibits disclosure of pre-1997 earnings posted to SSNs issued for non-work purposes. The *only* exception is when we initiate the disclosure. Refer requests for pre-1997 earnings information to OPD

### b. Post-1997 earnings posted to SSN issued for non-work purposes

The Immigration and Nationality Act (8 U.S.C. § 1360(c)(2)) requires us to disclose certain information to DHS about aliens who have earnings posted to SSNs that were issued for non-work purposes *after* January 1, 1997. The information that we may disclose is the:

- name and address of the alien;

- name and address of the person reporting the earnings; and

- amount of the earnings posted.

We make these disclosures annually to DHS in electronic format. Refer requests for post-1997 earnings posted to SSNs issued for non-work purposes to OPD.

### c. Educational and decentralized correspondence letters

DHS has responsibility for making determinations regarding an employee's legal status. We do not disclose information regarding our W-2 suspense file or any information concerning whether a particular employer would have received, did receive, or was qualified to receive, an Educational Correspondence (EDCOR) letter or a Decentralized Correspondence (DECOR) letter identifying employees whose names and SSNs may not match our records. For general questions relating to EDCOR, consult the Business Services Branch (BSB) in the Office of Central Operations (OCO) at the phone number provided in the EDCOR letters, 1-800-772-6270 (TTY 1-800 325-0778). DECOR letters are currently suspended. For additional information on these letters, see RM 01105.027 - Educational Correspondence (EDCOR) and Decentralized Correspondence (DECOR) Letters Mailed when Names and SSNs Do Not Match Our Records.

CEDC Case 000110

### 3. Law enforcement

DHS usually requests information for the purpose of identifying and locating aliens in the United States. However, we may also receive requests from DHS' CBP and ICE that relate to law enforcement. These requests must meet the criteria for a valid law enforcement request, as described in GN 03312.080. Although uncommon, CBP, ICE, or other DHS components may request information about a U.S. citizen.

The DHS United States Secret Service (USSS) protects the President and other high-level officials and investigates counterfeiting and other financial crimes, including financial institution fraud, identity theft, computer fraud, and computer-based attacks on our nation's financial, banking, and telecommunications infrastructure. We may disclose information to the USSS in response to requests involving national security or threats to the lives of government officials. Refer these requests directly to OPD.

Field offices and other agency components also get involved with and maintain certain investigatory records when developing fraud cases. These cases, Program Integrity Case Files, are under the jurisdiction of the Office of the Inspector General (OIG), Office of Investigations.

### 4. Requests received in a Teleservice Center (TSC)

We may receive calls from the DHS in the TSC. Advise the caller that the request must be in writing on official agency letterhead. The request must specifically state that the subject person is an alien. Provide the address below to the caller for mailing the request to the appropriate office for processing:

*Social Security Administration*

*Office of the General Counsel*

*Office of Privacy and Disclosure*

*ATTN: Keisha Mahoney-Jones*

*Disclosure and Data Support Division 1*

*Mailstop G-401 West High Rise Building*

*6401 Security Boulevard*

*Baltimore, MD 21235*

# Section History

Go To **Transmittal**

### Prior Versions of Section

| Effective Date | Title |
| --- | --- |
| 11/09/2023 - 04/28/2025 | Disclosure to the Department of Homeland Security (DHS) |
| 11/09/2023 - 11/08/2023 | Disclosure to the Department of Homeland Security (DHS) |
| 11/09/2023 - 11/08/2023 | Disclosure to the Department of Homeland Security (DHS) |
| 11/09/2023 - 11/08/2023 | Disclosure to the Department of Homeland Security (DHS) |

CEDC Case 000111

11/09/2023 - 11/08/2023 [Disclosure to the Department of Homeland Security (DHS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
07/28/2020 - 11/08/2023 [Disclosure to the Department of Homeland Security (DHS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
10/15/2019 - 07/27/2020 [Disclosure to the Department of Homeland Security (DHS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
06/03/2019 - 10/14/2019 [Disclosure to the Department of Homeland Security (DHS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
04/26/2019 - 06/02/2019 [Disclosure to the Department of Homeland Security (DHS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
12/28/2018 - 04/25/2019 [Disclosure to the Department of Homeland Security (DHS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
12/02/2016 - 12/27/2018 [Disclosure to the Department of Homeland Security (DHS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
04/27/2009 - 12/01/2016 [Disclosure to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)
09/12/2005 - 04/26/2009 [Disclosure to the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS)](http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095)

Link to this section:
http://policynet.ba.ssa.gov/poms.nsf/lnx/0203313095

*GN 03313.095 - Disclosure to the Department of Homeland Security (DHS)*
*Batch run: 04/29/2025*
*Rev:04/29/2025*

CEDC Case 000112

This section is no longer current. It appears here for historical purposes only.
Click here to go to the current version of this section.

## OBSOLETE POLICY

**Effective Dates:
02/06/2020 - 12/02/2025**

**TN 2 (02-20)**

# GN 03316.140 Disclosure Without Consent Under Ad Hoc Disclosure Situations

## A.  Disclosure policy

In exceptional cases, the Commissioner of Social Security or a designee may approve, on a case-by-case basis, disclosure of non-tax return information under the ad hoc disclosure provision of SSA's disclosure regulation (20 C.F.R. § 401.195). In these cases, the following requirements must be met:

• the disclosure seems appropriate or necessary, **and**

• there is no provision for disclosure in our disclosure regulations (20 C.F.R. Part 401) as interpreted by POMS GN Chapter 033, **and**

• no provision of law specifically prohibits the disclosure.

## B.  Disclosure procedure

Components should contact the Privacy Officer (PO) immediately, through the Office of the General Counsel, Office of Privacy and Disclosure, for all requests for information involving national security or other ad hoc disclosure situations.

Before referring the case to the PO, quickly find out as much as information as possible about the crime or other activity prompting the request, the requester's position in the law enforcement agency or other agency, and the information needed. You may ask the requester to fax or email a written request. Notify your Regional Privacy Act Coordinator if you contact the PO.

Please do not link to or bookmark this section. It is obsolete.

*GN 03316.140 - Disclosure Without Consent Under Ad Hoc Disclosure Situations*
*Batch run: 02/06/2020*
*Rev:02/06/2020*

CEDC Case 000113

(b) Within 90 days of the issuance of the Open Data Policy, the Administrator for Federal Procurement Policy, Controller of the Office of Federal Financial Management, CIO, and Administrator of OIRA shall work with the Chief Acquisition Officers Council, Chief Financial Officers Council, Chief Information Officers Council, and Federal Records Council to identify and initiate implementation of measures to support the integration of the Open Data Policy requirements into Federal acquisition and grant-making processes. Such efforts may include developing sample requirements language, grant and contract language, and workforce tools for agency acquisition, grant, and information management and technology professionals.

(c) Within 90 days of the date of this order, the Chief Performance Officer (CPO) shall work with the President's Management Council to establish a Cross-Agency Priority (CAP) Goal to track implementation of the Open Data Policy. The CPO shall work with agencies to set incremental performance goals, ensuring they have metrics and milestones in place to monitor advancement toward the CAP Goal. Progress on these goals shall be analyzed and reviewed by agency leadership, pursuant to the GPRA Modernization Act of 2010 (Public Law 111–352).

(d) Within 180 days of the date of this order, agencies shall report progress on the implementation of the CAP Goal to the CPO. Thereafter, agencies shall report progress quarterly, and as appropriate.

SEC. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) Nothing in this order shall compel or authorize the disclosure of privileged information, law enforcement information, national security information, personal information, or information the disclosure of which is prohibited by law.

(e) Independent agencies are requested to adhere to this order.

BARACK OBAMA.

FREEDOM OF INFORMATION ACT

Memorandum of President of the United States, Jan. 21, 2009, 74 F.R. 4683, provided:

Memorandum for the Heads of Executive Departments and Agencies

A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, "sunlight is said to be the best of disinfectants." In our democracy, the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a profound national commitment to ensuring an open Government. At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike.

The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies (agencies) should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public.

All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government. The presumption of disclosure should be applied to all decisions involving FOIA.

The presumption of disclosure also means that agencies should take affirmative steps to make information public. They should not wait for specific requests from the public. All agencies should use modern technology to inform citizens about what is known and done by their Government. Disclosure should be timely.

I direct the Attorney General to issue new guidelines governing the FOIA to the heads of executive departments and agencies, reaffirming the commitment to accountability and transparency, and to publish such guidelines in the Federal Register. In doing so, the Attorney General should review FOIA reports produced by the agencies under Executive Order 13392 of December 14, 2005. I also direct the Director of the Office of Management and Budget to update guidance to the agencies to increase and improve information dissemination to the public, including through the use of new technologies, and to publish such guidance in the Federal Register.

This memorandum does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The Director of the Office of Management and Budget is hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

§ 552a. Records maintained on individuals

(a) DEFINITIONS.—For purposes of this section—

(1) the term "agency" means agency as defined in section 552(e)[1] of this title;

(2) the term "individual" means a citizen of the United States or an alien lawfully admitted for permanent residence;

(3) the term "maintain" includes maintain, collect, use, or disseminate;

(4) the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

(5) the term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

(6) the term "statistical record" means a record in a system of records maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual, except as provided by section 8 of title 13;

(7) the term "routine use" means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected;

(8) the term "matching program"—

---

[1] See References in Text note below.

CEDC Case 000114

(A) means any computerized comparison of—

(i) two or more automated systems of records or a system of records with non-Federal records for the purpose of—

(I) establishing or verifying the eligibility of, or continuing compliance with statutory and regulatory requirements by, applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs, or

(II) recouping payments or delinquent debts under such Federal benefit programs, or

(ii) two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records,

(B) but does not include—

(i) matches performed to produce aggregate statistical data without any personal identifiers;

(ii) matches performed to support any research or statistical project, the specific data of which may not be used to make decisions concerning the rights, benefits, or privileges of specific individuals;

(iii) matches performed, by an agency (or component thereof) which performs as its principal function any activity pertaining to the enforcement of criminal laws, subsequent to the initiation of a specific criminal or civil law enforcement investigation of a named person or persons for the purpose of gathering evidence against such person or persons;

(iv) matches of tax information (I) pursuant to section 6103(d) of the Internal Revenue Code of 1986, (II) for purposes of tax administration as defined in section 6103(b)(4) of such Code, (III) for the purpose of intercepting a tax refund due an individual under authority granted by section 404(e), 464, or 1137 of the Social Security Act; or (IV) for the purpose of intercepting a tax refund due an individual under any other tax refund intercept program authorized by statute which has been determined by the Director of the Office of Management and Budget to contain verification, notice, and hearing requirements that are substantially similar to the procedures in section 1137 of the Social Security Act;

(v) matches—

(I) using records predominantly relating to Federal personnel, that are performed for routine administrative purposes (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)); or

(II) conducted by an agency using only records from systems of records maintained by that agency;

if the purpose of the match is not to take any adverse financial, personnel, disciplinary, or other adverse action against Federal personnel;

(vi) matches performed for foreign counterintelligence purposes or to produce background checks for security clearances of Federal personnel or Federal contractor personnel;

(vii) matches performed incident to a levy described in section 6103(k)(8) of the Internal Revenue Code of 1986;

(viii) matches performed pursuant to section 202(x)(3) or 1611(e)(1) of the Social Security Act (42 U.S.C. 402(x)(3), 1382(e)(1));

(ix) matches performed by the Secretary of Health and Human Services or the Inspector General of the Department of Health and Human Services with respect to potential fraud, waste, and abuse, including matches of a system of records with non-Federal records; or

(x) matches performed pursuant to section 3(d)(4) of the Achieving a Better Life Experience Act of 2014;[1]

(9) the term ''recipient agency'' means any agency, or contractor thereof, receiving records contained in a system of records from a source agency for use in a matching program;

(10) the term ''non-Federal agency'' means any State or local government, or agency thereof, which receives records contained in a system of records from a source agency for use in a matching program;

(11) the term ''source agency'' means any agency which discloses records contained in a system of records to be used in a matching program, or any State or local government, or agency thereof, which discloses records to be used in a matching program;

(12) the term ''Federal benefit program'' means any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals; and

(13) the term ''Federal personnel'' means officers and employees of the Government of the United States, members of the uniformed services (including members of the Reserve Components), individuals entitled to receive immediate or deferred retirement benefits under any retirement program of the Government of the United States (including survivor benefits).

(b) CONDITIONS OF DISCLOSURE.—No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

(2) required under section 552 of this title;

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

(4) to the Bureau of the Census for purposes of planning or carrying out a census or survey

CEDC Case 000115

or related activity pursuant to the provisions of title 13;

(5) to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;

(6) to the National Archives and Records Administration as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;

(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

(8) to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

(9) to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

(10) to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the Government Accountability Office;

(11) to the Director of the Congressional Budget Office, or any authorized representative of the Director, in the course of performance of the duties of the Congressional Budget Office;

(12) pursuant to the order of a court of competent jurisdiction; or

(13) to a consumer reporting agency in accordance with section 3711(e) of title 31.

(c) ACCOUNTING OF CERTAIN DISCLOSURES.—Each agency, with respect to each system of records under its control, shall—

(1) except for disclosures made under subsections (b)(1) or (b)(2) of this section, keep an accurate accounting of—

(A) the date, nature, and purpose of each disclosure of a record to any person or to another agency made under subsection (b) of this section; and

(B) the name and address of the person or agency to whom the disclosure is made;

(2) retain the accounting made under paragraph (1) of this subsection for at least five years or the life of the record, whichever is longer, after the disclosure for which the accounting is made;

(3) except for disclosures made under subsection (b)(7) of this section, make the accounting made under paragraph (1) of this subsection available to the individual named in the record at his request; and

(4) inform any person or other agency about any correction or notation of dispute made by the agency in accordance with subsection (d) of this section of any record that has been disclosed to the person or agency if an accounting of the disclosure was made.

(d) ACCESS TO RECORDS.—Each agency that maintains a system of records shall—

(1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence;

(2) permit the individual to request amendment of a record pertaining to him and—

(A) not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request, acknowledge in writing such receipt; and

(B) promptly, either—

(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or

(ii) inform the individual of its refusal to amend the record in accordance with his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official;

(3) permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal, and not later than 30 days (excluding Saturdays, Sundays, and legal public holidays) from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such 30-day period; and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of this section;

(4) in any disclosure, containing information about which the individual has filed a statement of disagreement, occurring after the filing of the statement under paragraph (3) of this subsection, clearly note any portion of the record which is disputed and provide copies of the statement and, if the agency deems it appropriate, copies of a concise statement of the reasons of the agency for not making the amendments requested, to persons or other agencies to whom the disputed record has been disclosed; and

CEDC Case 000116

(5) nothing in this section shall allow an individual access to any information compiled in reasonable anticipation of a civil action or proceeding.

(e) AGENCY REQUIREMENTS.—Each agency that maintains a system of records shall—

(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

(A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

(B) the principal purpose or purposes for which the information is intended to be used;

(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

(D) the effects on him, if any, of not providing all or any part of the requested information;

(4) subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

(A) the name and location of the system;

(B) the categories of individuals on whom records are maintained in the system;

(C) the categories of records maintained in the system;

(D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

(E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

(F) the title and business address of the agency official who is responsible for the system of records;

(G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

(I) the categories of sources of records in the system;

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

(6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

(7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

(8) make reasonable efforts to serve notice on an individual when any record on such individual is made available to any person under compulsory legal process when such process becomes a matter of public record;

(9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance;

(10) establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained;

(11) at least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency; and

(12) if such agency is a recipient agency or a source agency in a matching program with a non-Federal agency, with respect to any establishment or revision of a matching program, at least 30 days prior to conducting such program, publish in the Federal Register notice of such establishment or revision.

(f) AGENCY RULES.—In order to carry out the provisions of this section, each agency that maintains a system of records shall promulgate rules, in accordance with the requirements (including general notice) of section 553 of this title, which shall—

(1) establish procedures whereby an individual can be notified in response to his request if any system of records named by the individual contains a record pertaining to him;

(2) define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual;

(3) establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him, including spe-

CEDC Case 000117

cial procedure, if deemed necessary, for the disclosure to an individual of medical records, including psychological records, pertaining to him;

(4) establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under this section; and

(5) establish fees to be charged, if any, to any individual for making copies of his record, excluding the cost of any search for and review of the record.

The Office of the Federal Register shall biennially compile and publish the rules promulgated under this subsection and agency notices published under subsection (e)(4) of this section in a form available to the public at low cost.

(g)(1) CIVIL REMEDIES.—Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) refuses to comply with an individual request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

(2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct. In such a case the court shall determine the matter de novo.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(3)(A) In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. In such a case the court shall determine the matter de novo, and may examine the contents of any agency records in camera to determine whether the records or any portion thereof may be withheld under any of the ex-

emptions set forth in subsection (k) of this section, and the burden is on the agency to sustain its action.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

(5) An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy, within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. Nothing in this section shall be construed to authorize any civil action by reason of any injury sustained as the result of a disclosure of a record prior to September 27, 1975.

(h) RIGHTS OF LEGAL GUARDIANS.—For the purposes of this section, the parent of any minor, or the legal guardian of any individual who has been declared to be incompetent due to physical or mental incapacity or age by a court of competent jurisdiction, may act on behalf of the individual.

(i)(1) CRIMINAL PENALTIES.—Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

(2) Any officer or employee of any agency who willfully maintains a system of records without meeting the notice requirements of subsection (e)(4) of this section shall be guilty of a misdemeanor and fined not more than $5,000.

(3) Any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

CEDC Case 000118

(j) GENERAL EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from any part of this section except subsections (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10), and (11), and (i) if the system of records is—

(1) maintained by the Central Intelligence Agency; or

(2) maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals, and the activities of prosecutors, courts, correctional, probation, pardon, or parole authorities, and which consists of (A) information compiled for the purpose of identifying individual criminal offenders and alleged offenders and consisting only of identifying data and notations of arrests, the nature and disposition of criminal charges, sentencing, confinement, release, and parole and probation status; (B) information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual; or (C) reports identifiable to an individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment through release from supervision.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

(k) SPECIFIC EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from subsections (c)(3), (d), (e)(1), (e)(4)(G), (H), and (I) and (f) of this section if the system of records is—

(1) subject to the provisions of section 552(b)(1) of this title;

(2) investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section: *Provided, however,* That if any individual is denied any right, privilege, or benefit that he would otherwise be entitled by Federal law, or for which he would otherwise be eligible, as a result of the maintenance of such material, such material shall be provided to such individual, except to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(3) maintained in connection with providing protective services to the President of the United States or other individuals pursuant to section 3056 of title 18;

(4) required by statute to be maintained and used solely as statistical records;

(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service, Federal contracts, or access to classified information, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(6) testing or examination material used solely to determine individual qualifications for appointment or promotion in the Federal service the disclosure of which would compromise the objectivity or fairness of the testing or examination process; or

(7) evaluation material used to determine potential for promotion in the armed services, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

(*l*)(1) ARCHIVAL RECORDS.—Each agency record which is accepted by the Archivist of the United States for storage, processing, and servicing in accordance with section 3103 of title 44 shall, for the purposes of this section, be considered to be maintained by the agency which deposited the record and shall be subject to the provisions of this section. The Archivist of the United States shall not disclose the record except to the agency which maintains the record, or under rules established by that agency which are not inconsistent with the provisions of this section.

(2) Each agency record pertaining to an identifiable individual which was transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, prior to the effective date of this section, shall, for the purposes of this section, be considered to be maintained by the National Archives and shall not be subject to the provisions of this section, except that a statement generally describing such records (modeled after the requirements relating to records subject to subsections (e)(4)(A) through (G) of this section) shall be published in the Federal Register.

(3) Each agency record pertaining to an identifiable individual which is transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, on or after the effective date of this section, shall, for the purposes

CEDC Case 000119

of this section, be considered to be maintained by the National Archives and shall be exempt from the requirements of this section except subsections (e)(4)(A) through (G) and (e)(9) of this section.

(m)(1) GOVERNMENT CONTRACTORS.—When an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function, the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system. For purposes of subsection (i) of this section any such contractor and any employee of such contractor, if such contract is agreed to on or after the effective date of this section, shall be considered to be an employee of an agency.

(2) A consumer reporting agency to which a record is disclosed under section 3711(e) of title 31 shall not be considered a contractor for the purposes of this section.

(n) MAILING LISTS.—An individual's name and address may not be sold or rented by an agency unless such action is specifically authorized by law. This provision shall not be construed to require the withholding of names and addresses otherwise permitted to be made public.

