# EXHIBIT 8

ACLU

## NEWS & COMMENTARY

# All the Ways Palantir is Assisting Trump's Abusive Removal Campaign

How culpable is the company for the constitutional and human rights violations of the deportation drive?




Image: Flickr/Chad Davis

**Sophie Feng**, she/her/hers, ACLU Speech, Privacy, and Technology Project
**Jay Stanley**, ACLU Speech, Privacy, and Technology Project
March 24, 2026

***Subscribe to the Free Future Newsletter***
*Free Future home*

There's been a lot of coverage of the technology company Palantir recently and its role in providing tools to facilitate the violence, lawlessness, and human rights violations of President Trump's war on immigrants. We thought it would be useful to lay out the main prongs of what we know about the company's participation in that campaign.

We at the ACLU have been following Palantir since at least 2011. In 2018 we wrote about how the company was helping the city of New Orleans build a "deeply problematic" predictive policing risk assessment database incorporating "threat scores." Over the years, the company seems to have been involved in opaque ways with US security and other agencies in a period when those agencies really began exploring ways to use newly available mass surveillance data and analytics to achieve various goals.

Now the company's involvement in questionable government uses of mass data has reached a new level of clarity, with Amnesty International calling out the company's responsibility under United Nations human rights principles to "immediately cease their work" with the Trump deportation program. Given the lack of transparency that still exists, it can be hard to know the depth of Palantir's integration into the U.S. domestic security apparatus, but a combination of investigative journalism, company disclosures, and agency documentation point to four products and programs that seem to be at the heart of the company's involvement.

**1. "ELITE" system for data on targets**
Palantir's Enhanced Leads Identification and Targeting for Enforcement ("ELITE") system is used in immigration enforcement operations for "identifying and prioritizing high-value targets through advanced analytics," as its user guide puts it. According to an investigation by 404 Media, which obtained the guide, the app populates a map interface with targets for potential deportation — not only providing the location of targeted individuals and an "address confidence score," but also

allowing ICE officers to view additional information on potential targets, including their name, photo, Alien number, and date of birth.

But the system goes further, apparently providing information not only about specific people who have been deemed targets for deportation, but also about others who are near certain locations. ICE is using it, 404Media reports, to find locations where "lots of people it might detain could be based" — "target rich" areas where officers can most efficiently move toward fulfilling the deportation quotas they are being pressured to meet.

In court testimony, ICE agents said that the app displayed the numbers of people with an "immigration nexus" in particular locations, defined broadly as anyone who has had dealings with an immigration agency, even including naturalized US citizens.

The guide indicates the system draws on sensitive data from the Department of Health and Human Services (HHS), U.S. Citizenship and Immigration Services (USCIS), and "CLEAR," which is most likely the law enforcement commercial data broker product sold by Thompson-Reuters that offers access to a vast array of data about people. We already know that DHS is circumventing the Constitution by buying data that it would normally need a warrant to access. The user guide, 404Media reports, also says ominously that ELITE is "integrating new data sources," raising concerns that further sensitive information will be fed into the technology's dragnet.

The most recent DHS AI Use Case Inventory portrays ELITE's "AI-driven outputs" as relatively limited, and promises "human oversight and additional verification steps" and "human analysis and validation." Of course, we know that purveyors of AI technologies often promise humans in the loop — but that such oversight over AI outputs always seems to fall by the wayside. Based on 404Media's investigation, the inventory appears to significantly understate the scope and power of Palantir's product.

**2. The Investigative Case Management platform**

DHS's Investigative Case Management (ICM) platform functions as the backbone of the agency's immigration enforcement apparatus in the United States. As the name suggests, the ICM is for managing cases — supporting ICE through the lifetime of a criminal or civil detention and deportation case. But documents obtained by the Intercept suggest that, as the outlet sums it up, "the system is far from a passive administrator of ICE's case flow." The ICM not only provides standard case-tracking capabilities but also, as DHS's Privacy Impact Assessment for the ICM notes, allows users to "perform investigative research" to *build* cases against individuals.

We can only imagine what that looks like within the Trump deportation campaign, pressured as it is to deport far more immigrants than there are who have committed crimes.

To facilitate such case building, the system incorporates vast amounts of data from various agency platforms, including the FBI, DEA, ATF, and SEVIS (the platform used to monitor students or exchange visitors who are temporarily in the US). Agents can use the ICM to search across an ecosystem of interconnected platforms, returning information as detailed and personal as an individual's:

- Schooling
- Family relationships
- Employment information
- Phone records
- Immigration history
- Foreign exchange program status
- Personal connections
- Biometric traits

Case 1:25-cv-12822-IT Document 118-8 Filed 09/10/26 Page 4 of 9

- Criminal records
- Home and work addresses.

In addition to pulling data from various federally and privately owned databases, internal training documents reveal that ICE agents are encouraged to upload data to the ICM from other sources, including field operations. Reporting by the Guardian on a cache of ICE internal training documents, for example, revealed that agents were instructed on how to extract and upload files from phones seized at the US border or in the course of arrest.

