**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS, NATIONAL PARENTS UNION, NATIONAL KOREAN AMERICAN SERVICE AND EDUCATION CONSORTIUM, & UNDOCUBLACK NETWORK,

Plaintiffs,

v.

SCOTT BESSENT, ACTING COMMISSIONER OF THE INTERNAL REVENUE SERVICE AND SECRETARY OF THE TREASURY; DEPARTMENT OF THE TREASURY; INTERNAL REVENUE SERVICE; FRANK BISIGNANO, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION; SOCIAL SECURITY ADMINISTRATION; MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, ACTING DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

Defendants.

Civil Action No. 1:25-cv-12822-IT

**OPPOSITION TO DEFENDANTS' MOTION TO EXEMPT MATERIALS FROM DISCLOSURE**

## I. INTRODUCTION

After the Court ordered Defendant Social Security Administration ("SSA") to complete the Administrative Record ("AR"), Doc. No. 113, Defendants moved to exempt 34 documents from disclosure. SSA claims that these 34 documents reflect "inter- and intra-agency communications that SSA considered, either directly or indirectly, in deciding to share



6391216

noncitizen data with DHS in 2025" and has withheld them under the deliberative process privilege, the attorney-client privilege, and the attorney work product doctrine. Doc. No. 132. But Defendants have not met their burden to establish these privileges apply. Plaintiffs therefore respectfully request that the Court deny Defendants' motion to exempt the 34 documents from production, or alternatively, grant in-camera review to assess whether each privilege applies to the documents in question and whether any discretionary privilege should be waived.

## II. BACKGROUND

On May 29, 2026, SSA produced its AR, which contained approximately 162 pages of material. Doc. No. 103-1. After finding several deficiencies with SSA's AR, Plaintiffs moved to complete or supplement the AR. Doc. No. 108. On August 24, 2026, the Court granted Plaintiffs' motion, in part, requiring SSA to "complete the administrative record" by September 14, 2026, "with any agency correspondence and/or materials relevant to (1) all inter- and intra-agency communication SSA considered, either directly or indirectly, in deciding to share noncitizen data with DHS in 2025, inclusive of materials relevant to SSA's decision to exclude employer and income information for the February 2025 transfer, despite its earlier intention to do so; and (2) DOGE's participation in SSA's data sharing with DHS." Doc. No. 113.

On Saturday, September 12, 2026, two days before its deadline to complete the AR, SSA emailed Plaintiffs a privilege log listing 34 documents that SSA claimed were protected as attorney-client privileged, deliberative process privileged, or attorney work product. Based on the limited information Defendants provided, Plaintiffs objected to SSA's exemptions. SSA produced its supplemental AR on September 14, 2026, revealing 200 pages of additional materials. Doc. No. 125-1. Defendants subsequently filed this motion. Doc. No. 132. Plaintiffs are scheduled to file their motion for summary judgment as to their claims against SSA on

October 23, 2026. Doc. No. 115.

## III. ARGUMENT

The Court should reject Defendants' argument that allegedly privileged materials are not part of the AR and thus should not be subject to a motion for exemption, which is both circular and lacks binding support. Doc. No. 132 at 4–5. In any event, Defendants' privilege log fails to substantiate each privilege assertion, especially given that Defendants have withheld the 34 documents in their entirety instead of redacting selected portions. Nor have Defendants attempted to explain how any factual information, timelines, analyses, or reports therein would be privileged. Defendants bear the burden of establishing that each withheld document is protected by the claimed privilege. See Moradi v. Morgan, 527 F. Supp. 3d 144, 155 (D. Mass. 2021) (deliberative process privilege); In re Grand Jury Proc., 802 F.3d 57, 65 (1st Cir. 2015) (attorney-client privilege); Felisberto v. Dumdey, 541 F. Supp. 3d 142, 147 (D. Mass. 2021) (work product doctrine). Defendants fail to carry their burden.