(*o*) MATCHING AGREEMENTS.—(1) No record which is contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency or non-Federal agency specifying—

(A) the purpose and legal authority for conducting the program;

(B) the justification for the program and the anticipated results, including a specific estimate of any savings;

(C) a description of the records that will be matched, including each data element that will be used, the approximate number of records that will be matched, and the projected starting and completion dates of the matching program;

(D) procedures for providing individualized notice at the time of application, and notice periodically thereafter as directed by the Data Integrity Board of such agency (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)), to—

(i) applicants for and recipients of financial assistance or payments under Federal benefit programs, and

(ii) applicants for and holders of positions as Federal personnel,

that any information provided by such applicants, recipients, holders, and individuals may be subject to verification through matching programs;

(E) procedures for verifying information produced in such matching program as required by subsection (p);

(F) procedures for the retention and timely destruction of identifiable records created by a recipient agency or non-Federal agency in such matching program;

(G) procedures for ensuring the administrative, technical, and physical security of the records matched and the results of such programs;

(H) prohibitions on duplication and redisclosure of records provided by the source agency within or outside the recipient agency or the non-Federal agency, except where required by law or essential to the conduct of the matching program;

(I) procedures governing the use by a recipient agency or non-Federal agency of records provided in a matching program by a source agency, including procedures governing return of the records to the source agency or destruction of records used in such program;

(J) information on assessments that have been made on the accuracy of the records that will be used in such matching program; and

(K) that the Comptroller General may have access to all records of a recipient agency or a non-Federal agency that the Comptroller General deems necessary in order to monitor or verify compliance with the agreement.

(2)(A) A copy of each agreement entered into pursuant to paragraph (1) shall—

(i) be transmitted to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives; and

(ii) be available upon request to the public.

(B) No such agreement shall be effective until 30 days after the date on which such a copy is transmitted pursuant to subparagraph (A)(i).

(C) Such an agreement shall remain in effect only for such period, not to exceed 18 months, as the Data Integrity Board of the agency determines is appropriate in light of the purposes, and length of time necessary for the conduct, of the matching program.

(D) Within 3 months prior to the expiration of such an agreement pursuant to subparagraph (C), the Data Integrity Board of the agency may, without additional review, renew the matching agreement for a current, ongoing matching program for not more than one additional year if—

(i) such program will be conducted without any change; and

(ii) each party to the agreement certifies to the Board in writing that the program has been conducted in compliance with the agreement.

(p) VERIFICATION AND OPPORTUNITY TO CONTEST FINDINGS.—(1) In order to protect any individual whose records are used in a matching program, no recipient agency, non-Federal agency, or source agency may suspend, terminate, reduce, or make a final denial of any financial assistance or payment under a Federal benefit program to such individual, or take other adverse action against such individual, as a result of information produced by such matching program, until—

(A)(i) the agency has independently verified the information; or

(ii) the Data Integrity Board of the agency, or in the case of a non-Federal agency the Data Integrity Board of the source agency, determines in accordance with guidance issued by the Director of the Office of Management and Budget that—

(I) the information is limited to identification and amount of benefits paid by the source agency under a Federal benefit program; and

CEDC Case 000120

(II) there is a high degree of confidence that the information provided to the recipient agency is accurate;

(B) the individual receives a notice from the agency containing a statement of its findings and informing the individual of the opportunity to contest such findings; and

(C)(i) the expiration of any time period established for the program by statute or regulation for the individual to respond to that notice; or

(ii) in the case of a program for which no such period is established, the end of the 30-day period beginning on the date on which notice under subparagraph (B) is mailed or otherwise provided to the individual.

(2) Independent verification referred to in paragraph (1) requires investigation and confirmation of specific information relating to an individual that is used as a basis for an adverse action against the individual, including where applicable investigation and confirmation of—

(A) the amount of any asset or income involved;

(B) whether such individual actually has or had access to such asset or income for such individual's own use; and

(C) the period or periods when the individual actually had such asset or income.

(3) Notwithstanding paragraph (1), an agency may take any appropriate action otherwise prohibited by such paragraph if the agency determines that the public health or public safety may be adversely affected or significantly threatened during any notice period required by such paragraph.

(q) SANCTIONS.—(1) Notwithstanding any other provision of law, no source agency may disclose any record which is contained in a system of records to a recipient agency or non-Federal agency for a matching program if such source agency has reason to believe that the requirements of subsection (p), or any matching agreement entered into pursuant to subsection (o), or both, are not being met by such recipient agency.

(2) No source agency may renew a matching agreement unless—

(A) the recipient agency or non-Federal agency has certified that it has complied with the provisions of that agreement; and

(B) the source agency has no reason to believe that the certification is inaccurate.

(r) REPORT ON NEW SYSTEMS AND MATCHING PROGRAMS.—Each agency that proposes to establish or make a significant change in a system of records or a matching program shall provide adequate advance notice of any such proposal (in duplicate) to the Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of Management and Budget in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals.

(s) BIENNIAL REPORT.—The President shall biennially submit to the Speaker of the House of Representatives and the President pro tempore of the Senate a report—

(1) describing the actions of the Director of the Office of Management and Budget pursuant to section 6 of the Privacy Act of 1974 during the preceding 2 years;

(2) describing the exercise of individual rights of access and amendment under this section during such years;

(3) identifying changes in or additions to systems of records;

(4) containing such other information concerning administration of this section as may be necessary or useful to the Congress in reviewing the effectiveness of this section in carrying out the purposes of the Privacy Act of 1974.

(t)(1) EFFECT OF OTHER LAWS.—No agency shall rely on any exemption contained in section 552 of this title to withhold from an individual any record which is otherwise accessible to such individual under the provisions of this section.

(2) No agency shall rely on any exemption in this section to withhold from an individual any record which is otherwise accessible to such individual under the provisions of section 552 of this title.

(u) DATA INTEGRITY BOARDS.—(1) Every agency conducting or participating in a matching program shall establish a Data Integrity Board to oversee and coordinate among the various components of such agency the agency's implementation of this section.

(2) Each Data Integrity Board shall consist of senior officials designated by the head of the agency, and shall include any senior official designated by the head of the agency as responsible for implementation of this section, and the inspector general of the agency, if any. The inspector general shall not serve as chairman of the Data Integrity Board.

(3) Each Data Integrity Board—

(A) shall review, approve, and maintain all written agreements for receipt or disclosure of agency records for matching programs to ensure compliance with subsection (o), and all relevant statutes, regulations, and guidelines;

(B) shall review all matching programs in which the agency has participated during the year, either as a source agency or recipient agency, determine compliance with applicable laws, regulations, guidelines, and agency agreements, and assess the costs and benefits of such programs;

(C) shall review all recurring matching programs in which the agency has participated during the year, either as a source agency or recipient agency, for continued justification for such disclosures;

(D) shall compile an annual report, which shall be submitted to the head of the agency and the Office of Management and Budget and made available to the public on request, describing the matching activities of the agency, including—

(i) matching programs in which the agency has participated as a source agency or recipient agency;

(ii) matching agreements proposed under subsection (o) that were disapproved by the Board;

(iii) any changes in membership or structure of the Board in the preceding year;

CEDC Case 000121

(iv) the reasons for any waiver of the requirement in paragraph (4) of this section for completion and submission of a cost-benefit analysis prior to the approval of a matching program;

(v) any violations of matching agreements that have been alleged or identified and any corrective action taken; and

(vi) any other information required by the Director of the Office of Management and Budget to be included in such report;

(E) shall serve as a clearinghouse for receiving and providing information on the accuracy, completeness, and reliability of records used in matching programs;

(F) shall provide interpretation and guidance to agency components and personnel on the requirements of this section for matching programs;

(G) shall review agency recordkeeping and disposal policies and practices for matching programs to assure compliance with this section; and

(H) may review and report on any agency matching activities that are not matching programs.

(4)(A) Except as provided in subparagraphs (B) and (C), a Data Integrity Board shall not approve any written agreement for a matching program unless the agency has completed and submitted to such Board a cost-benefit analysis of the proposed program and such analysis demonstrates that the program is likely to be cost effective.[2]

(B) The Board may waive the requirements of subparagraph (A) of this paragraph if it determines in writing, in accordance with guidelines prescribed by the Director of the Office of Management and Budget, that a cost-benefit analysis is not required.

(C) A cost-benefit analysis shall not be required under subparagraph (A) prior to the initial approval of a written agreement for a matching program that is specifically required by statute. Any subsequent written agreement for such a program shall not be approved by the Data Integrity Board unless the agency has submitted a cost-benefit analysis of the program as conducted under the preceding approval of such agreement.

(5)(A) If a matching agreement is disapproved by a Data Integrity Board, any party to such agreement may appeal the disapproval to the Director of the Office of Management and Budget. Timely notice of the filing of such an appeal shall be provided by the Director of the Office of Management and Budget to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives.

(B) The Director of the Office of Management and Budget may approve a matching agreement notwithstanding the disapproval of a Data Integrity Board if the Director determines that—

(i) the matching program will be consistent with all applicable legal, regulatory, and policy requirements;

(ii) there is adequate evidence that the matching agreement will be cost-effective; and

(iii) the matching program is in the public interest.

(C) The decision of the Director to approve a matching agreement shall not take effect until 30 days after it is reported to committees described in subparagraph (A).

(D) If the Data Integrity Board and the Director of the Office of Management and Budget disapprove a matching program proposed by the inspector general of an agency, the inspector general may report the disapproval to the head of the agency and to the Congress.

(6) In the reports required by paragraph (3)(D), agency matching activities that are not matching programs may be reported on an aggregate basis, if and to the extent necessary to protect ongoing law enforcement or counterintelligence investigations.

(v) OFFICE OF MANAGEMENT AND BUDGET RESPONSIBILITIES.—The Director of the Office of Management and Budget shall—

(1) develop and, after notice and opportunity for public comment, prescribe guidelines and regulations for the use of agencies in implementing the provisions of this section; and

(2) provide continuing assistance to and oversight of the implementation of this section by agencies.

(w) APPLICABILITY TO BUREAU OF CONSUMER FINANCIAL PROTECTION.—Except as provided in the Consumer Financial Protection Act of 2010, this section shall apply with respect to the Bureau of Consumer Financial Protection.

(Added Pub. L. 93–579, §3, Dec. 31, 1974, 88 Stat. 1897; amended Pub. L. 94–183, §2(2), Dec. 31, 1975, 89 Stat. 1057; Pub. L. 97–365, §2, Oct. 25, 1982, 96 Stat. 1749; Pub. L. 97–375, title II, §201(a), (b), Dec. 21, 1982, 96 Stat. 1821; Pub. L. 97–452, §2(a)(1), Jan. 12, 1983, 96 Stat. 2478; Pub. L. 98–477, §2(c), Oct. 15, 1984, 98 Stat. 2211; Pub. L. 98–497, title I, §107(g), Oct. 19, 1984, 98 Stat. 2292; Pub. L. 100–503, §§2–6(a), 7, 8, Oct. 18, 1988, 102 Stat. 2507–2514; Pub. L. 101–508, title VII, §7201(b)(1), Nov. 5, 1990, 104 Stat. 1388–334; Pub. L. 103–66, title XIII, §13581(c), Aug. 10, 1993, 107 Stat. 611; Pub. L. 104–193, title I, §110(w), Aug. 22, 1996, 110 Stat. 2175; Pub. L. 104–226, §1(b)(3), Oct. 2, 1996, 110 Stat. 3033; Pub. L. 104–316, title I, §115(g)(2)(B), Oct. 19, 1996, 110 Stat. 3835; Pub. L. 105–34, title X, §1026(b)(2), Aug. 5, 1997, 111 Stat. 925; Pub. L. 105–362, title XIII, §1301(d), Nov. 10, 1998, 112 Stat. 3293; Pub. L. 106–170, title IV, §402(a)(2), Dec. 17, 1999, 113 Stat. 1908; Pub. L. 108–271, §8(b), July 7, 2004, 118 Stat. 814; Pub. L. 111–148, title VI, §6402(b)(2), Mar. 23, 2010, 124 Stat. 756; Pub. L. 111–203, title X, §1082, July 21, 2010, 124 Stat. 2080; Pub. L. 113–295, div. B, title I, §102(d), Dec. 19, 2014, 128 Stat. 4062; Pub. L. 118–104, §2, Oct. 2, 2024, 138 Stat. 1586.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 552(e) of this title, referred to in subsec. (a)(1), was redesignated section 552(f) of this title by section 1802(b) of Pub. L. 99–570.

Section 6103 of the Internal Revenue Code of 1986, referred to in subsec. (a)(8)(B)(iv), (vii), is classified to section 6103 of Title 26, Internal Revenue Code.

Sections 404, 464, and 1137 of the Social Security Act, referred to in subsec. (a)(8)(B)(iv), are classified to sec-

[2] So in original. Probably should be ''cost-effective.''

tions 604, 664, and 1320b–7, respectively, of Title 42, The Public Health and Welfare.

The Achieving a Better Life Experience Act of 2014, referred to in subsec. (a)(8)(B)(x), probably means Pub. L. 113–295, div. B, Dec. 19, 2014, 128 Stat. 4056, known as the Stephen Beck, Jr., Achieving a Better Life Experience Act of 2014 or the Stephen Beck, Jr., ABLE Act of 2014. The Act does not contain a section 3.

For effective date of this section, referred to in subsecs. (k)(2), (5), (7), (l)(2), (3), and (m), see Effective Date note below.

Section 6 of the Privacy Act of 1974, referred to in subsec. (s)(1), is section 6 of Pub. L. 93–579, which was set out below and was repealed by section 6(c) of Pub. L. 100–503.

For classification of the Privacy Act of 1974, referred to in subsec. (s)(4), see Short Title note below.

The Consumer Financial Protection Act of 2010, referred to in subsec. (w), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955, which enacted subchapter V (§ 5481 et seq.) of chapter 53 of Title 12, Banks and Banking, and enacted and amended numerous other sections and notes in the Code. For complete classification of this Act to the Code, see Short Title note set out under section 5301 of Title 12 and Tables.

### CODIFICATION

Section 552a of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2244 of Title 7, Agriculture.

### AMENDMENTS

2024—Subsec. (b)(11) to (13). Pub. L. 118–104 added par. (11) and redesignated former pars. (11) and (12) as (12) and (13), respectively.

2014—Subsec. (a)(8)(B)(x). Pub. L. 113–295 added cl. (x).

2010—Subsec. (a)(8)(B)(ix). Pub. L. 111–148 added cl. (ix).

Subsec. (w). Pub. L. 111–203 added subsec. (w).

2004—Subsec. (b)(10). Pub. L. 108–271 substituted ''Government Accountability Office'' for ''General Accounting Office''.

1999—Subsec. (a)(8)(B)(viii). Pub. L. 106–170 added cl. (viii).

1998—Subsec. (u)(6), (7). Pub. L. 105–362 redesignated par. (7) as (6), substituted ''paragraph (3)(D)'' for ''paragraphs (3)(D) and (6)'', and struck out former par. (6) which read as follows: ''The Director of the Office of Management and Budget shall, annually during the first 3 years after the date of enactment of this subsection and biennially thereafter, consolidate in a report to the Congress the information contained in the reports from the various Data Integrity Boards under paragraph (3)(D). Such report shall include detailed information about costs and benefits of matching programs that are conducted during the period covered by such consolidated report, and shall identify each waiver granted by a Data Integrity Board of the requirement for completion and submission of a cost-benefit analysis and the reasons for granting the waiver.''

1997—Subsec. (a)(8)(B)(vii). Pub. L. 105–34 added cl. (vii).

1996—Subsec. (a)(8)(B)(iv)(III). Pub. L. 104–193 substituted ''section 404(e), 464,'' for ''section 464''.

Subsec. (a)(8)(B)(v) to (vii). Pub. L. 104–226 inserted ''or'' at end of cl. (v), struck out ''or'' at end of cl. (vi), and struck out cl. (vii) which read as follows: ''matches performed pursuant to section 6103(l)(12) of the Internal Revenue Code of 1986 and section 1144 of the Social Security Act;''.

Subsecs. (b)(12), (m)(2). Pub. L. 104–316 substituted ''3711(e)'' for ''3711(f)''.

1993—Subsec. (a)(8)(B)(vii). Pub. L. 103–66 added cl. (vii).

1990—Subsec. (p). Pub. L. 101–508 amended subsec. (p) generally, restating former pars. (1) and (3) as par. (1), adding provisions relating to Data Integrity Boards, and restating former pars. (2) and (4) as (2) and (3), respectively.

1988—Subsec. (a)(8) to (13). Pub. L. 100–503, § 5, added pars. (8) to (13).

Subsec. (e)(12). Pub. L. 100–503, § 3(a), added par. (12).

Subsec. (f). Pub. L. 100–503, § 7, substituted ''biennially'' for ''annually'' in last sentence.

Subsecs. (o) to (q). Pub. L. 100–503, § 2(2), added subsecs. (o) to (q). Former subsecs. (o) to (q) redesignated (r) to (t), respectively.

Subsec. (r). Pub. L. 100–503, § 3(b), inserted ''and matching programs'' in heading and amended text generally. Prior to amendment, text read as follows: ''Each agency shall provide adequate advance notice to Congress and the Office of Management and Budget of any proposal to establish or alter any system of records in order to permit an evaluation of the probable or potential effect of such proposal on the privacy and other personal or property rights of individuals or the disclosure of information relating to such individuals, and its effect on the preservation of the constitutional principles of federalism and separation of powers.''

Pub. L. 100–503, § 2(1), redesignated former subsec. (o) as (r).

Subsec. (s). Pub. L. 100–503, § 8, substituted ''Biennial'' for ''Annual'' in heading, ''biennially submit'' for ''annually submit'' in introductory provisions, ''preceding 2 years'' for ''preceding year'' in par. (1), and ''such years'' for ''such year'' in par. (2).

Pub. L. 100–503, § 2(1), redesignated former subsec. (p) as (s).

Subsec. (t). Pub. L. 100–503, § 2(1), redesignated former subsec. (q) as (t).

Subsec. (u). Pub. L. 100–503, § 4, added subsec. (u).

Subsec. (v). Pub. L. 100–503, § 6(a), added subsec. (v).

1984—Subsec. (b)(6). Pub. L. 98–497, § 107(g)(1), substituted ''National Archives and Records Administration'' for ''National Archives of the United States'', and ''Archivist of the United States or the designee of the Archivist'' for ''Administrator of General Services or his designee''.

Subsec. (l)(1). Pub. L. 98–497, § 107(g)(2), substituted ''Archivist of the United States'' for ''Administrator of General Services'' in two places.

Subsec. (q). Pub. L. 98–477 designated existing provisions as par. (1) and added par. (2).

1983—Subsec. (b)(12). Pub. L. 97–452 substituted ''section 3711(f) of title 31'' for ''section 3(d) of the Federal Claims Collection Act of 1966 (31 U.S.C. 952(d))''.

Subsec. (m)(2). Pub. L. 97–452 substituted ''section 3711(f) of title 31'' for ''section 3(d) of the Federal Claims Collection Act of 1966 (31 U.S.C. 952(d))''.

1982—Subsec. (b)(12). Pub. L. 97–365, § 2(a), added par. (12).

Subsec. (e)(4). Pub. L. 97–375, § 201(a), substituted ''upon establishment or revision'' for ''at least annually'' after ''Federal Register''.

Subsec. (m). Pub. L. 97–365, § 2(b), designated existing provisions as par. (1) and added par. (2).

Subsec. (p). Pub. L. 97–375, § 201(b), substituted provisions requiring annual submission of a report by the President to the Speaker of the House and President pro tempore of the Senate relating to the Director of the Office of Management and Budget, individual rights of access, changes or additions to systems of records, and other necessary or useful information, for provisions which had directed the President to submit to the Speaker of the House and the President of the Senate, by June 30 of each calendar year, a consolidated report, separately listing for each Federal agency the number of records contained in any system of records which were exempted from the application of this section under the provisions of subsections (j) and (k) of this section during the preceding calendar year, and the reasons for the exemptions, and such other information as indicate efforts to administer fully this section.

1975—Subsec. (g)(5). Pub. L. 94–183 substituted ''to September 27, 1975'' for ''to the effective date of this section''.

CEDC Case 000123

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

Committee on Governmental Affairs of Senate changed to Committee on Homeland Security and Governmental Affairs of Senate, effective Jan. 4, 2005, by Senate Resolution No. 445, One Hundred Eighth Congress, Oct. 9, 2004.

Committee on Government Operations of House of Representatives treated as referring to Committee on Government Reform and Oversight of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Government Reform and Oversight of House of Representatives changed to Committee on Government Reform of House of Representatives by House Resolution No. 5, One Hundred Sixth Congress, Jan. 6, 1999. Committee on Government Reform of House of Representatives changed to Committee on Oversight and Government Reform of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007. Committee on Oversight and Government Reform of House of Representatives changed to Committee on Oversight and Reform of House of Representatives by House Resolution No. 6, One Hundred Sixteenth Congress, Jan. 9, 2019. Committee on Oversight and Reform of House of Representatives changed to Committee on Oversight and Accountability of House of Representatives by House Resolution No. 5, One Hundred Eighteenth Congress, Jan. 9, 2023.