The data housed within the ICM isn't limited to people who make contact with the U.S. immigration system. An ICM funding document states that "U.S. Citizens are still subject to criminal prosecution and thus are a part of ICM."

The ICM has been run by Palantir since 2014 (and Palantir has secured a sole source deal to continue developing the software through at least April 2026). A contract between ICE and Palantir notes specifically that the "ICM is based on Palantir's proprietary solution that has already been configured specifically for ICE's operational needs." The privacy interests implicated by the sweeping amounts of data caught up in the ICM have led to litigation against ICE, including a 2017 Freedom of Information Act lawsuit by the Electronic Privacy Information Center.

**3. ImmigrationOS to monitor and track immigrants**

According to ICE contract documents, the Immigration Operating System or ImmigrationOS is an augmentation of the ICM, possibly using AI, that seeks to parse vast amounts of data in service of three main priorities of the Trump Administration's mass deportation agenda:

- "Streamlining selection and apprehension operations of illegal aliens" to identify and prioritize individuals targeted for deportation on the basis of criteria such as immigration records, criminal histories, and prior affiliations.
- Monitoring and tracking "self-deportations" and visa overstays with "near real-time visibility." This technology comes directly on the heels of the Trump administration's directive to immigrants illegally living in the United States to "self-deport."
- Providing logistical support to minimize inefficiencies throughout the deportation process "from identification to removal." (ICE terms this "immigration lifecycle management.")

ICE entered a $30 million contract with Palantir in April 2025 to upgrade the ICM with those capabilities. The system is intended to enhance the existing ICM platform, leveraging the vast amounts of personal data from private and public entities accessible within the ICM.

Funding to build the ImmigrationOS platform was incorporated into the existing sole-source ICM deal, which has ballooned to over $145 million. A prototype of ImmigrationOS was scheduled for delivery to the agency on September 25, 2025, with the contract running through September 2027.

**4. ICE Tip Processing**

The 2025 DHS AI Use Case Inventory also makes mention of a newly deployed "AI-Enhanced ICE Tip Processing" program purchased from Palantir. The software uses generative AI to summarize and categorize incoming tips to ICE, as well as translate non-English tips into English. Although there is little transparency or reporting into this product, Wired suggests that this system may be an AI upgrade to the previous tip synthesis tool known as FALCON, used by ICE since 2012.

**A problematic role**

Palantir's CEO has publicly claimed that his company's tools promote, rather than degrade, civil liberties, for example by ensuring that "that the state and its agents can see only what ought to be seen." But, given what has been disclosed publicly, it's hard to put much stock in the company's claims. Among the troubling themes that appear to characterize Palantir's work for ICE are:

- **Consolidation of government data.** Palantir's consolidation of government data typically separated within siloed agency databases amounts to the creation of centralized dossiers of information on individuals within the US immigration system — dossiers that aren't limited to violent criminals, but include visa holders and even U.S. citizens swept up in Palantir's data dragnet. Such data consolidation, which Congress sought to limit in the Privacy Act of 1974, significantly increases the risk of data misuse by bad actors within Palantir or ICE and by external hackers, as my colleague Cody Venzke explains in an ACLU white paper.
- **Use of private-sector data.** We know that agencies such as DHS and the FBI are purchasing personal data on Americans from private data brokers for information that they would normally need a warrant to seek. The House of Representatives voted to block law enforcement from doing such end runs in 2024, but the legislation did not pass the Senate. (The bill may come up for future votes and could still be enacted.)
- **Lack of transparency and oversight.** We know little about the selection criteria and algorithms used for identifying targets for deportations, the fairness or bias of those algorithms, their transparency, or their compatibility with due process rights.

**How culpable is the company?**

At the end of the day, ultimate responsibility for the Trump Administration's ICE kidnapping campaign lies with the Trump Administration itself. But the stench of the campaign's cruel, brutal, and lawless character inevitably carries over to any company that, like Palantir, participates in facilitating those constitutional and human rights violations and plays a key role in carrying it out. But the company is even more culpable to the extent that they:

- Drive demand for their services within the government ("here's something you should pay us to build") rather than simply responding to it ("yes we could do that").
- Are building bespoke solutions as opposed to applying tools of general applicability. Nobody would blame Microsoft if CBP were using an Excel spreadsheet in their abusive operations, for example, but custom-built applications tailored for the removal campaign are a different matter.
- Are building things that few, if any, other companies have the expertise to build, as opposed to applications that a wide variety of companies could build just as well.
- Are building applications that are customized to the Trump Administration's specific goals and tactics — mass removal without due process, random identity checks, racial profiling, etc. — rather than for a more general government capability for legally proper and reasonably targeted removal operations.

We don't know the full answers to these questions. What we do know is that Palantir's tools form the backbone for ICE's mass deportation regime, that Palantir employees are deeply embedded within the agencies they serve — and that even among those employees there is dissension and doubt about the company's role. In justifying its sole-source ImmigrationOS contract, ICE noted that "Palantir remains the sole provider capable of meeting the specific needs and requirements of ICE," and that "Palantir has developed deep institutional knowledge of ICE operations over more than a decade of support." The company's work cannot be separated from the constitutional and human rights violations of Trump's deportation drive.