### A. The deliberative process privilege does not exempt the materials from disclosure.

#### 1. The deliberative process privilege does not apply.

"[T]he deliberative process privilege shields from disclosure documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which government decisions and policies are formulated." U.S. Fish & Wildlife Serv. v. Sierra Club, Inc., 592 U.S. 261, 267 (2021). The party invoking the privilege "must demonstrate that the [documents at issue] were both predecisional and deliberative." N.H. Right to Life v. U.S. Dep't of Health and Human Servs., 778 F.3d 43, 52 (1st Cir. 2015).[1] A document is predecisional if the

[1] All internal quotes or citations are omitted and emphases added unless otherwise noted.

agency can "(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." Providence Journal Co. v. U.S. Dep't of the Army, 981 F.2d 552, 557 (1st Cir. 1992). A document is "deliberative" if it "(i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." Id. at 559. "[F]actual statements or post-decisional documents explaining or justifying a decision already made" are not protected by the privilege. Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 885–86 (1st Cir. 1995).

SSA improperly claims a blanket privilege over all 34 documents without showing that purely factual material is so "inextricably intertwined with the deliberative sections of documents that [the factual material's] disclosure would inevitably reveal [SSA's] deliberations." In re Pharm. Indus. Average Wholesale Price Litig., 254 F.R.D. 35, 40 (D. Mass. 2008); Am. Trucking Ass'n, Inc. v. Alviti, 496 F. Supp. 3d 699, 716 (D.R.I. 2020) ("Purely factual documents, 'segregable factual portions' of documents, and any documents that would not inaccurately reflect the views of the [government] would not be covered."). Many of the privilege log entries contain broad descriptions about the content of entire email threads or groupings of attachments (some that include background emails, facts, or reports) without justifying why those documents should be withheld in their entirety. Nor do they "provide a sufficiently detailed explanation to enable the district court to make a de novo determination of the agency's claim of exemption[.]" Moradi, 527 F. Supp. 3d at 156–57.

For example, SSA describes documents 2, 3, 4, 5, 6, 7, 9, 10, and 12 as including "relevant background emails." Doc. No. 132-1. Based on this description, Plaintiffs (and the Court) have no way to assess whether those relevant background materials contain non-deliberative information or other factual information that would not be privileged. Relevant background emails could illuminate how SSA's databases pull and aggregate data or whether those databases contain confidential taxpayer information that might be shared with DHS. In fact, other than the privilege log itself, Plaintiffs have no insight into the SSA's decision regarding the August 2025 Letter because SSA's AR is nearly devoid of agency communications during this timeframe.[2]

Moreover, documents 3A, 3B, 4A, 7A, 7B, 7C, 7D, 7E, 7F, 7G, and 7-H are all email attachments that provide the "facts and analysis" and "records" "deemed relevant by the Deputy General Counsel to the advice" in the attached emails. Doc. No. 132-1. SSA does not explain what that factual information is and thus provides no adequate basis for Plaintiffs or this Court to assess whether these attachments are "inextricably intertwined within the deliberative sections" of the corresponding email to reveal the SSA's deliberative process. See In re Pharm., 254 F.R.D. at 40; Commw. of Mass., by Dep't of Public Welfare v. U.S. Dep't of Health and Hum. Servs., 727 F. Supp. 35, 44 (D. Mass. 1989) (noting that "[c]ompilations of factual data" do "not reveal predecisional deliberative material"); Johnson v. Central Intelligence Agency, 330 F.

[2] The only documents produced by SSA that post-date discussions about SSA's February 2025 transfer are several final agreements including (1) the Master Interconnection Security Agreement (ISA) between Homeland Security Enterprise Network (HSEN) and SSA; (2) the ISAs between ICE and SSA via HSEN; (3) the final SSA Letter Documenting Agreement for Ongoing Data Sharing with ICE, and (4) three SSA policies regarding disclosure to the Department of Homeland Security (two of which are obsolete/archived). The only email produced is a formal email transmitting the final Acting Commissioner Decision Memorandum on Providing Information to Department of Homeland Security, U.S. Immigration and Customs Enforcement for Identifying and Locating Aliens. See Doc. Nos. 103-1, 125-1.