#### EFFECTIVE DATE OF 2014 AMENDMENT

Pub. L. 113–295, div. B, title I, § 102(f)(1), Dec. 19, 2014, 128 Stat. 4062, provided that: ''The amendments made by this section [enacting section 529A of Title 26, Internal Revenue Code, and amending this section, section 5517 of Title 12, Banks and Banking, and sections 26, 877A, 4965, 4973, and 6693 of Title 26] shall apply to taxable years beginning after December 31, 2014.''

#### EFFECTIVE DATE OF 2010 AMENDMENT

Pub. L. 111–203, title X, § 1082, July 21, 2010, 124 Stat. 2080, provided that the amendment made by section 1082 is effective on July 21, 2010.

Pub. L. 111–203, title X, § 1100H, July 21, 2010, 124 Stat. 2113, provided that: ''Except as otherwise provided in this subtitle [subtitle H (§§ 1081–1100H) of title X of Pub. L. 111–203, see Tables for classification] and the amendments made by this subtitle, this subtitle and the amendments made by this subtitle, other than sections 1081 [amending section 8G of Pub. L. 95–452, formerly set out in the Appendix to this title, and enacting provisions set out as a note under section 8G of Pub. L. 95–452] and 1082 [amending this section and enacting provisions set out as a note under this section], shall become effective on the designated transfer date.''

[The term ''designated transfer date'' is defined in section 5481(9) of Title 12, Banks and Banking, as the date established under section 5582 of Title 12, which is July 21, 2011.]

#### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–170 applicable to individuals whose period of confinement in an institution commences on or after the first day of the fourth month beginning after December 1999, see section 402(a)(4) of Pub. L. 106–170, set out as a note under section 402 of Title 42, The Public Health and Welfare.

#### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–34 applicable to levies issued after Aug. 5, 1997, see section 1026(c) of Pub. L. 105–34, set out as a note under section 6103 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of Title 42, The Public Health and Welfare.

#### EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by Pub. L. 103–66 effective Jan. 1, 1994, see section 13581(d) of Pub. L. 103–66, set out as a note under section 1395y of Title 42, The Public Health and Welfare.

#### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–503, § 10, Oct. 18, 1988, 102 Stat. 2514, as amended by Pub. L. 101–56, § 2, July 19, 1989, 103 Stat. 149, provided that:

''(a) IN GENERAL.—Except as provided in subsections (b) and (c), the amendments made by this Act [amending this section and repealing provisions set out as a note below] shall take effect 9 months after the date of enactment of this Act [Oct. 18, 1988].

''(b) EXCEPTIONS.—The amendment made by sections 3(b), 6, 7, and 8 of this Act [amending this section and repealing provisions set out as a note below] shall take effect upon enactment.

''(c) EFFECTIVE DATE DELAYED FOR EXISTING PROGRAMS.—In the case of any matching program (as defined in section 552a(a)(8) of title 5, United States Code, as added by section 5 of this Act) in operation before June 1, 1989, the amendments made by this Act (other than the amendments described in subsection (b)) shall take effect January 1, 1990, if—

''(1) such matching program is identified by an agency as being in operation before June 1, 1989; and

''(2) such identification is—

''(A) submitted by the agency to the Committee on Governmental Affairs of the Senate, the Committee on Government Operations of the House of Representatives, and the Office of Management and Budget before August 1, 1989, in a report which contains a schedule showing the dates on which the agency expects to have such matching program in compliance with the amendments made by this Act, and

''(B) published by the Office of Management and Budget in the Federal Register, before September 15, 1989.''

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–497 effective Apr. 1, 1985, see section 301 of Pub. L. 98–497, set out as a note under section 2102 of Title 44, Public Printing and Documents.

#### EFFECTIVE DATE

Pub. L. 93–579, § 8, Dec. 31, 1974, 88 Stat. 1910, provided that: ''The provisions of this Act [enacting this section and provisions set out as notes under this section] shall be effective on and after the date of enactment [Dec. 31, 1974], except that the amendments made by sections 3 and 4 [enacting this section and amending analysis preceding section 500 of this title] shall become effective 270 days following the day on which this Act is enacted.''

#### SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–508, title VII, § 7201(a), Nov. 5, 1990, 104 Stat. 1388–334, provided that: ''This section [amending this section and enacting provisions set out as notes below] may be cited as the 'Computer Matching and Privacy Protection Amendments of 1990'.''

#### SHORT TITLE OF 1989 AMENDMENT

Pub. L. 101–56, § 1, July 19, 1989, 103 Stat. 149, provided that: ''This Act [amending section 10 of Pub. L. 100–503,

CEDC Case 000124

set out as a note above] may be cited as the 'Computer Matching and Privacy Protection Act Amendments of 1989'.''

### SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–503, §1, Oct. 18, 1988, 102 Stat. 2507, provided that: ''This Act [amending this section, enacting provisions set out as notes above and below, and repealing provisions set out as a note below] may be cited as the 'Computer Matching and Privacy Protection Act of 1988'.''

### SHORT TITLE OF 1974 AMENDMENT

Pub. L. 93–579, §1, Dec. 31, 1974, 88 Stat. 1896, provided: ''That this Act [enacting this section and provisions set out as notes under this section] may be cited as the 'Privacy Act of 1974'.''

### SHORT TITLE

This section is popularly known as the ''Privacy Act'' and the ''Privacy Act of 1974''.

### TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of reporting provisions in subsec. (s) of this section, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 31 of House Document No. 103–7.

### DELEGATION OF FUNCTIONS

Functions of Director of Office of Management and Budget under this section delegated to Administrator for Office of Information and Regulatory Affairs by section 3 of Pub. L. 96–511, Dec. 11, 1980, 94 Stat. 2825, set out as a note under section 3503 of Title 44, Public Printing and Documents.

### OMB GUIDANCE ON ELECTRONIC CONSENT AND ACCESS FORMS

Pub. L. 116–50, §3, Aug. 22, 2019, 133 Stat. 1073, provided that:

''(a) GUIDANCE.—Not later than 1 year after the date of the enactment of this Act [Aug. 22, 2019], the Director shall issue guidance that does the following:

''(1) Requires each agency to accept electronic identity proofing and authentication processes for the purposes of allowing an individual to provide prior written consent for the disclosure of the individual's records under section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) of such title.

''(2) Creates a template for electronic consent and access forms and requires each agency to post the template on the agency website and to accept the forms from any individual properly identity proofed and authenticated in accordance with paragraph (1) for the purpose of authorizing disclosure of the individual's records under section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) of such title.

''(3) Requires each agency to accept the electronic consent and access forms described in paragraph (2) from any individual properly identity proofed and authenticated in accordance with paragraph (1) for the purpose of authorizing disclosure of the individual's records to another entity, including a congressional office, in accordance with section 552a(b) of title 5, United States Code, or for individual access to records under section 552a(d) [of such title].

''(b) AGENCY COMPLIANCE.—Each agency shall comply with the guidance issued pursuant to subsection (a) not later than 1 year after the date on which such guidance is issued.

''(c) DEFINITIONS.—In this section:

''(1) AGENCY; INDIVIDUAL; RECORD.—The terms 'agency', 'individual', and 'record' have the meanings given those terms in section 552a(a) of title 5, United States Code.

''(2) DIRECTOR.—The term 'Director' means the Director of the Office of Management and Budget.''

### EXTENSION OF PRIVACY ACT REMEDIES TO CITIZENS OF DESIGNATED COUNTRIES

Pub. L. 114–126, Feb. 24, 2016, 130 Stat. 282, provided that:

''SECTION 1. SHORT TITLE.

''This Act may be cited as the 'Judicial Redress Act of 2015'.

''SEC. 2. EXTENSION OF PRIVACY ACT REMEDIES TO CITIZENS OF DESIGNATED COUNTRIES.

''(a) CIVIL ACTION; CIVIL REMEDIES.—With respect to covered records, a covered person may bring a civil action against an agency and obtain civil remedies, in the same manner, to the same extent, and subject to the same limitations, including exemptions and exceptions, as an individual may bring and obtain with respect to records under—

''(1) section 552a(g)(1)(D) of title 5, United States Code, but only with respect to disclosures intentionally or willfully made in violation of section 552a(b) of such title; and

''(2) subparagraphs (A) and (B) of section 552a(g)(1) of title 5, United States Code, but such an action may only be brought against a designated Federal agency or component.

''(b) EXCLUSIVE REMEDIES.—The remedies set forth in subsection (a) are the exclusive remedies available to a covered person under this section.

''(c) APPLICATION OF THE PRIVACY ACT WITH RESPECT TO A COVERED PERSON.—For purposes of a civil action described in subsection (a), a covered person shall have the same rights, and be subject to the same limitations, including exemptions and exceptions, as an individual has and is subject to under section 552a of title 5, United States Code, when pursuing the civil remedies described in paragraphs (1) and (2) of subsection (a).

''(d) DESIGNATION OF COVERED COUNTRY.—

''(1) IN GENERAL.—The Attorney General may, with the concurrence of the Secretary of State, the Secretary of the Treasury, and the Secretary of Homeland Security, designate a foreign country or regional economic integration organization, or member country of such organization, as a 'covered country' for purposes of this section if—

''(A)(i) the country or regional economic integration organization, or member country of such organization, has entered into an agreement with the United States that provides for appropriate privacy protections for information shared for the purpose of preventing, investigating, detecting, or prosecuting criminal offenses; or

''(ii) the Attorney General has determined that the country or regional economic integration organization, or member country of such organization, has effectively shared information with the United States for the purpose of preventing, investigating, detecting, or prosecuting criminal offenses and has appropriate privacy protections for such shared information;

''(B) the country or regional economic integration organization, or member country of such organization, permits the transfer of personal data for commercial purposes between the territory of that country or regional economic organization and the territory of the United States, through an agreement with the United States or otherwise; and

''(C) the Attorney General has certified that the policies regarding the transfer of personal data for commercial purposes and related actions of the country or regional economic integration organization, or member country of such organization, do not materially impede the national security interests of the United States.

''(2) REMOVAL OF DESIGNATION.—The Attorney General may, with the concurrence of the Secretary of State, the Secretary of the Treasury, and the Sec-

CEDC Case 000125

retary of Homeland Security, revoke the designation of a foreign country or regional economic integration organization, or member country of such organization, as a 'covered country' if the Attorney General determines that such designated 'covered country'—

"(A) is not complying with the agreement described under paragraph (1)(A)(i);

"(B) no longer meets the requirements for designation under paragraph (1)(A)(ii);

"(C) fails to meet the requirements under paragraph (1)(B);

"(D) no longer meets the requirements for certification under paragraph (1)(C); or

"(E) impedes the transfer of information (for purposes of reporting or preventing unlawful activity) to the United States by a private entity or person.

"(e) DESIGNATION OF DESIGNATED FEDERAL AGENCY OR COMPONENT.—

"(1) IN GENERAL.—The Attorney General shall determine whether an agency or component thereof is a 'designated Federal agency or component' for purposes of this section. The Attorney General shall not designate any agency or component thereof other than the Department of Justice or a component of the Department of Justice without the concurrence of the head of the relevant agency, or of the agency to which the component belongs.

"(2) REQUIREMENTS FOR DESIGNATION.—The Attorney General may determine that an agency or component of an agency is a 'designated Federal agency or component' for purposes of this section, if—

"(A) the Attorney General determines that information exchanged by such agency with a covered country is within the scope of an agreement referred to in subsection (d)(1)(A); or

"(B) with respect to a country or regional economic integration organization, or member country of such organization, that has been designated as a 'covered country' under subsection (d)(1)(B), the Attorney General determines that designating such agency or component thereof is in the law enforcement interests of the United States.

"(f) FEDERAL REGISTER REQUIREMENT; NONREVIEWABLE DETERMINATION.—The Attorney General shall publish each determination made under subsections (d) and (e). Such determination shall not be subject to judicial or administrative review.

"(g) JURISDICTION.—The United States District Court for the District of Columbia shall have exclusive jurisdiction over any claim arising under this section.

"(h) DEFINITIONS.—In this Act:

"(1) AGENCY.—The term 'agency' has the meaning given that term in section 552(f) of title 5, United States Code.

"(2) COVERED COUNTRY.—The term 'covered country' means a country or regional economic integration organization, or member country of such organization, designated in accordance with subsection (d).

"(3) COVERED PERSON.—The term 'covered person' means a natural person (other than an individual) who is a citizen of a covered country.

"(4) COVERED RECORD.—The term 'covered record' has the same meaning for a covered person as a record has for an individual under section 552a of title 5, United States Code, once the covered record is transferred—

"(A) by a public authority of, or private entity within, a country or regional economic organization, or member country of such organization, which at the time the record is transferred is a covered country; and

"(B) to a designated Federal agency or component for purposes of preventing, investigating, detecting, or prosecuting criminal offenses.

"(5) DESIGNATED FEDERAL AGENCY OR COMPONENT.—The term 'designated Federal agency or component' means a Federal agency or component of an agency designated in accordance with subsection (e).

"(6) INDIVIDUAL.—The term 'individual' has the meaning given that term in section 552a(a)(2) of title 5, United States Code.

"(i) PRESERVATION OF PRIVILEGES.—Nothing in this section shall be construed to waive any applicable privilege or require the disclosure of classified information. Upon an agency's request, the district court shall review in camera and ex parte any submission by the agency in connection with this subsection.

"(j) EFFECTIVE DATE.—This Act shall take effect 90 days after the date of the enactment of this Act [Feb. 24, 2016].''

PUBLICATION OF GUIDANCE UNDER SUBSECTION (p)(1)(A)(ii)

Pub. L. 101–508, title VII, § 7201(b)(2), Nov. 5, 1990, 104 Stat. 1388–334, provided that: "Not later than 90 days after the date of the enactment of this Act [Nov. 5, 1990], the Director of the Office of Management and Budget shall publish guidance under subsection (p)(1)(A)(ii) of section 552a of title 5, United States Code, as amended by this Act.''

LIMITATION ON APPLICATION OF VERIFICATION REQUIREMENT

Pub. L. 101–508, title VII, § 7201(c), Nov. 5, 1990, 104 Stat. 1388–335, provided that: "Section 552a(p)(1)(A)(ii)(II) of title 5, United States Code, as amended by section 2 [probably means section 7201(b)(1) of Pub. L. 101–508], shall not apply to a program referred to in paragraph (1), (2), or (4) of section 1137(b) of the Social Security Act (42 U.S.C. 1320b–7), until the earlier of—

"(1) the date on which the Data Integrity Board of the Federal agency which administers that program determines that there is not a high degree of confidence that information provided by that agency under Federal matching programs is accurate; or

"(2) 30 days after the date of publication of guidance under section 2(b) [probably means section 7201(b)(2) of Pub. L. 101–508, set out as a note above].''

EFFECTIVE DATE DELAYED FOR CERTAIN EDUCATION BENEFITS COMPUTER MATCHING PROGRAMS

Pub. L. 101–366, title II, § 206(d), Aug. 15, 1990, 104 Stat. 442, provided that:

"(1) In the case of computer matching programs between the Department of Veterans Affairs and the Department of Defense in the administration of education benefits programs under chapters 30 and 32 of title 38 and chapter 106 of title 10, United States Code, the amendments made to section 552a of title 5, United States Code, by the Computer Matching and Privacy Protection Act of 1988 [Pub. L. 100–503] (other than the amendments made by section 10(b) of that Act) [see Effective Date of 1988 Amendment note above] shall take effect on October 1, 1990.

"(2) For purposes of this subsection, the term 'matching program' has the same meaning provided in section 552a(a)(8) of title 5, United States Code.''

IMPLEMENTATION GUIDANCE FOR 1988 AMENDMENTS

Pub. L. 100–503, § 6(b), Oct. 18, 1988, 102 Stat. 2513, required the Director, pursuant to section 552a(v) of this title, to develop guidelines and regulations for the use of agencies in implementing amendments made by Pub. L. 100–503 not later than 8 months after Oct. 18, 1988.

CONSTRUCTION OF 1988 AMENDMENTS

Pub. L. 100–503, § 9, Oct. 18, 1988, 102 Stat. 2514, provided that: "Nothing in the amendments made by this Act [amending this section and repealing provisions set out as a note below] shall be construed to authorize—

"(1) the establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies;

"(2) the direct linking of computerized systems of records maintained by Federal agencies;

"(3) the computer matching of records not otherwise authorized by law; or

"(4) the disclosure of records for computer matching except to a Federal, State, or local agency.''

CEDC Case 000126

CONGRESSIONAL FINDINGS AND STATEMENT OF PURPOSE

Pub. L. 93–579, §2, Dec. 31, 1974, 88 Stat. 1896, provided that:

''(a) The Congress finds that—

''(1) the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies;

''(2) the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the Government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information;

''(3) the opportunities for an individual to secure employment, insurance, and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems;

''(4) the right to privacy is a personal and fundamental right protected by the Constitution of the United States; and

''(5) in order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies.

''(b) The purpose of this Act [enacting this section and provisions set out as notes under this section] is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

''(1) permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by such agencies;

''(2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent;

''(3) permit an individual to gain access to information pertaining to him in Federal agency records, to have a copy made of all or any portion thereof, and to correct or amend such records;

''(4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information;

''(5) permit exemptions from the requirements with respect to records provided in this Act only in those cases where there is an important public policy need for such exemption as has been determined by specific statutory authority; and

''(6) be subject to civil suit for any damages which occur as a result of willful or intentional action which violates any individual's rights under this Act.''

PRIVACY PROTECTION STUDY COMMISSION

Pub. L. 93–579, §5, Dec. 31, 1974, 88 Stat. 1905, as amended by Pub. L. 95–38, June 1, 1977, 91 Stat. 179, which established the Privacy Protection Study Commission and provided that the Commission study data banks, automated data processing programs and information systems of governmental, regional and private organizations to determine standards and procedures in force for protection of personal information, that the Commission report to the President and Congress the extent to which requirements and principles of section 552a of title 5 should be applied to the information practices of those organizations, and that it make other legislative recommendations to protect the privacy of individuals while meeting the legitimate informational needs of government and society, ceased to exist on September 30, 1977, pursuant to section 5(g) of Pub. L. 93–579.

GUIDELINES AND REGULATIONS FOR MAINTENANCE OF PRIVACY AND PROTECTION OF RECORDS OF INDIVIDUALS

Pub. L. 93–579, §6, Dec. 31, 1974, 88 Stat. 1909, which provided that the Office of Management and Budget shall develop guidelines and regulations for use of agencies in implementing provisions of this section and provide continuing assistance to and oversight of the implementation of the provisions of such section by agencies, was repealed by Pub. L. 100–503, §6(c), Oct. 18, 1988, 102 Stat. 2513.

DISCLOSURE OF SOCIAL SECURITY NUMBER

Pub. L. 93–579, §7, Dec. 31, 1974, 88 Stat. 1909, provided that:

''(a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

''(2) the [The] provisions of paragraph (1) of this subsection shall not apply with respect to—

''(A) any disclosure which is required by Federal statute, or

''(B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.

''(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.''

AUTHORIZATION OF APPROPRIATIONS TO PRIVACY PROTECTION STUDY COMMISSION

Pub. L. 93–579, §9, Dec. 31, 1974, 88 Stat. 1910, as amended by Pub. L. 94–394, Sept. 3, 1976, 90 Stat. 1198, authorized appropriations for the period beginning July 1, 1975, and ending on September 30, 1977.

**Executive Documents**

EX. ORD. NO. 9397. NUMBERING SYSTEM FOR FEDERAL ACCOUNTS RELATING TO INDIVIDUAL PERSONS

Ex. Ord. No. 9397, Nov. 22, 1943, 8 F.R. 16095, as amended by Ex. Ord. No. 13478, §2, Nov. 18, 2008, 73 F.R. 70239, provided:

WHEREAS certain Federal agencies from time to time require in the administration of their activities a system of numerical identification of accounts of individual persons; and

WHEREAS some seventy million persons have heretofore been assigned account numbers pursuant to the Social Security Act; and

WHEREAS a large percentage of Federal employees have already been assigned account numbers pursuant to the Social Security Act; and

WHEREAS it is desirable in the interest of economy and orderly administration that the Federal Government move towards the use of a single, unduplicated numerical identification system of accounts and avoid the unnecessary establishment of additional systems:

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States, it is hereby ordered as follows:

1. Hereafter any Federal department, establishment, or agency may, whenever the head thereof finds it advisable to establish a new system of permanent account numbers pertaining to individual persons, utilize the Social Security Act account numbers assigned pursuant to title 20, section 422.103 of the Code of Federal Regulations and pursuant to paragraph 2 of this order.