## Related Issues

**Privacy & Technology** **Immigration and Customs Enforcement**

**Human Rights and Immigration** **Immigrants' Rights and Detention**

**Immigrants' Rights** **ICE and Border Patrol Abuses**

**Human Rights**

## Related Content

News & Commentary Aug 2026



**Privacy & Technology** **Criminal Law Reform**

### Another Problem With AI-Assisted Police Reports: Companies Can Have Incentives to Distort Their Content

Police Companies Could Train Their AI to Hide Use of Their Products or Make Them Look Good

**By:** Jay Stanley

News & Commentary Aug 2026




**Privacy & Technology**

### Beware of Other License Plate Surveillance Companies Besides Flock

Flock deserves the heat it's getting, but switching to another provider won't necessarily improve anything

**By:** Jay Stanley

News & Commentary Aug 2026




**Privacy & Technology**

## Despite 'New' Updates, Flock's Creepy Cameras Remain Major Civil Liberties Threat

In response to Flock's announcement of operational changes, the ACLU breaks down why many fall short.

**By:** Chad Marlow

Press Release Aug 2026



**Privacy & Technology** **National Security**

## As Public Opposition to Flock Grows, ACLU Responds to Surveillance Company's "New" Updates

NEW YORK – Amid nationwide outcry against its automatic license plate readers, Flock Safety announced today that it will reduce its standard data retention policy and allegedly provide more control over local data searches, among other changes. However, according to American Civil Liberties Union's new analysis, many of the proposed changes seem to be a thinly veiled PR attempt to counter communities' genuine privacy concerns with its mass surveillance system with largely hollow security promises, rather than an earnest effort to address them. While the ACLU acknowledges one potentially positive development, most of the proposed changes stand little chance of making a positive difference for civil liberties.

"Transforming an exceptionally dangerous mass surveillance system into one that is fully protective of civil rights and civil liberties is a difficult, if not impossible task. That is even more the case with a company like Flock, whose nearly $1 billion in venture capitalist funding has locked it into an operational model that seeks to trade our privacy for massive profits," said Chad Marlow, senior policy counsel at ACLU. "Given that Flock's latest announcement still appears more focused on addressing a PR problem than the significant privacy and other harms its products create, we will continue to analyze the company's proposals fairly and honestly. We just won't be holding our breath." Flock operates more than 120,000 automatic license plate readers in at least 6,000 cities across the country, raising serious concerns around mass surveillance, data privacy, and how police and the government can use this data to go after immigrants, protestors, and others. Just this week, the Institute for Justice published a database with more than 100 incidents of ALPR abuse, including romantic stalking, wrongful stops and detentions, non-law enforcement use, and other types of misconduct. One of the changes announced is that Flock will decrease its standard data retention option to one week from 30 days. This seems positive at first blush, but as the ACLU's breakdown explains, the devil will be in the details. For example, an exception to the data retention policy is something called "Evidence Mode, which is "when a search is tied to a case number, that data is preserved instead of aging out after 7 days." As the ACLU notes, "If 'Evidence Mode' only retains hit result data that police determine may be evidence in an active investigation of a specific case, then the change may be a positive one. But if Evidence Mode triggers the retention of any ALPR data that is searched, then the new mode could indefinitely retain all the ALPR data Flock collects and shares nationally." Another "change" the company is implementing is that local police will be able to decide what types of offenses other Flock customers can search their data for. The ACLU contends that this is not new. Flock has attempted this before, and the security measure failed because police were easily able to circumvent the system's requirement that they input the purpose of their search. Finally, Flock announced that in response to the reports of police abuse, they will now require reasons for a search, and that they plan to universally roll out its audit assistance tool to detect police misuse. Flock's announcement fails to note how easily users have circumvented "search reason" security measures in the past or how its new policy improves the quality of the feature. And while providing "Audit Assistance" to all departments makes sense, the ACLU notes that there is no evidence that the tool works consistently to address what the Washington Post observed is a growing pattern of police officers turning Flock into a personal stalking tool. To determine the efficacy of this tool, Flock needs to have it analyzed by an independent evaluator. Until then, the ACLU says, "we don't know if the tool is a real security measure or just window dressing." Dozens of communities across the country have successfully convinced their leaders to cancel Flock contracts, suspend their ALPR programs, or deactivate the cameras, with many more cities considering new legislation to rein in this mass warrantless surveillance tech. In June, the ACLU launched its "Get the Flock Out" campaign to bring together the litigation, advocacy, and legislative efforts of ACLU affiliates in each state, show how communities across the country are fighting back against the spread of Flock and other license plate readers, and lay out how lawmakers at the local, state, and federal level can best protect our rights.

Case 1:25-cv-12822-IT Document 118-8 Filed 09/10/26 Page 9 of 9

ACLU

© 2026 American Civil Liberties Union