Supp. 3d 628, 646 (D. Mass. 2018) ("Although it may aid the deliberative process," the document is not deliberative if "[i]t does not reflect the give-and-take of the consultative process."). SSA's assertion that facts, analyses, or records were "deemed relevant by the Deputy General counsel" to advice provided in a separate document does not establish that those materials themselves are deliberative. Doc. No. 132-1.

Aside from the factual material, SSA also fails to establish why some of the documents withheld are deliberative. According to the privilege log, documents 1 and 5 are emails discussing administrative matters rather than "mak[ing] recommendations or express[ing] opinions on legal or policy matters." Stamps v. Town of Framingham, 38 F. Supp. 3d 134, 140 (D. Mass. 2014). Document 5 concerns SSA's and DHS's discussions of "the status of the draft data exchange agreement[,]" while document 1 discusses "coordinating input on the draft data exchange" with only "a template" attached to the email. Doc. No. 132-1. A status update is not "an essential link in [the] consultative process[.]" Providence, 981 F.2d at 559. Nor does coordinating input necessarily mean that the content is deliberative. SSA should be required to produce all documents that are administrative in nature.

SSA has also not explained why documents 12, 12-A, 12-B, and 12-C are "predecisional." SSA asserts the 34 withheld documents preceded the August 2025 Letter to DHS memorializing their data-sharing arrangement, Doc. No. 132 at 5-6, but it is not clear that these four documents "precede, in temporal sequence, [to] the decision to which [they] relate[]" because they are dated the same day the August 2025 letter was sent to DHS, Providence, 981 F.2d at 557. Even though the August 2025 Letter appears to be SSA's final articulation of its data sharing agreement with ICE, the privilege log states that these documents are "draft versions of a letter ***accompanying*** the August 27, 2025 Data Sharing Agreement between SSA and ICE."

Doc. No. 132-1. The use of the word "accompanying" infers that the August 27, 2025 Data Sharing Agreement was a final "decision already made" prior to the drafting of the letter, making it more likely that the draft letters simply "explain or justify" that decision. Texaco, 60 F.3d at 885. The omission of the word "draft" from SSA's privilege entry to describe the August 27, 2025 data sharing agreement between SSA and ICE—a label SSA explicitly enumerated in other log entries—further underscores this point. As a result, SSA's log does not clearly "pinpoint the specific agency decision" to which the drafts purportedly correlate. Providence, 981 F.2d at 557. In sum, SSA has not carried its burden to explain how these documents inform a decision that remained open. See Moradi, 527 F. Supp. 3d at 155.[3]

**2. In the alternative, the Court should exercise its discretion to find the privilege does not apply.**

Even if the withheld documents satisfy the criteria for protection under the deliberative process privilege, the privilege is "not absolute," and the Court can "exercise its discretion" to not apply the privilege. Texaco, 60 F.3d at 885. A reviewing court may consider numerous factors including "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." In re Pharm., 254 F.R.D. at 40. The Court can be "flexible" in determining whether "a sufficient showing of need" "overcome[s]" the privilege. Woonasquatucket River Watershed Council v. U.S. Dep't of Agric., 2025 WL 2281864, at *2 (D.R.I. Aug. 8, 2025).

---

[3] If the documents are not predecisional, they are also not deliberative, because they could not have formed part of the agency's deliberations leading to that decision. See U.S. Fish & Wildlife Serv., 592 U.S. at 268 ("There is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional.").

The Court should exercise its discretion to deny the privilege because all the factors weigh in favor of disclosure. First, the documents SSA seeks to exempt from disclosure are relevant to assessing the rationale for its decision and the factual assessments, data, or materials the agency considered in reaching its agreement to share data with DHS. SSA argues that these documents are relevant only to the data-sharing arrangement between SSA and DHS and do not reflect the decisionmaker's rationale. See Doc. No. 132 at 7–8. But Plaintiffs challenge the DHS-SSA data-sharing arrangement as contrary to law and arbitrary and capricious under the APA—this information is central to Plaintiffs' claims. SSA's own privilege log reveals that the materials at issue contain factual information, analyses, and records that were considered, directly or indirectly, by decisionmakers. SSA's invocation of the deliberative process privilege should not allow it to shield large swaths of relevant information in the administrative record.