2. The Social Security Administration shall provide for the assignment of an account number to each person who is required by any Federal agency to have such a number but who has not previously been assigned such number by the Administration. The Administration may accomplish this purpose by (a) assigning such numbers to individual persons, (b) assigning blocks of numbers to Federal agencies for reassignment to indi-

CEDC Case 000127

vidual persons, or (c) making such other arrangements for the assignment of numbers as it may deem appropriate.

3. The Social Security Administration shall furnish, upon request of any Federal agency utilizing the numerical identification system of accounts provided for in this order, the account number pertaining to any person with whom such agency has an account or the name and other identifying data pertaining to any account number of any such person.

4. The Social Security Administration and each Federal agency shall maintain the confidential character of information relating to individual persons obtained pursuant to the provisions of this order.

5. There shall be transferred to the Social Security Administration, from time to time, such amounts as the Director of the Office of Management and Budget shall determine to be required for reimbursement by any Federal agency for the services rendered by the Administration pursuant to the provisions of this order.

6. This order shall be implemented in accordance with applicable law and subject to the availability of appropriations.

7. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers, employees, or agents, or any other person.

8. This order shall be published in the Federal Register.

#### CLASSIFIED NATIONAL SECURITY INFORMATION

For provisions relating to a response to a request for information under this section when the fact of its existence or nonexistence is itself classified or when it was originally classified by another agency, see Ex. Ord. No. 13526, §3.6, Dec. 29, 2009, 75 F.R. 718, set out as a note under section 3161 of Title 50, War and National Defense.

### § 552b. Open meetings

(a) For purposes of this section—

(1) the term ''agency'' means any agency, as defined in section 552(e)[1] of this title, headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency;

(2) the term ''meeting'' means the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint conduct or disposition of official agency business, but does not include deliberations required or permitted by subsection (d) or (e); and

(3) the term ''member'' means an individual who belongs to a collegial body heading an agency.

(b) Members shall not jointly conduct or dispose of agency business other than in accordance with this section. Except as provided in subsection (c), every portion of every meeting of an agency shall be open to public observation.

(c) Except in a case where the agency finds that the public interest requires otherwise, the second sentence of subsection (b) shall not apply to any portion of an agency meeting, and the requirements of subsections (d) and (e) shall not

[1] See References in Text note below.

apply to any information pertaining to such meeting otherwise required by this section to be disclosed to the public, where the agency properly determines that such portion or portions of its meeting or the disclosure of such information is likely to—

(1) disclose matters that are (A) specifically authorized under criteria established by an Executive order to be kept secret in the interests of national defense or foreign policy and (B) in fact properly classified pursuant to such Executive order;

(2) relate solely to the internal personnel rules and practices of an agency;

(3) disclose matters specifically exempted from disclosure by statute (other than section 552 of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(4) disclose trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) involve accusing any person of a crime, or formally censuring any person;

(6) disclose information of a personal nature where disclosure would constitute a clearly unwarranted invasion of personal privacy;

(7) disclose investigatory records compiled for law enforcement purposes, or information which if written would be contained in such records, but only to the extent that the production of such records or information would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;

(8) disclose information contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions;

(9) disclose information the premature disclosure of which would—

(A) in the case of an agency which regulates currencies, securities, commodities, or financial institutions, be likely to (i) lead to significant financial speculation in currencies, securities, or commodities, or (ii) significantly endanger the stability of any financial institution; or

(B) in the case of any agency, be likely to significantly frustrate implementation of a proposed agency action,

except that subparagraph (B) shall not apply in any instance where the agency has already disclosed to the public the content or nature of its proposed action, or where the agency is required by law to make such disclosure on its

Case 1:25-cv-12822-JT    Document 103-1    Filed 05/29/26    Page 132 of 165

This content is from the eCFR and is authoritative but unofficial.

## Title 20 —Employees' Benefits
## Chapter III —Social Security Administration

**Part 401**  Privacy and Disclosure of Official Records and Information

  **Subpart A**  General

    **§ 401.5**  Purpose of the regulations.

    **§ 401.10**  Applicability.

    **§ 401.15**  Limitations on scope.

    **§ 401.20**  Scope.

    **§ 401.25**  Terms defined.

  **Subpart B**  The Privacy Act

    **§ 401.30**  Privacy Act and other responsibilities.

    **§ 401.35**  Your right to request records.

    **§ 401.40**  How to get your own records.

    **§ 401.45**  Verifying your identity.

    **§ 401.50**  Granting notification of or access to a record.

    **§ 401.55**  Access to medical records.

    **§ 401.60**  Access to or notification of program records about more than one individual.

    **§ 401.65**  How to correct your record.

    **§ 401.70**  Appeals of refusals to correct records or refusals to allow access to records.

    **§ 401.75**  Rights of parents or legal guardians.

    **§ 401.80**  Accounting for disclosures.

    **§ 401.85**  Exempt systems.

    **§ 401.90**  Contractors.

    **§ 401.95**  Fees.

  **Subpart C**  Disclosure of Official Records and Information

    **§ 401.100**  Disclosure of records with the written consent of the subject of the record.

    **§ 401.105**  Disclosure of personal information without the consent of the subject of the record.

    **§ 401.110**  Disclosure of personal information in nonprogram records without the consent of the subject of the record.

    **§ 401.115**  Disclosure of personal information in program records without the consent of the subject of the record.

    **§ 401.120**  Disclosures required by law.

    **§ 401.125**  Disclosures prohibited by law.

    **§ 401.130**  Freedom of Information Act.

    **§ 401.135**  Other laws.

    **§ 401.140**  General principles.

CEDC Case 000129

Case 1:25-cv-12822-JT     Document 103-1     Filed 05/29/26     Page 133 of 165

§ 401.145   Safeguards against unauthorized redisclosure or use.
§ 401.150   Compatible purposes.
§ 401.155   Law enforcement purposes.
§ 401.160   Health or safety.
§ 401.165   Statistical and research activities.
§ 401.170   Congress.
§ 401.175   Government Accountability Office.
§ 401.180   Disclosure under court order or other legal process.
§ 401.185   Other specific recipients.
§ 401.190   Deceased persons.
§ 401.195   Situations not specified in this part.
§ 401.200   Blood donor locator service.

**Appendix A to Part 401**

Employee Standards of Conduct

# PART 401—PRIVACY AND DISCLOSURE OF OFFICIAL RECORDS AND INFORMATION

**Authority:** Secs. 205, 702(a)(5), 1106, and 1141 of the Social Security Act (42 U.S.C. 405, 902(a)(5), 1306, and 1320b-11); 5 U.S.C. 552 and 552a; 8 U.S.C. 1360; 26 U.S.C. 6103; 30 U.S.C. 923.

**Source:** 62 FR 4143, Jan. 29, 1997, unless otherwise noted.

## Subpart A—General

## § 401.5 Purpose of the regulations.

(a) *General.* The purpose of this part is to describe the Social Security Administration (SSA) policies and procedures for implementing the requirements of the Privacy Act of 1974, 5 U.S.C. 552a and section 1106 of the Social Security Act concerning disclosure of information about individuals, both with and without their consent. This part also complies with other applicable statutes.

(b) *Privacy.* This part implements the Privacy Act by establishing agency policies and procedures for the maintenance of records. This part also establishes agency policies and procedures under which you can ask us whether we maintain records about you or obtain access to your records. Additionally, this part establishes policies and procedures under which you may seek to have your record corrected or amended if you believe that your record is not accurate, timely, complete, or relevant.

(c) *Disclosure.* This part also sets out the general guidelines which we follow in deciding whether to make disclosures. However, we must examine the facts of each case separately to decide if we should disclose the information or keep it confidential.

CEDC Case 000130

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 134 of 165

## § 401.10 Applicability.

(a)  *SSA.* All SSA employees and components are governed by this part. SSA employees governed by this part include all regular and special government employees of SSA; experts and consultants whose temporary (not in excess of 1 year) or intermittent services have been procured by SSA by contract pursuant to 5 U.S.C. 3109; volunteers where acceptance of their services are authorized by law; those individuals performing gratuitous services as permitted under conditions prescribed by the Office of Personnel Management; and, participants in work-study or training programs.

(b)  *Other entities.* This part also applies to advisory committees and councils within the meaning of the Federal Advisory Committee Act which provide advice to: Any official or component of SSA; or the President and for which SSA has been delegated responsibility for providing services.

## § 401.15 Limitations on scope.

The regulations in this part do not—

(a)  Make available to an individual records which are not retrieved by that individual's name or other personal identifier.

(b)  Make available to the general public records which are retrieved by an individual's name or other personal identifier or make available to the general public records which would otherwise not be available to the general public under the Freedom of Information Act, 5 U.S.C. 552, and part 402 of this title.

(c)  Govern the maintenance or disclosure of, notification about or access to, records in the possession of SSA which are subject to the regulations of another agency, such as personnel records which are part of a system of records administered by the Office of Personnel Management.

(d)  Apply to grantees, including State and local governments or subdivisions thereof, administering federally funded programs.

(e)  Make available records compiled by SSA in reasonable anticipation of court litigation or formal administrative proceedings. The availability of such records to the general public or to any subject individual or party to such litigation or proceedings shall be governed by applicable constitutional principles, rules of discovery, and applicable regulations of the agency.

## § 401.20 Scope.

(a)  *Access.* Sections 401.30 through 401.95, which set out SSA's rules for implementing the Privacy Act, apply to records retrieved by an individual's name or personal identifier subject to the Privacy Act. The rules in §§ 401.30 through 401.95 also apply to information developed by medical sources for the Social Security program and shall not be accessed except as permitted by this part.

(b)  *Disclosure —*

(1)  *Program records.* Regulations that apply to the disclosure of information about an individual contained in SSA's program records are set out in §§ 401.100 through 401.200 of this part. These regulations also apply to the disclosure of other Federal program information which SSA maintains. That information includes:

CEDC Case 000131

(i) Health insurance records which SSA maintains for the Health Care Financing Administration's (HCFA) programs under title XVIII of the Social Security Act. We will disclose these records to HCFA. HCFA may redisclose these records under the regulations applying to records in HCFA's custody;

(ii) Black lung benefit records which SSA maintains for the administration of the Federal Coal Mine Health and Safety Act; (However, this information is not covered by section 1106 of the Social Security Act.) and

(iii) Information retained by medical sources pertaining to a consultative examination performed for the Social Security program shall not be disclosed except as permitted by this part.

(2) *Nonprogram records.* Section 401.110 sets out rules applicable to the disclosure of nonprogram records, e.g., SSA's administrative and personnel records.

*[62 FR 4143, Jan. 29, 1997, as amended at 65 FR 16812, Mar. 30, 2000; 72 FR 20939, Apr. 27, 2007]*

## § 401.25 Terms defined.

*Access* means making a record available to a subject individual.

*Act* means the Social Security Act.

*Agency* means the Social Security Administration.

*Commissioner* means the Commissioner of Social Security.

*Disclosure* means making a record about an individual available to or releasing it to another party.

*FOIA* means the Freedom of Information Act.

*Individual* when used in connection with the Privacy Act or for disclosure of nonprogram records, means a living person who is a citizen of the United States or an alien lawfully admitted for permanent residence. It does not include persons such as sole proprietorships, partnerships, or corporations. A business firm which is identified by the name of one or more persons is not an individual. When used in connection with the rules governing program information, *individual* means a living natural person; this does not include corporations, partnerships, and unincorporated business or professional groups of two or more persons.

*Information* means information about an individual, and includes, but is not limited to, vital statistics; race, sex, or other physical characteristics; earnings information; professional fees paid to an individual and other financial information; benefit data or other claims information; the social security number, employer identification number, or other individual identifier; address; phone number; medical information, including psychological or psychiatric information or lay information used in a medical determination; and information about marital and family relationships and other personal relationships.

*Maintain* means to establish, collect, use, or disseminate when used in connection with the term *record*; and, to have control over or responsibility for a system of records when used in connection with the term *system of records*.

*Notification* means communication to an individual whether he is a subject individual. (*Subject individual* is defined further on in this section.)

CEDC Case 000132

*Program information* means personal information and records collected and compiled by SSA in order to discharge its responsibilities under titles I, II, IV part A, X, XI, XIV, XVI and XVIII of the Act and parts B and C of the Federal Coal Mine Health and Safety Act.

*Record* means any item, collection, or grouping of information about an individual that is maintained by SSA including, but not limited to, information such as an individual's education, financial transactions, medical history, and criminal or employment history that contains the individual's name, or an identifying number, symbol, or any other means by which an individual can be identified. When used in this part, record means only a record which is in a system of records.

*Routine use* means the disclosure of a record outside SSA, without the consent of the subject individual, for a purpose which is compatible with the purpose for which the record was collected. It includes disclosures required to be made by statutes other than the Freedom of Information Act, 5 U.S.C. 552. It does not include disclosures which the Privacy Act otherwise permits without the consent of the subject individual and without regard to whether they are compatible with the purpose for which the information is collected, such as disclosures to the Bureau of the Census, the General Accounting Office, or to Congress.

*Social Security Administration (SSA)* means

(1) that Federal agency which has administrative responsibilities under titles, I, II, X, XI, XIV, XVI, and XVIII of the Act; and

(2) units of State governments which make determinations under agreements made under sections 221 and 1633 of the Act.

*Social Security program* means any program or provision of law which SSA is responsible for administering, including the Freedom of Information Act and Privacy Act. This includes our responsibilities under parts B and C of the Federal Coal Mine Health and Safety Act.

*Statistical record* means a record maintained for statistical research or reporting purposes only and not maintained to make determinations about a particular subject individual.

*Subject individual* means the person to whom a record pertains.

*System of records* means a group of records under our control from which information about an individual is retrieved by the name of the individual or by an identifying number, symbol, or other identifying particular. Single records or groups of records which are not retrieved by a personal identifier are not part of a system of records. Papers maintained by individual Agency employees which are prepared, maintained, or discarded at the discretion of the employee and which are not subject to the Federal Records Act, 44 U.S.C. 2901, are not part of a system of records; provided, that such personal papers are not used by the employee or the Agency to determine any rights, benefits, or privileges of individuals.

*We* and *our* mean the Social Security Administration.

## Subpart B—The Privacy Act

## § 401.30 Privacy Act and other responsibilities.

(a) *Policy.* Our policy is to protect the privacy of individuals to the fullest extent possible while nonetheless permitting the exchange of records required to fulfill our administrative and program responsibilities, and responsibilities for disclosing records which the general public is entitled to have under the Freedom of Information Act, 5 U.S.C. 552, and 20 CFR part 402.

(b) *Maintenance of records.* We will maintain no record unless:

CEDC Case 000133

Case 1:25-cv-12822-IT   Document 103-1   Filed 05/29/26   Page 137 of 165

(1) It is relevant and necessary to accomplish an SSA function which is required to be accomplished by statute or Executive Order;

(2) We obtain the information in the record, as much as it is practicable, from the subject individual if we may use the record to determine an individual's rights, benefits or privileges under Federal programs;

(3) We inform the individual providing the record to us of the authority for our asking him or her to provide the record (including whether providing the record is mandatory or voluntary, the principal purpose for maintaining the record, the routine uses for the record, and what effect his or her refusal to provide the record may have on him or her). Further, the individual agrees to provide the record, if the individual is not required by statute or Executive Order to do so.

(c) *First Amendment rights.* We will keep no record which describes how an individual exercises rights guaranteed by the First Amendment unless we are expressly authorized:

(1) By statute,

(2) By the subject individual, or

(3) Unless pertinent to and within the scope of an authorized law enforcement activity.

(d) *Privacy Officer.* The Privacy Officer is an advisor to the Agency on all privacy policy and disclosure matters. The Privacy Officer coordinates the development and implementation of Agency privacy policies and related legal requirements to ensure Privacy Act compliance, and monitors the coordination, collection, maintenance, use and disclosure of personal information. The Privacy Officer also ensures the integration of privacy principles into information technology systems architecture and technical designs, and generally provides to Agency officials policy guidance and directives in carrying out the privacy and disclosure policy.

(e) *Senior Agency Official for Privacy.* The Senior Agency Official for Privacy assumes overall responsibility and accountability for ensuring the agency's implementation of information privacy protections as well as agency compliance with federal laws, regulations, and policies relating to the privacy of information, such as the Privacy Act. The compliance efforts also include reviewing information privacy procedures to ensure that they are comprehensive and up-to-date and, where additional or revised procedures may be called for, working with the relevant agency offices in the consideration, adoption, and implementation of such procedures. The official also ensures that agency employees and contractors receive appropriate training and education programs regarding the information privacy laws, regulations, polices and procedures governing the agency's handling of personal information. In addition to the compliance role, the official has a central policy-making role in the agency's development and evaluation of legislative, regulatory and other policy proposals which might implicate information privacy issues, including those relating to the collection, use, sharing, and disclosure of personal information.

(f) *Privacy Impact Assessment.* In our comprehensive Privacy Impact Assessment (PIA) review process, we incorporate the tenets of privacy law, SSA privacy regulations, and privacy policy directly into the development of certain Information Technology projects. Our review examines the risks and ramifications of collecting, maintaining and disseminating information in identifiable form in an electronic information system and identifies and evaluates protections and alternate processes to reduce the risk of unauthorized disclosures. As we accomplish the PIA review, we ask systems personnel and program personnel to resolve questions on data needs and data protection prior to the development of the electronic system.

[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20939, Apr. 27, 2007]

CEDC Case 000134

## § 401.35 Your right to request records.

The Privacy Act gives you the right to direct access to most records about yourself that are in our systems of records. Exceptions to this Privacy Act right include—

(a) Special procedures for access to certain medical records (see 5 U.S.C. 552a(f)(3) and § 401.55);

(b) Unavailability of certain criminal law enforcement records (see 5 U.S.C. 552a(k), and § 401.85); and

(c) Unavailability of records compiled in reasonable anticipation of a court action or formal administrative proceeding.

> Note to § 401.35: The Freedom of Information Act (see 20 CFR part 402) allows you to request information from SSA whether or not it is in a system of records.

## § 401.40 How to get your own records.

(a) *Your right to notification and access.* Subject to the provisions governing medical records in § 401.55, you may ask for notification of or access to any record about yourself that is in an SSA system of records. If you are a minor, you may get information about yourself under the same rules as for an adult. Under the Privacy Act, if you are the parent or guardian of a minor, or the legal guardian of someone who has been declared legally incompetent, and you are acting on his or her behalf, you may ask for information about that individual. You may be accompanied by another individual of your choice when you request access to a record in person, *provided* that you affirmatively authorize the presence of such other individual during any discussion of a record to which you are requesting access.

(b) *Identifying the records.* At the time of your request, you must specify which systems of records you wish to have searched and the records to which you wish to have access. You may also request copies of all or any such records. Also, we may ask you to provide sufficient particulars to enable us to distinguish between records on individuals with the same name. The necessary particulars are set forth in the notices of systems of records which are published in the FEDERAL REGISTER.

(c) *Requesting notification or access.* To request notification of or access to a record, you may visit your local social security office or write to the manager of the SSA system of records. The name and address of the manager of the system is part of the notice of systems of records. Every local social security office keeps a copy of the FEDERAL REGISTER containing that notice. That office can also help you get access to your record. You do not need to use any special form to ask for a record about you in our files, but your request must give enough identifying information about the record you want to enable us to find your particular record. This identifying information should include the system of records in which the record is located and the name and social security number (or other identifier) under which the record is filed. We do not honor requests for all records, all information, or similar blanket requests. Before granting notification of or access to a record, we may, if you are making your request in person, require you to put your request in writing if you have not already done so.

## § 401.45 Verifying your identity.

(a) *When required.* Unless you are making a request for notification of or access to a record in person, and you are personally known to the SSA representative, you must verify your identity in accordance with paragraph (b) of this section if:

CEDC Case 000135

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 139 of 165

(1) You make a request for notification of a record and we determine that the mere notice of the existence of the record would be a clearly unwarranted invasion of privacy if disclosed to someone other than the subject individual; or,

(2) You make a request for access to a record which is not required to be disclosed to the general public under the Freedom of Information Act, 5 U.S.C. 552, and part 402 of this chapter.

(b) *Manner of verifying identity* —

(1) *Request in person.* If you make a request to us in person, you must provide at least one piece of tangible identification such as a driver's license, passport, alien or voter registration card, or union card to verify your identity. If you do not have identification papers to verify your identity, you must certify in writing that you are the individual who you claim to be and that you understand that the knowing and willful request for or acquisition of a record pertaining to an individual under false pretenses is a criminal offense.

(2) *Request by telephone.* If you make a request by telephone, you must verify your identity by providing identifying particulars which parallel the record to which notification or access is being sought. If we determine that the particulars provided by telephone are insufficient, you will be required to submit your request in writing or in person. We will not accept telephone requests where an individual is requesting notification of or access to sensitive records such as medical records.