The second factor favors disclosure because there is no other available evidence during this time frame regarding SSA's decision to enter an ongoing data-sharing arrangement with DHS. Given the limited AR, Plaintiffs only have the August 2025 Letter as proof of SSA's stated rationale for the decision or the facts SSA considered in coming to that determination. The additional evidence that Defendants attempt to shield from disclosure is the "best evidence available for the claims," and should counsel in favor of disclosure. Woonasquatucket, 2025 WL 2281864, at *3.

The third factor—seriousness of the litigation and the issues involved—also favors disclosure. Plaintiffs allege that SSA has shared protected taxpayer data with DHS for civil immigration enforcement purposes in contravention of 26 U.S.C. § 6103(i)(2), which has the effect of eroding taxpayer confidence in the government's ability or willingness to protect sensitive taxpayer data, threatening the federal government's tax revenue by chilling the

participation of immigrants and non-citizens in paying their taxes, and putting immigrants in peril of wrongful arrest, detention, or deportation. These issues are "surely important." Woonasquatucket, 2025 WL 2281864, at *3. The fourth factor also tips in favor of not applying the privilege where the SSA's "actions are at the center of the litigation." Id. SSA does not dispute that factors three and four are present here. Doc. No. 132 at 8 n.3.

Finally, Plaintiffs recognize that the deliberative process privilege is meant to "encourage candor," "improv[e] agency decisionmaking," and "blunt[] the chilling effect that accompanies the prospect of disclosure." U.S. Fish & Wildlife Serv., 592 U.S. at 267. But its protections should not be used to shield more than is necessary to protect that deliberative process. If the Court finds that the deliberative process privilege applies in some instances, it can apply the privilege to specific documents or deliberative statements. Redactions would preserve legitimately privileged information, while leaving the unprivileged portions of the record available for Plaintiffs and the Court to assess Plaintiffs' claims with the benefit of a full AR.

**B. Attorney client privilege does not exempt these materials from disclosure.**

Defendants claim attorney client privilege over all but four documents in their privilege log. Attorney client privilege is "narrowly construed" and "protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice." Blattman v. Scaramellino, 891 F.3d 1, 4 (1st Cir. 2018). "That protection ceases, or is often said to be 'waived,' when otherwise privileged communications are disclosed to a third party." Id.

For document 2, Defendants first say the email thread is "between SSA executives" and merely "discussing" the data sharing arrangements; they make no argument that a business conversation between non-lawyers would be privileged (it is not). Though the General Counsel is included on the thread, simply including a lawyer on an email thread between nonlawyers is insufficient to establish the privilege. See, e.g., N.H. Youth Movement v. Scanlan, 2026 U.S.

Dist. LEXIS 8715, at *17 (D. N.H. Jan. 15, 2026) ("Although a lawyer is present on certain of the emails, nothing in the content of the emails suggests that the lawyer requested or used this information, much less did so for the purpose of providing legal advice."). And while Defendants assert that ***some*** of the emails included within document 2 "seek[] legal advice," many are merely "[b]ackground"—to the extent the "background" documents are not communications made for the purpose of seeking or receiving legal advice, they are not privileged and should be disclosed. The same is true for documents 3, 4, 6, 7, 9, 10, 12, 12-A, 12-B and 12-C.

Documents 3-A and B, 4-A, and 7-A-H are not privileged because the government does not show these "facts," "[t]imelines," and "records" were communications made for the purpose of seeking or receiving legal advice. See Blattman, 891 F.3d at 4. And any "analysis" of these facts can be withheld as privileged only if it is ***legal*** analysis—as opposed to, for example, business or strategic analysis—an assertion notably absent from the privilege log.