(3) *Electronic requests.* If you make a request by computer or other electronic means, e.g., over the Internet, we require you to verify your identity by using identity confirmation procedures that are commensurate with the sensitivity of the information that you are requesting. If we cannot confirm your identity using our identity confirmation procedures, we will not process the electronic request. When you cannot verify your identity through our procedures, we will require you to submit your request in writing.

(4) *Electronic disclosures.* When we collect or provide personally identifiable information over open networks such as the Internet, we use encryption in all of our automated online transaction systems to protect the confidentiality of the information. When we provide an online access option, such as a standard e-mail comment form on our Web site, and encryption is not being used, we alert you that personally identifiable information (such as your social security number) should not be included in your message.

(5) *Requests not made in person.* Except as provided in paragraphs (b)(2) of this section, if you do not make a request in person, you must submit a written request to SSA to verify your identify or you must certify in your request that you are the individual you claim to be. You must also sign a statement that you understand that the knowing and willful request for or acquisition of a record pertaining to an individual under false pretenses is a criminal offense.

(6) *Requests on behalf of another.* If you make a request on behalf of a minor or legal incompetent as authorized under § 401.40, you must verify your relationship to the minor or legal incompetent, in addition to verifying your own identity, by providing a copy of the minor's birth certificate, a court order, or other competent evidence of guardianship to SSA; except that you are not required to verify your relationship to the minor or legal incompetent when you are not required to verify your own identity or when evidence of your relationship to the minor or legal incompetent has been previously given to SSA.

CEDC Case 000136

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 140 of 165

(7) *Medical records—additional verification.* You need to further verify your identity if you are requesting notification of or access to sensitive records such as medical records. Any information for further verification must parallel the information in the record to which notification or access is being sought. Such further verification may include such particulars as the date or place of birth, names of parents, name of employer or the specific times the individual received medical treatment.

*[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20939, Apr. 27, 2007]*

## § 401.50 Granting notification of or access to a record.

(a) *General.* Subject to the provisions governing medical records in § 401.55 and the provisions governing exempt systems in § 401.85, upon receipt of your request for notification of or access to a record and verification of your identity, we will review your request and grant notification or access to a record, if you are the subject of the record.

(b) *Our delay in responding.* If we determine that we will have to delay responding to your request because of the number of requests we are processing, a breakdown of equipment, shortage of personnel, storage of records in other locations, etc., we will so inform you and tell you when notification or access will be granted.

## § 401.55 Access to medical records.

(a) *General.* You have a right to access your medical records, including any psychological information that we maintain.

(b) *Medical records procedures —*

(1) *Notification of or access to medical records.*

(i) You may request notification of or access to a medical record pertaining to you. Unless you are a parent or guardian requesting notification of or access to a minor's medical record, you must make a request for a medical record in accordance with this section and the procedures in §§ 401.45 through 401.50 of this part.

(ii) When you request medical information about yourself, you must also name a representative in writing. The representative may be a physician, other health professional, or other responsible individual who will be willing to review the record and inform you of its contents. Following the discussion, you are entitled to your records. The representative does not have the discretion to withhold any part of your record. If you do not designate a representative, we may decline to release the requested information. In some cases, it may be possible to release medical information directly to you rather than to your representative.

(2) *Utilization of the designated representative.* You will be granted direct access to your medical record if we can determine that direct access is not likely to have an adverse effect on you. If we believe that we are not qualified to determine, or if we do determine, that direct access to you is likely to have an adverse effect, the record will be sent to the designated representative. We will inform you in writing that the record has been sent.

(c) *Medical records of minors —*

(1) *Request by the minor.* You may request access to your own medical records in accordance with paragraph (b) of this section.

CEDC Case 000137

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 141 of 165

(2) *Requests on a minor's behalf; notification of or access to medical records to an individual on a minor's behalf.*

    (i) To protect the privacy of a minor, we will not give to a parent or guardian direct notification of or access to a minor's record, even though the parent or guardian who requests such notification or access is authorized to act on a minor's behalf as provided in § 401.75 of this part.

    (ii) A parent or guardian must make all requests for notification of or access to a minor's medical record in accordance with this paragraph and the procedures in §§ 401.45 through 401.50 of this part. A parent or guardian must at the time he or she makes a request designate a family physician or other health professional (other than a family member) to whom the record, if any, will be sent. If the parent or guardian will not designate a representative, we will decline to release the requested information.

    (iii) Where a medical record on the minor exists, we will in all cases send it to the physician or health professional designated by the parent or guardian. The representative will review the record, discuss its contents with the parent or legal guardian, then release the entire record to the parent or legal guardian. The representative does not have the discretion to withhold any part of the minor's record. We will respond in the following similar manner to the parent or guardian making the request: "We have completed processing your request for notification of or access to _____'s (Name of minor) medical records. Please be informed that if any medical record was found pertaining to that individual, it has been sent to your designated physician or health professional."

    (iv) In each case where we send a minor's medical record to a physician or health professional, we will make reasonable efforts to inform the minor that we have given the record to the representative.

(3) *Requests on behalf of an incapacitated adult.* If you are the legal guardian of an adult who has been declared legally incompetent, you may receive his or her records directly.

[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20939, Apr. 27, 2007]

## § 401.60 Access to or notification of program records about more than one individual.

When information about more than one individual is in one record filed under your social security number, you may receive the information about you and the fact of entitlement and the amount of benefits payable to other persons based on your record. You may receive information about yourself or others, which is filed under someone else's social security number, if that information affects your entitlement to social security benefits or the amount of those benefits.

[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20940, Apr. 27, 2007]

## § 401.65 How to correct your record.

(a) *How to request a correction.* This section applies to all records kept by SSA (as described in § 401.5) except for records of earnings. (20 CFR 422.125 describes how to request correction of your earnings record.) You may request that your record be corrected or amended if you believe that the record is not accurate, timely, complete, relevant, or necessary to the administration of a social security program. To amend or correct your record, you should write to the manager identified in the notice of systems of

CEDC Case 000138

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 142 of 165

records which is published in the FEDERAL REGISTER (see § 401.40(c) on how to locate this information). The staff at any social security office can help you prepare the request. You should submit any available evidence to support your request. Your request should indicate—

(1)   The system of records from which the record is retrieved;

(2)   The particular record which you want to correct or amend;

(3)   Whether you want to add, delete or substitute information in the record; and

(4)   Your reasons for believing that your record should be corrected or amended.

(b)   *What we will not change.* You cannot use the correction process to alter, delete, or amend information which is part of a determination of fact or which is evidence received in the record of a claim in the administrative appeal process. Disagreements with these determinations are to be resolved through the SSA appeal process. (See subparts I and J of part 404, and subpart N of part 416, of this chapter.) For example, you cannot use the correction process to alter or delete a document showing a birth date used in deciding your social security claim. However, you may submit a statement on why you think certain information should be altered, deleted, or amended, and we will make this statement part of your file.

(c)   *Acknowledgment of correction request.* We will acknowledge receipt of a correction request within 10 working days, unless we can review and process the request and give an initial determination of denial or compliance before that time.

(d)   *Notice of error.* If the record is wrong, we will correct it promptly. If wrong information was disclosed from the record, we will tell all those of whom we are aware received that information that it was wrong and will give them the correct information. This will not be necessary if the change is not due to an error, e.g., a change of name or address.

(e)   *Record found to be correct.* If the record is correct, we will inform you in writing of the reason why we refuse to amend your record and we will also inform you of your right to seek a review of the refusal and the name and address of the official to whom you should send your request for review.

(f)   *Record of another government agency.* If you request us to correct or amend a record governed by the regulation of another government agency, e.g., Office of Personnel Management, Federal Bureau of Investigation, we will forward your request to such government agency for processing and we will inform you in writing of the referral.

## § 401.70 Appeals of refusals to correct records or refusals to allow access to records.

(a)   *General.* This section describes how to appeal decisions we make under the Privacy Act concerning your request for correction of or access to your records, those of your minor child, or those of a person for whom you are the legal guardian. This section describes how to appeal decisions made by SSA under the Privacy Act concerning your request for correction of or access to your records, those of your minor child, or those of a person for whom you are the legal guardian. We generally handle a denial of your request for information about another person under the provisions of the Freedom of Information Act (see part 402 of this chapter). To appeal a decision under this section, your request must be in writing.

(b)   *Appeal of refusal to correct or amend records.* If we deny your request to correct an SSA record, you may request a review of that decision. As discussed in § 401.65(e), our letter denying your request will tell you to whom to write.

CEDC Case 000139

(1)  We will review your request within 30 working days from the date of the receipt. However, for a good reason and with the approval of the Executive Director for the Office of Privacy and Disclosure, we may extend this time limit up to an additional 30 days. In that case, we will notify you about the delay, the reason for it and the date when the review is expected to be completed.

(2)  If, after review, we determine that the record should be corrected, we will do so. However, if we refuse to amend the record as you requested, we will inform you that—

(i)  Your request has been refused and the reason for the refusal;

(ii)  The refusal is our final decision; and

(iii)  You have a right to seek court review of our final decision.

(3)  We will also inform you that you have a right to file a statement of disagreement with the decision. Your statement should include the reason you disagree. We will make your statement available to anyone to whom the record is subsequently disclosed, together with a statement of our reasons for refusing to amend the record. Also, we will provide a copy of your statement to individuals whom we are aware received the record previously.

(c)  *Appeals after denial of access.* If, under the Privacy Act, we deny your request for access to your own record, those of your minor child or those of a person to whom you are the legal guardian, we will advise you in writing of the reason for that denial, the name and title or position of the person responsible for the decision and your right to appeal that decision. You may appeal the denial decision to the Office of the General Counsel, Office of Privacy and Disclosure, Social Security Administration, Attn: Executive Director, 6401 Security Boulevard, Baltimore, MD 21235, within 30 days after you receive notice denying all or part of your request, or, if later, within 30 days after you receive materials sent to you in partial compliance with your request.

(d)  *Filing your appeal.* If you file an appeal, the Executive Director or his or her designee will review your request and any supporting information submitted and then send you a notice explaining the decision on your appeal. The time limit for making our decision after we receive your appeal is 30 working days. The Executive Director or his or her designee may extend this time limit up to 30 additional working days if one of the circumstances in 20 CFR 402.140 is met. We will notify you in writing of any extension, the reason for the extension and the date by which we will decide your appeal. The notice of the decision on your appeal will explain your right to have the matter reviewed in a Federal district court if you disagree with all or part of our decision.

*[72 FR 20940, Apr. 27, 2007, as amended at 88 FR 1329, Jan. 10, 2023]*

## § 401.75 Rights of parents or legal guardians.

For purposes of this part, a parent or guardian of any minor or the legal guardian of any individual who has been declared incompetent due to physical or mental incapacity or age by a court of competent jurisdiction is authorized to act on behalf of a minor or incompetent individual. Except as provided in § 401.45, governing procedures for verifying an individual's identity, and § 401.55(c) governing special procedures for notification of or access to a minor's medical records, if you are authorized to act on behalf of a minor or legal incompetent, you will be viewed as if you were the individual or subject individual.

CEDC Case 000140

Case 1:25-cv-12822-JT   Document 103-1   Filed 05/29/26   Page 144 of 165

## § 401.80 Accounting for disclosures.

(a) We will maintain an accounting of all disclosures of a record for five years or for the life of the record, whichever is longer; *except that,* we will not make accounting for:

(1) Disclosures under paragraphs (a) and (b) of § 401.110; and,

(2) Disclosures of your record made with your written consent.

(b) The accounting will include:

(1) The date, nature, and purpose of each disclosure; and

(2) The name and address of the person or entity to whom the disclosure is made.

(c) You may request access to an accounting of disclosures of your record. You must request access to an accounting in accordance with the procedures in § 401.40. You will be granted access to an accounting of the disclosures of your record in accordance with the procedures of this part which govern access to the related record. We may, at our discretion, grant access to an accounting of a disclosure of a record made under paragraph (g) of § 401.110.

## § 401.85 Exempt systems.

(a) *General policy.* The Privacy Act permits certain types of specific systems of records to be exempt from some of its requirements. Our policy is to exercise authority to exempt systems of records only in compelling cases.

(b) *Specific systems of records exempted.*

(1) Those systems of records listed in paragraph (b)(2) of this section are exempt from the following provisions of the Act and this part:

(i) 5 U.S.C. 552a(c)(3) and paragraph (c) of § 401.80 of this part which require that you be granted access to an accounting of disclosures of your record.

(ii) 5 U.S.C. 552a (d) (1) through (4) and (f) and §§ 401.35 through 401.75 relating to notification of or access to records and correction or amendment of records.

(iii) 5 U.S.C. 552a(e)(4) (G) and (H) which require that we include information about SSA procedures for notification, access, and correction or amendment of records in the notice for the systems of records.

(iv) 5 U.S.C. 552a(e)(3) and § 401.30 which require that if we ask you to provide a record to us, we must inform you of the authority for our asking you to provide the record (including whether providing the record is mandatory or voluntary, the principal purposes for maintaining the record, the routine uses for the record, and what effect your refusal to provide the record may have on you), and if you are not required by statute or Executive Order to provide the record, that you agree to provide the record. This exemption applies only to an investigatory record compiled by SSA for criminal law enforcement purposes in a system of records exempt under subsection (j)(2) of the Privacy Act to the extent that these requirements would prejudice the conduct of the investigation.

(2) The following systems of records are exempt from those provisions of the Privacy Act and this part listed in paragraph (b)(1) of this section:

CEDC Case 000141

(i) Pursuant to subsection (j)(2) of the Privacy Act, the Investigatory Material Compiled for Law Enforcement Purposes System, SSA.

(ii) Pursuant to subsection (k)(2) of the Privacy Act:

(A) The General Criminal Investigation Files, SSA;

(B) The Criminal Investigations File, SSA; and,

(C) The Program Integrity Case Files, SSA.

(D) Civil and Administrative Investigative Files of the Inspector General, SSA/OIG.

(E) Complaint Files and Log. SSA/OGC.

(F) Anti-Harassment & Hostile Work Environment Case Tracking and Records System, SSA.

(G) Social Security Administration Violence Evaluation and Reporting System, SSA.

(H) Anti-Fraud System, SSA.

(iii) Pursuant to subsection (k)(5) of the Privacy Act:

(A) Security and Suitability Files.

(B) [Reserved]

(iv) Pursuant to subsection (k)(6) of the Privacy Act, the Personnel Research and Merit Promotion Test Records, SSA/DCHR/OPE.

(c) *Notification of or access to records in exempt systems of records.*

(1) Where a system of records is exempt as provided in paragraph (b) of this section, you may nonetheless request notification of or access to a record in that system. You should make requests for notification of or access to a record in an exempt system of records in accordance with the procedures of §§ 401.35 through 401.55.

(2) We will grant you notification of or access to a record in an exempt system but only to the extent such notification or access would not reveal the identity of a source who furnished the record to us under an express promise, and prior to September 27, 1975, an implied promise, that his or her identity would be held in confidence, if:

(i) The record is in a system of records which is exempt under subsection (k)(2) of the Privacy Act and you have been, as a result of the maintenance of the record, denied a right, privilege, or benefit to which you would otherwise be eligible; or,

(ii) The record is in a system of records which is exempt under subsection (k)(5) of the Privacy Act.

(3) If we do not grant you notification of or access to a record in a system of records exempt under subsections (k) (2) and (5) of the Privacy Act in accordance with this paragraph, we will inform you that the identity of a confidential source would be revealed if we granted you notification of or access to the record.

(d) *Discretionary actions by SSA.* Unless disclosure of a record to the general public is otherwise prohibited by law, we may at our discretion grant notification of or access to a record in a system of records which is exempt under paragraph (b) of this section. Discretionary notification of or access to a record in

CEDC Case 000142

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 146 of 165

accordance with this paragraph will not be a precedent for discretionary notification of or access to a similar or related record and will not obligate us to exercise discretion to grant notification of or access to any other record in a system of records which is exempt under paragraph (b) of this section.

*[62 FR 4143, Jan. 29, 1997, as amended at 82 FR 16510, Apr. 5, 2017; 83 FR 63416, Dec. 10, 2018; 84 FR 45901, Sept. 3, 2019; 87 FR 25141, Apr. 28, 2022]*

## § 401.90 Contractors.

(a)  All contracts which require a contractor to maintain, or on behalf of SSA to maintain, a system of records to accomplish an SSA function must contain a provision requiring the contractor to comply with the Privacy Act and this part.

(b)  A contractor and any employee of such contractor will be considered employees of SSA only for the purposes of the criminal penalties of the Privacy Act, 5 U.S.C. 552a(i), and the employee standards of conduct (see appendix A of this part) where the contract contains a provision requiring the contractor to comply with the Privacy Act and this part.

(c)  This section does not apply to systems of records maintained by a contractor as a result of his management discretion, e.g., the contractor's personnel records.

## § 401.95 Fees.

(a)  *Policy.* Where applicable, we will charge fees for copying records in accordance with the schedule set forth in this section. We may only charge fees where you request that a copy be made of the record to which you are granted access. We will not charge a fee for searching a system of records, whether the search is manual, mechanical, or electronic. Where we must copy the record in order to provide access to the record (e.g., computer printout where no screen reading is available), we will provide the copy to you without cost. Where we make a medical record available to a representative designated by you or to a physician or health professional designated by a parent or guardian under § 401.55 of this part, we will not charge a fee.

(b)  *Fee schedule.* Our Privacy Act fee schedule is as follows:

(1)  Copying of records susceptible to photocopying—$.10 per page.

(2)  Copying records not susceptible to photocopying (e.g., punch cards or magnetic tapes)—at actual cost to be determined on a case-by-case basis.

(3)  We will not charge if the total amount of copying does not exceed $25.

(c)  *Other fees.* We also follow §§ 402.155 through 402.165 of this chapter to determine the amount of fees, if any, we will charge for providing information under the FOIA and Privacy Act.

## Subpart C—Disclosure of Official Records and Information

## § 401.100 Disclosure of records with the written consent of the subject of the record.

(a)  *General.* Except as permitted by the Privacy Act and the regulations in this part, or when required by the FOIA, we will not disclose your records without your written consent.

CEDC Case 000143

Case 1:25-cv-12822-IT   Document 103-1   Filed 05/29/26   Page 147 of 165

(b) *Disclosure with written consent.* The written consent must clearly specify to whom the information may be disclosed, the information you want us to disclose (e.g., social security number, date and place of birth, monthly Social Security benefit amount, date of entitlement), and, where applicable, during which timeframe the information may be disclosed (e.g., during the school year, while the subject individual is out of the country, whenever the subject individual is receiving specific services).

(c) *Disclosure of the entire record.* We will not disclose your entire record. For example, we will not honor a blanket consent for all information in a system of records or any other record consisting of a variety of data elements. We will disclose only the information you specify in the consent. We will verify your identity and where applicable (e.g., where you consent to disclosure of a record to a specific individual), the identity of the individual to whom the record is to be disclosed.

(d) A parent or guardian of a minor is not authorized to give written consent to a disclosure of a minor's medical record. See § 401.55(c)(2) for the procedures for disclosure of or access to medical records of minors.

*[72 FR 20940, Apr. 27, 2007]*

## § 401.105 Disclosure of personal information without the consent of the subject of the record.

(a) SSA maintains two categories of records which contain personal information:

(1) Nonprogram records, primarily administrative and personnel records which contain information about SSA's activities as a government agency and employer, and

(2) Program records which contain information about SSA's clients that it keeps to administer benefit programs under Federal law.

(b) We apply different levels of confidentiality to disclosures of information in the categories in paragraphs (a) (1) and (2) of this section. For administrative and personnel records, the Privacy Act applies. To the extent that SSA has physical custody of personnel records maintained as part of the Office of Personnel Management's (OPM) Privacy Act government-wide systems of records, these records are subject to OPM's rules on access and disclosure at 5 CFR parts 293 and 297. For program records, we apply somewhat more strict confidentiality standards than those found in the Privacy Act. The reason for this difference in treatment is that our program records include information about a much greater number of persons than our administrative records, the information we must collect for program purposes is often very sensitive, and claimants are required by statute and regulation to provide us with the information in order to establish entitlement for benefits.

*[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20940, Apr. 27, 2007]*

## § 401.110 Disclosure of personal information in nonprogram records without the consent of the subject of the record.

The disclosures listed in this section may be made from our nonprogram records, e.g., administrative and personnel records, without your consent. Such disclosures are those:

(a) To officers and employees of SSA who have a need for the record in the performance of their duties. The SSA official who is responsible for the record may upon request of any officer or employee, or on his own initiative, determine what constitutes legitimate need.