Documents 9-A, and 10-B are drafts of the data-sharing agreement that Defendants say include some legal advice, but these drafts were shared with employees at ICE—an outside agency—not attorneys. And "including [the other agency's] employees on these communications destroys the attorney-client privilege" between SSA and its employees. N.H. Youth Movement, 2026 U.S. Dist. LEXIS 8715, *19.

Finally, documents 2-A and 8-A are drafts of the data-sharing agreement whose contents were information "to be communicated to the public[.]" Winchester Cap. Mgmt. Co. v. Manufacturers Hanover Tr. Co., 144 F.R.D. 170, 174 (D. Mass. 1992); see also City of Springfield v. Rexnord Corp., 196 F.R.D. 7, 9 (D. Mass. 2000) (declining to apply attorney-client privilege where documents prepared with attorney's assistance represented defendants' planned public position). To the extent these drafts have comments to or from attorneys

regarding legal advice, those comments can be redacted while the rest of the draft should be disclosed.[4]

### C. The attorney work product doctrine does not apply.

Finally, Defendants assert that nearly every document in their privilege log is exempted from disclosure under the attorney work product doctrine. This doctrine "protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party." Maine v. U.S. Dep't of Int., 298 F.3d 60, 66 (1st Cir. 2002). "The privilege [is] aimed centrally at protecting the ***litigation process***." United States v. Textron Inc. & Subsidiaries, 577 F.3d 21, 30 (1st Cir. 2009). The documents must have "been prepared or obtained ***because of*** the prospect of litigation," Maine, 298 F.3d at 68, which does not include "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation," id. at 70.

In Maine, the First Circuit affirmed the district court's holding that the contested documents could not be withheld under the work product doctrine because the government had not demonstrated they had been prepared "because of the prospect of litigation." Id. at 68. The First Circuit found insufficient the government's argument that three other lawsuits had been filed related to the underlying agency action, so it was "reasonable for the attorneys advising the [agency] to anticipate more litigation at various stages in the process." Id. at 69.

Here, Defendants' argument is even more tenuous. Defendants do not assert the contested documents were created because of this litigation, nor do they point to any supporting evidence

---

[4] To the extent this Court believes these documents or any other documents are subject to attorney client privilege, Plaintiffs respectfully request that the Court first conduct an in-camera review to determine application of the privilege, document by document. N.H. Youth Movement, 2026 U.S. Dist. LEXIS 8715, at *10–22.

to support that assertion. Cf. Maine, 298 F.3d at 69 (noting the government submitted supporting declarations from agency officials regarding reasonably anticipated litigation). And unlike in Maine, Defendants do not even point to other lawsuits relating to this agency (SSA's) action to assert that they reasonably anticipated litigation here—which, at any rate, was insufficient to justify invoking the work product doctrine in Maine. Here, Defendants argue that ***different*** lawsuits were filed against ***different*** agencies related to ***different*** agency action. Just because the government has been sued for one agency action does not mean all documents touching on another agency action are attorney work product. See Textron, 577 F.3d at 29 ("It is not enough to trigger work product protection that the subject matter of a document relates to a subject that might conceivably be litigated."). Nor is it the law that anytime the press publishes a news story about government action, the government can then rely on that news article as the basis for its belief that litigation is anticipated—that would be an impermissibly broad and untethered reading of "anticipation."

Not a single document listed on Defendants' privilege log meets the legal standard of being created "because of" the prospect of litigation; each one would have been created to carry out the general business of the agency, including to implement the data sharing arrangements at issue here. See Maine, 298 F.3d at 70; Textron, 577 F.3d at 30 ("[W]ork product protection does not extend to documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation."). For example, documents 1, 1-A, 2, 2-A, 3, 8, 8-A, 9, 9-A, 10, 10-B, 11, 12, 12-A, 12-B, and 12-C all concern the draft data-sharing agreement itself. The agency would have had to discuss and revise the agreement itself to create, implement, and carry out the agreement; each document would have been created regardless of the existence of litigation. The same is true of the documents showing negotiations

of the agreement—documents 4, 6, 7—and discussing or deliberating the agreement—documents 5, 9, 10, and 11.