CEDC Case 000144

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 148 of 165

(b)   Required to be disclosed under the Freedom of Information Act, 5 U.S.C. 552, and 20 CFR part 402.

(c)   For a routine use as defined in § 401.25 of this part. Routine uses will be listed in any notice of a system of records. SSA publishes notices of systems of records, including all pertinent routine uses, in the FEDERAL REGISTER.

(d)   To the Bureau of the Census for purposes of planning or carrying out a census or survey or related activity pursuant to the provisions of Title 13 U.S.C.

(e)   To a recipient who has provided us with advance written assurance that the record will be used solely as a statistical research or reporting record; *Provided,* that, the record is transferred in a form that does not identify the subject individual.

(f)   To the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Administrator of General Services or his designee to determine whether the record has such value.

(g)   To another government agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of such government agency or instrumentality has submitted a written request to us, specifying the record desired and the law enforcement activity for which the record is sought.

(h)   To an individual pursuant to a showing of compelling circumstances affecting the health or safety of any individual if a notice of the disclosure is transmitted to the last known address of the subject individual.

(i)   To either House of Congress, or to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee.

(j)   To the Comptroller General, or any of his authorized representatives, in the course of the performance of duties of the Government Accountability Office.

(k)   Pursuant to the order of a court of competent jurisdiction.

*[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20940, Apr. 27, 2007]*

## § 401.115 Disclosure of personal information in program records without the consent of the subject of the record.

This section describes how various laws control the disclosure of personal information that we keep. We disclose information in the program records only when a legitimate need exists. For example, we disclose information to officers and employees of SSA who have a need for the record in the performance of their duties. We also must consider the laws identified below in the respective order when we disclose program information:

(a)   Some laws require us to disclose information (§ 401.120); some laws require us to withhold information (§ 401.125). These laws control whenever they apply.

(b)   If no law of this type applies in a given case, then we must look to FOIA principles. See § 401.130.

(c)   When FOIA principles do not require disclosure, we may disclose information if both the Privacy Act and section 1106 of the Social Security Act permit the disclosure.

*[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20940, Apr. 27, 2007]*

CEDC Case 000145

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 149 of 165

## § 401.120 Disclosures required by law.

We disclose information when a law specifically requires it. The Social Security Act requires us to disclose information for certain program purposes. These include disclosures to the SSA Office of Inspector General, the Federal Parent Locator Service, and to States pursuant to an arrangement regarding use of the Blood Donor Locator Service. Also, there are other laws which require that we furnish other agencies information which they need for their programs. These agencies include the Department of Veterans Affairs for its benefit programs, U.S. Citizenship and Immigration Services to carry out its duties regarding aliens, the Railroad Retirement Board for its benefit programs, and to Federal, State and local agencies administering Temporary Assistance for Needy Families, Medicaid, unemployment compensation, food stamps, and other programs.

[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20941, Apr. 27, 2007]

## § 401.125 Disclosures prohibited by law.

We do not disclose information when a law specifically prohibits it. The Internal Revenue Code generally prohibits us from disclosing tax return information which we receive to maintain individual earnings records. This includes, for example, amounts of wages and contributions from employers. Other laws restrict our disclosure of certain information about drug and alcohol abuse which we collect to determine eligibility for social security benefits.

## § 401.130 Freedom of Information Act.

The FOIA requires us to disclose any information in our records upon request from the public, unless one of several exemptions in the FOIA applies. When the FOIA requires disclosure (see part 402 of this chapter), the Privacy Act permits it. *The public* does not include Federal agencies, courts, or the Congress, but does include State agencies, individuals, corporations, and most other parties. The FOIA does not apply to requests that are not from *the public* (e.g., from a Federal agency). However, we apply FOIA principles to requests from these other sources for disclosure of program information.

## § 401.135 Other laws.

When the FOIA does not apply, we may not disclose any personal information unless both the Privacy Act and section 1106 of the Social Security Act permit the disclosure. Section 1106 of the Social Security Act requires that disclosures which may be made must be set out in statute or regulations; therefore, any disclosure permitted by this part is permitted by section 1106.

## § 401.140 General principles.

When no law specifically requiring or prohibiting disclosure applies to a question of whether to disclose information, we follow FOIA principles to resolve that question. We do this to insure uniform treatment in all situations. The FOIA principle which most often applies to SSA disclosure questions is whether the disclosure would result in a "clearly unwarranted invasion of personal privacy." To decide whether a disclosure would be a clearly unwarranted invasion of personal privacy we consider—

(a)  The sensitivity of the information (e.g., whether individuals would suffer harm or embarrassment as a result of the disclosure);

(b)  The public interest in the disclosure;

(c)  The rights and expectations of individuals to have their personal information kept confidential;

CEDC Case 000146

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 150 of 165

(d)   The public's interest in maintaining general standards of confidentiality of personal information; and

(e)   The existence of safeguards against unauthorized rediscslosure or use.

## § 401.145 Safeguards against unauthorized rediscslosure or use.

(a)   The FOIA does not authorize us to impose any restrictions on how information is used after we disclose it under that law. In applying FOIA principles, we consider whether the information will be adequately safeguarded against improper use or rediscslosure. We must consider all the ways in which the recipient might use the information and how likely the recipient is to redisclose the information to other parties. Thus, before we disclose personal information we may consider such factors as—

(1)   Whether only those individuals who have a need to know the information will obtain it;

(2)   Whether appropriate measures to safeguard the information to avoid unwarranted use or misuse will be taken; and

(3)   Whether we would be permitted to conduct on-site inspections to see whether the safeguards are being met.

(b)   We feel that there is a strong public interest in sharing information with other agencies with programs having the same or similar purposes, so we generally share information with those agencies. However, since there is usually little or no public interest in disclosing information for disputes between two private parties or for other private or commercial purposes, we generally do not share information for these purposes.

## § 401.150 Compatible purposes.

(a)   *General.* The Privacy Act allows us to disclose information maintained in a system of records without your consent to any other party if such disclosure is pursuant to a routine use published in the system's notice of system of records. A "Routine use" must be compatible with the purpose for which SSA collected the information.

(b)   *Notice of routine use disclosures.* A list of permissible routine use disclosures is included in every system of records notice published in the FEDERAL REGISTER.

(c)   *Determining compatibility —*

(1)   *Disclosure to carry out SSA programs.* We disclose information for published routine uses necessary to carry out SSA's programs.

(2)   *Disclosure to carry out programs similar to SSA programs.* We may disclose information for the administration of other government programs. These disclosures are pursuant to published routine uses where the use is compatible with the purpose for which the information was collected. These programs generally meet the following conditions:

(i)   The program is clearly identifiable as a Federal, State, or local government program.

(ii)   The information requested concerns eligibility, benefit amounts, or other matters of benefit status in a Social Security program and is relevant to determining the same matters in the other program. For example, we disclose information to the Railroad Retirement Board for pension and unemployment compensation programs, to the Department of Veterans Affairs for its benefit programs, to worker's compensation programs, to State general assistance programs and to other income maintenance programs at all levels of government. We also disclose for health maintenance programs like Medicaid and Medicare.

CEDC Case 000147

(iii)   The information will be used for appropriate epidemiological or similar research purposes.

*[72 FR 20941, Apr. 27, 2007]*

## § 401.155 Law enforcement purposes.

(a)   *General.* The Privacy Act allows us to disclose information for law enforcement purposes under certain conditions. Much of the information in our files is especially sensitive or very personal. Furthermore, participation in social security programs is mandatory, so people cannot limit what information is given to us. Therefore, we generally disclose information for law enforcement purposes only in limited situations. The Privacy Act allows us to disclose information if the head of the law enforcement agency makes a written request giving enough information to show that the conditions in paragraphs (b) or (c) of this section are met, what information is needed, and why it is needed. Paragraphs (b) and (c) of this section discuss the disclosures we generally make for these purposes.

(b)   *Serious crimes.* SSA may disclose information for criminal law enforcement purposes where a violent crime such as murder or kidnapping has been committed and the individual about whom the information is being sought has been indicted or convicted of that crime.

(c)   *Criminal activity involving the social security program or another program with the same purposes.* We disclose information when necessary to investigate or prosecute fraud or other criminal activity involving the social security program. We may also disclose information for investigation or prosecution of criminal activity in other income-maintenance or health-maintenance programs (e.g., other governmental pension programs, unemployment compensation, general assistance, Medicare or Medicaid) if the information concerns eligibility, benefit amounts, or other matters of benefit status in a social security program and is relevant to determining the same matters in the other program.

*[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20941, Apr. 27, 2007]*

## § 401.160 Health or safety.

The Privacy Act allows us to disclose information in compelling circumstances where an individual's health or safety is affected. For example, if we learn that someone has been exposed to an excessive amount of radiation, we may notify that person and appropriate health officials. If we learn that someone has made a threat against someone else, we may notify that other person and law enforcement officials. When we make these disclosures, the Privacy Act requires us to send a notice of the disclosure to the last known address of the person whose record was disclosed.

## § 401.165 Statistical and research activities.

(a)   *General.* Statistical and research activities often do not require information in a format that identifies specific individuals. Therefore, whenever possible, we release information for statistical or research purposes only in the form of aggregates or individual data that cannot be associated with a particular individual. The Privacy Act allows us to release records if there are safeguards that the record will be used solely as a statistical or research record and the individual cannot be identified from any information in the record.

CEDC Case 000148

(b) *Safeguards for disclosure with identifiers.* The Privacy Act also allows us to disclose data for statistical and research purposes in a form allowing individual identification, pursuant to published routine use, when the purpose is compatible with the purpose for which the record was collected. We will disclose personally identifiable information for statistical and research purposes if—

  (1) We determine that the requestor needs the information in an identifiable form for a statistical or research activity, will use the information only for that purpose, and will protect individuals from unreasonable and unwanted contacts;

  (2) The activity is designed to increase knowledge about present or alternative Social Security programs or other Federal or State income-maintenance or health-maintenance programs; or is used for research that is of importance to the Social Security program or the Social Security beneficiaries; or an epidemiological research project that relates to the Social Security program or beneficiaries; and

  (3) The recipient will keep the information as a system of statistical records, will follow appropriate safeguards, and agrees to our on-site inspection of those safeguards so we can be sure the information is used or redisclosed only for statistical or research purposes. No redisclosure of the information may be made without SSA's approval.

(c) *Statistical record.* A statistical record is a record in a system of records which is maintained only for statistical and research purposes, and which is not used to make any determination about an individual. We maintain and use statistical records only for statistical and research purposes. We may disclose a statistical record if the conditions in paragraph (b) of this section are met.

(d) *Compiling of records.* Where a request for information for statistical and research purposes would require us to compile records, and doing that would be administratively burdensome to ongoing SSA operations, we may decline to furnish the information.

*[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 20941, Apr. 27, 2007]*

## § 401.170 Congress.

(a) We disclose information to either House of Congress. We also disclose information to any committee or subcommittee of either House, or to any joint committee of Congress or subcommittee of that committee, if the information is on a matter within the committee's or subcommittee's jurisdiction.

(b) We disclose to any member of Congress the information needed to respond to constituents' requests for information about themselves (including requests from parents of minors, or legal guardians). However, these disclosures are subject to the restrictions in §§ 401.35 through 401.60.

## § 401.175 Government Accountability Office.

We disclose information to the Government Accountability Office when that agency needs the information to carry out its duties.

*[72 FR 20941, Apr. 27, 2007]*

## § 401.180 Disclosure under court order or other legal process.

(a) *General.* The Privacy Act permits us to disclose information when we are ordered to do so by a court of competent jurisdiction. When information is used in a court proceeding, it usually becomes part of the public record of the proceeding and its confidentiality often cannot be protected in that record. Much of

CEDC Case 000149

Case 1:25-cv-12822-IT   Document 103-1   Filed 05/29/26   Page 153 of 165

the information that we collect and maintain in our records on individuals is especially sensitive. Therefore, we follow the rules in paragraph (d) of this section in deciding whether we may disclose information in response to an order from a court of competent jurisdiction. When we disclose pursuant to an order from a court of competent jurisdiction, and the order is a matter of public record, the Privacy Act requires us to send a notice of the disclosure to the last known address of the person whose record was disclosed.

(b) *Court.* For purposes of this section, a court is an institution of the judicial branch of the U.S. Federal government consisting of one or more judges who seek to adjudicate disputes and administer justice. (See 404.2(c)(6) of this chapter). Entities not in the judicial branch of the Federal government are not courts for purposes of this section.

(c) *Court order.* For purposes of this section, a court order is any legal process which satisfies all of the following conditions:

   (1)   It is issued under the authority of a Federal court;

   (2)   A judge or a magistrate judge of that court signs it;

   (3)   It commands SSA to disclose information; and

   (4)   The court is a court of competent jurisdiction.

(d) *Court of competent jurisdiction.* It is the view of SSA that under the Privacy Act the Federal Government has not waived sovereign immunity, which precludes state court jurisdiction over a Federal agency or official. Therefore, SSA will not honor state court orders as a basis for disclosure. State court orders will be treated in accordance with the other provisions of this part.

(e) *Conditions for disclosure under a court order of competent jurisdiction.* We disclose information in compliance with an order of a court of competent jurisdiction if—

   (1)   another section of this part specifically allows such disclosure, or

   (2)   SSA, the Commissioner of Social Security, or any officer or employee of SSA in his or her official capacity is properly a party in the proceeding, or

   (3)   disclosure of the information is necessary to ensure that an individual who is accused of criminal activity receives due process of law in a criminal proceeding under the jurisdiction of the judicial branch of the Federal government.

(f) *In other circumstances.* We may disclose information to a court of competent jurisdiction in circumstances other than those stated in paragraph (e) of this section. We will make our decision regarding disclosure by balancing the needs of a court while preserving the confidentiality of information. For example, we may disclose information under a court order that restricts the use and redisclosure of the information by the participants in the proceeding; we may offer the information for inspection by the court *in camera* and under seal; or we may arrange for the court to exclude information identifying individuals from that portion of the record of the proceedings that is available to the public. We will make these determinations in accordance with § 401.140.

(g) *Other regulations on request for testimony, subpoenas and production of records in legal proceedings.* See 20 CFR part 403 of this chapter for additional rules covering disclosure of information and records governed by this part and requested in connection with legal proceedings.

*[72 FR 20941, Apr. 27, 2007]*

CEDC Case 000150

Case 1:25-cv-12822-JT   Document 103-1   Filed 05/29/26   Page 154 of 165

## § 401.185 Other specific recipients.

In addition to disclosures we make under the routine use provision, we also release information to—

    (a)   The Bureau of the Census for purposes of planning or carrying out a census, survey, or related activity; and

    (b)   The National Archives of the United States if the record has sufficient historical or other value to warrant its continued preservation by the United States Government. We also disclose a record to the Administrator of General Services for a determination of whether the record has such a value.

## § 401.190 Deceased persons.

We do not consider the disclosure of information about a deceased person to be a clearly unwarranted invasion of that person's privacy. However, in disclosing information about a deceased person, we follow the principles in § 401.115 to insure that the privacy rights of a living person are not violated.

## § 401.195 Situations not specified in this part.

If no other provision in this part specifically allows SSA to disclose information, the Commissioner or designee may disclose this information if not prohibited by Federal law. For example, the Commissioner or designee may disclose information necessary to respond to life threatening situations.

## § 401.200 Blood donor locator service.

    (a)   *General.* We will enter into arrangements with State agencies under which we will furnish to them at their request the last known personal mailing addresses (residence or post office box) of blood donors whose blood donations show that they are or may be infected with the human immunodeficiency virus which causes acquired immune deficiency syndrome. The State agency or other authorized person, as defined in paragraph (b) of this section, will then inform the donors that they may need medical care and treatment. The safeguards that must be used by authorized persons as a condition to receiving address information from the Blood Donor Locator Service are in paragraph (g) of this section, and the requirements for a request for address information are in paragraph (d) of this section.

    (b)   *Definitions. State* means the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Commonwealth of Northern Marianas, and the Trust Territory of the Pacific Islands.

        *Authorized person* means—

        (1)   Any agency of a State (or of a political subdivision of a State) which has duties or authority under State law relating to the public health or otherwise has the duty or authority under State law to regulate blood donations; and

        (2)   Any entity engaged in the acceptance of blood donations which is licensed or registered by the Food and Drug Administration in connection with the acceptance of such blood donations, and which provides for—

            (i)   The confidentiality of any address information received pursuant to the rules in this part and section 1141 of the Social Security Act and related blood donor records;

CEDC Case 000151

(ii) Blood donor notification procedures for individuals with respect to whom such information is requested and a finding has been made that they are or may be infected with the human immunodeficiency virus; and

(iii) Counseling services for such individuals who have been found to have such virus. New counseling programs are not required, and an entity may use existing counseling programs or referrals to provide these services.

*Related blood donor records* means any record, list, or compilation established in connection with a request for address information which indicates, directly or indirectly, the identity of any individual with respect to whom a request for address information has been made pursuant to the rules in this part.

(c) *Use of social security number for identification.* A State or an authorized person in the State may require a blood donor to furnish his or her social security number when donating blood. The number may then be used by an authorized person to identify and locate a donor whose blood donation indicates that he or she is or may be infected with the human immunodeficiency virus.

(d) *Request for address of blood donor.* An authorized person who has been unable to locate a blood donor at the address he or she may have given at the time of the blood donation may request assistance from the State agency which has arranged with us to participate in the Blood Donor Locator Service. The request to the Blood Donor Locator Service must—

(1) Be in writing;

(2) Be from a participating State agency either on its own behalf as an authorized person or on behalf of another authorized person;

(3) Indicate that the authorized person meets the confidentiality safeguards of paragraph (g) of this section; and

(4) Include the donor's name and social security number, the addresses at which the authorized person attempted without success to contact the donor, the date of the blood donation if available, a statement that the donor has tested positive for the human immunodeficiency virus according to the latest Food and Drug Administration standards or that the history of the subsequent use of the donated blood or blood products indicates that the donor has or may have the human immunodeficiency virus, and the name and address of the requesting blood donation facility.

(e) *SSA response to request for address.* After receiving a request that meets the requirements of paragraph (d) of this section, we will search our records for the donor's latest personal mailing address. If we do not find a current address, we will request that the Internal Revenue Service search its tax records and furnish us any personal mailing address information from its files, as required under section 6103(m)(6) of the Internal Revenue Code. After completing these searches, we will provide to the requesting State agency either the latest mailing address available for the donor or a response stating that we do not have this information. We will then destroy the records or delete all identifying donor information related to the request and maintain only the information that we will need to monitor the compliance of authorized persons with the confidentiality safeguards contained in paragraph (g) of this section.

(f) *SSA refusal to furnish address.* If we determine that an authorized person has not met the requirements of paragraphs (d) and (g) of this section, we will not furnish address information to the State agency. In that case, we will notify the State agency of our determination, explain the reasons for our determination, and explain that the State agency may request administrative review of our determination. The Commissioner of Social Security or a delegate of the Commissioner will conduct this review. The review will be based on

CEDC Case 000152

the information of record and there will not be an opportunity for an oral hearing. A request for administrative review, which may be submitted only by a State agency, must be in writing. The State agency must send its request for administrative review to the Commissioner of Social Security, 6401 Security Boulevard, Baltimore, MD 21235, within 60 days after receiving our notice refusing to give the donor's address. The request for review must include supporting information or evidence that the requirements of the rules in this part have been met. If we do not furnish address information because an authorized person failed to comply with the confidentiality safeguards of paragraph (g) of this section, the State agency will have an opportunity to submit evidence that the authorized person is now in compliance. If we then determine, based on our review of the request for administrative review and the supporting evidence, that the authorized person meets the requirements of the rules in this part, we will respond to the address request as provided in paragraph (e) of this section. If we determine on administrative review that the requirements have not been met, we will notify the State agency in writing of our decision. We will make our determination within 30 days after receiving the request for administrative review, unless we notify the State agency within this 30-day time period that we will need additional time. Our determination on the request for administrative review will give the findings of fact, the reasons for the decision, and what actions the State agency should take to ensure that it or the blood donation facility is in compliance with the rules in this part.

(g) *Safeguards to ensure confidentiality of blood donor records.* We will require assurance that authorized persons have established and continue to maintain adequate safeguards to protect the confidentiality of both address information received from the Blood Donor Locator Service and related blood donor records. The authorized person must, to the satisfaction of the Secretary—

(1) Establish and maintain a system for standardizing records which includes the reasons for requesting the addresses of blood donors, dates of the requests, and any disclosures of address information;

(2) Store blood donors' addresses received from the Blood Donor Locator Service and all related blood donor records in a secure area or place that is physically safe from access by persons other than those whose duties and responsibilities require access;

(3) Restrict access to these records to authorized employees and officials who need them to perform their official duties related to notifying blood donors who are or may be infected with the human immunodeficiency virus that they may need medical care and treatment;

(4) Advise all personnel who will have access to the records of the confidential nature of the information, the safeguards required to protect the information, and the civil and criminal sanctions for unauthorized use or disclosure of the information;

(5) Destroy the address information received from the Blood Donor Locator Service, as well as any records established in connection with the request which indicate directly or indirectly the identity of the individual, after notifying or attempting to notify the donor at the address obtained from the Blood Donor Locator Service; and

(6) Upon request, report to us the procedures established and utilized to ensure the confidentiality of address information and related blood donor records. We reserve the right to make onsite inspections to ensure that these procedures are adequate and are being followed and to request such information as we may need to ensure that the safeguards required in this section are being met.