Documents 3-A, 3-B, 4-A purport to contain legal advice "to limited employees involved in this [data-sharing] agreement," and documents 5-A, 6, 7, 7-A-H, 7-I, 8, 8-A, 9, 10, 10-A, and 12 purport to contain advice or opinions related to the arrangements. From the government's ambiguous descriptions, it is impossible to tell whether the advice or opinions concerned anticipated litigation, as opposed to, for example, the mechanics of the agency action. See Textron, 577 F.3d at 29–30 (It is not "enough that the materials were prepared by lawyers or represent legal thinking. . . . It is only work done in anticipation of or for trial that is protected."). And the government's failure to provide sufficient information to make this assessment supports rejecting its attempt to invoke the work product doctrine. Cf. Maine, 298 F.3d at 69–70.

Finally, to the extent this Court finds any of these documents are attorney work product, the Court should still require the production of the documents because they are critical for Plaintiffs to assess SSA's and ICE's compliance with the APA and § 6103, and there is no way for Plaintiffs to obtain the "substantial equivalent" of internal agency drafts, deliberations, negotiations, and analysis "without undue burden." See Fed. R. Civ. P. 26(b)(3)(A)(ii); Gulluni v. Levy, 85 F.4th 76, 83 (1st Cir. 2023) ("[T]here are limits to the scope of this privilege upon a showing of a substantial need and undue hardship."); City of Springfield v. Rexnord Corp., 196 F.R.D. 7, 10 (D. Mass. 2000) (waiving work product doctrine where party established a "substantial need" for the documents).[5]

---

[5] If this Court finds that the work product doctrine may apply to any documents, Plaintiffs respectfully request that the Court review the documents *in camera* before making final protection determinations. See, e.g., U.S. E.E.O.C. v. Otis Worldwide Corp., 2025 WL 1234152,

## IV. CONCLUSION

For those reasons, the Court should deny Defendants' motion and require disclosure of the contested materials. Given these materials are critical for Plaintiffs and this Court to draft and assess the cross motions for summary judgment, Plaintiffs request that the Court order disclosure of the contested materials—which Defendants already have collected—within three Court days of the entry of the order addressing this motion.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: October 12, 2026

By: */s/ Leo L. Lam*

Leo L. Lam (*Admitted Pro Hac Vice*)
llam@keker.com
Laurie Carr Mims (*Admitted Pro Hac Vice*)
lmims@keker.com
Sarah Salomon (*Admitted Pro Hac Vice*)
ssalomon@keker.com
Charlotte Kamai (*Admitted Pro Hac Vice*)
ckamai@keker.com
Melissa P. Cordial (*Admitted Pro Hac Vice*)
mcordial@keker.com
Kelly M. Hernandez (*Admitted Pro Hac Vice*)
khernandez@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

ASIAN LAW CAUCUS
Joshua Rosenthal (*Admitted Pro Hac Vice*)
joshr@asianlawcaucus.org
Dorothy Chang (*Admitted Pro Hac Vice*)
dorothyc@asianlawcaucus.org
55 Columbus Avenue

at *4 (D. Mass. Apr. 29, 2025) (applying work product doctrine and attorney client privilege only after *in camera* review).

San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

GREATER BOSTON LEGAL SERVICES
Luz Arevalo BBO 564011
larevalo@gbls.org
Angela Divaris (*Admitted Pro Hac Vice*)
adivaris@gbls.org
Gary Klein BBO 560769
gklein@gbls.org
197 Friend Street
Boston, MA 02114
Telephone: (617) 461-4944

Attorneys for Plaintiffs COMMUNITY ECONOMIC DEVELOPMENT CENTER OF SOUTHEASTERN MASSACHUSETTS, NATIONAL PARENTS UNION, NATIONAL KOREAN AMERICAN SERVICE AND EDUCATION CONSORTIUM, & UNDOCUBLACK NETWORK

**CERTIFICATE OF SERVICE**

I certify that this document is being filed on October 12, 2026, through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF). Any counsel for other parties who are not registered participants are being served by first class mail.

*/s/ Leo L. Lam*
LEO L. LAM