CEDC Case 000153

(h)  *Unauthorized disclosure.* Any official or employee of the Federal Government, a State, or a blood donation facility who discloses blood donor information, except as provided for in this section or under a provision of law, will be subject to the same criminal penalty as provided in section 7213(a) of the Internal Revenue Code of 1986 for the unauthorized disclosure of tax information.

## Appendix A to Part 401—Employee Standards of Conduct

(a)  *General.* All SSA employees are required to be aware of their responsibilities under the Privacy Act of 1974, 5 U.S.C. 552a. Regulations implementing the Privacy Act are set forth in this part. Instruction on the requirements of the Act and regulation shall be provided to all new employees of SSA. In addition, supervisors shall be responsible for assuring that employees who are working with systems of records or who undertake new duties which require the use of systems of records are informed of their responsibilities. Supervisors shall also be responsible for assuring that all employees who work with such systems of records are periodically reminded of the requirements of the Privacy Act and are advised of any new provisions or interpretations of the Act.

(b)  *Penalties.*

(1)  All employees must guard against improper disclosure of records which are governed by the Privacy Act. Because of the serious consequences of improper invasions of personal privacy, employees may be subject to disciplinary action and criminal prosecution for knowing and willful violations of the Privacy Act and regulation. In addition, employees may also be subject to disciplinary action for unknowing or unwillful violations, where the employee had notice of the provisions of the Privacy Act and regulations and failed to inform himself or herself sufficiently or to conduct himself or herself in accordance with the requirements to avoid violations.

(2)  SSA may be subjected to civil liability for the following actions undertaken by its employees:

(a)  Making a determination under the Privacy Act and §§ 401.65 and 401.70 not to amend an individual's record in accordance with his or her request, or failing to make such review in conformity with those provisions;

(b)  Refusing to comply with an individual's request for notification of or access to a record pertaining to him or her;

(c)  Failing to maintain any record pertaining to any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such a record, and consequently makes a determination which is adverse to the individual; or

(d)  Failing to comply with any other provision of the Act or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual.

(3)  An employee may be personally subject to criminal liability as set forth below and in 5 U.S.C. 552a (i):

(a)  *Willful disclosure.* Any officer or employee of SSA, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by the Privacy Act or by rules or regulations established thereunder, and who, knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and may be fined not more than $5,000.

CEDC Case 000154

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 158 of 165

(b)  *Notice requirements.* Any officer or employee of SSA who willfully maintains a system of records without meeting the notice requirements [of the Privacy Act] shall be guilty of a misdemeanor and may be fined not more than $5,000.

(c)  *Rules governing employees not working with systems of records.* Employees whose duties do not involve working with systems of records will not generally disclose to any one, without specific authorization from their supervisors, records pertaining to employees or other individuals which by reason of their official duties are available to them. Notwithstanding the above, the following records concerning Federal employees are a matter of public record and no further authorization is necessary for disclosure:

(1)  Name and title of individual.

(2)  Grade classification or equivalent and annual rate of salary.

(3)  Position description.

In addition, employees shall disclose records which are listed in SSA's Freedom of Information Regulation as being available to the public. Requests for other records will be referred to the responsible SSA Freedom of Information Officer. This does not preclude employees from discussing matters which are known to them personally, and without resort to a record, to official investigators of Federal agencies for official purposes such as suitability checks, Equal Employment Opportunity investigations, adverse action proceedings, grievance proceedings, etc.

(d)  *Rules governing employees whose duties require use or reference to systems of records.* Employees whose official duties require that they refer to, maintain, service, or otherwise deal with systems of records (hereinafter referred to as "Systems Employees") are governed by the general provisions. In addition, extra precautions are required and systems employees are held to higher standards of conduct.

(1)  Systems Employees shall:

(a)  Be informed with respect to their responsibilities under the Privacy Act;

(b)  Be alert to possible misuses of the system and report to their supervisors any potential or actual use of the system which they believe is not in compliance with the Privacy Act and regulation;

(c)  Disclose records within SSA only to an employee who has a legitimate need to know the record in the course of his or her official duties;

(d)  Maintain records as accurately as practicable.

(e)  Consult with a supervisor prior to taking any action where they are in doubt whether such action is in conformance with the Act and regulation.

(2)  Systems employees shall not:

(a)  Disclose in any form records from a system of records except (1) with the consent or at the request of the subject individual; or (2) where its disclosure is permitted under § 401.110.

(b)  Permit unauthorized individuals to be present in controlled areas. Any unauthorized individuals observed in controlled areas shall be reported to a supervisor or to the guard force.

(c)  Knowingly or willfully take action which might subject SSA to civil liability.

CEDC Case 000155

Case 1:25-cv-12822-IT    Document 103-1    Filed 05/29/26    Page 159 of 165

(d)  Make any arrangements for the design, development, or operation of any system of records without making reasonable effort to provide that the system can be maintained in accordance with the Act and regulation.

(e)  *Contracting officers.* In addition to any applicable provisions set forth above, those employees whose official duties involve entering into contracts on behalf of SSA shall also be governed by the following provisions:

(1)  *Contracts for design, or development of systems and equipment.* The contracting officer shall not enter into any contract for the design or development of a system of records, or for equipment to store, service or maintain a system of records unless the contracting officer has made reasonable effort to ensure that the product to be purchased is capable of being used without violation of the Privacy Act or the regulations in this part. He shall give special attention to provision of physical safeguards.

(2)  *Contracts for the operation of systems of records.* The Contracting Officer, in conjunction with other officials whom he feels appropriate, shall review all proposed contracts providing for the operation of systems of records prior to execution of the contracts to determine whether operation of the system of records is for the purpose of accomplishing a Department function. If it is determined that the operation of the system is to accomplish an SSA function, the contracting officer shall be responsible for including in the contract appropriate provisions to apply the provisions of the Privacy Act and regulation to the system, including prohibitions against improper release by the contractor, his employees, agents, or subcontractors.

(3)  *Other service contracts.* Contracting officers entering into general service contracts shall be responsible for determining the appropriateness of including provisions in the contract to prevent potential misuse (inadvertent or otherwise) by employees, agents, or subcontractors of the contractor.

(f)  *Rules governing SSA officials responsible for managing systems of records.* In addition to the requirements for Systems Employees, SSA officials responsible for managing systems of records as described in § 401.40(c) (system managers) shall:

(1)  Respond to all requests for notification of or access, disclosure, or amendment of records in a timely fashion in accordance with the Privacy Act and regulation;

(2)  Make any amendment of records accurately and in a timely fashion;

(3)  Inform all persons whom the accounting records show have received copies of the record prior to the amendments of the correction; and

(4)  Associate any statement of disagreement with the disputed record, and

(a)  Transmit a copy of the statement to all persons whom the accounting records show have received a copy of the disputed record, and

(b)  Transmit that statement with any future disclosure.

*[62 FR 4143, Jan. 29, 1997, as amended at 72 FR 69617, Dec. 10, 2007]*

CEDC Case 000156

Page 2555    TITLE 42—THE PUBLIC HEALTH AND WELFARE    §1306

### SHORT TITLE OF 1961 AMENDMENT

Pub. L. 87–64, §1, June 30, 1961, 75 Stat. 131, provided: "That this Act [enacting section 1313 of this title, amending sections 303, 402, 403, 409, 413, 414, 415, 416, 418, 423, 1203, 1308, and 1353 of this title, sections 1401, 1402, 3101 and 3111 of Title 26, Internal Revenue Code, and section 228a of Title 45, Railroads, and enacting provisions set out as notes under sections 303, 402, 403, 414, 415, 416, 1301, and 1308 of this title and under sections 1401 and 1402 of Title 26] may be cited as the 'Social Security Amendments of 1961.'"

### SHORT TITLE OF 1960 AMENDMENT

Pub. L. 86–778, §1, Sept. 13, 1960, 74 Stat. 924, provided that this Act [enacting sections 726 and 1312 of this title and sections 3125 and 3308 of Title 26, Internal Revenue Code, amending sections 301 to 304, 306, 401, 401a, 402, 403, 405, 408 to 411, 413 to 416, 418, 422, 423, 501, 701, 702, 704, 711, 712, 714, 721, 722, 1101 to 1104, 1202, 1301, 1308, 1321 to 1324, 1361, 1363, 1364, 1367, 1371, and 1400c of this title, sections 1402, 1403, 3121, 3301, 3302, 3305, 3306, 6205, 6413, 7213, and 7701 of Title 26, section 49d of Title 29, Labor, sections 228a, 228c, and 228e of Title 45, Railroads, and section 1421h of Title 48, Territories and Insular Possessions, repealing section 419 of this title, and enacting provisions set out as notes under sections 301, 302, 401, 402, 403, 405, 410, 411, 413 to 418, 422, 423, 701, 1101, 1202, 1202a, 1301, 1321, 1362, 1363, and 1364 of this title, sections 1402, 3121, 3301, 3304, 3305, and 3306 of Title 26, and section 49d of Title 29] may be cited as the "Social Security Amendments of 1960."

Pub. L. 86–778, title V, §501, Sept. 13, 1960, 74 Stat. 970, provided that: "This title [enacting section 3308 of Title 26, Internal Revenue Code, amending sections 501, 1101 to 1104, 1301, 1321 to 1324, 1361 to 1364, 1367, 1371, and 1400c of this title, sections 3301, 3302, 3305, 3306, and 3309 of Title 26, and section 49d of Title 29, Labor, and enacting provisions set out as notes under sections 1301, 1321, and 1362 to 1364 of this title, sections 3301, 3304, and 3305 of Title 26, and section 49d of Title 29] may be cited as the 'Employment Security Act of 1960.'"

### SHORT TITLE OF 1958 AMENDMENT

Pub. L. 85–840, §1, Aug. 28, 1958, 72 Stat. 1013, provided that this Act [enacting sections 722 to 725 and 1311 of this title, amending sections 302, 303, 401, 402, 403, 406, 408, 409 to 411, 413 to 418, 422, 423, 425, 603, 701, 702, 711, 712, 1203, 1301, 1306, 1308, and 1353 of this title, sections 1401, 1402, 3101, 3111, 3121, 3122, 6334, and 6413 of Title 26, Internal Revenue Code, and section 228a of Title 45, Railroads, repealing section 424 of this title, and enacting provisions set out as notes under sections 303, 402, 403, 410, 411, 415, 416, 417, 418, 422, 721, 1202a, 1301 of this title and sections 1401, 1402, and 3121 of Title 26] should be popularly known as the "Social Security Amendments of 1958".

### SHORT TITLE OF 1956 AMENDMENT

Act Aug. 1, 1956, ch. 836, §1, 70 Stat. 807, provided: "That this Act [enacting sections 401a, 423, 424, 425, 906, and 1310 of this title and section 3113 of Title 26, Internal Revenue Code, amending sections 301 to 303, 401, 402, 403, 405, 409 to 411, 413 to 416, 418, 421, 422, 601 to 603, 606, 721, 1201 to 1203, 1301, 1308, and 1351 to 1353 of this title, sections 1401, 1402, 3101, 3102, 3111, and 3121 of Title 26, and sections 228 and 228e of Title 45, Railroads, and amending provisions set out as a note under section 3121 of Title 26] may be cited as the 'Social Security Amendments of 1956.'"

### SHORT TITLE OF 1954 AMENDMENT

Act Aug. 5, 1954, ch. 657, §1, 68 Stat. 668, provided that: "This Act [enacting sections 1101 to 1103, 1322, and 1323 of this title and amending sections 503, 1104, and 1321 of this title and sections 1601, 1603, and 1607 of former Title 26, Internal Revenue Code of 1939] may be cited as the 'Employment Security Administration Financing Act of 1954.'"

### SHORT TITLE OF 1952 AMENDMENT

Act July 18, 1952, ch. 945, §1, 66 Stat. 767, provided that: "This Act [enacting sections 420, 421, and 1309 of this title, amending sections 303, 403, 405, 413, 414, 415, 416, 417, 603, 1203, and 1353 of this title and sections 228a, 228e of Title 45, Railroads, and enacting provisions set out as notes under sections 303, 402, 403, 413, 415, and 417 of this title] may be cited as the 'Social Security Act Amendments of 1952'."

### SHORT TITLE OF 1950 AMENDMENT

Act Aug. 28, 1950, ch. 809, §1, 64 Stat. 477, provided in part that act Aug. 28, 1950, may be cited as the "Social Security Act Amendments of 1950". For complete classification of this Act to the Code, see Tables.

## §1306. Disclosure of information in possession of Social Security Administration or Department of Health and Human Services

### (a) Disclosure prohibited; exceptions

(1) No disclosure of any return or portion of a return (including information returns and other written statements) filed with the Commissioner of Internal Revenue under title VIII of the Social Security Act or under subchapter E of chapter 1 or subchapter A of chapter 9 of the Internal Revenue Code [of 1939], or under regulations made under authority thereof, which has been transmitted to the head of the applicable agency by the Commissioner of Internal Revenue, or of any file, record, report, or other paper, or any information, obtained at any time by the head of the applicable agency or by any officer or employee of the applicable agency in the course of discharging the duties of the head of the applicable agency under this chapter, and no disclosure of any such file, record, report, or other paper, or information, obtained at any time by any person from the head of the applicable agency or from any officer or employee of the applicable agency, shall be made except as the head of the applicable agency may by regulations prescribe and except as otherwise provided by Federal law. Any person who shall violate any provision of this section shall be deemed guilty of a felony and, upon conviction thereof, shall be punished by a fine not exceeding $10,000 for each occurrence of a violation, or by imprisonment not exceeding 5 years, or both.

(2) For purposes of this subsection and subsection (b), the term "applicable agency" means—

(A) the Social Security Administration, with respect to matter transmitted to or obtained by such Administration or matter disclosed by such Administration, or

(B) the Department of Health and Human Services, with respect to matter transmitted to or obtained by such Department or matter disclosed by such Department.

### (b) Requests for information and services

Requests for information, disclosure of which is authorized by regulations prescribed pursuant to subsection (a) of this section, and requests for services, may, subject to such limitations as may be prescribed by the head of the applicable agency to avoid undue interference with his functions under this chapter, be complied with if the agency, person, or organization making the request agrees to pay for the information or services requested in such amount, if any (not

exceeding the cost of furnishing the information or services), as may be determined by the head of the applicable agency. Payments for information or services furnished pursuant to this section shall be made in advance or by way of reimbursement, as may be requested by the head of the applicable agency, and shall be deposited in the Treasury as a special deposit to be used to reimburse the appropriations (including authorizations to make expenditures from the Federal Old-Age and Survivors Insurance Trust Fund, the Federal Disability Insurance Trust Fund, the Federal Hospital Insurance Trust Fund, and the Federal Supplementary Medical Insurance Trust Fund) for the unit or units of the applicable agency which furnished the information or services. Notwithstanding the preceding provisions of this subsection, requests for information made pursuant to the provisions of part D of subchapter IV of this chapter for the purpose of using Federal records for locating parents shall be complied with and the cost incurred in providing such information shall be paid for as provided in such part D of subchapter IV.

**(c) Cost reimbursement**

Notwithstanding sections 552 and 552a of title 5 or any other provision of law, whenever the Commissioner of Social Security or the Secretary determines that a request for information is made in order to assist a party in interest (as defined in section 1002 of title 29) with respect to the administration of an employee benefit plan (as so defined), or is made for any other purpose not directly related to the administration of the program or programs under this chapter to which such information relates, such Commissioner or Secretary may require the requester to pay the full cost, as determined by such Commissioner or Secretary, of providing such information.

**(d) Compliance with requests**

Notwithstanding any other provision of this section, in any case in which—

(1) information regarding whether an individual is shown on the records of the Commissioner of Social Security as being alive or deceased is requested from the Commissioner for purposes of epidemiological or similar research which the Commissioner in consultation with the Secretary of Health and Human Services finds may reasonably be expected to contribute to a national health interest, and

(2) the requester agrees to reimburse the Commissioner for providing such information and to comply with limitations on safeguarding and rerelease or redisclosure of such information as may be specified by the Commissioner,

the Commissioner shall comply with such request, except to the extent that compliance with such request would constitute a violation of the terms of any contract entered into under section 405(r) of this title.

**(e) Public inspection**

Notwithstanding any other provision of this section the Secretary shall make available to each State agency operating a program under subchapter XIX and shall, subject to the limitations contained in subsection (e),[1] make available for public inspection in readily accessible form and fashion, the following official reports (not including, however, references to any internal tolerance rules and practices that may be contained therein, internal working papers or other informal memoranda) dealing with the operation of the health programs established by subchapters XVIII and XIX—

(1) individual contractor performance reviews and other formal evaluations of the performance of carriers, intermediaries, and State agencies, including the reports of follow-up reviews;

(2) comparative evaluations of the performance of such contractors, including comparisons of either overall performance or of any particular aspect of contractor operation; and

(3) program validation survey reports and other formal evaluations of the performance of providers of services, including the reports of follow-up reviews, except that such reports shall not identify individual patients, individual health care practitioners, or other individuals.

**(f) Opportunity for review**

No report described in subsection (e) shall be made public by the Secretary or the State subchapter XIX agency until the contractor or provider of services whose performance is being evaluated has had a reasonable opportunity (not exceeding 60 days) to review such report and to offer comments pertinent parts of which may be incorporated in the public report; nor shall the Secretary be required to include in any such report information with respect to any deficiency (or improper practice or procedures) which is known by the Secretary to have been fully corrected, within 60 days of the date such deficiency was first brought to the attention of such contractor or provider of services, as the case may be.

**(g) Agreement with Secretary of the Treasury**

Notwithstanding any other provision of this section, the Commissioner of Social Security shall enter into an agreement with the Secretary of the Treasury under which—

(1) if the Secretary provides the Commissioner with the information described in section 6103(k)(15) of the Internal Revenue Code of 1986 with respect to any individual, the Commissioner shall indicate to the Secretary as to whether such individual receives disability insurance benefits under section 423 of this title or supplemental security income benefits under subchapter XVI of this chapter (including State supplementary payments of the type referred to in section 1382e(a) of this title or payments of the type described in section 212(a) of Public Law 93–66 [42 U.S.C. 1382 note]);

(2) appropriate safeguards are included to assure that the indication described in paragraph (1) will be used solely for the purpose of determining if tax receivables involving such individual are not eligible for collection pursuant to a qualified tax collection contract by reason of section 6306(d)(3)(E) of the Internal Revenue Code of 1986; and

---

[1] So in original. Probably should be subsection ''(f),''.

CEDC Case 000158

(3) the Secretary shall pay the Commissioner of Social Security the full costs (including systems and administrative costs) of providing the indication described in paragraph (1).

(Aug. 14, 1935, ch. 531, title XI, §1106, as added Aug. 10, 1939, ch. 666, title VIII, §802, 53 Stat. 1398; amended Aug. 28, 1950, ch. 809, title IV, §403(d), 64 Stat. 559; Pub. L. 85–840, title VII, §701, Aug. 28, 1958, 72 Stat. 1055; Pub. L. 89–97, title I, §108(c), title III, §340, July 30, 1965, 79 Stat. 339, 411; Pub. L. 90–248, title I, §168, title II, §241(c)(1), Jan. 2, 1968, 81 Stat. 875, 917; Pub. L. 92–603, title II, §249C(a), Oct. 30, 1972, 86 Stat. 1428; Pub. L. 93–647, §101(d), Jan. 4, 1975, 88 Stat. 2360; Pub. L. 97–35, title XXII, §2207, Aug. 13, 1981, 95 Stat. 838; Pub. L. 98–369, div. B, title VI, §2663(j)(2)(D)(ii), (*l*), July 18, 1984, 98 Stat. 1170, 1171; Pub. L. 103–296, title I, §108(b)(2)–(5), title III, §§311(a), 313(a), Aug. 15, 1994, 108 Stat. 1481, 1482, 1525, 1530; Pub. L. 116–260, div. N, title II, §283(a), div. FF, title I, §102(a), Dec. 27, 2020, 134 Stat. 1984, 3083.)

### Editorial Notes

#### REFERENCES IN TEXT

Title VIII of the Social Security Act, referred to in subsec. (a)(1), probably refers to former title VIII of the Act, which was classified to subchapter VIII (§1001 et seq.) of this chapter prior to its omission from the Code as superseded by the provisions of the Internal Revenue Code of 1939 and the Internal Revenue Code of 1986.

Subchapter E of chapter 1 and subchapter A of chapter 9 of the Internal Revenue Code of 1939, referred to in subsec. (a), were comprised of sections 480 to 482 and 1400 to 1432, respectively, and were repealed (subject to certain exceptions) by section 7851(a)(1)(A), (3) of the Internal Revenue Code of 1954, Title 26. The Internal Revenue Code of 1954 was redesignated the Internal Revenue Code of 1986 by Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095. For table of comparisons of the 1939 Code to the 1986 Code, see Table I preceding section 1 of Title 26, Internal Revenue Code. See also section 7852(b) of Title 26 for provision that references in any other law to a provision of the 1939 Code, unless expressly incompatible with the intent thereof, shall be deemed a reference to the corresponding provision of the 1986 Code.

For provision deeming a reference in other laws to a provision of the 1939 Code as a reference to the corresponding provisions of the 1986 Code, see section 7852(b) of the 1986 Code. For table of comparisons of the 1939 Code to the 1986 Code, see table preceding section 1 of Title 26, Internal Revenue Code. The Internal Revenue Code of 1986 is classified generally to Title 26.

Sections 6103(k)(15) and 6306(d)(3)(E) of the Internal Revenue Code of 1986, referred to in subsec. (g)(1) and (2), are classified to sections 6103(k)(15) and 6306(d)(3)(E), respectively, of Title 26, Internal Revenue Code.

#### AMENDMENTS

2020—Subsec. (g). Pub. L. 116–260, div. N, §283(a), and div. FF, §102(a), made substantially identical amendments, adding subsec. (g). Text is based on amendment by div. N, §283(a).

1994—Subsec. (a). Pub. L. 103–296, §313(a), in par. (1), substituted "felony" for "misdemeanor", "$10,000 for each occurrence of a violation" for "$1,000", and "5 years" for "one year".

Pub. L. 103–296, §108(b)(2), designated existing provisions as par. (1), substituted "head of the applicable agency" for "Secretary" wherever appearing and "employee of the applicable agency" for "employee of the Department of Health and Human Services" in two places, and added par. (2).

Subsec. (b). Pub. L. 103–296, §108(b)(3), substituted "head of the applicable agency" for "Secretary" wherever appearing and "applicable agency which" for "Department of Health and Human Services which".

Subsec. (c). Pub. L. 103–296, §108(b)(4), substituted "the Commissioner of Social Security or the Secretary" for "the Secretary" where first appearing and "such Commissioner or Secretary" for "the Secretary" where appearing subsequently in two places.

Subsec. (d). Pub. L. 103–296, §311(a)(3), added subsec. (d). Former subsec. (d) redesignated (e).

Pub. L. 103–296, §108(b)(5) in subsec. (d) as added by Pub. L. 103–296, §311(a)(3), in par. (1) substituted "Commissioner of Social Security" for "Secretary" after "records of the", "Commissioner" for "Secretary" after "from the", "Commissioner in consultation with the Secretary of Health and Human Services" for "Secretary" after "which the", and in par. (2) and closing provisions substituted "Commissioner" for "Secretary" wherever appearing.

Subsec. (e). Pub. L. 103–296, §311(a)(1), redesignated subsec. (d) as (e). Former subsec. (e) redesignated (f).

Subsec. (f). Pub. L. 103–296, §311(a)(1), (2), redesignated subsec. (e) as (f) and substituted "subsection (e)" for "subsection (d)".

1984—Subsec. (a). Pub. L. 98–369, §2663(*l*), substituted "Secretary" and "Department of Health and Human Services" for "Administrator" and "Federal Security Agency", respectively, wherever appearing.

Subsec. (b). Pub. L. 98–369, §2663(j)(2)(D)(ii), substituted "Health and Human Services" for "Health, Education, and Welfare".

1981—Subsec. (a). Pub. L. 97–35, §2207(1), substituted "as otherwise provided by Federal law" for "as provided in part D of subchapter IV of this chapter".

Subsec. (c). Pub. L. 97–35, §2207(2), added subsec. (c).

1975—Subsec. (a). Pub. L. 93–647, §101(d)(1), inserted "and except as provided in part D of subchapter IV of this chapter" after "may by regulations prescribe".

Subsec. (b). Pub. L. 93–647, §101(d)(2), inserted provision relating to compliance with requests for information made pursuant to part D of subchapter IV of this chapter for purpose of using Federal records to locate parents.

Subsec. (c). Pub. L. 93–647, §101(d)(3), repealed subsec. (c) relating to requests by State or local agencies for most recent address of any individual maintained pursuant to section 405 of this title and requirements for release of such information.

1972—Subsecs. (d), (e). Pub. L. 92–603 added subsecs. (d) and (e).

1968—Subsec. (c)(1). Pub. L. 90–248, §241(c)(1), struck out "IV," after "I," and inserted "or part A of subchapter IV of this chapter," after "XIX of this chapter,".

Subsec. (c)(1)(A), (B). Pub. L. 90–248, §168(a), designated existing provisions as subpar. (A), redesignated former subpars. (A) to (D) as cls. (i) to (iv) thereof, and added subpar. (B).

Subsec. (c)(2). Pub. L. 90–248, §168(b)(1), substituted "(and, in the case of a request under paragraph (1)(A), shall be accompanied by a certified copy of the order referred to in clauses (i) and (iv) thereof)" for ", and shall be accompanied by a certified copy of the order referred to in paragraph (1)(A) of this subsection".

Subsec. (c)(3). Pub. L. 90–248, §168(b)(2), substituted "authorized by subparagraph (A)(iv) or (B)" for "authorized by subparagraph (D)".

1965—Subsec. (b). Pub. L. 89–97, §108(c), provided for use of special deposit in the Treasury (made up of payments for information and services furnished) to reimburse authorizations to make expenditures from the Federal Hospital Insurance Trust Fund and the Supplementary Medical Insurance Trust Fund.

Subsec. (c). Pub. L. 89–97, §340, added subsec. (c).

1958—Subsec. (b). Pub. L. 85–840 amended subsec. (b) generally, authorizing compliance with requests for services if the agency, person, or organization making the request agrees to pay for the services.

1950—Act Aug. 28, 1950, amended section generally, designating existing provisions as subsec. (a), sub-

CEDC Case 000159

stituting "under subchapter E of chapter 1 or subchapter A of chapter 9 of the Internal Revenue Code of 1939" for "the Federal Insurance Contributions Act," reflecting the transfer of functions from the Social Security Board to the Federal Security Administrator and the Federal Security Agency, and adding subsec. (b).

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2020 AMENDMENT

Amendment by Pub. L. 116–260 applicable to disclosures made on or after Dec. 27, 2020, see section 284(a)(4) of div. N of Pub. L. 116–260 and section 102(c) of div. FF of Pub. L. 116–260, set out as notes under section 6103 of Title 26, Internal Revenue Code.

##### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by section 108(b)(2)–(5) of Pub. L. 103–296 effective Mar. 31, 1995, see section 110(a) of Pub. L. 103–296, set out as a note under section 401 of this title.

Amendment by section 311(a) of Pub. L. 103–296, applicable with respect to requests for information made after Aug. 15, 1994, see section 311(c) of Pub. L. 103–296, set out as a note under section 6103 of Title 26, Internal Revenue Code.

Pub. L. 103–296, title III, § 313(c), Aug. 15, 1994, 108 Stat. 1530, provided that: "The amendments made by this section [amending this section and section 1307 of this title] shall apply to violations occurring on or after the date of the enactment of this Act [Aug. 15, 1994]."

##### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

##### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 93–647 effective Aug. 1, 1975, see section 101(f) of Pub. L. 93–647, set out as an Effective Date note under section 651 of this title.

##### EFFECTIVE DATE OF 1972 AMENDMENT

Pub. L. 92–603, title II, § 249C(b), Oct. 30, 1972, 86 Stat. 1428, provided that: "The provisions of subsection (a) [amending this section] shall apply with respect to reports which are completed by the Secretary after the third calendar month following the enactment of this Act [Oct. 30, 1972]."

### § 1306a. Public access to State disbursement records

No State or any agency or political subdivision thereof shall be deprived of any grant-in-aid or other payment to which it otherwise is or has become entitled pursuant to subchapter I (other than section 303(a)(3) thereof), IV, X, XIV, or XVI (other than section 1383(a)(3) thereof) of this chapter, by reason of the enactment or enforcement by such State of any legislation prescribing any conditions under which public access may be had to records of the disbursement of any such funds or payments within such State, if such legislation prohibits the use of any list or names obtained through such access to such records for commercial or political purposes.

(Oct. 20, 1951, ch. 521, title VI, § 618, 65 Stat. 569; Pub. L. 86–778, title VI, § 603(a), Sept. 13, 1960, 74 Stat. 992; Pub. L. 87–543, title I, § 141(e), July 25, 1962, 76 Stat. 205.)

#### Editorial Notes

##### REFERENCES IN TEXT

Section 303(a)(3), referred to in text, was repealed by Pub. L. 97–35, title XXI, § 2184(a)(4)(A), Aug. 13, 1981, 95 Stat. 816.

Section 1383(a)(3), referred to in text, was in the original a reference to section 1603(a)(3) of the Social Security Act as added July 25, 1962, Pub. L. 87–543, title I, § 141(a), 76 Stat. 200, and amended. That section was amended generally by Pub. L. 92–603, § 301, Oct. 30, 1972, 86 Stat. 1478. However, the amendment by Pub. L. 92–603 was inapplicable to Puerto Rico, Guam, and the Virgin Islands, so that the prior section (which is set out as a note under section 1383 of this title) continues in effect for Puerto Rico, Guam, and the Virgin Islands.

##### CODIFICATION

Section was enacted as part of act Oct. 20, 1951, popularly known as the Revenue Act of 1951, and not as part of the Social Security Act which comprises this chapter.

##### AMENDMENTS

1962—Pub. L. 87–543 substituted "XIV, or XVI (other than section 1383(a)(3) thereof)" for "or XIV".

1960—Pub. L. 86–778 inserted "(other than section 303(a)(3) thereof)" after "pursuant to subchapter I".

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 1960 AMENDMENT

Pub. L. 86–778, title VI, § 603(b), Sept. 13, 1960, 74 Stat. 992, provided that: "The amendment made by subsection (a) [amending this section] shall take effect October 1, 1960."

### § 1306b. State data exchanges

Whenever the Commissioner of Social Security requests information from a State for the purpose of ascertaining an individual's eligibility for benefits (or the correct amount of such benefits) under subchapter II or XVI of this chapter, the standards of the Commissioner promulgated pursuant to section 1306 of this title or any other Federal law for the use, safeguarding, and disclosure of information are deemed to meet any standards of the State that would otherwise apply to the disclosure of information by the State to the Commissioner.

(Pub. L. 106–169, title II, § 209, Dec. 14, 1999, 113 Stat. 1842.)

#### Editorial Notes

##### CODIFICATION

Section was enacted as part of the Foster Care Independence Act of 1999, and not as part of the Social Security Act which comprises this chapter.

### § 1306c. Restriction on access to the Death Master File

#### (a) In general

The Secretary of Commerce shall not disclose to any person information contained on the Death Master File with respect to any deceased individual at any time during the 3-calendar-year period beginning on the date of the individual's death, unless such person is certified under the program established under subsection (b).

#### (b) Certification program

##### (1) In general

The Secretary of Commerce shall establish a program—

I, §133, title III, §308(d)(4)(L), (e)(1)(M), (g)(5)(A)(i), Sept. 30, 1996, 110 Stat. 3009–563, 3009–618, 3009–619, 3009–623; Pub. L. 109–162, title VIII, §826, Jan. 5, 2006, 119 Stat. 3065; Pub. L. 109–271, §6(g), Aug. 12, 2006, 120 Stat. 763.)

### Editorial Notes

#### References in Text

This chapter, referred to in subsecs. (b) and (c), was in the original, "this Act", meaning act June 27, 1952, ch. 477, 66 Stat. 163, known as the Immigration and Nationality Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables.

#### Amendments

2006—Subsecs. (h), (i). Pub. L. 109–271 redesignated subsec. (i) as (h).

Subsec. (i). Pub. L. 109–162, which directed the amendment of this section "as amended by section 726" by adding cl. (i) at end, was executed by adding subsec. (i) at end to reflect the probable intent of Congress. Pub. L. 109–162 does not contain a section 726.

1996—Subsec. (a)(2), (4). Pub. L. 104–208, §308(d)(4)(L)(i), substituted "expulsion, or removal" for "or expulsion".

Subsec. (c). Pub. L. 104–208, §308(d)(4)(L)(ii), substituted "denial of admission to" for "exclusion from".

Subsec. (f)(1). Pub. L. 104–208, §308(g)(5)(A)(i), substituted "section 1229a" for "section 1252".

Subsec. (g). Pub. L. 104–208, §308(e)(1)(M), which directed amendment of subsec. (g) by substituting "removal" for "deportation" wherever appearing, could not be executed because the word "deportation" did not appear in subsec. (g).

Pub. L. 104–208, §133, added subsec. (g).

1991—Subsec. (a)(4). Pub. L. 102–232 substituted a semicolon for comma at end.

1990—Subsec. (a). Pub. L. 101–649, §503(a), struck out "and" at end of par. (3), substituted "United States, and" for "United States. Any such employee shall also have the power to execute any warrant or other process issued by any officer under any law regulating the admission, exclusion, or expulsion of aliens." at end of par. (4), and added par. (5) and concluding provisions.

Subsec. (f). Pub. L. 101–649, §503(b)(1), added subsec. (f).

1988—Subsec. (d). Pub. L. 100–525, §5, added par. (3) and closing provisions and struck out former par. (3) which read as follows: "requests the Service to determine promptly whether or not to issue a detainer to detain the alien, the officer or employee of the Service shall promptly determine whether or not to issue such a detainer. If such a detainer is issued and the alien is not otherwise detained by Federal, State, or local officials, the Attorney General shall effectively and expeditiously take custody of the alien."

Subsec. (e). Pub. L. 100–525, §2(e)(2), made technical amendment to directory language of Pub. L. 99–603, §116, and redesignated the subsec. (d) added by such §116, as (e). See 1986 Amendment note below.

1986—Subsec. (d). Pub. L. 99–570 added subsec. (d).

Subsec. (e). Pub. L. 99–603, as amended by Pub. L. 100–525, §2(e), added subsec. (e), which prior to amendment by Pub. L. 100–525, was designated as a second subsec. (d) of this section.

1976—Subsec. (b). Pub. L. 94–550 inserted "(or who has executed an unsworn declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28)" after "to whom such oath has been administered" and "(or subscribe under penalty of perjury as permitted under section 1746 of title 28)" after "give false evidence or swear".

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1996 Amendment

Amendment by section 308(d)(4)(L), (e)(1)(M), (g)(5)(A)(i) of Pub. L. 104–208 effective, with certain transitional provisions, on the first day of the first month beginning more than 180 days after Sept. 30, 1996, see section 309 of Pub. L. 104–208, set out as a note under section 1101 of this title.

#### Effective Date of 1991 Amendment

Amendment by Pub. L. 102–232 effective as if included in the enactment of the Immigration Act of 1990, Pub. L. 101–649, see section 310(1) of Pub. L. 102–232, set out as a note under section 1101 of this title.

#### Effective Date of 1988 Amendment

Amendment by section 2(e) of Pub. L. 100–525 effective as if included in enactment of Immigration Reform and Control Act of 1986, Pub. L. 99–603, see section 2(s) of Pub. L. 100–525, set out as a note under section 1101 of this title.

#### Abolition of Immigration and Naturalization Service and Transfer of Functions

For abolition of Immigration and Naturalization Service, transfer of functions, and treatment of related references, see note set out under section 1551 of this title.

### §1358. Local jurisdiction over immigrant stations

The officers in charge of the various immigrant stations shall admit therein the proper State and local officers charged with the enforcement of the laws of the State or Territory of the United States in which any such immigrant station is located in order that such State and local officers may preserve the peace and make arrests for crimes under the laws of the States and Territories. For the purpose of this section the jurisdiction of such State and local officers and of the State and local courts shall extend over such immigrant stations.

(June 27, 1952, ch. 477, title II, ch. 9, §288, 66 Stat. 234.)

### §1359. Application to American Indians born in Canada

Nothing in this subchapter shall be construed to affect the right of American Indians born in Canada to pass the borders of the United States, but such right shall extend only to persons who possess at least 50 per centum of blood of the American Indian race.

(June 27, 1952, ch. 477, title II, ch. 9, §289, 66 Stat. 234.)

### §1360. Establishment of central file; information from other departments and agencies

#### (a) Establishment of central file

There shall be established in the office of the Commissioner, for the use of security and enforcement agencies of the Government of the United States, a central index, which shall contain the names of all aliens heretofore admitted or denied admission to the United States, insofar as such information is available from the existing records of the Service, and the names of all aliens hereafter admitted or denied admission to the United States, the names of their sponsors of record, if any, and such other rel-

evant information as the Attorney General shall require as an aid to the proper enforcement of this chapter.

**(b) Information from other departments and agencies**

Any information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States shall be made available to the Service upon request made by the Attorney General to the head of any such department or agency.

**(c) Reports on social security account numbers and earnings of aliens not authorized to work**

(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1996), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate quantity of social security account numbers issued to aliens not authorized to be employed, with respect to which, in such fiscal year, earnings were reported to the Social Security Administration.

(2) If earnings are reported on or after January 1, 1997, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.

**(d) Certification of search of Service records**

A written certification signed by the Attorney General or by any officer of the Service designated by the Attorney General to make such certification, that after diligent search no record or entry of a specified nature is found to exist in the records of the Service, shall be admissible as evidence in any proceeding as evidence that the records of the Service contain no such record or entry, and shall have the same effect as the testimony of a witness given in open court.

(June 27, 1952, ch. 477, title II, ch. 9, §290, 66 Stat. 234; Pub. L. 100–525, §9(q), Oct. 24, 1988, 102 Stat. 2621; Pub. L. 104–208, div. C, title III, §308(d)(4)(M), title IV, §414(a), Sept. 30, 1996, 110 Stat. 3009–618, 3009–669.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original, ''this Act'', meaning act June 27, 1952, ch. 477, 66 Stat. 163, known as the Immigration and Nationality Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables.

#### AMENDMENTS

1996—Subsec. (a). Pub. L. 104–208, §308(d)(4)(M), substituted ''admitted or denied admission to the United States'' for ''admitted to the United States, or excluded therefrom'' in two places.

Subsec. (c). Pub. L. 104–208, §414(a), amended subsec. (c) generally. Prior to amendment, subsec. (c) read as follows: ''The Secretary of Health and Human Services shall notify the Attorney General upon request whenever any alien is issued a social security account number and social security card. The Secretary shall also furnish such available information as may be requested by the Attorney General regarding the identity and location of aliens in the United States.''

1988—Subsec. (c). Pub. L. 100–525 substituted ''Secretary of Health and Human Services'' for ''Federal Security Administrator'' and ''The Secretary'' for ''The Administrator''.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by section 308(d)(4)(M) of Pub. L. 104–208 effective, with certain transitional provisions, on the first day of the first month beginning more than 180 days after Sept. 30, 1996, see section 309 of Pub. L. 104–208, set out as a note under section 1101 of this title.

#### ABOLITION OF IMMIGRATION AND NATURALIZATION SERVICE AND TRANSFER OF FUNCTIONS

For abolition of Immigration and Naturalization Service, transfer of functions, and treatment of related references, see note set out under section 1551 of this title.

#### REPORT ON FRAUDULENT USE OF SOCIAL SECURITY ACCOUNT NUMBERS

Pub. L. 104–208, div. C, title IV, §414(b), Sept. 30, 1996, 110 Stat. 3009–669, as amended by Pub. L. 108–156, §3(d), Dec. 3, 2003, 117 Stat. 1945, directed the Commissioner of Social Security to transmit to the Secretary of Homeland Security, by not later than 1 year after Sept. 30, 1996, a report on the extent to which social security account numbers and cards were used by aliens for fraudulent purposes.

## § 1361. Burden of proof upon alien

Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not inadmissible under any provision of this chapter, and, if an alien, that he is entitled to the nonimmigrant, immigrant, special immigrant, immediate relative, or refugee status claimed, as the case may be. If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not inadmissible under any provision of this chapter. In any removal proceeding under part IV of this subchapter against any person, the burden of proof shall be upon such person to show the time, place, and manner of his entry into the United States, but in presenting such proof he shall be entitled to the production of his visa or other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry in the custody of the Service. If such burden of proof is not sustained, such person shall be presumed to be in the United States in violation of law.

CEDC Case 000162